# EXHIBIT R



# Intersect ENT, Inc. NasdaqGM:XENT

# Company Conference Presentation

**Wednesday, January 09, 2019 12:30 AM GMT**

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants .................................................................. 3

Presentation .................................................................. 4

Question and Answer .................................................................. 9

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

**EXECUTIVES**

**Jeryl L. Hilleman**
*Chief Financial Officer*

**Lisa D. Earnhardt**
*CEO, President & Director*

**ANALYSTS**

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research
Division*

**Unknown Analyst**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Good afternoon, everyone. I'm Robbie Marcus, the medtech analyst at J.P. Morgan. I'm very happy to have Lisa Earnhardt, the CEO of Intersect ENT. Lisa?

**Lisa D. Earnhardt**
*CEO, President & Director*

Great. Thank you so much, Robbie and J.P. Morgan, for giving us the opportunity to update you all on what we're up to at Intersect ENT. Over the course of the presentation, I will be making a number of forward-looking statements.

So we're excited at Intersect to be really focused on a large unmet need, in particular, with patients with chronic sinus disease. We have 4 clinical -- 4 products that are available commercially, so a portfolio of products, a number of growth drivers, especially with one of the most recent products we've launched, which is PROPEL Contour, as well as the first physician-administered drug that we just launched in a targeted fashion this past year, SINUVA. And we'll talk quite a bit more about that, but feel good about the path forward.

We have had innovation to be core to who we are at Intersect. We've continued to invest in our pipeline. In fact, we just commenced enrollment in a randomized clinical trial for our ASCEND drug-coated balloon program.

And we continue to be in a strong position from a financial perspective. Our historical gross margins have been in the 80% range, and we have over $100 million in cash on the balance sheet. As you can see, we've delivered solid growth since we went public in 2014, wrapping up 2018 at around $108.5 million in revenue.

So we are focused squarely on meeting the needs of patients with chronic sinusitis, a large condition 1 out of 8 adults in the U.S. suffer. Unfortunately, it is quite a debilitating condition, so patients suffer from facial pain and pressure, loss of sense of smell and taste. And therefore, these patients actually end up losing over a month of work every year. And so because of that, it's actually the -- 1 of the top 10 most costly conditions for employers, and we truly believe there is a better way to manage these patients.

And part of that is with our innovative product portfolio, which we are the first and only drug-releasing implants for chronic sinusitis. It's a combination of both local drug delivery of an anti-inflammatory combined with mechanical spacing to hold open the sinus cavities.

We have 2 family of products on the market today. We have the PROPEL family of products that have been proven to improve surgical outcomes. We also have SINUVA, which is designed specifically for use in the physician office, which is really a less invasive, more cost-effective solution for patients that have recurrent disease.

So we're at a point now where our mission is really focused on having patients across the care continuum have the benefit of localized drug delivery that suffer from sinus disease. And we believe, with the multiple products that we have, with the multiple indications, regardless of the patient, their anatomy, their disease, the setting of care, we have products now that we're able to help meet the needs of these patients and their physicians.

So we're fortunate to be looking at a great market opportunity. The last several years have been focused on the surgical market opportunity where PROPEL is used. So if every patient undergoing sinus surgery had the benefit of PROPEL, it'd be about a $800 million business or market opportunity.

With SINUVA, we're looking at those patients who have had surgery, have continuing disease, and that's actually a larger market opportunity than PROPEL. And ultimately, we believe there's an opportunity to

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

intervene earlier on the disease progression, and this is actually where our drug-coated balloon offering will play.

So for the last 10 years, we have been focused squarely on developing clinical evidence and really a robust portfolio of clinical studies that demonstrate our products not only improve outcomes, reduce postoperative complications but also improve the overall cost of care. So we've run over 14 studies, multiple sites around the country. And we really believe we have led the way in the field of otolaryngology as it relates to raising the bar for clinical evidence. And we think today, more than ever, that focus on clinical evidence is so critically important as we demonstrate the value of our technologies.

So let's talk a little bit more about the PROPEL family of products. So these products have been commercial for the -- I guess, PROPEL, that started in 2011. And we, most recently, got Contour approved in 2017. So the PROPEL families are all used and can be used in different patients who are undergoing sinus surgery. But while they're different shapes and sizes, the constant is they are all a spring-like implant that gets placed in the sinus immediately following some sort of surgical intervention, it opens up or springs open to prop open the sinus cavity, and then it delivers mometasone furoate, which is an advanced corticosteroid, directly to the sinus mucosa. And then the implant either bioabsorbs or it's removed at the discretion of the physician.

