GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Jennifer M. Leinbach (#281404)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Lead Plaintiff Avi Yaron*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVI YARON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>INTERSECT ENT, INC., LISA D. EARNHARDT, JERYL L. HILLEMAN, and ROBERT H. BINNEY, JR.,<br><br>Defendants. | Case No.: 4:19-cv-02647-JSW<br><br>**OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Date: May 29, 2020<br>Time: 9:00 a.m.<br>Judge: Hon. Jeffrey S. White<br>Courtroom: 5 |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................................. 1

III.    LEGAL STANDARD ......................................................................................................... 5

IV.     THE COMPLAINT ADEQUATELY ALLEGES FALSITY ............................................ 5

        A.      Defendants Inflated Intersect's Revenue Through A Channel Stuffing Scheme ...... 5

        B.      Defendants Had A Duty To Disclose Intersect's Shifting Sales Practices ............... 8

V.      THE COMPLAINT ADEQUATELY ALLEGES SCIENTER .......................................... 10

VI.     THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION .............................. 14

VII.    THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON CLAIMS .......... 15

VIII.   CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

CASES

*Azar v. Yelp, Inc.*,
　2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................................ 13

*Berson v. Applied Signal,*
　*Tech.*, 527 F.3d 982 (9th Cir. 2008) ........................................................................................ 9

*Bielousov v. GoPro, Inc.*,
　2017 WL 3168522 (N.D. Cal. July 26, 2017) ........................................................................ 12

*Brody v. Transitional Hospitals Corp.*,
　280 F.3d 997 (9th Cir. 2002) ............................................................................................ 5, 6

*Carpenters Health & Welfare Fund v. Coca Cola Co.*,
　321 F. Supp. 2d 1342 (N.D. Ga. 2004) .................................................................................. 7

*Cunha v. Hansen Natural Corp.*,
　2011 WL 8993148 n.2 (C.D. Cal. May 12, 2011) .............................................................. 5, 6, 7

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005) ........................................................................................................... 14

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
　751 F.3d 990 (9th Cir. 2014) ............................................................................................... 10

*Eminence Capital, LLC v. Aspeon, Inc.*,
　316 F.3d 1048 (9th Cir. 2003) ............................................................................................. 15

*Estate of Saunders v. Comm'r*,
　745 F.3d 953 (9th Cir. 2014) ............................................................................................... 10

*Fecht v. Price Co.*,
　70 F.3d 1078 (9th Cir. 1995) ................................................................................................. 5

*Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*,
　367 F. Supp. 3d 16 (S.D.N.Y. 2019) ...................................................................................... 7

*Greebel v. FTP Software, Inc.*,
　194 F.3d 185 (1st Cir. 1999) ................................................................................................. 7

*Holley v. Gilead Scis., Inc.*,
　379 F. Supp. 3d 809 (N.D. Cal. 2019) .................................................................................. 10

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017)...................................................................................... 5

*In re BofI Holding, Inc. Sec. Litig.*,
  302 F. Supp. 3d 1128 (S.D. Cal. 2018) ................................................................... 15

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ..................................................................... 11

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................................ 6

*In re Commtouch Software Ltd. Sec. Litig.*,
  2002 WL 31417998 (N.D. Cal. July 24, 2002)........................................................ 13

*In re Connetics Corp. Sec. Litig.*,
  2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)........................................................... 7

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008)................................................................... 13

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005)................................................................................... 7

*In re Dura Pharms, Inc. Sec. Litig.*,
  452 F. Supp. 2d  (S.D. Cal. 2006) ............................................................................ 6

*In re Gilead Sciences Sec. Litig.*,
  536 F.3d (9th Cir. 2008)......................................................................................... 14

*In re Impax Laboratories, Inc. Sec. Litig.*,
  2007 WL 7022753 (N.D. Cal. July 18, 2007) ......................................................... 13

*In re Interlink Elecs., Inc. Sec. Litig.*,
  2008 WL 4531967 (C.D. Cal. Oct. 6, 2008) ............................................................. 6

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008)................................................................... 12

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011) ....................................................................... 8

*In re PerkinElmer, Inc. Sec. Litig.*,
  286 F. Supp. 2d 46 (D. Mass. 2003) .......................................................................... 9

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)........................................................................ 5, 10, 12

*In re Salesforce.com Sec. Litig.*,
  2005 WL 6327481 (N.D. Cal. Dec. 22, 2005) ............................................................... 9

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................................................................. 6

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002) ......................................................................... 7

*In re St. Jude Medical, Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) ....................................................................... 6, 8

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................................ 12

*In re Van der Moolen Holding, N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) .......................................................................... 9

*In Re Violin Memory Sec. Litig.*,
  2014 WL 5525946 n.2 (N.D. Cal. Oct. 31, 2014) ....................................................... 10

*In re Zynga Inc. Sec. Litig.*,
  2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ....................................................... 14, 15

*Institutional Investors Group v. Avaya*,
  564 F.3d 242 (3d Cir. 2009) ..................................................................................... 6, 11

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................................................... 15

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) ................................................................ 11

*Makor Issues & Rights, Ltd. v. Tellabs,
  Corp.*, 513 F.3d 702 (7th Cir. 2008) ...................................................................... 6, 14

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................................... 9, 14

*Mauss v. Nuvasive, Inc.*,
  2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ....................................................... 14, 15

