UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AVI YARON,

            Plaintiff,

    v.

INTERSECT ENT, INC.,

            Defendants.

Case No.  19-cv-02647-JSW

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Re: Dkt. No. 27

Now before the Court is defendants' motion to dismiss the consolidated amended class action complaint ("CAC").  The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the motion suitable for disposition without oral argument. See N.D. Civ. L.R. 7-1(b).  The Court GRANTS defendants' motions to dismiss.

**BACKGROUND[1]**

Plaintiff Avi Yaron brings this federal securities class action against Intersect ENT, Inc. ("Intersect"); Intersect's former CEO, Lisa D. Earnhardt; former CFO, Jeryl L. Hilleman; and former Chief Commercial Officer and Vice President, Robert H. Binney, Jr.  Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, as well as Section 20(a) against the individual defendants, on behalf of persons and entities that purchased or otherwise acquired Intersect securities between February 27, 2018 and August 1, 2019 (the "Class Period").

---

[1] The following facts are alleged in the CAC or are uncontested facts stated in judicially noticed documents.  *See infra* at 5-6.

United States District Court
Northern District of California

1

Intersect is a commercial drug delivery company that focuses on ear, nose, and throat conditions. (Dkt. No. 24 ("CAC") ¶ 2.) Intersect's "bread and butter" lies with its PROPEL line of implants used in sinus surgery. (*Id.*) Regulated as a medical device, PROPEL products are sold directly to customers—meaning, hospitals and surgery centers. (Dkt. No. 28-1 ("Q1 FY18 Form 10-Q") at 5, 17.) To drive demand for PROPEL products, Intersect relies on educating physicians on the use and benefits of the implants. (*Id.* at 18.)

In March 2018, Intersect launched a second line of products called SINUVA. (CAC ¶ 43.) Unlike PROPEL, SINUVA products are implanted during routine physician visits and are regulated as physician-administered drugs. (Q1 FY18 Form 10-Q at 5.) Because of the different regulation, SINUVA products cannot be sold directly to customers but must instead be sold to specialty pharmacies and distributors. (*Id.*) The pharmacies and distributors then sell to health care providers, who must seek reimbursement from the pharmacy or insurance company. (*Id.* at 24.) SINUVA represents Intersect's first physician-administered drug product and the first such drug in the otolaryngology market. (*Id.*; CAC ¶ 155.)

From the start, Intersect cautioned investors that SINUVA's launch may detract from sales of PROPEL. (CAC ¶¶ 51-52.) In particular, Earnhardt and Hilleman warned that as the sales team focused on navigating the SINUVA launch, it may devote less time to PROPEL sales. (*Id.* ¶¶ 51-52, 56.) Defendants continued to warn investors that SINUVA sales may detract—and are, in fact, detracting—from PROPEL sales throughout the Class Period. (*E.g.*, *id.* ¶¶ 115, 123, 131, 135, 139, 153, 169, 176, 180.) However, defendants also represented that PROPEL sales were growing and that no fundamental change affected those sales outside of SINUVA-related sales force distraction. (*Id.* ¶¶ 58, 97, 127, 165, 169.) They did so even as Intersect lowered revenue guidance in Q2 2018 and Q1 2019. (*Id.* ¶¶ 176, 180.)

Unbeknownst to investors, Intersect's sales team became increasing reliant on discounted end-of-quarter bulk sales to meet PROPEL sales forecasts. (*Id.* ¶¶ 4, 61.) According to former sales employees, the company had used discounted bulk sales prior to and throughout the Class Period. (*Id.* ¶¶ 64-68.) In addition, Intersect sales employees used other incentives—such as price protection and payment extensions—to induce end-of-quarter PROPEL sales. (*Id.* ¶¶ 69-70.)