So once again, we've invested heavily here with randomized, blinded multi-center trials. In this case, in fact, for PROPEL and Mini, when are used in the ethmoid, it's actually the only device used in sinus surgery that has Level 1a evidence. So you can see here the data that shows that with the use of these products, we have a 35% reduction in postoperative interventions.

We recently launched PROPEL Contour, and that was the primary growth driver for us in 2018. In fact, it represents about 30% of our revenue, so really proud of what the team has been able to accomplish with this launch in the last several quarters. And once again, this product, same drug, same dose, a different form factor, so it's an hourglass shape with a lower profile. So it's uniquely designed for the peripheral or the dependent sinuses, in particular, the frontal and maxillary sinuses. The reason this product has had to such a strong uptake is that the frontal sinus, which is the sinus behind your eyebrows, is in such close proximity to the ocular compartment in the brain. And given that, there's a lot of challenges doing a procedure in the frontal sinus. And it's also very susceptible given the narrow anatomy to restenose or to close. And as you can see here, the use of Contour versus the standard of care had a 65% reduction in the need for any sort of postoperative intervention, so really compelling data. We're excited to have the -- a meta-analysis or pooled analysis with all of our frontal data, which will be published in the first half of this year.

So the PROPEL family of products continues to be the majority of our revenue at Intersect. Today, we're working with about 1 in 3 otolaryngologists or ENTs across the country. That's just about 2,500 surgeons, to put that number in perspective. We're at about half of the accounts that do sinus surgery. And about 1 in 8 patients across the country that receives sinus surgery have the benefit of PROPEL.

Now the question is, and the question I want my customers to be thinking of, is not should I use PROPEL for this patient, but what PROPEL should I use, right? So it's a mind-shift theme. So it's really, there aren't other products that are competitive to what we're doing, we're creating a new market, and it's really helping them choose innovation over the status quo.

So -- and we had some stumbles on the PROPEL product, our base business, as we launched a first-of-its-kind product with SINUVA. It is the first physician-administered drug for us, so it's the first product that we've launched that's regulated as a pharmaceutical. It's also the first physician-administered drug for the otolaryngology specialty, so there were lots of learnings.

And because of that, we realized we were bandwidth constrained. And so while we continue to drive new adoption of Contour and we added new accounts, where -- what we failed to do was drive continued depth and continued penetration with our existing customers. So we made the decision to expand our sales force and brought on about 20 new reps this fall, so we have a sales organization now of about 140 sales representatives across the country. That's a mix of both territory managers as well as sales consultants. So our territory number has stayed roughly about the same this past year at around 80, and the rest are

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

sales consultants. That's really helpful in terms of having the feet on the street so that we can support the cases and have those clinical discussions with physicians, so they're making the right decisions for each and every one of their patients.

So once again, much like we've invested in clinical evidence and demonstrating the value of our technology in terms of improving outcomes, we've also made investments in terms of looking from a health economic standpoint. And we have a couple of different studies that demonstrate that, yes, while PROPEL costs more upfront for the hospital or the surgery center, which is where the primary use is, we're actually saving money for the health care system over time.

So let's switch gears to SINUVA, which is our newest product and has been a source of lots of conversations over the last 48 hours. So SINUVA, as I said, is -- was regulated as a pharmaceutical, so went down the NDA pathway. And that is because it actually has 4x the drug of our other products. It is the same active corticosteroid, so it's still mometasone furoate. But in this case, it's higher dose, and it's also delivered over a 90-day period of time versus our PROPEL implants, which is 30.

And that's based on the clinical need here. So in this case, we're taking patients who've had surgery previously. They have had their cavities opened up, bone and tissue removed. And now what has happened in some patients, it is a chronic sinus condition, and so they have pallets or extensive inflammatory condition regrow. And that's what you see here, where it talks about ethmoid sinus pre-implant. This cavity should be open. So this patient can't breathe, they can't smell, they can't taste, all things I would argue we would like to do in life. What we see here, though, is SINUVA placed in the office setting under simple -- local anesthesia protocol, and immediately, the patient feels better because they feel the sense of an opening, which is because of the mechanical properties of the implant. Over time, the drug is delivered in a sustained fashion, and that reduces the inflammatory component. So really excited about the potential for this therapy and really pleased with the initial interest.