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
  2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012) ............................................................ 11

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ......................................................................................... 8

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018)..................................................................................... 15

*Murphy v. Precision Castparts Corp.*,
2017 WL 30844274 (D. Ore. June 27, 2017)............................................................ 13

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)..................................................................................... 10

*Paciga v. Invuity Inc.*,
2019 WL 3779694 (N.D. Cal., Aug. 12, 2019)........................................................... 9

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014)..................................................................................... 10

*S. Ferry LP v. Killinger*,
542 F.3d 776 (9th Cir. 2008)................................................................................ 6, 13

*SEC v. Fuhlendorf*,
2011 WL 999221 (W.D. Wash. Mar. 17, 2011).......................................................... 9

*SEC v. Leslie*,
2012 WL 116562 (N.D. Cal. Jan. 13, 2012) .............................................................. 9

*SEC v. Mozilo*,
2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) .............................................................. 5

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................... 10

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009).................................................................................... 9

*South Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009) ............................................................... 11

*Stanley v. Safeskin Corp.*,
2000 WL 33115908 (S.D. Cal. Sept. 15, 2000) .......................................................... 6

*Strougo v. Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015)......................................................................... 9

*Teamsters Local 617 Pension and Welfare Funds*,
690 F. Supp. 2d 959 (D. Ariz. 2010)........................................................................ 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .................................................................................... 5, 6, 10, 14

*Vitalone v. Logitech Int'l SA*,
   2012 WL 13041992 (N.D. Cal. July 13, 2012) .......................................................... 6

*Waterford Township Police v. Mattel, Inc.*,
   321 F. Supp. 3d 1133 (C.D. Cal. 2018)................................................................ 6, 7, 8

STATUTES

15 U.S.C. §78u-4(b)(2) ........................................................................................................ 10

REGULATIONS

64 Fed. Reg. 152 ...................................................................................................................... 9

OTHER AUTHORITIES

64 Fed. Reg. 45150 (1999).................................................................................................... 9

**SUMMARY OF ARGUMENT**

In this securities fraud class action, Plaintiff adequately alleges every element of an Exchange Act claim under §§10(b) and 20(a). Defendants' challenges to the Complaint fail.

**First**, the Complaint adequately pleads that Defendants' statements were materially misleading because the failure to disclose Intersect's channel stuffing practices "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1008 (9th Cir. 2002). Defendants' assertion that channel stuffing claims are "disfavored" misstates the law. *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148, at *3 n.7 (C.D. Cal. May 12, 2011).

**Second**, Defendants had a duty to disclose Intersect's channel stuffing practices because once they chose to speak about the factors affecting the growth of Intersect's primary products, "they were bound to do so in a manner that wouldn't mislead investors." *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008). Defendants' quantitative materiality argument misapprehends the Court's role on a motion to dismiss and ignores the SEC's guidance in SAB 99.

**Third**, the Complaint pleads specific facts giving rise to a strong inference of scienter as required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Among other things, those facts include the content and context of Defendants' misrepresentations, Defendants' assurances that they were monitoring the growth trends that they misrepresented, new management's rapid discovery of the channel stuffing practices following the resignation of Intersect's CEO and CFO, and the accounts of multiple confidential witnesses. The core operations doctrine further supports a strong inference of scienter. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).

**Fourth**, the Complaint adequately pleads loss causation as to the August 1, 2018 disclosure. *In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015).

**Fifth**, the Complaint adequately pleads control person claims pursuant to §20(a). The Complaint adequately alleges both a primary violation of the securities law and that each of the Individual Defendants, including Binney, exercised control over Intersect.

## I.    INTRODUCTION

Throughout the Class Period, Defendants misled investors about Intersect's operations by failing to disclose a channel stuffing scheme used to artificially inflate Intersect's results.[2] Intersect employed a sales model dependent on end-of-quarter discounted bulk sales that helped the Company reach short-term revenue goals but was inherently unsustainable. The bulk sales jammed customer shelves with unneeded product and led—predictably—to a material number of customers not purchasing more until the excess was used. The risks concealed by Defendants' scheme began to materialize in 2018 when bulk sales in Q1 2018 caused revenue growth to slow in Q2, and the scheme ultimately fell apart when new management admitted after Q2 2019 that Intersect's revenue growth would stall completely for the year. The price of Intersect's stock fell dramatically following the revelations, and the investor losses are recoverable.

Defendants unsuccessfully attempt to distract from this simple narrative of fraud by pointing to their Class Period acknowledgements that challenges posed by the launch of a new product could negatively impact sales results. This defense falls short. Defendants never suggested to investors that revenue growth was materially impacted by sales that did not reflect demand for Intersect's "bread and butter" product. The Complaint details the sales practices, quantifies their impact, and is replete with allegations showing the Individual Defendants were personally aware of the bulk sales practices at all relevant times. The Complaint states a claim for violations of Sections 10(b) and 20(a) of the Exchange Act, and Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

Intersect is a commercial drug delivery company. ¶2. Before the Class Period,[3] Intersect derived its revenue almost exclusively from its PROPEL family of products, which are an assortment of implants used in sinus surgery. ¶2. Intersect's financial results regularly exceeded

---

[2] Capitalized terms have the same meaning as in the Complaint (Dkt. No. 24). References to Defendants' brief in support of their motion to dismiss (Dkt. No. 27) are cited as "MTD __," and references to exhibits to Defendants' Kirby Declaration (Dkt. No. 28) are cited as "Ex. __." Unless indicated otherwise, all emphasis in this brief has been added, all internal citations, quotation marks and alterations have been removed, and all "¶__" references are to the Complaint.