2

United States District Court
Northern District of California

In June 2019, Intersect experienced a change in leadership.  Earnhardt stepped down as CEO "to accept another opportunity," and Hilleman simultaneously resigned as CFO "as part of a planned transition."  (*Id*. ¶¶ 194-96.)  The new interim CEO—Kieran Gallahue—went to work investigating why Intersect's "long history of product and clinical innovation" has "not always translated to delivering the desired commercial results."  (*Id*. ¶ 100.)  On August 1, 2019, Gallahue announced that the company looked into "PROPEL demand and customer ordering dynamics" and concluded that:

> Instead of focusing primarily on working with physicians to broaden their understanding of PROPEL's clinical end benefits and its appropriate usage, as we have done in the past, with less time available to focus on PROPEL, we responded commercially by offering selective discounts on high volume orders.  While inner [sic] totality the discounted high-volume orders have not been a major factor in our business, they have been growing and moving us away from the flow of natural market demand, and we have already taken steps to correct this.

(*Id*.)  Gallahue announced that Intersect curbed the discount bulk ordering practice, which had a negative impact on short-term revenues.  (*Id*.)  Additionally, Gallahue informed investors that as part of the "back to basics" approach, revenues will continue to be lower for the remainder of the year, as customers use up existing inventory and the sales force focuses again on generating demand.  (*Id*. ¶¶ 100-01.)  However, Gallahue clarified that bulk discounting  "was just something that built over . . . the last 6 or so quarters," when the field was focused a "little bit more on the support side with SINUVA," and accounted for only "a few percentage points of the total annual revenues, maybe 2%, 3%."  (*Id*. ¶ 102.)  Gallahue asserted that bulk pricing did not have "a substantial impact on any given period."  (*Id*.)

The market responded by driving Intersect's stock price down by 18%.  (*Id*. ¶ 105.)  The stock price drop compounded the earlier 25% drop in response to missed earnings from the previous quarter and a similar 19% drop in August 2018.  (*Id*. ¶¶ 98, 213-14.)

The Court shall address additional facts as necessary in the analysis.

//

//

//

3

United States District Court
Northern District of California

**ANALYSIS**

**A.      Legal Standard.**

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal under Rule 12(b)(6) is granted when the pleadings fail to state a claim upon which relief can be granted. Pursuant to *Bell Atlantic v. Twombly*, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

Where a plaintiff alleges fraud, Rule 9(b) requires the plaintiff to state the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b). Particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged. *See Kearns v. v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Rule 9(b) "has long been applied to securities complaints." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). However, for claims under Section 10(b) and Rule 10b-5, the complaint must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Id*. The PSLRA requires that "a complaint 'plead with particularity both falsity and scienter.'" *Id.* (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002)).

Under the PSLRA, a plaintiff pleading falsity must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to adequately plead scienter, the PSLRA requires that the plaintiff "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco*, 552 F.3d at 991 (quoting 15 U.S.C. § 78u-4(b)(2)). An inference of scienter is "strong" for purposes of dismissal "only if a reasonable person would deem the inference of scienter cogent

4

United States District Court
Northern District of California

and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

To assist the Court in determining whether a plaintiff has satisfied this heightened pleading standard, "the Supreme Court has provided three points of instruction: (1) 'courts must, as with any [12(b)(6)] motion to dismiss . . ., accept all factual allegations in the complaint as true'; (2) 'courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss'; and (3) 'in determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inference.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citing *Tellabs*, 551 U.S. at 322-23).

**B.     Request for Judicial Notice.**

Defendants seek judicial notice of 27 documents in support of their motion to dismiss. (Dkt. No. 29.)  The documents are SEC filings, investor call transcripts, conference presentation transcripts, and one analyst report.  Defendants contend that judicial notice is proper under the incorporation by reference doctrine and Federal Rule of Evidence 201.  Plaintiff does not oppose.