So much like we did with PROPEL, we invested heavily in the clinical science. We ran 4 prospective studies in over 400 patients. The most significant one was the RESOLVE II trial, which is a 300-patient prospective, randomized, blinded and, in this case, sham-controlled trial. So it's the first sham procedure that we're aware that was done in this specialty. Patients were literally blindfolded and earmuffed and had the delivery system inserted but the implant not deployed in the control arm. And then they obviously got the implants in the treatment arm.

In this case, we looked at both objective and subjective outcomes because both matter, right? What is the physician seeing? What is the extent of polyp disease? And for the patient, what's their sense of obstruction? Can they breathe? Can they smell? Can they taste? So those are all things we looked at in this clinical trial, and we were thrilled with the outcomes here.

So here, you see some of those endpoints actually over time, and then you can see we had a relatively immediate impact for these patients. So they're feeling good even at day 14, which is pretty quick after the therapeutic intervention, and that's sustained through the course of 90 days.

So let's shift gears now. We have the product. We have the clinical evidence. So let's shift gears in terms of commercialization. Well, this product, as I've said, is a pharmaceutical product. So because of that, physicians have been using an unassigned J code, which is standard for physician-administered drugs. So coming to market, it's standard that an unassigned J code is utilized. We are seeking a product-specific J code and anticipate having that in place as of January of 2020. We have applied for that.

For the physician, they are reimbursed via procedure codes or CPT codes. And there are a couple of different procedures that they're doing as part of placing the implant, whether it be an endoscopy or a debridement. They will determine, depending on his or her work, what is the most appropriate code. So the coding is set for that. We look forward to having a product-specific J code because we know, over time, that will help streamline the process. There's also some psychological benefit for physicians having a product-specific J code because we know that will just streamline everything, and it's one less thing to think about.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We have also invested in health care economics. And this data we've shared previously but will be published in the coming months. But once again, it's easy to imagine -- here we have an implant, a procedure that's done in the office setting versus taking a patient to the operating room, putting them under general anesthesia. It's clear even with the patient who might get this once a year or even twice a year, there is going to be a health economic benefit. So we're excited to have this data in hand.

So SINUVA was really an important element of our 2018. We fell short of our expectations, but we feel like we're in a good place in terms of having established our foundation for 2019 and beyond.

So let me talk a little bit about our experience with SINUVA. And I think first and foremost, the most important thing is the clinical outcomes, the physician and patient interest have all been fantastic. So the interest has been strong. And I mention patients here because it really is impactful. In fact, as I think about the first 2 commercial patients we treated with SINUVA, both have had 13 prior sinus surgeries. As you might imagine, they are looking for alternatives, right? So lots of interest here.

And also, the clinical experience has been very consistent with our clinical trials, so we've been pleased with the outcomes there. So we've had 1,200 patients who've had the benefit of SINUVA to date. About 500 physicians have done those procedures. We're in a really strong position from a payer coverage standpoint, where all the national payers at this point have positive coverage that either have a written policy on SINUVA that's positive and/or they've put us on their formulary. So we feel like we're in a really great place from a coverage standpoint.

Probably where the most learnings were for us this year were around product access. So what does that mean? Well, because it's a pharmaceutical, we're not selling the product directly to the end user or the physician or the patient. In this case, we're using third-party partners who are helping with this stat. So we've established a network of specialty pharmacies and specialty distributors that the physician can use based on the patient's insurance and based on their specific plan.

And so coming out of the gate with the launch of SINUVA, we had anticipated the majority physicians would likely elect to fill their prescription via a specialty pharmacy because in that situation, the specialty pharmacy does a lot of the heavy lifting as it relates to prior authorization and collecting the copayment and actually billing the payer and collecting, all the kind of work that physicians don't necessarily enjoy doing nor, in this case, the ENTs have not done as it relates to a physician-administered drug previously.

So at the end of the day, though, we've recognized that while some payers, while the vast majority of payers are paying for SINUVA, not all payers will allow specialty pharmacies to be used based on the physician's plan -- I mean, based on the patient's plan and the physician's contractual relationship. So we're at a point now that physicians need to be comfortable with buying and billing the product as well as using specialty pharmacy. Quite honestly, it's 50-50 right now in terms of our volume going through, and so it's important that physicians get comfortable with buy and bill. So that a learning process for the physician. It does require a physician to put money out of pocket and take the risk on themselves in terms of getting reimbursement, which for a new product, as you know, can be challenging.