[3] Plaintiff brings this class action on behalf of himself and others who purchased or acquired Intersect's securities between February 27, 2018 and August 1, 2019 (the "Class Period").

analyst's expectations and showed revenue growth of more than 20% in 2017. ¶¶4, 44-46. In Q1 2018, Intersect was preparing to launch a new product called SINUVA, which represented an opportunity to expand Intersect's business. ¶¶3, 43, 48. Throughout this time period, Defendant Earnhardt was Intersect's CEO and Defendant Hilleman was its CFO. ¶¶21, 22.

On January 9, 2018, Defendants forecast 2018 revenue growth of 15%-20%, slightly below its recent record of more than 20% growth in 2017. ¶¶49-50. Defendants stated that the SINUVA launch was expected to have "some [negative] impact on PROPEL sales." ¶51 Analysts attributed the lowered expectations to Intersect's habit of "under-promising and over delivering," explaining that any distraction from the SINUVA launch was likely to be limited as the physician call point would not change and sales personnel already spent about 30% of their time in the office. ¶53.

The Class Period begins on February 27, 2018, when Defendants released Intersect's Q4 2017 and FY 2017 financial results and reaffirmed its 2018 revenue guidance. ¶111. Defendants confirmed that the conservative guidance accounted for the expected impact of the SINUVA launch, stating that focus on SINUVA "could come a bit at the expense of PROPEL." ¶115.

By this time, however, Intersect had commenced an undisclosed shift in sales practices that artificially inflated the Company's sales and financial results. ¶112. As later admitted by Intersect's interim CEO, Intersect's sales personnel shifted from "working with physicians to broaden their understanding of PROPEL's clinical end benefits and its appropriate usage" to "offering selective discounts on high volume orders." ¶100. This resulted in Intersect's sales "moving ... away from the flow of natural market demand," which in turn led to customers stockpiling inventory. ¶100. Between 2% to 3% of Intersect's sales during the Class Period were attributable to bulk end-of-quarter sales. ¶104. Defendants concealed these facts from investors.

On May 1, 2018, Defendants reported Q1 2018 revenue growth of 21%, attributing it primarily to "growth in adoption of" PROPEL products. ¶117. Defendants also reaffirmed Intersect's FY 2018 revenue forecast. ¶¶117, 121. Defendants said there "were no surprises in our first quarter PROPEL family results" despite SINUVA's launch. ¶119. Trying to understand why Intersect maintained its conservative annual guidance notwithstanding the strong Q1 results, an analyst asked Defendant Hilleman "what other items [beyond SINUVA] … should be factoring

into thinking about guidance?" ¶123. Hilleman responded by discussing the challenges related to SINUVA and made no mention of the shift to channel stuffing practices. ¶¶125-31.

On August 1, 2018, Defendants announced Q2 2018 results showing revenue growth had slowed to just 10% year-over-year—well below expectations—and Defendants lowered annual revenue guidance to $106 to $109 million, down from $111 to $116 million previously. ¶133. Defendant Earnhardt blamed the SINUVA launch for the "disappointing Q2 for PROPEL." ¶135. According to Defendants, sales personnel were spending "a disproportionate amount of time" on "troubleshooting" the SINUVA sales process at the expense of selling PROPEL. ¶139. Defendants told investors during the analyst call on August 3, 2018 that, in looking to Q3, "we are implementing improvements to market access and expanding our sales force." ¶137. Intersect's stock price fell more than 19% on the news. ¶12. Defendants, however, continued to conceal that sales results were materially impacted by illicit channel stuffing practices. ¶¶138, 140, 142.

On November 5, 2018, Defendants announced Q3 2018 results showing revenue increased 11% year-over-year, again "attributable to growth in the adoption of" PROPEL. ¶¶143, 151. Defendant Hilleman told investors Intersect's "most pointed focus" was "continuing to grow the business … in the range of 20%." ¶147. Earnhardt told investors "there really was *no fundamental change in our perspective for PROPEL this year outside of the SINUVA launch*." ¶149. Once again, Defendants omitted any mention that revenues were impacted by a material number of quarter-end discounted bulk sales. ¶150.[4]

On February 25, 2019, Defendants announced Q4 2018 and full year 2018 results. ¶159; ¶167. Defendants still claimed that quarterly and annual revenue growth was "attributable to growth in the adoption of" PROPEL. ¶159. Defendants forecast 2019 revenue in the range of $123-$127 million. ¶159. Hilleman said "fourth quarter and full year revenue were in line with the guidance we set last summer, with both PROPEL and SINUVA hitting their targets." ¶163. When pressed about whether Q1 guidance signaled a slowdown in Intersect's core business, Defendants claimed the projected quarterly slowdown "ties very much to seasonality." ¶165. At an investor

---

[4] On November 28, 2018 and January 8, 2019, Defendants spoke at investor conferences and again claimed that the cause of the slowdown in PROPEL growth was limited to the SINUVA launch and failed to mention Intersect's channel stuffing as a material factor in that slowdown. ¶¶153-58.