Incorporation by reference allows a court to consider documents cited in the complaint "as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir 2018).  Incorporation by reference is proper where plaintiff "refers extensively to the document" or "the document forms the basis of plaintiff's claim." *Id*. at 1002 (citing *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).  Here, plaintiff contends that defendants' SEC filings, earnings calls, and presentations at certain conferences contained false or misleading statements. Accordingly, those documents are central to plaintiff's claims and are properly incorporated by reference.  As to the analyst report, plaintiff only cites the report once, in discussing analyst reactions to defendants' statements.  (CAC ¶ 20.)  The report is neither extensively cited nor integral to any claim, and therefore not properly incorporated. *See Khoja*, 899 F.3d at 1003.

The analyst report may nevertheless be considered under judicial notice.  Federal Rule of Evidence 201 allows courts to consider adjudicative facts that are "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from

sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Analyst reports are subject to judicial notice not for the truth of their contents, but to determine the information available to the market. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. 2008); *In re Century Aluminum Co. Sec. Litig.*, No. C 09-10001 SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011). Here, defendants seek judicial notice that the market understood Intersect's 2019 earnings guidance to be $123-127 million. Although redundant of the CAC allegations, the Court takes judicial notice of Intersect's guidance.

Accordingly, the Court considers the documents cited in defendants' request.

## C.    Securities Exchange Act Claims.

Plaintiff contends that defendants misled investors by failing to disclose its channel stuffing scheme that artificially inflated financial results. According to plaintiff, the bulk pricing sales practice was inherently unsustainable and predictably led to inventory build-up among customers, who then failed to buy additional product in later quarters. Plaintiff contends that this practice eventually resulted in lower revenue, including when the scheme was finally disclosed and curtailed in August 2019.

Defendants dispute that they have done anything wrong. According to defendants, the company adequately warned investors that the SINUVA launch might divert sales force resources from PROPEL and that this is exactly what happened. Defendants argue that plaintiff's claims should be dismissed because the CAC (1) fails to allege a channel stuffing scheme, (2) fails to plead a material omission, (3) fails to plead scienter with particularity, and (4) fails to plead loss causation. Defendants also move to dismiss plaintiffs' Section 20(a) claims for failure to plead a predicate violation under Section 10(b) and failure to allege that defendant Binney acted as a control person. The Court provides an overview of the legal framework and then addresses defendants' arguments.

### 1.         Legal Framework.

Section 10(b) of the 1934 Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."

United States District Court
Northern District of California

United States District Court
Northern District of California

15 U.S.C. § 78j(b).  Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.  Section 20(a) creates joint and several liability for the "control person" who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or any rule or regulation thereunder . . . to the same extent as such controlled person to any person to whom such controlled personal is liable . . . ."  15 U.S.C. § 78t(a).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts that show: (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

A statement is misleading if "it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks omitted).  Even if a statement is not false, it may be misleading if it omits material information.  *Khoja*, 899 F.3d at 1008–09 (citation omitted).  "[A]n omission is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  But omissions are actionable only where they "make the actual statements misleading," even if investors "consider the omitted information significant."  *Markette v. XOMA Corp.*, No. 15-cv-03425-HSG, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017).

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud."

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  To act with scienter, defendant must have "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (internal quotation marks omitted).  Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).  "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

The scienter inquiry is "inherently comparative." *Tellabs*, 551 U.S. at 323.  Thus, in evaluating scienter, the court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint" and only allow the claims "if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991 (citing *Tellabs*, 551 U.S. at 323).  The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted).  Rather, a complaint survives if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326.  In evaluating scienter, the court adopts a holistic view and takes "a practical and common-sense perspective." *S. Ferry*, 542 F.3d at 784.

Loss causation "is simply 'a causal connection between the material misrepresentation and the loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted).  To satisfy the loss causation requirement, "the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* (citation omitted).  Disclosure of fraud "is not a sine qua non of loss causation." *Id.*  Instead, under a "materialization of the risk" theory, plaintiff may allege that "the very facts about which defendant lied" caused the injuries. *Id.*  Any kind of proximate cause satisfies this requirement. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F. 3d 750, 753-54 (9th Cir. 2018).