So what we've done are a number of different things. First and foremost, we have established a reimbursement hub, so basically, a concierge service that can help the physicians sort of facilitate that process and work with the payer as well as understand what's the most appropriate path. Is this patient eligible to be -- have their prescription filled as a specialty pharmacy, or does the physician need to buy and bill? So we're really putting all of the patients through that funnel now.

We're at a point now where the vast majority of prescriptions are actually getting prior authorization within 30 days. So that time frame is important and also the fact that it's a predictable time frame because, once again, this is new for physicians. And out of the gate, I would say things were not as predictable. It could have been a couple of weeks, or it could have been a couple of months. And so now we know routinely less than 30 days. 75% of all prescriptions that are written on SINUVA are actually receiving a prior authorization. So those are also statistics that continuing to improve and we've gone through the first couple of quarters of launch.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We do see physicians starting to adopt buy and bill, so they are incorporating that as part of their practice. At the end of the third quarter, we had 80 physicians doing buy and bill; and at the end of the fourth quarter, 140. So we're making progress, albeit slowly because in this case, the physician is going to treat 1, maybe 2 patients, they're going to see how the clinical outcomes are, they're also going to see what their payment is before they're going to go ahead and put more dollars at risk.

So we do anticipate the ramp for SINUVA will be real this year, in 2019, although we do think it will be measured as we go over the course of the year because it will take some time for the physicians to get comfortable because it is new for them.

The other thing that we're doing is surrounding not only our sales team, which we've increased the size, but we're surrounding them with additional reimbursement support, because, once again, my sales team is -- they're excellent at many, many things, but they aren't as deep on reimbursement knowledge, and I want them spending more time talking about the clinical value of our technology. And then we're bringing some experts in to help support them and really support the physician offices as well because, as I said, we're creating a new market. This is new for the field of otolaryngology. And we want to make sure we're setting them up for success because, importantly, we want physician customers to be SINUVA customers for life. We also want their patients to be. And so we really do believe we've established that foundation this year.

Late last year, we announced an exciting new platform project for us at Intersect. As I mentioned previously, innovation is core to who we are, really focused on innovation that's clinically meaningful. And we believe our drug-coated balloon, which we just started a randomized clinical trial on late in December, will be one of those new breakthrough technologies for us. It's an existing market today. There are a number of players who have technologies in this space, and we're really focused on the benefits of the drug delivery to improve sinus patency. So excited about this. We'll have data readout at the end of this year.

So everything I've talked about today has been on the U.S. market. I'm a big believer in the old adage "build business close to home." That said, I recognize there's a whole world out there, and we've continued to make strategic investments in markets, starting first in Europe, where we've been in Germany for a couple of years now. I actually have some employees there really driving adoption, hospital by hospital, going through the NUB process. We've started selling as well in Switzerland, Austria and England. And we've also initiated work to get our Shonin approval in Japan.

So as I look at 2019, really, as I think about our growth opportunities, it's leveraging the sales force expansion that I discussed earlier and really ramping SINUVA throughout the year. We have a number of important clinical milestones forthcoming, which includes the ENCORE results in the second quarter of '19. You may recall this is a study looking at repeat use of SINUVA with patients followed out to a year.

We also, as I just mentioned, will have the drug-coated balloon results, the top line results by the end of this year as well. And I guess I should mention there is we were -- we do believe if the results are positive, this could serve as the approval study for the program. We've -- obviously, when we've talked about this program publicly previously, we've talked about approval time lines of maybe 2 to 3 years because we may need to do an additional confirmatory study here, depending on the outcomes.

The reimbursement will be all about making sure we're moving the needle with SINUVA and continuing to streamline the product access. We will have a preliminary decision on the J code for SINUVA or product-specific code for SINUVA in May. And we did just share that we had -- are setting our sights for a healthy growth rate once again this year.

So I look forward to speaking with you all just down the hall in Q&A. Thanks again. Bye-bye.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

[indiscernible] SINUVA in health-based business. And then maybe we'll address 2019 after that.

**Jeryl L. Hilleman**
*Chief Financial Officer*

Do you want to go ahead?

**Lisa D. Earnhardt**
*CEO, President & Director*

Sure.

**Jeryl L. Hilleman**
*Chief Financial Officer*

Do I repeat the questions?

**Lisa D. Earnhardt**
*CEO, President & Director*

No, I think you're all right. [indiscernible]

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

No, I think they can hear it.