conference three days later, an analyst asked "how much of the PROPEL growth deceleration" was due to "market saturation or penetration" and questioned Earnhardt's confidence that the issue could be addressed by putting additional resources into PROPEL. ¶169. Earnhardt cited reasons she saw "headroom" to grow, asserted Intersect was addressing the issues with "additional bandwidth," and affirmed her confidence that the market for PROPEL was not "penetrated." *Id.*

On May 6, 2019, Defendants announced revenue growth of just 8% for Q1 2019. ¶171. Defendants lowered full year 2019 revenue by more than $10 million. ¶171. Analysts were confused by Defendants' renewed excuse that SINUVA was to blame for disappointing PROPEL sales given Defendants' previous representations that they were addressing the issue with additional staff. ¶176. In truth, Intersect's channel stuffing practices could no longer be sustained.

On August 1, 2019, following the resignation of Defendant Earnhardt as CEO and the announcement that Hilleman would be "transition[ing]" from her role as CFO,[5] interim CEO Kieran Gallahue revealed for the first time that Intersect had been reliant on bulk discount sales of PROPEL for the prior six quarters to achieve quarterly revenue targets. ¶62. Gallahue disclosed that Intersect's sales force had begun "offering selective discounts on high volume orders" and that "the discounted high-volume orders ... have been growing and moving us away from the flow of natural market demand." ¶¶62, 100. Gallahue admitted that Intersect made an "an adjustment to order discounting immediately at the end of Q2 [2019] and felt its adverse impact on short-term revenues." ¶62. Gallahue stated that the change would "result in lowering customer shell stock and potentially reducing revenues for the remainder of the year." ¶100.

Analysts were stunned by Intersect's admissions and pressed for answers. Gallahue revealed that the bulk deals accounted for "a few percentage points of the total annual revenues, maybe 2%, 3% or so." ¶102. He admitted that for customers to work through the excess inventory would be a "process … over 1, 2, 3 quarters." ¶102.

On November 1, 2019, Intersect revealed the full extent of the bulk sales problem. New CEO Tom West announced that the Company would have "flat growth" in 2019 as compared to

---

[5] ¶¶194, 196. Earnhardt resigned as CEO on June 5, 2019, a move announced one month earlier; Intersect announced that Hilleman would step down as CFO in 2020 on June 27, 2019. *Id.*

2018 due to Intersect's channel stuffing practices. Specifically, West reported that Intersect's customers had multiple quarters worth of inventory on their shelves and estimated that Intersect "cleared in the range of $1.5 to $2 million of customer inventory accumulation sold in prior quarters," which lowered Intersect's Q3 results commensurately. ¶107. West admitted that "PROPEL is not likely to go back to the 20% grower." ¶109.

## III.    LEGAL STANDARD

When determining the sufficiency of a pleading, the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs II*"). To allege violations of section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a materially false or misleading statement or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). Of these elements, Defendants challenge only material falsity, scienter and loss causation.

## IV.    THE COMPLAINT ADEQUATELY ALLEGES FALSITY

A plaintiff need only allege facts giving rise to a "reasonable inference" that the challenged statement was false or misleading. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017). "[A] statement that is literally true can be misleading and thus actionable under the securities laws" if it "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1008 (9th Cir. 2002). "Both the materiality and misleading nature of a misstatement or omission are usually questions for the trier of fact." *SEC v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht*, 70 F.3d at 1081.

### A.  Defendants Inflated Intersect's Revenue Through A Channel Stuffing Scheme

"Channel stuffing is premature pushing of product into the wholesale channel to artificially inflate sales." *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148, at *1 n.2 (C.D. Cal. May 12, 2011). That is exactly what happened here. Within two months of the Individual Defendants'

resignations, Intersect's interim CEO admitted that (i) for the past six quarters, Intersect had relied on bulk discount sales to achieve short-term revenue targets, (ii) those practices were immediately discontinued by new management, and (iii) Intersect's sales suffered an immediate, material hit and would face ongoing headwinds as customers worked through excess inventory. Analysts were stunned, because Defendants had repeatedly represented that the sole reason for Intersect's conservative guidance and the deceleration in PROPEL growth was the SINUVA launch. *E.g.*, ¶¶123, 149, 176. Thus, Defendants "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

Defendants contend that channel stuffing claims are "disfavored,"[6] but multiple courts in this circuit and elsewhere have sustained securities fraud claims based on channel stuffing. *See, e.g.*, *Cunha*, 2011 WL 8993148, at *2-*4; *In re Dura Pharms, Inc. Sec. Litig.*, 452 F. Supp. 2d 1004 (S.D. Cal. 2006).[7] Even the cases relied on by Defendants acknowledge that channel stuffing allegations will state a claim so long as the plaintiff (1) pleads sufficient corroborating details, such as specific amounts and dates, and (2) adequately alleges that the channel stuffing practices were used to "artificially inflate sales." *Vitalone v. Logitech Int'l SA*, 2012 WL 13041992, at *4 (N.D. Cal. July 13, 2012); *accord Waterford Township Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1147-48 (C.D. Cal. 2018). Plaintiff has satisfied both elements here.