8

Here, defendants challenge the first, second, and fifth elements:  material misrepresentation or omission of fact, scienter, and loss causation.

### 2. Material Misrepresentation or Omission

#### a. Channel Stuffing

Defendants first argue that plaintiff fails to plead a channel stuffing scheme—which defendants claim are "disfavored" in the Ninth Circuit.

Channel stuffing is "the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).  The Supreme Court has recognized that channel stuffing may be "the illegitimate kind (e.g., writing orders for products customers had not requested) or the legitimate kind (e.g., offering customers discounts as an incentive to buy)."  *Tellabs*, 551 U.S. at 325; *accord In re Watchguard Sec. Litig.*, No. C05-678LR, 2007 WL 2927663, at *4 n.5 (W.D. Wash. 2006) ("'Channel stuffing' is merely good business when the customers want or keep the products they receive; it is bad business when the customers do not want the products and return them.").  Here, plaintiff alleges the legitimate kind—plaintiff claims that defendants offered bulk discounts to increase end-of-quarter sales, but does not allege that customers had not requested or wanted the products.

As many investors and most Costco shoppers know, bulk discounting is not in itself an illicit scheme.  Courts have recognized that there may be legitimate reasons to shift sales earlier in the cycle.  *See Broudo v. Dura Pharma., Inc.*, 339 F.3d 933, 940 (9th Cir. 2003), *rev'd on other grounds*, 544 U.S. 336 (2005).  For example, where demand exhibits seasonality, a company may choose to drive up sales during the high season to make up for lower sales later on.  *See Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1148 (C.D. Cal. 2018); *In re ICN Pharma., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1061-62 (C.D. Cal. 2004).  When used as a regular business practice, channel stuffing is not inherently unsustainable and not guaranteed to lower sales in the future.  *See Steckman*, 143 F.3d at 1298 (finding purely speculative that channel stuffing would materially impact future sales); *see also Oracle*, 627 F.3d at 383-84 (recognizing that a company's sales were regularly "made in the final days of a quarter").

9

However, even legitimate types of channel stuffing may be part of a fraudulent scheme when used to hide poor business fundamentals. *See, e.g.*, *Cunha v. Hansen Natural Corp.*, No. EDCV 08-1249-GW, 2011 WL 8993148, at *3 (C.D. Cal. May 12, 2011); *In re Dura Pharma., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1028 (S.D. Cal. 2006).  When used in this way, channel stuffing is necessarily a short-term scheme. *ICN Pharma.*, 299 F. Supp. 2d at 1062.  Because channel stuffing "borrows" from future demand, the underlying weakness will necessarily reveal itself in time, and the fraud lies in capitalizing on the appearance of strength while aware of the underlying weakness. *See id.*  As such, channel stuffing is primarily evidence of scienter, not fraud in itself. *See Broudo*, 339 F.3d at 940 (analyzing channel stuffing as weak evidence of scienter); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999) (same).

Defendants argue that channel stuffing claims are "disfavored" in the Ninth Circuit, implying that the claims should be dismissed. *See Waterford Twp. Police*, 321 F. Supp. at 1147; *ICN Pharma.*, 299 F. Supp. 2d at 1061.  However, as explained above, channel stuffing may support a Section 10(b) claim when plaintiff alleges that defendants knew that business was weak, falsely represented to investors that business was strong, and used channel stuffing to bolster their misrepresentations in the short-term.  Alternatively, channel stuffing involving shipping unneeded or unordered product may also be actionable. *See Tellabs*, 551 U.S. at 325; *e.g.*, *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1014 (S.D. Cal. 2011).  *Steckman*—the case purportedly holding that channel stuffing claims are disfavored—does not so hold.  In *Steckman*, the court merely concluded that a corporation did not violate Item 303 of SEC regulations by failing to disclose channel stuffing because there was no evidence that the practice would impact future earnings. *See* 143 F.3d at 1296-98.