**Jeryl L. Hilleman**
*Chief Financial Officer*

Okay, good. First of all, thank you all for coming here at the end of the day. We do appreciate it. And it's a great chance to kind of give some early views on how Q4 played out, and were really pleased with the dynamics we saw in both PROPEL and SINUVA. With PROPEL, one of the key things that we're working to do is really bring on an expanded sales force at our sales consultant level, which is the more junior rep level, to supplement some of the drivers of growth that we have traditionally relied upon. As we look back at 2018, we were able to continue to grow our business with new accounts and really met our plan with that metric; with the rollout of Contour, and we're in about 70% of accounts now stock Contour, and that's something we'll continue to hopefully work on and elevate the adoption of Contour throughout our base. But I think with the advent of SINUVA, we really need to expand the sales force a little bit to continue to drive growth in the business from current accounts, and that's something that, by hiring 20 reps in Q3 and early Q4, we think we're really positioned to continue to strengthen PROPEL and to drive to higher levels of growth as we go through the quarters in 2019. For SINUVA, and for those of you who might have seen Lisa's presentation, she talked about how we were building the foundation of SINUVA. And one of the things that we've really needed to do is tighten up market access, the timing under which prior authorizations occur, the rate of prior authorizations, and also getting doctors comfortable that some patients will need to have them buy the product in order for the patient to access it. Sometimes, they can go through specialty pharmacy; but other times, they'll have to actually buy the product. So I think as we look at the metrics from Q4, we're really pleased with how that's evolving. We're shortening the time frame for prior authorization to under a month. We are increasing the rate of prior authorization. The last reported metric we gave was on the Q3 call of 75%. We're seeing that rising. And we're also expanding the number of doctors who have done buy and bill, so I think we're continuing to get to a critical mass of those doctors where we can build on SINUVA. So as we look at those factors, all of which are positive for PROPEL and for SINUVA, we think we'll be in a better place and continue to be in a place to drive growth. And for SINUVA, it's our intent to grow the business quarter-over-quarter as we go through the year and

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

expand on physician adoption, and also, physicians are able to more regularly use and more smoothly use SINUVA in their practice; and for PROPEL, as we get these reps on board and get them experienced to leverage that growth. So I think as we've -- to connect the dots with your first question is how does this relate back to the 20% expectation, we really have stated that we expect to grow the business at 20%. We had referenced 20% for '19 and beyond. And as we look at '19, we continue to think we'll get to that level of growth with the business. But as we look at the start of the year, we want to make sure that we're really giving clarity to where we think we'll execute on as we continue to push forward with SINUVA and PROPEL. Q1 is a seasonally challenging quarter. There's about a 20% drop-off in procedural volumes, and we're really guiding to in line with that change in procedures as we have in the past. So when you put all that together, when you get to the detailed level, it works out in line with our guidance, but we do continue to believe we'll be able to continue to improve the growth rate of both products.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

So maybe if I can phrase your answer on 2019 a different way; you still feel good about the business growing 20%. You're referencing 20%. Guidance is 13% to 17%. So maybe think about it progressing through the year as SINUVA builds and maybe exiting the year closer to 20%, but the full year will look something 15-ish percent?

**Jeryl L. Hilleman**
*Chief Financial Officer*

Yes.

**Lisa D. Earnhardt**
*CEO, President & Director*

I think that's a good paraphrase.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

And I didn't see it in the press release, but can you help us understand what's built into the guidance for SINUVA expectations in the base business? And then is international a material number at all?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes, I'll start with that. Our focus this year is really driving top line growth. So we, at least at this point, have not given guidance on a product-specific basis. SINUVA will ramp over the course of the year. What we've talked about previously is getting PROPEL back to about 10% growth rate, which is, as you know, north of where we've been the last couple of quarters. And so that's sort of -- as we're thinking this year, just thinking about that as you think about your own models and those types of things, international is a small but growing portion, but it still is immaterial at this point in terms of a contributor. And it's just PROPEL at this time.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

And then we're to think low single-digit millions?

**Jeryl L. Hilleman**
*Chief Financial Officer*

For -- yes.

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes, yes.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

And so maybe I could put it another way. The Street going into the guidance, was at about $10 million for SINUVA next year. Is that an unreasonable way to be thinking about the product?

**Jeryl L. Hilleman**
*Chief Financial Officer*

We haven't provided product-specific guidance. I think if you take where we are now and progress quarter-by-quarter, it's consistent -- you could build a case that's consistent with our logic.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Okay. Maybe we could take a step back to fourth quarter. You've had some nice wins on the reimbursement side. You now have all the national carriers, the positive decision for SINUVA. So maybe you could help us understand what the exit rate of fourth quarter looks like maybe versus coming into the fourth quarter and third quarter. And how do we think about the progression in market adoption going into early next year?