First, the Complaint identifies six quarters in which Defendants engaged in improper discounted bulk sales and the approximate amounts that these transactions comprised (2%-3% of Intersect's revenue). Defendants ask for additional details—including "specific transactions,

---

[6] MTD 8-9. "Neither *Broudo* nor *Tellabs* supports the proposition that 'channel-stuffing' claims, generally speaking, are simply 'disfavored' such that the characterization has any real effect." *Cunha*, 2011 WL 8993148, at *3 n.7. In fact, the notion that channel stuffing claims are disfavored is inconsistent with *Tellabs II*, which requires complaints to be reviewed "holistically." 551 U.S. at 326. Discounting channel stuffing claims would also be inconsistent with *South Ferry*, which interprets *Tellabs II* as prohibiting courts from "develop[ing] separate[] rules of thumb" for different categories of allegations. *See S. Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

[7] *See also, e.g.*, *Stanley v. Safeskin Corp.*, 2000 WL 33115908 (S.D. Cal. Sept. 15, 2000); *In re Interlink Elecs., Inc. Sec. Litig.*, 2008 WL 4531967 (C.D. Cal. Oct. 6, 2008); *Makor Issues & Rights, Ltd. v. Tellabs Corp.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs III*"); *Institutional Investors Group v. Avaya*, 564 F.3d 242, 269 (3d Cir. 2009); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001); *In re Salix Pharms., Ltd.*, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016); *In re St. Jude Medical, Inc. Sec. Litig.*, 836 F. Supp. 2d 878 (D. Minn. 2011).

specific shipments, specific customers, specific times, or specific dollar amounts." MTD 9. But Plaintiff is not required to provide further detail at this stage, particularly given the specific facts that already have been admitted. *Cf. In re Daou Sys., Inc.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005) (allegations of financial misstatements should identify basic details such as approximate amounts misstated, transaction dates, and customers, but "Plaintiffs need not allege each of those particular details");[8] *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (denying motion to dismiss despite failure to plead "nuts and bolts of defendants' alleged channel stuffing" where other allegations supplied sufficient particularity).[9]

Second, the Complaint adequately pleads that the bulk discount deals were used to artificially hit short-term revenue targets. Interim CEO Gallahue admitted that these "discounted high-volume orders ... have been growing and ***moving us away from the flow of natural market demand***." ¶100. This is not fraud by hindsight. As detailed *infra* at Sec.V, the accounts of multiple confidential witnesses and other facts support a strong inference that Defendants were aware of and authorized these discounted bulk deals at the same time that they were giving misleading responses to questions from analysts about PROPEL's growth trends.

Importantly, a channel stuffing claim does not require an accounting misstatement based on improper revenue recognition, and instead may be predicated on the misleading impression created by a company's financial statements based on the failure to disclose the scheme. *See, e.g.*, *Cunha*, 2011 WL 8993148, at *2 ("even if the financial results could not be 'false' … the channel-stuffing could at the very least cause those results to be misleading where it resulted in an overloaded supply chain that could not sustain impressive early results").[10] Here, the Complaint

---

[8] *Accord Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999) (holding that a complete failure to plead approximate amounts misstated or any transaction details warranted dismissal, but clarifying that a plaintiff need not plead "each of these particulars"). One of Defendants' key cases, *Mattel*, relies on *Greebel* for the relevant pleading standard. 321 F. Supp. 3d at 1147.

[9] *See also Carpenters Health & Welfare Fund v. Coca Cola Co.*, 321 F. Supp. 2d 1342, 1351-52 (N.D. Ga. 2004) ("it would be unrealistic to require Plaintiffs to detail every particular channel stuffing transaction without the benefit of discovery").

[10] *See also Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32-33 (S.D.N.Y. 2019) (sustaining channel stuffing claims based on statements concerning strength of demand and drivers of growth); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1363 (N.D. Ga. 2002) (sustaining channel stuffing claims, separate from those based on alleged GAAP

alleges not only that Defendants' reported financial results and guidance were misleading due to the failure to disclose the channel stuffing, but that Defendants issued misleading statements about the causes and drivers of PROPEL's growth. These statements included specific denials of undisclosed factors beyond the SINUVA launch when Defendants knew that channel stuffing was employed to hit revenue targets. *E.g.*, ¶¶123, 149, 176.[11] These denials, along with Intersect's later admissions, differentiates this case from the channel stuffing decisions cited by Defendants.[12]

### B. Defendants Had A Duty To Disclose Intersect's Shifting Sales Practices

Defendants' two additional arguments concerning the duty to disclose are both unavailing. MTD 10-11. First, Defendants argue that Intersect's failure to disclose its sales practices was not misleading because Defendants warned investors that Intersect's sales team would be distracted by the SINUVA launch and that PROPEL sales were expected to suffer as a result. MTD 10. Defendants claim that "the increase in discounted volume orders was simply an example of how the sales team's focus on the SINUVA launch impacted PROPEL's sales." *Id.* But there is a fundamental difference between sales force distraction causing an inability to execute sales and offering bulk discounts to mask ebbing demand and artificially hit projections. Analysts repeatedly asked Defendants whether any factor other than the SINUVA launch—such as "market saturation" (¶169)—was causing deceleration in PROPEL growth, and Defendants repeatedly responded by pointing to insufficient resources and distraction due to SINUVA. Defendants did not disclose the

violations, where plaintiffs alleged "that the Company misrepresented its financial condition by failing to disclose its channel stuffing activity"), *aff'd*, 374 F.3d 1015 (11th Cir. 2004).