Defendants argue that plaintiff fails to plead a channel stuffing because the CAC fails to allege "specific transactions, specific shipments, specific customers, specific[] times, or specific dollar amounts." *ICN Pharma.*, 299 F. Supp. 2d at 1062.  In this case, however, Intersect admitted that discounted bulk sales took place over six quarters and that it resulted in inventory build-up worth 2% to 3% of annual sales.  (CAC ¶¶ 100-02.)  Where defendants admit the practice they are accused of, they properly have notice of the conduct they need to defend, and the requirements of

10

Rule 9 are satisfied. *See Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (the purpose of Rule 9 is to "give defendants notice of the particular misconduct [alleged]" so that "they can defend against the charge and not just deny that they have done anything wrong"); *see also In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (finding channel stuffing allegations sufficient where defendants failed to plead "nuts and bolts" transactions but provided other allegations with particularity).

Accordingly, the Court finds that channel stuffing may support a Section 10(b) claim and does not dismiss on this ground.

### b.      Material Misrepresentation or Omission.

Notwithstanding the above, plaintiff fails to allege any material misrepresentation or omission. To satisfy this element, plaintiff must show that defendants' statements "g[a]ve a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Hewlett-Packard*, 845 F.3d at 1275. It is not enough that a reasonable investor may have wanted to know additional information; defendants must have affirmatively misled investors through their statements. *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Here, plaintiff challenges three sets of alleged misrepresentations or omissions: (1) defendants' announcements of financial results and earnings guidance, (2) defendants' statements that PROPEL sales were strong, and (3) defendants' statements that weakening PROPEL growth was due to SINUVA-related sales force distraction.

Beginning with the first category, plaintiff does not claim that defendants' financial reporting or guidance were false. As discussed above, plaintiff does not allege that customers did not order the products they bought or that Intersect had misrepresented the revenue for each quarter. Instead, plaintiff's sole allegation is that the revenue was artificially inflated by channel stuffing. Plaintiff's claim fails because this set of statements made no representation about the causes or nature of the revenue or guidance. (*See* CAC ¶¶ 111, 113, 117, 119, 121, 125, 133, 137, 141, 143, 145, 151, 159, 161, 163, 167, 171, 173, 178.) Defendants did not represent that the revenue was "organic," sustainable, or corresponded to quarterly demand for individual PROPEL products. Instead, defendants simply reported revenue and accurately attributed the revenue to

United States District Court
Northern District of California

11

PROPEL sales.  Because defendants did not implicate any causes for the revenue or sales, the positive reports alone are not misleading.  *See Metzler*, 540 F.3d at 1070 (rejecting argument that positive financial reports were false because defendants relied on fraudulent conduct to achieve the results); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019) (same); *In re Finisar Corp. Sec. Litig.*, No. 5:11-cv-01252 EJD, 2013 WL 211206, at *4 (N.D. Cal. Jan. 16, 2013) (finding no duty to explain how company achieved positive financial results or to disclose their unsustainability).

Turning to the second set of statements, plaintiff challenges defendants' representations of strong PROPEL growth and opportunity for growth.  (CAC ¶¶ 119, 127, 129, 139, 147, 149, 157, 169.)  If growth was actually declining in this time period, defendants' statements may have been misleading.  But that is not what plaintiff alleges.  Instead, PROPEL sales appear to have been growing, as defendants said, and Intersect met its guidance for most of the Class Period.  Even if channel stuffing shifted some sales from quarter to quarter, the growth from "regular" demand appears to have been at least as strong as the "artificial" growth—making defendants statements essentially true.  (*Compare id*. ¶ 119 (reporting 21% growth), ¶ 169 (13% growth), *with id*. ¶ 102 (channel stuffing accounted for 2 or 3% annual revenue); *see also id*. ¶ 102 (channel stuffing had no "substantial impact on any given period"), ¶ 100 (bulk discount orders "have not been a major factor in our business").)  Accordingly, defendants' representations were not misleading even under plaintiff's theory of falsity.[2]