**Lisa D. Earnhardt**
*CEO, President & Director*

Many of the new -- or at least a few of the new national payer policies, they didn't go into effect until January 1. So it's probably a little bit premature to talk about sort of beginning and end. We feel -- fortunately, we are now starting from a position of strength. We have CMS' concurrence on using J3490. We have all the top national payers covering it. And I think it will take a couple of quarters to see how it all sort of plays out, right, because every patient's insurance plan is just a little bit different, right, in terms of whether it's going to be covered under the medical benefit or the pharmacy benefit, all those types of things. So I think it's a little early for us to get too specific there.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

And maybe help us understand. This year, we saw the base business take a step down in growth as people were spending so much time dealing with SINUVA and the reimbursement and pre-authorization. That should improve in 2019. But maybe give us some relative commentary on how you've seen that progress over the course of 2018 going international. How good do you feel about that?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes, we really didn't see improvements over the course. Like from Q2, Q3 and Q4, I think our growth rate was very similar for PROPEL. It was around 7%. And as you know, we did hire about 20 additional sales representatives in the fall, and that's where we have the confidence that those individuals will provide the incremental support that's needed to continue to drive growth on PROPEL, especially with our existing customers. And so we expect that to play out. It typically takes a quarter or 2 for them to get up to speed and really contributing at a full level, and so we expect that to play out over the course of 2019.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

So it does really only just take about a quarter or so, and then they're at...

**Lisa D. Earnhardt**
*CEO, President & Director*

Like a quarter or 2, right, yes. So I would expect, by the second quarter, we would start to see some of that impact.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

And again, that helps play into the confidence in maybe 20% towards the second part of the year versus the first part of the year.

**Lisa D. Earnhardt**
*CEO, President & Director*

Correct. Correct.

**Jeryl L. Hilleman**
*Chief Financial Officer*

Right, yes.

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Okay. Let me ask if there's any question.

**Unknown Analyst**

Yes. Just on the SINUVA update, you updated the number of patients treated and that physician number. I think in the fourth quarter, it seemed like there's 500-or-so physicians trained and I think around 500, a little more of patients treated. I guess when do you expect that to just start to disconnect and mature over time? One treatment per physician [indiscernible] run rate, so when do we see that improve?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes. So the question was with regards to the number of physicians and the number of patients were actually relatively equivalent in the fourth quarter, right? And so not all 500 physicians treated patients in the fourth quarter. But you're absolutely right. Over time, you would expect physicians to treat a number of patients within a quarter. So I think it'll take a couple of quarters because what we're really seeing right now, [ James ], is that physicians are treating a patient, especially if they're needing to go through the buy-and-bill process. And they're waiting until they're -- they see the patient, the prescribed SINUVA, then they wait to get the prior authorization, they do the treatment, and then they submit the claim to the insurance company, and they're going to want to wait until they get that -- they get paid on that claim before they're willing to put additional capital at risk. So it will take a little bit longer because of the need for them to do buy and bill for some patient plans. So that is what's going to sort of be a gating factor for us. And that's why we've talked about SINUVA as really ramping over the course of the year.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Right. Any other questions? So still with the unfortunate episode of the hopefully getting Medicare J code, and it didn't. Now you're confident in filing and will get the preliminary decision in May and feel good about 2020. Help us understand. Maybe some know the answers, some don't, so...

**Jeryl L. Hilleman**
*Chief Financial Officer*

Yes.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

For those that don't, help us understand what exactly happened that gave you confidence and then ultimately, didn't get it and why you feel good about 2020.

**Lisa D. Earnhardt**
*CEO, President & Director*

Are you good?

**Jeryl L. Hilleman**
*Chief Financial Officer*

Yes. For -- I think the best news that we received on this was the CMS letter in November, where they spoke to why they had not issued the code. And much as it was frustrating, they did not have a public document referencing the termination date of our existing codes. And it was really the fact that there were codes that could be used to submit SINUVA claims that had been a big part of why -- that had been the determination of why they did not issue the code. So knowing that the codes now -- there is a public document, it was published by CMS, the physician fee schedule, that takes that concern off the table. The codes have been sunset. They do no longer exist, so they cannot be referenced since they don't exist. But further, then CMS talked about how the J -- in the absence of a product-specific code, that the unassigned J code should be used. So that pointed to that this product should be submitted under a J code. So when you put those facts together, we feel very optimistic that SINUVA will get a J code in this round.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Is there any mechanistic or logical reason that CMS would say, look, you're doing great with the miscellaneous code; you don't need a product-specific code?