[11] Defendants argue that Plaintiff has engaged in impermissible "puzzle pleading" by citing lengthy block quotes and alleging that these statements were misleading for the same reasons (*i.e.*, for failure to disclose the channel stuffing). MTD 8 n.9. This "argument ignores the fact that an individual 'statement' is not necessarily confined to a single sentence." *St. Jude*, 836 F. Supp. 2d at 888. "Many of the statements at issue were provided in direct response to questions from financial analysts at conferences expressly to discuss [Intersect's] earnings and guidance." *Id.* Plaintiff cannot be faulted for including the context of these exchanges, as they are important for understanding the substance of Defendants' representations. *See, e.g.*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.").

[12] Defendants' cases are inapposite for additional reasons. *E.g.*, *Mattel*, 321 F. Supp. 3d at 1148 (legitimate seasonality reasons for toy company to push sales in Q4); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 996 (S.D. Cal. 2011) (summary judgment decision, not motion to dismiss).

bulk sales practices and what those practices indicated about the health and growth rate of Intersect's core PROPEL business.[13] Once Defendants chose to discuss the reasons for PROPEL's growth trends and the factors underlying its guidance, "they were bound to do so in a manner that wouldn't mislead investors." *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008); *see also In re Van der Moolen Holding, N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (statements that put source of revenue at issue created duty to disclose improper conduct).[14]

Second, Defendants argue that their failure to disclose was immaterial, because the discounted bulk sales accounted for only 2%-3% of annual revenues. MTD 11. This argument fails. First, "[q]uestions of materiality involve assessments peculiarly within the province of the trier of fact" and the Court may usurp that determination only if "reasonable minds cannot differ." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009), *aff'd sub nom. Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011). Second, Defendants ignore that materiality includes both a quantitative and qualitative analysis. "'[Q]uantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality.'" *SEC v. Fuhlendorf*, 2011 WL 999221, at *7 (W.D. Wash. Mar. 17, 2011) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45151 (1999) ("SAB 99")).[15] Under SAB 99, several qualitative factors can render a quantitatively small misstatement material, including whether the misstatement "hides a failure to meet analysts' consensus expectations for the enterprise" or "masks a change in earnings or other trends." 64 Fed. Reg. at 45152. Here, the

---

[13] *See, e.g.*, ¶123 (identifying only SINUVA launch as basis for conservative guidance); ¶149 ("no fundamental change in our perspective for PROPEL this year outside of the SINUVA launch"); ¶169 (expressing confidence that market for PROPEL was not "penetrated" and identifying "constraints" due to SINUVA as sole reason for slowing PROPEL growth); ¶176 (similar).

[14] *Paciga v. Invuity Inc.*, 2019 WL 3779694 (N.D. Cal., Aug. 12, 2019) is inapposite. There, the Court held that customer ordering patterns did not necessarily conflict with the company's stated plan to sell more to existing customers. The case did not involve specific denials to analyst questions about undisclosed factors dragging down the growth of the company's core business. The same is true of *In re Salesforce.com Sec. Litig.*, 2005 WL 6327481 (N.D. Cal. Dec. 22, 2005). There, the Court held that the failure to disclose an internal forecast prior to an IPO was not misleading when the company had not issued any forecast and only reported historical figures.

[15] *See also SEC v. Leslie*, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012); *In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 54 (D. Mass. 2003); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015).

discounted bulk deals were used to mask growth trends in PROPEL and to meet otherwise unobtainable projections. While Gallahue stated that the bulk sales were not a "major factor" (¶100), he admitted that "*even a couple of percentage of annual sales ... affects the growth rate … and that sort of drives [Intersect] towards that flat period*." ¶101. In other words, the sales were material. Finally, Intersect's stock price dropped more than 18% on disclosure of the channel stuffing. ¶215. That drop provides additional evidence of materiality. *See, e.g.*, *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (stock drop following disclosure of effects of settlement supported finding of materiality).[16]

## V.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014), *overruled in part by City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*, 856 F.3d 605, 616 (9th Cir. 2017). A strong inference of scienter arises if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs II*, 551 U.S. at 324-26. "[A] tie goes to the plaintiffs when there are multiple plausible theories." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

---

[16] Defendants raise several additional arguments solely by way of footnote. MTD 11 n.14. They expand these arguments with a 36 page appendix. Dkt. No. 28-28. These arguments are not properly raised and should not be considered, particularly given the Court's page limits. *See Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 834 (N.D. Cal. 2019) ("'Arguments raised only in footnotes … are generally deemed waived' and need not be considered.") (quoting *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014)); *In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *1 n.2 (N.D. Cal. Oct. 31, 2014) (chart supplementing motion to dismiss did not comply with "rules governing local civil practice in this district"); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1126 (N.D. Cal. 2017) (declining to consider appendix). If the Court wishes to entertain these arguments, Plaintiff requests an opportunity to fully brief the issues.

Here, multiple factors support a strong inference of scienter. First, "the most powerful evidence of scienter is the content and context of [Defendants'] statements themselves." *Avaya*, 564 F.3d at 269. The Individual Defendants repeatedly answered specific questions from analysts about growth trends in Intersect's core business of PROPEL products with responses indicating detailed knowledge of the subject matter. *E.g.*, ¶127 (Hilleman detailed factors underlying "continued growth in PROPEL"); ¶169 (Earnhardt discussed trends supporting her conclusion that there was additional "headroom" for PROPEL growth);[17] *see South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (CEO's "statements *themselves* suggest that he had actual knowledge of" WaMu's hedging operations) (emphasis in original).