Finally, plaintiff challenges defendants' attribution of weakening PROPEL growth and lowered guidance to SINUVA-related sales distraction.  (CAC ¶¶ 115, 121, 123, 131, 135, 137, 139, 147, 149, 153, 155, 157, 165, 169, 175-76, 180.)  According to plaintiff, these statements were misleading because defendants *affirmatively* opined on the causes of weakening PROPEL sales without disclosing the material impact of channel stuffing.  *See Brody*, 280 F.3d at 1006. Plaintiff points out that analysts had expressly asked defendants about other factors that may be impacting PROPEL sales and defendants affirmatively represented that no other factors were

---

[2] As explained above, the Court does not perceive that discounted bulk sales were "fake" or not representative of demand, but considers the allegations in light most favorable to plaintiff.

12

United States District Court
Northern District of California

influencing the PROPEL market.  (*See id*. ¶¶ 165, 169, 176.)

Key to plaintiff's theory is that channel stuffing represented a separate risk impacting PROPEL sales over and above SINUVA-related distraction.  (*See* Dkt. No. 30 ("Opp.") at 8:13-15.)  But plaintiff's allegations do not support this conclusion.  As an initial matter, Intersect's interim CEO made clear that its sales force shifted to bulk discounting because of "less time to focus on PROPEL" following SINUVA's launch when "the field was a little bit more on the support side with SINUVA."  (CAC ¶¶ 100, 102.)  The risk from channel stuffing is thus expressly connected to the risk from the SINUVA distraction.  Moreover, the interim CEO explained that as the sales force focused on SINUVA, it stopped investing in physician education and other market development.  (*Id*. ¶ 100.)  Accordingly, the missed earnings plausibly stemmed from reduced PROPEL market development due to SINUVA distraction—not channel stuffing.  Since Intersect amply warned investors of this risk, defendants cannot be held liable for the losses that resulted.

Plaintiff nevertheless argues that channel stuffing presented a separate risk affecting demand because it was inherently unsustainable.  Here, again, plaintiff's allegations do not support its claim.  According to the CAC, channel stuffing took place prior to and throughout the Class Period, stretching for at least six quarters.  (CAC ¶¶ 64, 102.)  The sheer length of time that bulk discounting took place undermines the argument that it was inherently unsustainable or hid short-term weakness.  *See ICN Pharma.*, 299 F. Supp. 2d at 1062.  Although bulk discounting eventually resulted in built-up inventory among customers, plaintiff's allegations do not suggest that defendants faced this risk when they made the challenged statements.  (*See* CAC ¶ 100 (explaining that channel stuffing "was a bit by bit sort of process that grew over time" without "substantial impact on any given period").)  Accordingly, the omissions were not misleading when made because defendants lacked contemporaneous basis to know that they were misleading.  *See Vitalone v. Logitech Int'l SA*, No. C 11-03855 RS, 2012 WL 13041992, at *5 (N.D. Cal. July 13, 2012) (eventual high levels of inventory are not evidence of falsity).

Plaintiff makes much of Intersect's post-class admission that "discounted high-volume orders . . . have been growing and moving us away from the natural market demand," but this statement does not suggest that channel stuffing impacted growth.  (CAC ¶ 100.)  It merely states

that that channel stuffing (and bulk sales generally) are not closely coupled to demand for individual units. Notably, the reduction in revenue in August 2019 did not occur due to channel stuffing, but due to management's decision to *end* channel stuffing. (*See id*.) As Intersect's new CEO explained, if management had not decided to draw down inventory, demand would have been higher and PROPEL would have continued to grow. (*Id*. ¶ 109.) While there may be many reasons to align sales with quarterly unit demand, Intersect's post-class statements do not suggest that channel stuffing had a negative impact during the Class Period.