**Jeryl L. Hilleman**
*Chief Financial Officer*

Yes. Their role really is to make sure products have codes, and we've submitted for the J code. Drugs typically do have their own assigned code. They're also looking out, though, they want to make sure that there aren't 2 codes that can be used to code for a product. So in this case, there would be no other code, as they're acknowledging by saying use the unassigned code. So we'd not anticipate that would be the scenario.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Does that mean that CMS -- so CMS effectively did an analysis on SINUVA and said this a J code product? They didn't just say because there was already a code, this is a nonstarter and we're not looking at it? I mean, is that -- is there -- how certain are you that those 2 conclusions sort of fit together because they say unassigned J code, that means this is a J codable product and that now it's basically just you wait until May, and that's kind of when we get the possible update?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes. So the question was with regards to how do you know that CMS has really done the analysis to determine that a J code would be most appropriate. Well, J codes are used for physician-administered drugs. And SINUVA is a drug that's administered by a physician, so it obviously reads squarely on the description of a J code. And then the fact that they did reinforce that, we feel that, that really is as definitive as it could be as it relates to communication from CMS. But as Jeri said, that was probably the best piece of news we got from CMS, where there wasn't much good news from them for us at least in 2018, but at least the letter we got in late November provided a really clear map in terms of their thinking versus when we got the preliminary decision, they had just referenced, well, there's other codes that could be used. And then when we got the final decision, it was like you're just not getting a code. And so it was great to actually get a more detailed description of their decision and what they think should happen moving forward.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Unknown Analyst**

Maybe something to the drug-coated balloon trial, and you said it's a superiority trial. But maybe if you were to show non-inferiority, that you went ahead and submitted that, and then you were on the course [indiscernible] like you said afterwards, try dose superiority. Or is this [indiscernible] superiority or not?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes, so the question that [ Lennox ] asked was with regards to the drug-coated balloon trial, the ASCEND trial, which is indeed designed as a superiority trial over the -- over a plain balloon for opening up the sinus. And so we would probably cross that bridge when we come do it in terms of the clinical data. So assuming the clinical data is positive, we would move forward with a submission of the PMA. If it wasn't but we thought we could get a non-inferiority claim, we might think of working in partnership with the FDA in terms of what the most appropriate path forward will be.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Now let me just go around [ Lennox' ] question here. Is there a reason to bring a drug-coated balloon to market if it does have better data, given the higher cost?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes. So we think that there is value there. Physicians just intuitively would appreciate the value of having drug. All things created equal, if we're able to provide -- price the product on a -- maybe with a small premium, all things being equal, they would prefer having the drug there. It's sort of belt and suspenders in terms of being able to offer as much value as you can to your patient.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Okay. But just thinking about it...

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes, and that's why the reason we did it as superiority, right, because we want to be able to say it's better, right? And I think most physicians just intuitively believe it will better, like why wouldn't it be? But of course, there's the devil's in the detail in terms of the clinical trial and the powering and the treatment effect and all those types of things. Fortunately, we've run many very similar trials in very similar patients previously and had -- obviously had great confidence given our bench data in our preclinical work as well as the small clinical trial we had done leading into the randomized trial.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

And so help us understand how this jives with Intersect's current sales force and product offering.

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes, we believe this is extraordinarily complementary to our current sales effort as well as our product offering. From a sales perspective, we're calling on ENTs each and every day that are doing sinus procedures. About 5,000 ENTs across the country use balloon technology today, and we're -- I think the vast majority of physicians that we work with are already using some sort of balloon technology as part of their armamentarium. In terms of our product portfolio, we believe this is really complementary because we see this playing a unique role in particular in the physician's office setting, where we have a very small percent of our sales going through that channel. The good news is that there's established reimbursement for balloon use in the office setting. Physicians are already doing about 200,000 sinus surgery -- sinus

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

procedures using balloons already today, so they're familiar with that technology. So we think it really is very complementary to the products that we have today.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Is this a product that you have similar gross margins to 90-ish percent?

**Lisa D. Earnhardt**
*CEO, President & Director*

80-ish percent gross margins.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Sorry, 80-ish.