Defendants also held themselves out as monitoring sales and inventory data. Defendants argue that Hilleman's statement that "[w]e track inventory" referred only to SINUVA, not PROPEL. MTD 13. Defendants, however, represented that they were monitoring both SINUVA and PROPEL, and specifically trends in PROPEL growth in the face of the SINUVA launch. *See, e.g.*, Ex. M at 5 (Earnhardt claimed that Defendants responded to disappointing PROPEL growth in Q2 18 by "expand[ing] the staffing and … ***closely monitoring performance*** to ensure effectiveness").[18] These statements support a strong inference that Defendants were in fact monitoring sales trends in PROPEL and surely would have known about the end-of-quarter discounted bulk sales deals. *See, e.g.*, *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (defendants' statements that they "closely monitored" advertiser cancellations supported scienter).[19]

Second, new management's immediate discovery and discontinuation of the discounted bulk deals in Q2 2019 following Earnhardt's resignation (and the announcement of Hilleman's

---

[17] *See also* ¶¶115, 123, 129, 131, 139, 149, 153, 155, 157, 165, 175, 176, 180.

[18] *See also* Ex. C at 12 (Hilleman responding to question about growth trends in PROPEL by saying "we're going to be watching and monitoring closely"); ¶90 (Earnhardt pointing to expansion of "existing accounts stocking [PROPEL] Contour by 20%" in Q2 2018); ¶127 (Hilleman: "a little under half of our accounts are currently stocking [PROPEL] Contour").

[19] *See also Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *2-3 (S.D.N.Y. Sept. 14, 2012) (scienter adequately pled where defendants represented "they closely monitored" the subject of their false statements); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (similar).

"transition") supports a strong inference that these practices were obvious and known by the Individual Defendants. *See In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]he fact that the new CEO ... discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly.").[20]

Third, the Complaint's confidential witness allegations strengthen the inference that Defendants were aware of the end-of-quarter bulk sales practices and, indeed, that these practices were authorized and directed by the Company's senior management. ¶¶64-89. All four of the CWs corroborated the existence of bulking at quarter end, indicating that the practice was widespread and institutionalized. ¶65. Both CW1 and CW4 described pressure from management to use bulk sales to hit sales targets, including the use of a "chase list" provided by managers to help identify customers more likely to make bulk purchases. ¶¶75-79. CW4 explained that bulk deals were tracked in spreadsheets and on salesforce.com—a program designed to track sales on a granular level. ¶¶72, 74. CW4 also stated that he believed that Defendant Binney knew about the practice because he approved the bulk deals and the bulk deals were incorporated into the sales projections, and that be believed that Defendant Earnhardt knew about bulk deals because she sent congratulatory emails lauding the sales. ¶82.

All of the CWs are described "with sufficient particularity to establish their reliability and personal knowledge" and their statements are "themselves … indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45. While Defendants argue that the CWs did not interact with the Individual Defendants, their collective accounts nonetheless establish that information about the discounted bulk deals was easily accessible on salesforce.com, that the practice was widespread, and that the pressure for these practices came from the top. Together, with the totality of the Complaint's other

[20] Likewise, the timing and circumstances of Earnhardt's and Hilleman's departures—stepping down after a reduction in guidance and multiple previous quarters of blaming declining PROPEL growth on the SINUVA launch—bolsters the inference of scienter. *See, e.g.*, *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (resignation of company's president strengthened inference of scienter); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-976 (N.D. Cal. 2009) ("the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances").

allegations, the CW allegations help support an inference of scienter. *See, e.g.*, *Murphy v. Precision Castparts Corp.*, 2017 WL 30844274, at \*14, 17 (D. Ore. June 27, 2017) (CW allegations of "widespread reliance on aggressive sales strategies … to create an impression of organic and sustainable growth" supported pleading of falsity and formed part of totality of allegations that holistically created strong inference of scienter).[21]

Fourth, it is well recognized that "the theory that facts critical to a business's core operations ... are known to a company's key officers—can be one relevant part of a complaint that raises a strong inference of scienter." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*20 (N.D. Cal. Nov. 27, 2018); *see S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (core operations "allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information"). Defendants described PROPEL as the Company's "bread and butter" and throughout the Class Period nearly all revenue was generated by PROPEL sales. ¶¶185-186; *see also* ¶49 (92% of revenue from PROPEL). The importance of PROPEL thus supports a strong inference that Defendants were tracking sales and customer inventory buildup of PROPEL.[22]

Finally, a holistic weighing of the competing inferences strongly supports the conclusion that scienter is adequately pled. Defendants' pattern of misleading responses to direct questions from analysts, their acknowledgment that they were monitoring PROPEL growth data, the rapid discovery and discontinuation of the bulk sales practices by new management (and new management's admissions about the scope and effect of those practices), the mutually reinforcing accounts of multiple CWs, and the core operations doctrine together give rise to a strong inference

---

[21] *See also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (CW statements gave rise to strong inference that significant deviations from underwriting standards were widespread and formed part of holistic body of facts giving rise to strong inference of scienter).