Accordingly, plaintiff fails to allege facts to show that channel stuffing negatively impacted PROPEL sales or growth prospects during the Class Period, so as to make defendants' statements about those sales and prospects misleading. Plaintiff also fails to allege facts to show that channel stuffing covered up hidden declining demand—as opposed to known declining demand related to the SINUVA launch, of which investors were extensively warned. For these reasons, the Court finds that plaintiff fails to plead falsity.

### 3. Scienter.

Because plaintiff has not pled falsity, the CAC fails to plead scienter. The Court addresses this element to underscore that an innocent inference is far more plausible in this case than the inference of scienter.

Plaintiff relies on four avenues to establish scienter: (1) defendants' statements about tracking performance, (2) new management's discovery of channel stuffing, (3) confidential witnesses, and (4) the core operations theory. None of these avenues are sufficient to establish scienter, either individually or from a holistic perspective. First, defendants' statements that they tracked sales and monitored performance do not suggest knowledge that channel stuffing hurt those sales.[3] Because bulk pricing is a common and legitimate sales technique, defendants may know that most sales occur at the end of quarter without suspecting that the practice had any negative impact. *See Oracle*, 627 F.3d at 383-84. Second, new management did not apparently discover the built-up inventory until after a two-month investigation into "PROPEL demand and

---

[3] Defendants' statement that they tracked inventory to ensure that "we're not building up inventory" related to SINUVA, not PROPEL. (*See* CAC ¶ 189; Dkt. No. 28-16 at 13.)

United States District Court
Northern District of California

customer ordering dynamics." (*See* CAC ¶ 100.)  Earnhardt's and Hillerman's departures, made for apparently unrelated reasons, does not in itself suggest scienter.  *See Zucco*, 552 F.3d at 1002 (requiring facts weighing against departures for "unrelated personal or business reasons").

Third, the confidential witnesses consist entirely of sales force employees who engaged and observed bulk discounting practices.  (*See* CAC ¶¶ 64-89.)  None of the confidential witnesses knew the individual defendants, interacted with them, or communicated any information to them about bulk pricing and its effect on demand.  *See Oracle*, 2019 WL 6877195, at *12 (finding no scienter where witnesses lacked personal knowledge of defendants or information communicated to them).  The witnesses state that sales data were stored in a salesforce database, but mere access to internal data and reports does not establish knowledge by the executives.  *Metzler*, 540 F.3d at 1068; *Bao v. Solarcity Corp.*, No. 14-cv-01435-BLF, 2016 WL 4192177, at *11 (N.D. Cal. Aug. 9, 2016).  At most, the confidential witness allegations show that bulk pricing took place—not that the individual defendants knew about the practice or about its effect on inventory.[4]

Finally, plaintiff's core operation allegations are insufficient.  Establishing scienter under a core operations theory is "not easy" and requires "specific admissions" by executives of "detailed involvement in the minutia of a company's operations, such as data monitoring," or else "witness accounts demonstrating that executives had actual involvement in creating false reports."  *Police Ret. Sys.*, 759 F.3d at 1062.  Plaintiff provides neither of these.  Moreover, it is plausible and not "absurd" that Intersect's executives would not have been aware of built-up inventory amounting to 2% or 3% of annual sales that had no "substantial impact on any given period."  *See id.* (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008)).  Such facts, coming at a time of intense focus on another product, might not have been prominent enough to notice.

Weighing against these factors are many other facts suggesting an innocent inference.  Plaintiff's alleged fraud rests on defendants artificially inflating revenues to increase stock price.

---

[4] CW4 alleges belief that Binney knew of the practice because he approved deals and incorporated the deals into sales projections, while Earnhardt knew because she sent congratulatory messages about end of quarter deals.  (CAC ¶ 82.)  Such allegations are far too speculative and attenuated to raise an inference of scienter.  *See Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).