**Jeryl L. Hilleman**
*Chief Financial Officer*

It may very well be on the same range.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Okay. And just thinking about differentiated reimbursement potential for a superiority trial of the drug-coated balloon, what would be the process to achieve that?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes, at this point, Robbie, we're not focused on getting differentiated reimbursement. The reimbursement rates are -- we think are sufficient to support whether it be a drug-coated balloon or a plain balloon as they exist today. And so as I think about where we're focusing our energy, we certainly are spending a lot of time on reimbursement and product access with SINUVA. And I'm looking forward to spending less time on that with our drug-coated balloon offering.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Any questions?

**Unknown Analyst**

Yes, can I just ask to Kyle's point earlier on the multiple treatments? Once you get a positive prior authorization, reimbursement might have changed, basically assured because the insurance company just told you, you could use it. So I don't quite understand why they're kind of waiting before doing the second procedure because once you've acquired authorization, right, you shouldn't need to worry about this.

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes. So the question was, is what is really the physician's hesitation of using the product if you are getting a prior authorization. And we wholeheartedly confer that having that prior authorization is a very important step. And the fact that payers now, they have written policies or have put us on formulary, that's another fact pattern. Finally, the other thing that we've started doing is amassing a library of EOBs or basically explanation of benefits or payment, payment records that demonstrate payments. At the end of the day, though, it's still coming out of the -- they're still putting money from their pocketbook at risk. And some physicians, they're in small practices, they might be solo practice, and so they're going to want to see other practices take that risk first before they do.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Unknown Analyst**

As -- just given what's happened since the last year, have you tossed out breakeven in the business [indiscernible]?

**Jeryl L. Hilleman**
*Chief Financial Officer*

Yes, I mean, right now, we're really focused on driving the top line growth of SINUVA. And then the timing of when we might choose to achieve breakeven is going to be really dependent on the degree of success with SINUVA. And then, of course, we're continuing to invest in our pipeline, so we haven't given it a specific time frame.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

I want to ask about using the SINUVA or the PROPEL technology into other drugs and in different applications because it's interesting that you went into drug-coated balloon first beyond doing the core competency of the stent. So maybe just help us understand what's beyond that and how aggressive -- or what's the potential for taking multiple different pipeline products to market?

**Lisa D. Earnhardt**
*CEO, President & Director*

It's a good question, Robbie, and we're always thinking about what's the right -- sort of how do we pull this business together and that strategic puzzle in terms of where we're making the investment. I mean, at the end of the day, chronic sinusitis is an inflammatory condition, and steroids treat inflammation. And so that's really been our focus initially was really having those products across the continuum of care, and the drug-coated balloon was always part of that vision. We just hadn't articulated that because we wanted to wait until we are far enough along that we had got -- until it was really becoming a reality, right? So we might think over time, continuing to make investments in our current products and making improvements there and then also looking at potentially different therapeutic agents as well. I mean, there's more work and time frame that needs to happen there because that might flip something into a drug pathway or at least a PMA, and so those are important considerations. But if you were to review our IP portfolio, you see we've contemplated a number of different product iterations, applications as well as therapeutic agents.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Any last questions?

**Unknown Analyst**

Can I just ask one more? So sort of the nature of your PROPEL business is coming now from the really strong certain Asian countries. You've kind of regional operations. The 20 new reps, are they going to be focused on new account creation, or are they going to be focused to getting deeper in the areas where there already seems to be acceptance and adoption of PROPEL business?

**Lisa D. Earnhardt**
*CEO, President & Director*

Yes. Set the question was with regards to the focus of the new representatives we've brought on board. And their focus is really going to be with existing physician and existing accounts really driving depth. We think that's a great area to focus because we know just time and time, once we spend time in the clinical education, we have -- give physicians the opportunity for peer-to-peer interactions, talking about clinical case studies. That, over time, helps them think more expansively about their use of PROPEL. And as Jeri, I think, had mentioned, we've continued to add new accounts, we think, at a pretty good clip. It's just a matter of we want to make sure that physicians are thinking about the use of PROPEL more expansively versus being more selective, which some physicians are today.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

Great.

**Lisa D. Earnhardt**
*CEO, President & Director*

Great.

**Robert Justin Marcus**
*JP Morgan Chase & Co, Research Division*

We're going to end it there.

**Lisa D. Earnhardt**
*CEO, President & Director*

Great. Thank you so much.

**Jeryl L. Hilleman**
*Chief Financial Officer*
Thank you.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.