[22] Interest's small size enhances this inference. Executives are typically closer to problems in a smaller company. *See, e.g., Curry*, 2012 WL 3242447, at \*11-\*12 (that company had "less than 200 employees" contributed to inference of scienter); *In re Impax Laboratories, Inc. Sec. Litig.*, 2007 WL 7022753, at \*10 (N.D. Cal. July 18, 2007) (similar re company with 453 employees). During the Class Period, Intersect employed 393 employees. ¶35. Given Intersect's "modest size, it is unlikely that transactions ... would fly below the radar of top management." *In re Commtouch Software Ltd. Sec. Litig.*, 2002 WL 31417998, at \*9 (N.D. Cal. July 24, 2002).

that Defendants knew, or were deliberately reckless in not knowing, that Intersect's financial profile was artificially inflated by channel stuffing practices.[23] The opposing inference that Defendants seek to draw—that they were unaware of the practices and did not act recklessly in failing to learn about them—does not square with the facts and is simply not credible.[24]

## VI.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Defendants' fraud was revealed to the market through a series of partial corrective disclosures and/or partial materializations of concealed risks on August 1, 2018, May 7, 2019 and August 1, 2019. ¶¶210-15. Following each disclosure, Intersect's stock price fell significantly. Defendants concede the causal connection between disclosure of their alleged fraud and the price declines in 2019 but challenge the corrective nature of the August 1, 2018 disclosure. MTD 15. Defendants are wrong.

"[T]he requirements for pleading loss causation are not meant to impose a great burden upon a plaintiff." *In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation ... dismissal is inappropriate." *In re Gilead Sciences Sec. Litig.*, 536 F.3d at 1049, 1057 (9th Cir. 2008). Loss causation can be pled under both "corrective disclosure" and "materialization of the risk" theories. *See Mauss v. Nuvasive, Inc.*, 2015 WL 10857519, at *15 (S.D. Cal. Aug. 28, 2015).

On August 1, 2108, Defendants blamed "a disappointing Q2 [2018] for PROPEL" on the sales team being "focused on introducing SINUVA and navigating inefficiencies in product access … [to] sufficiently engage in the more hands-on side of growth." ¶135. This disclosure stopped

---

[23] Plaintiff does not attempt to plead "collective scienter." MTD 14. Intersect's scienter is based on the imputation of the scienter of Earnhardt, Hilleman and Binney.

[24] The Supreme Court has held on multiple occasions that the absence of an alleged motive is not fatal to a plaintiff's pleading of scienter. *See Matrixx Initiatives*, 563 U.S. at 48; *Tellabs II*, 551 U.S. at 325. Further, in *Tellabs III*, the Seventh Circuit held that plaintiffs' failure to allege insider trading or otherwise plead a motive did not undermine their pleading of scienter for channel stuffing claims. As Judge Posner explained, defendants' argument that plaintiffs' theory was economically irrational "confuses expected with realized benefits. … The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." 513 F.3d at 710.

short of disclosing the illicit channel stuffing scheme, but nonetheless revealed "***at least some aspect of the fraud*** … to the market.'" *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1135 (S.D. Cal. 2018); *see Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 754 (9th Cir. 2018) (loss causation alleged where "stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss"); *Zynga*, 2015 WL 1382217, at *7-8 (lower than expected earnings and issuance of "dismal forecast" followed by stock drop sufficient to plead loss causation). Even if the August 1 announcement is not seen as a corrective disclosure, the disappointing results were nonetheless a materialization of a risk inherent in a channel stuffing scheme. *See Mauss*, 2015 WL 10857519, at *15.

## VII.    THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON CLAIMS

The Complaint adequately alleges both a primary violation of §10(b) and that the Individual Defendants exercised control over Intersect, and therefore it sufficiently pleads §20(a) claims against the Individual Defendants. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1018 (9th Cir. 2018). The control element of a §20(a) claim is subject to the notice pleading requirements of Rule 8(a)(2). *See, e.g.*, *Teamsters Local 617 Pension and Welfare Funds*, 690 F. Supp. 2d 959, 965-70 (D. Ariz. 2010). With respect to Binney,[25] the Complaint alleges that as COO, "he was involved in the preparation, review, finalization and issuance of the Company's financial statements, and, before that, he knew that the sales information he was providing to Intersect would be incorporated into its public statements." ¶198. That is more than sufficient to allege control. Defendants do not challenge the pleading of control as to Earnhardt or Hilleman.

## VIII.    CONCLUSION

Defendants' motion should be denied in its entirety. If the Court grants any portion of the motion, Plaintiff requests leave to amend as amendment would not be futile. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to amend should be granted with particular liberality in PSLRA cases: "In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

---

[25] Defendants argue that the Complaint fails to plead a §10(b) claim against Binney. MTD 11-12. It does not purport to; it only alleges a §20(a) claim against Binney. *See* Complaint §XIII.

Dated: March 16, 2020                    **GLANCY PRONGAY & MURRAY LLP**


By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Jennifer M. Leinbach
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

-and-

**HOLZER & HOLZER, LLC**
Corey D. Holzer
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

*Attorneys for Lead Plaintiff Avi Yaron*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On March 16, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 16, 2020, at Los Angeles, California.


*s/ Robert V. Prongay*
Robert V. Prongay