United States District Court
Northern District of California

It therefore strains credulity that defendants would be persistently gloomy about their prospects while the company was focused on the SINUVA launch.  (*See, e.g.*, CAC ¶¶ 115, 123, 176; *see also id.* ¶ 53 (analysts expressing puzzlement at Intersect's conservatism).)  Moreover, the timing of defendants' channel stuffing—beginning prior to the Class Period (*id.* ¶ 64) and building up gradually (*id.* ¶ 102)—does not suggest a fraudulent scheme.  The magnitude of the alleged benefit—2% or 3% of annual revenues, with "no substantial impact on any given period," and never becoming "a major factor in our business"—also does not support scienter.  (*Id.* ¶ 100, 102)  Finally, Intersect's interim CEO framing of the problem—calling it a "question of balance" and a matter of priorities—does not suggest wrongdoing.  (*Id.*)

Viewed holistically, these facts suggest an innocent inference far more compellingly than they suggest scienter.  Intersect's sales force, facing a challenging product launch in a novel space, cuts back on the difficult work of educating physicians on existing products and shifts to "cheap" sales tactics, like discount pricing.  Executives notice the change and warn investors that PROPEL sales may fall, but fail to investigate the possible effect on inventory build-up.  Over the course of six quarters, the inventory accumulates and eventually amounts to 2% or 3% of annual revenue.  New management enters with a "back to basics" approach and decides to end the bulk discounting practice, resulting in short-term revenue declines.  This is neither a scheme to defraud investors nor deliberate recklessness.

Accordingly, the Court finds that plaintiff fails to plead scienter.

### 4.      Loss Causation

Defendants challenge plaintiffs' loss causation allegations for the August 1, 2018, revised guidance statement.  (CAC ¶ 213.)  Loss causation is not meant to impose a high burden—all it requires is proximate cause.  *Mineworkers' Pension Scheme*, 881 F. 3d at 753.  Plaintiffs may allege that disclosure of fraud led to decline in a security price or (under a "materialization of the risk" theory) that disclosure of the risk itself that was concealed by the fraud led to the decline.  *Nuveen*, 730 F.3d at 1120.  Here, plaintiff alleges that the revised guidance represented either a partial disclosure of fraud or the materialization of the declining PROPEL demand risk.

For the same reasons as stated previously, plaintiff fails to plead loss causation.  As

explained above, plaintiff fails to allege that channel stuffing had a material negative impact on Intersect's financial performance during the Class Period, and therefore fails to allege proximate cause between channel stuffing and the poor performance that led to missed guidance.  Moreover, plaintiff fails to plead that channel stuffing concealed any *hidden* risk to PROPEL demand—as opposed to known risks stemming from SINUVA distraction—sufficient to plead a materialization of the risk theory.  Accordingly, the Court finds that plaintiff fails to plead loss causation for the August 1, 2018, disclosure.

### 5. Section 20(a)

Defendants move to dismiss plaintiffs' Section 20(a) claims on the ground that plaintiffs fail to plead a predicate violation of Section 10(b).  For the reasons stated above, the Court agrees.  Defendants also contend that plaintiff fails to plead control person claims for Binney.  Whether a defendant acts as a control person "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).  Control person claims may be satisfied when "the person managed the company on a day-to-day basis and was involved in the formulation of financial statements." *Id*.  Here, plaintiff alleges that Binney was involved in "preparation, review, finalization and issuance of the Company's financial statements," as well as in approving sales deals.  (CAC ¶¶ 82, 198.)  The Court finds these allegations sufficient.

Accordingly, plaintiff fails to plead a Section 20(a) violation for lack of a predicate Section 10(b) violation only.

### D. CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motions to dismiss with leave to amend.  Plaintiff shall file and serve an amended complaint or a statement that no such amended complaint shall be filed within twenty days of the date of this Order, and defendants shall file their response within twenty days thereafter.

17

**IT IS SO ORDERED.**

Dated:  June 19, 2020

_____
JEFFREY S. WHITE
United States District Judge