GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Jennifer M. Leinbach (#281404)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Lead Plaintiff Avi Yaron*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| AVI YARON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>INTERSECT ENT, INC., LISA D. EARNHARDT, JERYL L. HILLEMAN and ROBERT H. BINNEY, JR.,<br><br>Defendants. | Case No.: 4:19-cv-02647-JSW<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW ................................................ 1

II.     JURISDICTION AND VENUE ........................................................................ 5

III.    PARTIES ......................................................................................................... 6

IV.     CONFIDENTIAL WITNESS ("CW") ALLEGATIONS ................................ 9

        A.      Confidential Witness Number One (CW1) ......................................... 9

        B.      Confidential Witness Number Two (CW2) ........................................ 9

        C.      Confidential Witness Number Three (CW3) .................................... 10

        D.      Confidential Witness Number Four (CW4) ..................................... 10

        E.      Confidential Witness Number Five (CW5) ...................................... 10

        F.      Confidential Witness Number Six (CW6) ........................................ 11

V.      OVERVIEW OF DEFENDANTS' FRAUDULENT CHANNEL STUFFING SCHEME
        AND COVER UP ........................................................................................... 11

        A.      Intersect's Business and Background ................................................ 11

                1.      PROPEL ................................................................................. 12

                2.      SINUVA ................................................................................. 12

        B.      Prior to the Class Period Intersect Reports Quarterly Revenues that Exceed
                Guidance ............................................................................................ 12

        C.      Intersect Claims Conservative Guidance at Start of Class Period .......... 13

        D.      During Class Period Defendants Tout Company's Revenue Growth ...... 15

        E.      Unbeknownst To Investors Defendants Were Reliant On Channel Stuffing ......... 18

        F.      AS TRUTH EMERGES, DEFENDANTS COVER UP FRAUDULENT
                CHANNEL STUFFING SCHEME ....................................................... 32

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........... 41

        A.      Materially False And Misleading Statements Regarding Intersect's Q4 2017 And
                FY 2017 Financial Results And FY 2018 Revenue Guidance ................. 41

1.    Q4 2017 Press Release ........................................................ 41

2.    Q4 2017 Earnings Call ......................................................... 41

B.    Materially False And Misleading Statements Regarding Intersect's Q1 2018 Financial Results And FY 2018 Revenue Guidance Q1 2018 Press Release ......... 43

1.    Q1 2018 Press Release ........................................................ 43

2.    Q1 2018 Earnings Call ......................................................... 44

3.    Q1 2018 10-Q ..................................................................... 46

C.    May 9, 2018 Deutsche Bank Healthcare Conference ............................................. 47

D.    May 16, 2018 Bank Of America Merrill Lynch Healthcare Conference ................ 48

E.    False And Misleading Statements Regarding Financial Results For Q2 2018 And FY 2018 Guidance ................................................................................. 49

1.    Q2 2018 Press Release ........................................................ 49

2.    Q2 2018 Earnings Call ......................................................... 50

3.    Q2 2018 10-Q ..................................................................... 53

F.    False And Misleading Statements Regarding Financial Results And FY 2018 Guidance For Q3 2018 ............................................................................. 54

1.    Q3 2018 Press Release ........................................................ 54

2.    Q3 2018 Earnings Call ......................................................... 54

3.    Q3 2018 10-Q ..................................................................... 57

G.    November 28, 2018 Piper Jaffray Health Care Conference .................................... 57

H.    January 8, 2019 JPMorgan Global Healthcare Conference ..................................... 58

I.    False And Misleading Statements Regarding Financial Results For Q4 2018, FY 2018 And FY 2019 Guidance ............................................................................. 60

1.    Q4 2018 Press Release ........................................................ 60

2.    Q4 2018 Earnings Call ......................................................... 61

3.    False And Misleading Statements In Intersect's 2018 Form 10-K ............ 62

J.   False And Misleading Statements From February 28, 2019 SVB Leerink Global Healthcare Conference ........................................................................ 63

K.   False And Misleading Statements Regarding Financial Results For Q1 2019 And FY 2019 Guidance ........................................................................ 65

    1.   Q1 2019 Press Release ........................................................................ 65

    2.   Q1 2019 Earnings Call ........................................................................ 66

    3.   Q1 2019 10-Q ........................................................................ 69

L.   May 14, 2019 Bank Of America Merrill Lynch Healthcare Conference ............... 70

VII.   ADDITIONAL MATERIALITY ALLEGATIONS ........................................................................ 72

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ........................................................................ 79

A.   PROPEL Is Intersect's "Bread and Butter" ........................................................................ 79

B.   Defendants Tracked Inventory And Bulk Sales ........................................................................ 80

C.   Defendants' Mid-Class Cover-Up Provides Evidence of Scienter ........................................................................ 80

D.   Defendant Earnhardt's Resignation And Defendant Hilleman's Departure Strengthens The Inference Of Scienter ........................................................................ 81

E.   Defendants' Precision Stuffing Supports A Strong Inference Of Scienter ............. 81

IX.   CORPORATE SCIENTER ALLEGATIONS ........................................................................ 82

X.   CLASS ACTION ALLEGATIONS ........................................................................ 84

XI.   LOSS CAUSATION ........................................................................ 85

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........................................................................ 87

XIII.   NO SAFE HARBOR ........................................................................ 88

XIV.   LEGAL CLAIMS ASSERTED ........................................................................ 89

XV.   PRAYER FOR RELIEF ........................................................................ 93

XVI.   JURY TRIAL DEMANDED ........................................................................ 93

1      Lead Plaintiff Avi Yaron ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Defendant Intersect ENT, Inc. ("Intersect" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Intersect; (c) review of other publicly available information concerning Intersect, including analyst reports and advisories and; (d) interviews of individuals with knowledge of the events described herein.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired Intersect securities between February 27, 2018 and August 1, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Intersect is a commercial drug delivery company that purports to develop products for patients with ear, nose, and throat conditions. The Company's PROPEL family of products, implants used in sinus surgery, are the Company's "bread and butter."  Intersect's revenue has been derived almost exclusively from the sales of PROPEL, and prior to the Class Period, Defendants reported quarterly revenue that exceeded the Company's financial guidance and demonstrated increased growth and demand driven by Intersect's PROPEL family of products.

3.    In March 2018, Intersect launched its new product, SINUVA, another type of sinus implant used to treat nasal polyps.  Just prior to its launch, Defendants assured investors that Intersect's "conservative" financial guidance was due to potential "sales force distraction" caused by SINUVA's launch.  Despite concerns over distraction with the sales force, Defendants continued to report quarterly revenue growth and quarterly revenue that almost always met the Company's revenue projections and beat Street expectations.  This puzzled analysts, who

continued to drill down on whether there was another undisclosed factor related to Defendants' supposedly conservative guidance, which Defendants repeatedly denied, citing SINUVA's launch as the sole reason for the conservatism.

4.      Unbeknownst to investors, to create this façade of a strongly growing business, Defendants routinely and systematically engaged in extremely aggressive quarter-end bulk selling of PROPEL products at deep volume discounts in order to create the false appearance that the Company had continued revenue growth and consistently beat targets and Street expectations and that this growth was based principally or entirely on organic growth in demand for PROPEL products.

5.      Defendants knew or recklessly disregarded that their quarter-end bulk sales on discount were ultimately unsustainable, and that, as a result of these risky sales practices, they had created a veritable "house of cards" that was susceptible to collapse.  Moreover, bulk sales of the PROPEL product was particularly unsustainable because the implant has an expiration date of about 18-24 months.  As reported by one confidential witness, bulk sales of the PROPEL product resulted in sales representatives having to help customers switch out PROPEL product that was near its expiration date.

6.      When Defendants' fraudulent channel stuffing scheme began to unravel, in Q2 2018 and Q1 2019, rather than come clean to investors, Defendants covered it up.  As a consequence of Defendants' bulk sales practices, each new quarter would start in the hole, as revenue had been pulled forward from the bulk sales in the prior quarter.  Thus, while Defendants reported revenue growth driven by PROPEL in Q1 2018 and Q4 2018, Defendants were forced to drastically lower revenue guidance in both Q2 2018 and Q1 2019.  In attempts to cover up the true reason for the downward revision and PROPEL's Q2 2018 guidance miss, Defendants falsely blamed SINUVA and the impact its launch had on Intersect's sales force.

7.      Defendants' cover up and fraudulent scheme was finally revealed to investors by new management.  In Q1 2019, Defendant Earnhardt resigned as CEO.  Thereafter, new management discovered that Intersect had been channel stuffing for the previous six quarters. New management announced they had ordered the immediate termination of the bulk sales

practice, that the channel stuffing had been extensive, and that the Company immediately felt its adverse impact on short-term revenues in the quarter.  In fact, new management revealed the channel stuffing had been so rampant that it resulted in an inventory buildup on the part of Intersect's customers that represented approximately 2%-3% of Intersect's annual revenues ($2.2 million to $3.2 million) and that this excess product in the channel would materially impact the Company for the remainder of 2019 and possibly into 2020 as Intersect's customers worked through the excess inventory.

8.      In November 2019, during the Q3 2019 earnings call, new management revealed that customers had multiple quarters worth of inventory on their shelves:

> Finally, we consciously more tightly aligned PROPEL shipments to procedure-driven customer order flow, encouraging utilization of existing product on customer shelves for the limited customers where ***inventory had grown beyond quarterly usage***. In our assessment, at the end of the third quarter, we achieved our goal in reducing shelf inventory and we continue to believe this issue will be largely behind us by year-end.[1]

9.      Analysts were surprised by new management's revelation of Intersect's rampant channel stuffing scheme.  Analysts at William Blair, Guggenheim and Northland Capital noted:

> On Thursday, August 1, Intersect ENT announced second-quarter results, updated its outlook for 2019, ***gave a sober reflection on the commercial challenges that have plagued growth for the last five quarters,*** and outlined a strategy to eventually return to growth.
>
> We are appreciative of the straightforward and streamlined approach to messaging, where management took responsibility for the organization's missteps and emphatically pronounced a path to get "back to basics." …
>
> ***Interestingly as it relates to revenue, management came forward with the admission sales have been bolstered over the last six or so quarters through the offering of discounts on high-volume orders. This has led to an increase in the number of devices on customer shelves, and at present it is estimated there is approximately 2% to 3% of annual revenue ($2.2 million to $3.2 million) at customers. As such, the team will need to work down this volume over the coming one to two quarters, which helps explain part of the reason why management is taking 2019 guidance from $115 million at the midpoint, to roughly $108.5 million (flat year-over-year).*** It also explains why the team is now rightsizing its manufacturing production to better reflect demand and in so

---

[1] Unless otherwise indicated, all emphasis in this Complaint has been added.

SECOND AMENDED CLASS ACTION COMPLAINT

3

doing will see less than typical overhead absorption and a 2020 gross margin that is likely to be below historical levels of roughly 80%.

\*\*\*

***In the meantime, visibility into Intersect's growth profile in 2020 and beyond is extremely limited***. The base Propel business was flat in 2Q, continuing a trend of decelerating growth that's now persisted for the past six quarters. We view the persistence of this slowdown as worrisome, especially since Intersect began adding resources to unburden its sales reps from having to troubleshoot Sinuva reimbursement issues (and free them up to refocus on Propel) a year ago. ***On Thursday's call, management disclosed that one of the sales team's responses to this lackluster Propel growth over the past few quarters has been an increasing reliance on bulk orders offered at a discount to customers. While these orders only topped out at 2-3% of sales, the decision to reverse this practice and draw down customer inventory is now expected to be a headwind in 2H19.*** While we believe there's still plenty of headroom for Propel adoption to increase over time, we don't expect investor concerns about peaking penetration of Intersect's core product line to go away until the franchise returns to growth.

\*\*\*

Q2-19 revs @ $26.7M, in-line with consensus & our estimates. FY19 guidance however was lowered once again from the $113 - $117M range to ~$108M, flat y/y. ***The shifting explanations of the root cause of continued softness in the business leaves us worried if there is something more fundamental at work*** (high ASP', bulk order strategy, distracted reps, poor fundamental demand, launch of dupilimumab, reimbursement codes). Maintain MP / lowering forward estimates, hence PT to $15.

Company emphasized its "back to basics" approach to its products. This shift in strategy required moving away from providing bulk order discounts (***which frankly speaking came as a surprise to us***.....the levels of inventory in the field remain unclear), and adopting a careful market build strategy.

10.     In engaging in such sales practices, Defendants knew or recklessly disregarded: (i) that the Company's earnings guidance, projections, sales and revenue figures reported for Q1-Q4 2018, and Q1-Q2 2019 were false and materially misleading, (ii) that these bulk sales practices caused the Company to issue materially misleading sales figures, and (iii) material risks that Defendants' sales practices created an inherent "air pocket" in sales, leaving the Company extremely vulnerable to missing sales and revenue targets.

11.     Thus, throughout the Class Period, Defendants violated the federal securities laws by disseminating materially false and misleading statements to the investing public regarding the Company's sales, revenue, and earnings.  As a result of Defendants' misstatements and omissions

as alleged herein, Intersect's stock traded at artificially inflated prices during the Class Period.

12.     The risks created by Defendants' illicit sales practices eventually materialized, catching up with the Company and causing it to lower its guidance.  These risks created by Defendants' actions first partially materialized on August 1, 2018, when Defendants announced disappointing results and missed guidance for Q2 2018, citing sales force distraction with the launch of SINUVA, and revised the Company's 2018 revenue guidance lower than the previously-provided range.  On this disclosure, shares of Intersect's stock fell $6.30, or more than 19%, to close at $26.05 per share on August 1, 2018, on unusually heavy trading volume.

13.     These risks further materialized on May 6, 2019, when Defendants announced disappointing Q1 2019 results, once again citing sales force distraction with the launch of SINUVA, and revised the Company's 2019 revenue guidance lower than the previously-provided range.  On this disclosure, shares of Intersect's stock fell $8.05, or more than 25%, to close at $25.10 per share on May 7, 2019, on unusually heavy trading volume.

14.     Yet another blow, and further materialization of Defendants' concealed risks, appeared upon the Company's disclosure of further disappointing Q2 2019 results on August 1, 2019.  New management revealed that Defendants had been engaged in a rampant channel stuffing scheme for the past six quarters and the Company's PROPEL business – its most important business segment – would be materially impacted going forward as customers worked through excess inventory.  As a result, Intersect further revised the Company's 2019 guidance downward. As the revelations set forth herein were absorbed by the market, the Company's stock was hammered by massive sales, sending the stock price plummeting to close at $16.50 per share on August 2, 2019.

## II.      JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.   In addition, the Company's principal executive offices are located in this district.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**III.    PARTIES**

19.     Lead Plaintiff Avi Yaron, purchased Intersect securities during the Class Period as set forth in the amended certification concurrently filed herewith and incorporated by reference, and suffered damages as a result of Defendants' federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Defendant Intersect is incorporated under the laws of Delaware with its principal executive offices located at 1555 Adams Drive, Menlo Park, California 94025.   Intersect's common stock trades on the NASDAQ exchange under the symbol "XENT."

21.     Defendant Lisa D. Earnhardt ("Earnhardt") was, since June 2008, the Chief Executive Officer ("CEO") of Intersect until June 5, 2019.  On May 6, 2019, Intersect announced that Earnhardt was to step down as CEO, effective June 5, 2019.  The May 2019 announcement indicated that Earnhardt was to remain on the Board of Directors.  Earnhardt is no longer on Intersect's Board.

22.     Defendant Jeryl ("Jeri") L. Hilleman ("Hilleman") was the Chief Financial Officer of Intersect from 2014 to November 26, 2019.   On June 27, 2019, Intersect announced that Hilleman was to step down as CFO.

23.     Defendant Robert H. Binney, Jr. ("Binney") served as Intersect's Chief Commercial Officer from January 2019 to June 26, 2020, and as its Vice President of Sales and

1  Marketing from April 2018 to January 2019 and its Vice President of Sales from July 2011 to
2  April 2018.  From June 2007 to July 2011, Binney served as Director of Sales for AccessClosure,
3  Inc., a privately-held medical device company, where he was responsible for eastern United States
4  sales. From June 2004 to June 2007, Binney served as Peripheral Sales Representative at Boston
5  Scientific's Peripheral Division.

6      24.    Defendants Earnhardt, Hilleman and Binney (collectively the "Individual
7  Defendants"), because of their positions with the Company, possessed the power and authority to
8  control the contents of the Company's reports to the SEC, press releases and presentations to
9  securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The
10 Individual Defendants were provided with copies of the Company's reports and press releases
11 alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and
12 opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and
13 access to material non-public information available to them, the Individual Defendants knew that
14 the adverse facts specified herein had not been disclosed to, and were being concealed from, the
15 public, and that the positive representations which were being made were then materially false
16 and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

17     25.    Relevant non-party Kieran Gallahue ("Gallahue"), served as Intersect's Lead
18 Director and a member of its Board of Directors since April 2015.  In connection with Defendant
19 Earnhardt's resignation, the Board of Directors appointed Gallahue as the Company's Executive
20 Chairman of the Board, effective May 7, 2019, and, in the event the Company did not recruit a
21 President and CEO by the effective date of Defendant Earnhardt's resignation, the Board
22 determined that Gallahue would serve as Interim President and CEO.  Gallahue served as Interim
23 President and CEO from June 5, 2019 through July 22, 2019, the commencement date of new
24 President and CEO Thomas A. West.  Gallahue remains the Executive Chairman of the Board of
25 Directors.

26     26.    Relevant non-party Thomas A. West ("West") was announced as the new President
27 and CEO of Intersect on June 27, 2019 and commenced his service in those roles on July 22, 2019.

28     27.    Relevant non-party Michelle Bunton served as Intersect's Midwest Regional Sales

1  Manager from February 2015 to the present.  From October 2008 to February 2015, Bunton served

2  as a regional sales manager for Cyberonics in the Kansas City, Missouri area.  From July 2003 to

3  October 2008, Bunton served as an executive therapeutic consultant for Cyberonics.  From

4  October 1998 to July 2003, Bunton served as a neuroscience sales representative for TAP/Abbott

5  Laboratories. Prior to October 1998, Bunton served as an office products sales representative for

6  IKON Office Solutions.

7       28.     Relevant non-party Dan Madara ("Madara") has served in two roles at Intersect.

8  From 2012 to 2016 Madara served as a Regional Sales Manager for Intersect's Northeast region.

9  Since January 2016, Madara has served as the Area Vice President/Director, Area Sales at

10  Intersect.  Prior to his roles at Intersect, from January 2011 to August 2012, Madara served as an

11  area manager for Bronchial Thermoplasty.  From July 2008 to January 2011, Madara served as a

12  territory manager for Boston Scientific.

13       29.     Relevant non-party Greg Mielke ("Mielke") was an Area Vice President of Sales at

14  Intersect from June 2013 to June 2020.  Mielke's role as Area Vice President of Sales included

15  managing sales and commercialization of Intersect's ENT products.  Prior to Mielke's role at

16  Intersect, he was a district sales manager at Vertos Medical, Inc. from February 2012 to June

17  2013, and was a regional sales director at St. Jude's Medical from June 2009 to January 2012.

18       30.     Relevant non-party David Tompkins ("Tompkins") is a Regional Sales Manager at

19  Intersect and has served in this role since October 2016.  Tompkins has also been a Territory

20  Manager at Intersect since May 2016.  Prior to these roles at Intersect, Tompkins has also served

21  as a district sales manager at Nevro from May 2015 to April 2016, and was an ENT consultant

22  from 2008 to May 2012.

23       31.     Relevant non-party Terrell Hickmon ("Hickmon") was a Regional Sales Manager

24  at Intersect from February 2017 to May 2020.  Prior to his role at Intersect, Hickmon served as a

25  regional sales manager at Cordis from March 2013 to February 2017.  Hickmon was a

26  representative at Medtronic Neuromodulation from December 2009 to March 2013, and prior to

27  that, served as a regional business manager from January 2008 to January 2010 and as a territory

28  manager from January 2007 to January 2008 at Boston Scientific.  Hickmon was a territory

1   manager at Ethicon from September 2004 to January 2007.

2   **IV.   CONFIDENTIAL WITNESS ("CW") ALLEGATIONS**

3        32.    Plaintiff's allegations are based upon the investigation of Lead Counsel, including

4 information in part obtained from former employees of Intersect.  Information provided by the

5 former employees is reliable and credible because: (a) each of the witnesses worked at Intersect

6 during, or just prior to, the Class Period; (b) each witness stated that she/he had personal

7 knowledge of the information provided; (c) the witnesses' job titles and responsibilities show that

8 they had personal knowledge of the information provided; (d) the witness accounts corroborate

9 one another; and (e) the witness accounts are corroborated by other information alleged herein.

10        **A.    Confidential Witness Number One (CW1)**

11        33.    CW1 was a Territory Manager (a sales representative) at Intersect from April 2016

12 to July 2019.  CW1 was responsible for the sale of PROPEL in Iowa, and also sold SINUVA after

13 it was launched in March 2018.  CW1 reported to Regional Sales Manager Michelle Bunton, who

14 managed sales representatives in a region that included Iowa, Nebraska, Missouri, parts of Illinois,

15 Arkansas, parts of Oklahoma, Kansas and part of Indiana.  Bunton reported to Dan Madera, who

16 managed Regional Sales Managers in the Northeast, in an area that included approximately one-

17 third of the country, from the Midwest to New England.  Madera reported to Defendant Binney.

18 In addition to CW1's duties selling PROPEL and SINUVA, CW1 was also responsible for

19 customer management, including handling customer issues, answering customer questions,

20 assisting doctors with making decisions about whether PROPEL appropriate for the patient, and

21 attending sinus surgeries.  There were about one hundred ENT doctors in CW1's territory, but

22 CW1 was always looking to obtain new ENT doctors as customers.

23        **B.    Confidential Witness Number Two (CW2)**

24        34.    CW2 worked at Intersect from April 2018 until the end of September 2019 as a

25 Territory Manager in Spokane, Washington.  CW2's territory was later expanded to include

26 Billings, Montana, parts of Idaho and half of Wyoming.  CW2 reported to Regional Sales

27 Manager Terrell Hickmon, whose territory included Washington, Nevada, Montana, Idaho, Utah,

28 Arizona, Colorado, and parts of Texas, including El Paso.  Hickmon reported to a Regional VP,

Greg Mielke, who was in charge of managing the Western territories.  Mielke reported to Defendant Binney, who reported to Defendant Earnhardt.  CW2 was responsible for PROPEL sales, as well as SINUVA after it launched.  CW2's job responsibilities included visiting ENTs in the territory, including those ENTs who had never used the product, or those ENTs who rarely used the product.  CW2 was responsible for trying to get those ENTs to adopt the product or use it more frequently.  CW2 also attended surgeries to ensure ENTs were using the product.

### C.  Confidential Witness Number Three (CW3)

35.  CW3 was a Territory Manager in parts of the Midwest including: Kansas City, Missouri, Wichita, Missouri, Topeka, Kansas, and St. Joseph, Missouri, for approximately four years until CW3 left the Company at the end of 2017.  CW3 reported to Regional Manager Michelle Bunton.  Bunton reported to Area VP Dan Madara.  According to CW3, Madara's Northeast territory had more sales than any other region.  CW3 estimated the region produced more than one-third of the Company's sales.  Madara reported to Defendant Binney.  Defendant Binney reported to Defendant Earnhardt.  Despite this chain of command, CW3 communicated directly with Defendant Binney while CW3 worked at Intersect.  CW3's responsibilities included PROPEL sales, as well as visiting ENT surgeons in CW3's territory, answering doctor's questions, attending PROPEL implant surgeries, and assisting with reimbursement, as necessary. CW3's territory included approximately 30-50 ENT surgeons.

### D.  Confidential Witness Number Four (CW4)

36.  CW4 worked at Intersect for the entirety of the Class Period.  CW4 was a Senior Sales Consultant and transitioned to a Territory Manager.  CW4's employment spanned from September 2015 or October 2015 to August 2019.  CW4's sales territory was in New Jersey. CW4 was responsible for selling PROPEL and then SINUVA after its launch.  CW4's area VP reported to Defendant Binney.

### E.  Confidential Witness Number Five (CW5)

37.  CW5 worked for Intersect as a Territory Manager from June 2017 to June 2019. As a Territory Manager, CW5 was responsible for the sale of PROPEL and SINUVA in the San Antonio, Texas area.  CW5's territory also included Corpus Christi, McAllen, and Brownsville.

CW5 recalled that PROPEL accounted for 90-95 percent of territory sales and about 90 percent of Intersect sales Company-wide.   CW5 reported to District Manager David Thompkins, who reported to Area VP Scott Kraus, and later to Dan Madara when Kraus left Intersect in November 2018.

**F.   Confidential Witness Number Six (CW6)**

38.   CW6 worked at Intersect during the entirety of the Class Period.   CW6 was a Regional Sales Manager from February 2017 until April 2020.   CW6 reported to Area VP of Sales Greg Mielke, who reported to Defendant Binney.   As a Regional Sales Manager, CW6 was responsible for overseeing sales representatives who sold both PROPEL and SINUVA in seven Northwestern states including: West Texas, Oregon, Washington, Colorado, Utah, Montana and Idaho.   CW6 was responsible for some high-earning territories.   During a January 2019 sales meeting in Miami, two of CW6's sales reps received President's Club, which was a special designation awarded to the top 12 sales reps at the Company in terms of percentage of sales and dollars.

**V.   OVERVIEW OF DEFENDANTS' FRAUDULENT CHANNEL STUFFING SCHEME AND COVER UP**

**A.   Intersect's Business and Background**

39.   Intersect is a commercial drug delivery company that purports to develop products for patients with ear, nose, and throat conditions.

40.   Intersect was incorporated in Delaware in 2003 as Sinexus.   In November 2009 Intersect changed its name from Sinexus to Intersect ENT.   Intersect's corporate offices are located in Menlo Park, California.   Per Intersect's 2018 Form 10-K, Intersect employed 393 employees, consisting of 86 in manufacturing, 80 in research, and 227 in sales or administrative roles.

41.   Intersect's products are steroid releasing implants approved to treat patients with chronic sinusitis.   These products include the Company's PROPEL family of products:  PROPEL, PROPEL mini, and PROPEL contour, which are used in conjunction with sinus surgery.   The Company's SINUVA sinus implant is used to treat patients who have had surgery yet suffer from

1  recurrent sinus obstruction due to polyps.

2        **1.**    **PROPEL**

3      42.    The PROPEL product is Intersect's "bread and butter."  According to the

4  Company's 2018 Form 10-K, Intersect's "revenue has been derived almost exclusively from the

5  sales of our PROPEL family of products, with limited sales of SINUVA beginning in March

6  2018."

7      43.    PROPEL implants mechanically prop open the sinuses and release mometasone

8  furoate, an advanced corticosteroid with anti-inflammatory properties, directly into the sinus

9  lining, and then dissolve.

10      44.    PROPEL is a self-expanding implant designed to conform to and hold open the

11  surgically enlarged sinuses while gradually releasing an anti-inflammatory steroid over a period of

12  approximately 30 days and is absorbed into the body over a period of approximately six weeks.

13  PROPEL Mini is used by physicians when treating smaller anatomies or following less extensive

14  procedures.  PROPEL Contour treats the sinus ostia.  Contour has a lower profile and hourglass

15  shape designed for use in the narrow and difficult to access sinus ostia.  Intersect received FDA

16  approval for PROPEL Contour in February 2017.

17      45.    PROPEL products are used almost exclusively in the operating room of a hospital

18  or ambulatory surgery center.

19        **2.**    **SINUVA**

20      46.    SINUVA is a mometasone furoate sinus implant.  SINUVA is designed to be used

21  in the physician's office setting to treat adult patients who have had ethmoid sinus surgery yet

22  suffer from recurrent sinus obstruction due to polyps.

23      47.    SINUVA, when placed during a routine physician visit, expands into the sinus

24  cavity and delivers an anti-inflammatory steroid directly to the site of polyp disease for 90 days.

25      48.    Intersect launched SINUVA in March 2018 for use in the office setting of care.

26  **B.**    **Prior to the Class Period Intersect Reports Quarterly Revenues that Exceed Guidance**

27

28      49.    Prior to the Class Period, Defendants consistently reported quarterly revenues that

exceeded the Company's financial guidance and demonstrated increased growth and demand.

50.     During the January 9, 2018 JPMorgan Healthcare Conference, where Defendants Earnhardt and Hilleman presented, Defendant Earnhardt reported double-digit revenue growth for 2017:

> So as I take a quick look at our financials to wrap up, we had a strong end of the quarter and the year in 2017, ending up just north of $96 million in revenue, *which represents 22% revenue growth for the year*. We also delivered 22% revenue growth for the fourth quarter. We continue to have a very strong balance sheet with over $100 million in cash on hand, and our gross margins continue to be in the 80-plus percent range.

51.     Analysts were pleased with Defendants' reported 2017 results and praised Intersect for beating Street expectations.  For example, a January 8, 2108 analyst report from Piper Jaffray applauded Intersect's PROPEL performance:

> Strong Finish To 2017. XENT announced preliminary Q4 revenue of $29.3M-$29.5M above the Street at $27.7M. While underlying details were not provided, we assume strong traction with Contour and *continued solid performance from Propel.*

52.     Similarly, a January 8, 2018, William Blair report praised PROPEL's continued success:

> Intersect anticipates fourth quarter 2017 revenues in the range of $29.3 million-$29.5 million (up 21%-22%) and full-year revenues to be in the range of $96.1 million-$96.3 million (up 22%), which is ahead of previously communicated guidance of $94.1 million- $94.6 million (20% growth). *We believe these solid results in the company's seasonally strongest quarter of the year reflect the continued stability and underlying demand for its core PROPEL family of products, along with the ongoing rollout of Contour.*

**C.     Intersect Claims Conservative Guidance at Start of Class Period**

53.     At the start of the Class Period, Defendants assured investors that the Company's 2018 guidance was conservative and factored in potential sales force distraction relating to the SINUVA launch.

54.     During the January 9, 2018 JPMorgan Healthcare Conference, where Defendants Earnhardt and Hilleman presented, Defendant Earnhardt offered guidance for 2018 revenue growth of 15% - 20%:

SECOND AMENDED CLASS ACTION COMPLAINT
13

As we look at our revenue outlook for the year, we're guiding 15% to 20% revenue growth with our SINUVA launch in the second quarter. And SINUVA, we anticipate, will contribute about 8% of our revenue in 2018.

55.     The Company's February 27, 2018 8-K reported 2018 revenue guidance of $111 to $116 million for the full year 2018:

The company continues to forecast full year 2018 revenue of $111 to $116 million, including an estimated 8% contribution from SINUVA product sales, and first quarter 2018 revenue of $23.2 to $23.7 million. The company continues to expect to launch SINUVA commercially in the second quarter of 2018.

The company expects full year 2018 gross margin of approximately 81% to 82% and operating expenses for the year of $113 to $115 million.

56.     During the Company's earnings call that day, Defendant Hilleman reported the same outlook of $111 to $116 million in revenue for 2018, claiming that the conservative outlook anticipated an impact on Intersect's sales force following SINUVA's launch:

As we anticipate 2018, we are reaffirming our outlook for $111 million to $116 million in total revenue. We also continue to expect to launch SINUVA in the second quarter and expect that SINUVA will generate about 8% of total revenue for the year.

***This view allows for the launch focus to have some impact on PROPEL sales, as our salesforce works to promote PROPEL and to introduce SINUVA.*** We have begun launch prep activities this quarter and are reaffirming our first quarter revenue outlook of $23.2 million to $23.7 million.

57.     Analysts attempted to drill down on Defendants' reasoning behind the conservative guidance and questioned whether it was a consequence of some other unindicated reason (e.g., such as ordering patterns) that Defendants were already seeing, which Defendants denied:

ANALYST: And then relating to the business, sort of, excluding SINUVA, and I appreciate the guidance and the philosophy behind the guidance, given the newness of this process. But I guess I know it's pretty early and the product hasn't launched yet, ***but the guidance assumes a slowdown in the base business growth rate, in part, because of the SINUVA launch and the focus on the SINUVA launch, I assume that thus far, that disruption hasn't happened, because the launch hasn't really happened, but I'm just curious is that guidance more reflecting what you anticipate conservatively, it might happen? Or is that guidance reflecting what you're already seeing happen today?***

DEFENDANT HILLEMAN: We set our guidance for the start of the year at the beginning of the year, and we're really upholding that now, because we believe

things are on track and that guidance was consistent with how we've given guidance in past quarters and also reflected in the fact that we're doing quite a bit of work with the salesforce preparing for the launch. So while that you're right, this launch technically hasn't happened, our internal activities and preparations certainly have started this quarter. ***And then we do expect and are allowing along for some focus on SINUVA that could come a bit at the expense of PROPEL and PROPEL Mini's growth rate, as the salesforce focuses a bit on the targeted launch that we'll have for the next couple of quarters.*** So we're really reaffirming our view of things, that we set at the beginning of the year and then that continues to be our outlook.

ANALYST: Well, just curious. ***<u>Is that something you're seeing now</u> or just something you're allowing for in guidance?***

DEFENDANT HILLEMAN: ***It's something we allowed for in our guidance.***

58.    Analysts were puzzled by this conservative guidance given that Intersect's base business, PROPEL, was purportedly coming off of a continued increase in 2017 with Contour beginning to be adopted by physicians, apparently chalking it up to Intersect's habit of "under-promising and over-delivering." For example, a January 8, 2018, analyst report from Guggenheim noted:

Initial 2018 guidance looks conservative.  For 2018, Intersect is calling for sales to grow 15-20% to $111-116M, bracketing the current Street consensus of $113.7M. Included in this outlook is an estimated $7-8M contribution from Sinuva, implying just 7-12% growth from the base business. This strikes us as conservative coming off of a 22% increase in 2017. ***While we would expect some disruption to the underlying Propel/Contour franchise as the sales force devotes attention to Sinuva, we believe this impact will be more modest given the fact that 1) there is no change in the physician call point and 2) Intersect's reps already spend ~30% of their time in the office setting as part of their normal customer detailing activity. However, coming off of a year in which Intersect succeeded in getting back in the habit of under-promising and over-delivering***, we see management's initial range as prudent, likely setting the stage for another beat and raise year in 2018.

**D.    During Class Period Defendants Tout Company's Revenue Growth**

59.    During the Class Period Defendants continued the façade of "under-promising and over-delivering" and touted Intersect's quarterly revenue growth and continued to report quarterly

SECOND AMENDED CLASS ACTION COMPLAINT

15

revenue that almost always consistently met Intersect's quarterly revenue projections.[2]

60.     For example, during Intersect's Q1 2018 earnings call, Defendant Hilleman touted the Company's financial success and continued growth of the PROPEL business:

> ***Our first quarter revenue of $24.7 million reflected a 21% growth in our PROPEL product business*** *and de minimis SINUVA revenue. This aggregate revenue is ahead of our guidance midpoint of $23.5 million, but still in line with our year guidance of $111 million to $116 million. We are, therefore, reaffirming our 2018 guidance, as we work through the early days of the SINUVA launch.*

61.     Analysts continued to drill down on why Defendants would maintain such conservative guidance given the "strong" Q1 2018 results and again questioned whether the conservativism was a result of some other undisclosed reason Defendants were seeing with the business, but Defendants continued to claim there was no other reason outside of SINUVA's launch and its impact on the sales force:

> ANALYST: Maybe I could just start with the guidance outlook. You guys did 21% in the first quarter. And if I take the midpoint of the range, and I back out the $8 million -- or the high single-digit million implied for SINUVA guidance, I'm getting to something like 10% growth in the base business for the balance of the year. ***So maybe you could help us understand how much is conservatism. Or what other items we should be factoring in thinking about guidance?***

> DEFENDANT HILLEMAN: So Robbie, it's a good question, and I think we'll be learning a lot more about that as we get through this first full quarter of launch because the -- ***we did have a great track record with PROPEL in Q1 continuing our growth. We recognized, though, that SINUVA is going to be a time and energy-intensive launch for our sales force as we go through the first couple of quarters. And our guidance really anticipates the impact that, that could have on overall business.*** As we go through Q2 and Q3, we'll be able to give a much clearer picture of whether that's the right outlook, or whether there is opportunity for changing that as we gain experience.

62.     Again, in Q3 2018 Defendants touted PROPEL's continued success with Defendant Earnhardt reporting continued growth for 2018:

> Turning to PROPEL, our Q3 year-over-year growth was similar to Q2 consistent with our stated expectations. Contour continues to be a strong element in our mix at 29% of PROPEL family sales, and we continue to add about 50 new PROPEL family accounts a quarter.

---

[2] As discussed *infra,* Intersect missed its Q2 2018 guidance – blaming the miss on SINUVA and "sales force distraction."

63.     Following Q3 2018 results analysts remained puzzled by the reaffirmed conservative guidance despite the continued "growth" of PROPEL and again questioned whether there was something else Defendants were factoring into their guidance other than SINUVA's launch, which, once again, Defendants denied:

> ANALYST: Lisa, what I was trying to understand is PROPEL. The math indicates growth rate, let's say, in the 10% or low double digits. How many sites are doing these cases independently, of the 2,800-or-so that you have? I'm just trying to connect the dots as *-- is there a fundamental change? Or is it just resources being diverted to SINUVA?* Any color would be great.
>
> DEFENDANT EARNHARDT: ***Yes, there really was no fundamental change in our perspective for PROPEL this year outside of the SINUVA launch**, which, as you know, has been, I hate to use the word distraction, because it's a labor of love and there's a lot of enthusiasm with SINUVA, but it certainly has taken some of our sales team's time in the last quarter or 2 and we'd expect the same thing in the fourth quarter.* But we do believe the additional resources we brought onboard in the third quarter, once they're up to speed and trained, will start having a more immediate impact, in particular as it relates to the PROPEL franchise.

64.     In Q4 2018, Defendants once again touted the Company's continued revenue growth when announcing Q4 2018 earnings – reportedly driven by PROPEL – and conservatively guided 2019 to revenue in the range of $123 to $127 million:

> Moving to PROPEL. Revenue grew 10% driven primarily by expanded usage of Contour among the current and new physicians. In the fourth quarter, Contour sales comprised 31% of total PROPEL sales, up from 26% at the end of 2017.

65.     Analysts were pleased with Intersect's financial results, but continued to be puzzled by Defendants' narrative that conservative projections were necessary to account for sales force "distraction" in launching and selling SINUVA.  For example, a Piper Jaffray analyst report dated January 7, 2019 noted that while Defendants claimed sales force distraction, Intersect had still managed to beat Street expectations and there was no apparent sales force "distraction:"

> Q4 Results Beat on Propel and Sinuva was in Line. XENT announced preliminary Q4'18 $32.6M-$32.8M (+11%) vs Street $32.2M (+9%) which implies full year 2018 $108.3-$108.5M (+12-13%) vs previous guidance of $106-$109M (+12%) and Street at $107.9M (+12%). Importantly, SINUVA contributed $1.2M in Q4 and $2.8M for the full year, which is pretty much in line given guidance was for a 4% full year contribution. While underlying details

were not provided we assume strong results from the PROPEL family with ~$31.5M (+7%) in Q4 at the midpoint deducting SINUVA from the total revenue preliminary number (we were modeling ~4.5% growth in this segment).

2019 Guidance Light but Probably Conservative; Upside Drivers Available. . . . Firstly, *we believe the core business can achieve growth of high single digits to low double digits as momentum is still very strong (as we saw this quarter) and the sales force has not proven to be distracted from SINUVA.*

**E.    Unbeknownst To Investors Defendants Were Reliant On Channel Stuffing**

66.    This analyst confusion about conservative guidance and Defendants' excuses about sales force distraction, in light of apparently continued "growth," was not unfounded. Intersect was reliant on discounted bulk sales at the end of each quarter to inflate revenue and misleadingly create an appearance of strong organic growth in demand for Intersect's "bread and butter" PROPEL products. Despite Defendants' misleading statements otherwise, a material and necessary factor in hitting Intersect's quarterly revenue targets was an undisclosed practice of channel stuffing. Intersect's PROPEL growth was built on a house of cards, and Defendants knew that with customers' shelves fully stocked, eventually bulk sales would catch up to the Company.

67.    On August 1, 2019, Kieran Gallahue, the Company's new interim CEO following the resignation of Defendant Earnhardt in June 2019,[3] admitted that Intersect had been reliant on bulk sales of PROPEL to achieve quarterly revenue targets during the Class Period:

While inner totality [sic] *the discounted high-volume orders have not been a major factor in our business, they have been growing and moving us away from the flow of natural market demand,* and we have already taken steps to correct this. We sought to address these challenges of competing demands by expanding the sales force in the latter part of last year.

However, a true market development campaign needs an organized, prioritized and sustain focus across the sales force to be effective. And in our case, market development and market expansion for PROPEL were not prioritized as highly in the past.

Additionally, we decided to scale back on the higher volume orders that I just mentioned.

---

[3] Prior to his appointment as interim CEO in June 2019, Gallahue was named Executive Chairman of the Board of Directors beginning in May 2019. Prior to May 2019, Gallahue served as Intersect's Lead Director.

*We began this adjustment to order discounting immediately at the end of Q2 and felt its adverse impact on short-term revenues in the quarter*. We plan to continue that renewed shift in balance from larger orders to a renewed focus on market development activities. This will result in lowering customer shell stock and potentially reducing revenues for the remainder of the year. Importantly, we believe the back to basics approach will yield stronger business fundamentals and will position PROPEL for additional, more sustainable and predictable growth in the future.

68.     This adverse material impact continued to shake Intersect into Q3 of 2019.  On November 1, 2019, Defendant Earnhardt's replacement, CEO West, admitted that Intersect's customers' shelves were stuffed with $1.5 to $2 million worth of inventory – and with so much built up, customers would *still* be working through that inventory through the end of the year.

69.     Intersect's former employees corroborate Defendants' admitted channel stuffing scheme and confirm that Intersect employees were not "distracted" by the launch of SINUVA – but had been channel stuffing prior to and throughout the Class Period.

70.     CW1 recounted that bulk sales at the end of the quarter occurred the entire time CW1 worked for the Company.  CW1 recalled that in the last month of each quarter, Intersect's sales representatives were asked to sell PROPEL in bulk at a discount so that the Company could meet its forecasts.

71.     CW1 believed that the percentage of sales attributable to bulk sales each quarter was significant.  CW1 recalled that every quarter there were huge jumps in revenue in the last two weeks of the quarter.  CW1 noted that it seemed as if the Company would not meet its projections, and then in the last two weeks, there were significant sales.  CW1 remembered that the sales were significant enough that it was obvious that the sales were not organic.  CW1 recalled the sales cycle consistently had peaks and troughs and explained that there was a sales peak in the last two weeks of a quarter followed by a trough, with almost no sales for the first three to six weeks of the quarter.   CW1 believed that without PROPEL bulk deals, Intersect would not have met projections.  CW1 noted that PROPEL accounted for the majority of the Company's sales even after SINUVA was launched.  SINUVA only accounted for about five percent of sales in CW1's territory.

72.     CW1 explained that there was a push to engage in bulk deals at the end of 2018.

CW1 estimated that bulk sales accounted for approximately twenty-five percent of CW1's sales in Q4 2018.  According to CW1, due to this push, the Company exceeded its plan in Q4 2018, which resulted in customers with excess inventory in Q1 and Q2 2019.

73.     CW2, CW3, CW4, CW5 and CW6 corroborate this account, and recalled the practice of bulking at the end of the quarter at Intersect.

74.     CW4 recalled that Intersect sales reps engaged in discounted bulk deals throughout CW4's tenure at the Company.  CW4 reported the discounted bulk deals were typically promoted at the end of quarters when there was a sense of urgency to achieve sales numbers.

75.     CW6 confirmed that Intersect engaged in bulk deals throughout CW6's entire tenure with the Company, and did so in order to meet sales targets.  CW6 estimated, as a Regional Manager with broader knowledge of the Company as a whole, that bulk deals easily accounted for 30 percent of sales each quarter.  CW6 recalled bulk sales were a Company practice before SINUVA launched.  CW6 confirmed that the Company wanted to continue to achieve double digit growth for PROPEL, but CW6 believed the Company's growth projections were unreasonable because the PROPEL market was saturated.  CW6 recalled that it was necessary to engage in bulk deals to meet the Company's sales targets.

76.     CW4 recounted that bulk discounts were offered on PROPEL.  CW4 recalled that a bulk purchase was typically 25 units, 50 units, 100 units or more.

77.     CW3 reported that in a typical bulk deal of the PROPEL product, which normally costs about $800, the product would be discounted to $700 if 50 or so PROPEL implants were purchased.  CW3 stated that extended payment terms were offered on bulk deals for approximately 60 days instead of 30.  CW3 noted that discounts could increase for bigger deals, such as $650 per unit if the customer purchased 100 units.

78.     CW2 explained that if a customer was purchasing in bulk, the product could be discounted to about $695 instead of the full price, and those deals needed approval.  CW2 remembered that deeper bulk discounts needed approval through Regional Managers.

79.     CW1 recounted that typical payment terms for an Intersect customer was 30 days, but it was easy to get approval to extend payment to 90 days.  CW1 reported that payment

1   extensions were offered to those purchasers who requested extensions.

2        80.   CW5 recounted the typical terms of bulk deals.  CW5 recalled that a discount

3   below 20 percent did not need a manager's approval, but any discount exceeding 20 percent had to

4   be approved by Madara.  CW5 remembered that CW5's supervisor told CW5 to offer payment

5   terms of net 90 days.  CW5 recalled that typical bulk deals, however, were usually net 60 days,

6   and non-bulk deals were net 30 days.

7        81.   In addition to a discounted price, CW4 reported that customers purchasing in bulk

8   were sometimes also offered "price protection."  CW4 described price protection as locking in the

9   current "full" price (not bulk discounted price) for the next year.  CW4 further explained that a

10  sales rep might leverage a pending price increase by indicating to the customer that if they

11  purchase in bulk, the customer would not be subject to the price increase for the next year.

12       82.   CW2 corroborates this account and explained that one way CW2 tried to get

13  customers to purchase units at the end of 2018 was to point out the price increase in 2019.  CW2

14  offered customers the 2018 PROPEL price throughout 2019 if the customer purchased in bulk at

15  the end of 2018.  CW2 told customers that if they purchased 10-30 units before the end of 2018

16  that CW2 would keep that same price through 2019.

17       83.   CW2 remembered that the Company's bulk sales practice created a lack of "price

18  integrity" at the Company.  Intersect customers paid a variety of different prices due to bulk

19  discounts.

20       84.   CW1 recalled that Intersect even built certain territories around bulking

21  opportunities.  CW1 noted that some territories had more opportunities for bulk deals than others.

22  For example, CW1 recalled that there were a large number of bulk deals in St. Louis, Arkansas

23  and Oklahoma City.  CW1 opined that there may have been larger accounts in these territories

24  with centralized purchasing, which made bulk purchases more appealing.

25       85.   CW4 believed Defendant Binney knew about the practice because he approved the

26  deals and because bulk deals were incorporated into the sales projections.  CW2 believed that

27  Binney set sales goals along with the Company's Sales Operations Manager, Joe Gregory.  CW3

28  believed that Binney worked directly with Area Directors to determine individual sales projections

1  for each territory.

2      86.    CW1 stated that Binney went over all sales projections in detail with Madara and

3  Bunton on a quarterly basis.  CW1's supervisor, Bunton, relayed Binney's messages to CW1.  For

4  example, Bunton would tell CW1, "Rob [Binney] is looking at your numbers and specific

5  accounts and is not sure whether you are the right person to perform."

6      87.    CW4 reported that bulk deals were tracked in spreadsheets and salesforce.com.

7  Salesforce.com is a third-party customer relationship management platform that Intersect used to,

8  *inter alia*, track sales data.  CW4 used salesforce.com to access sales order history and make

9  projections.   CW4 understood that Intersect executives, including Defendants Binney and

10  Earnhardt, had access to all accounts and information in salesforce.com.

11      88.    CW1 explained that forecasts were entered into and tracked in salesforce.com.  In

12  addition to forecasts, sales reps could see their actual orders in salesforce.com as well.  CW1

13  recalled that Madara had access to salesforce.com, as Madara would discuss salesforce.com data

14  with CW1.  According to CW1, viewing actual orders on salesforce.com helped sales reps track

15  their actual sales compared to forecasts.  Salesforce.com was updated daily and had the latest sales

16  information.

17      89.    CW2 and CW3 recounted using salesforce.com to access past order and revenue

18  information within respective territories.  CW3 would compile forecasts in salesforce.com and use

19  the platform to track orders.

20      90.    CW4 noted that bulk deals were identifiable in salesforce.com explaining that if the

21  purchases reflected a big spike at the end of a quarter, it could be looked at more closely to

22  determine why sales increased at the end of quarter.  CW4 noted that if the increase was due to

23  large purchases by a small number of customers, as opposed to a lot of small purchases by a large

24  number of customers, then that would indicate the product was sold in bulk.  CW4 believed, based

25  on the conversations CW4 had with managers about sales trends, that Intersect managers and

26  executives examined the sales data and were well aware that the bulk deals at the end of quarters

27  were critical to achieving sales targets.

28      91.    CW1 corroborates CW4's account, and recalled that bulk sales would have been

SECOND AMENDED CLASS ACTION COMPLAINT
22

apparent in salesforce.com because the data would show a spike in a sales rep's volume in a short period of time.

92.    During CW1's employment at Intersect, CW1 communicated with Regional Sales Manager Bunton at the end of quarters regarding a so-called "chase list" spreadsheet, and the two determined which of CW1's accounts CW1 should approach about buying in bulk before the end of the quarter.  CW1 recalled that the "chase list" was compiled in the third month of the quarter in an Excel spreadsheet.  CW1 recounted that CW1 was responsible for preparing the "chase list" and tried to include only those accounts that realistically could purchase bulk quantities.  CW1 remembers that Bunton and Madara reviewed the "chase list" and consistently added customers and increased the quantities for potential bulk sales in the "chase list" despite the actual needs of customers.  CW1 recalled that the "chase list" indicated amounts CW1 should try and sell to each account in order to meet the projections.  CW1 noted that Bunton also communicated with other sales representatives in the region regarding chase lists and bulk sales.

93.    CW4 explained that the chase list included the likelihood (expressed in a percentage) that customers would agree to a bulk deal and the potential number of units the customer might be willing to purchase in bulk.  CW4 initially prepared the chase list and then discussed the list with CW4's manager.  CW4 recalled discussing CW4's "chase list" frequently with CW4's manager and director.  CW4 reported that the "chase list" was divided into two categories, accounts with a 90 percent chance of agreeing to a bulk deal before the end of the quarter and accounts with a 50 percent chance.  CW4 initially assigned a percentage and quantity of the potential bulk deal and CW4's manager and director adjusted the numbers and amounts. CW4 recalled that often times CW4's supervisors would increase the number of percentages and units that should be offered to customers in bulk.

94.    CW4 recalled that managers discussed sales trends with sales reps which would include reviewing the previous year's deals.  For example, the manager might note that the previous year the sales rep sold 50 units to a customer and then suggest increasing that to 75 units. CW4 believed managers could see the accounts of all sales reps reporting to him/her.  CW4 primarily communicated with CW4's manager and director about bulk deals at the end of quarters

1   and discussed specific customer accounts.

2       95.     CW3 corroborates CW4's account, and recalled that sales reps first created

3   quarterly projections in salesforce.com and as the quarter progressed, sales reps began compiling

4   "chase lists" that dictated which sales were to be completed before the quarter's end to meet the

5   quarterly forecast.  CW3 believed the chase list morphed from a quarter end forecast to a list of

6   bulk deals to be completed before quarter's end.  Chase lists were used by management to keep

7   sales reps accountable.  If a sales rep's quarterly forecast projected a certain number of bulk deals

8   within the quarter, the chase list was a way for management to check on the status of those bulk

9   deals.

10      96.     CW6 recalled that in CW6's territory "target lists" were circulated each quarter that

11  included customers who had previously agreed to bulk deals.  The purpose of the "target list" was

12  to identify customers to propose bulk deals to in the current quarter.

13      97.     CW2 received emails on a daily basis that detailed where each sales representative

14  was in relation to his or her quota.  CW2 noted that Mielke sent the daily emails and all reps in

15  Mielke's entire area were included.  CW2 recalled that in these emails sales reps were ranked and

16  the email noted if anyone was above plan.  The email showed where the sales reps were compared

17  to forecast in a percentage.  The sales reps were listed in order showing their percent to goal,

18  meaning those closest to the goal or over goal were listed first.  CW2 remembered that sales reps

19  that were already over 100 percent were highlighted in green and those that had not yet achieved

20  goal (under 100 percent) were highlighted in yellow.

21      98.     CW2 knew, based on these emails, that bulking was occurring in the final weeks of

22  the quarter.  Big bulk sales were highlighted in these emails.  CW2 recalled that in the final weeks

23  of leading up to the end of a quarter, many representatives were at approximately 70-80 percent of

24  their quotas, but in the final weeks, these representatives went over their quotas.  CW2 noted that

25  there were certain territories, such as Minneapolis and Chicago, where a sales rep might have only

26  achieve 40-50 percent of his or her quota and in the last two weeks of the quarter those reps would

27  meet or exceed the goal.

28      99.     CW2 surmised from the daily emails that bulk sales were over 50 percent of the

1     quarterly sales in some territories.

2          100.   CW5 corroborates this account, and recalled receiving daily sales reports for

3     CW5's region.  The reports had the previous days' sales in units broken down by sales rep.  CW5

4     recalled that CW5's supervisor, Tompkins, and Madara, also received the daily sales reports.

5     CW5 believed that Binney received a Company-wide version of the daily sales report.

6          101.   CW3 explained that Intersect had a "sales board" where sales reps could see other

7     sales reps' actual sales compared to the forecast on a day-to-day basis throughout the quarter.

8          102.   CW1 reported that there was extreme pressure on sales representatives to engage in

9     bulk sales at the end of the quarter, but CW1 pushed back.  CW1 noted that all sales reps were

10    expected to at least attempt to make bulk deals at the quarter's end.  CW1 stated that CW1 did not

11    want to make deals that did not make sense for the customer.  CW1 stated that as a sales

12    representative, CW1 was to track the amount of product on customers' shelves to know when

13    there were opportunities for bulking.  CW1 remembered that certain customers refused to purchase

14    in bulk, but CW1 was required by the Regional Manager, Bunton, to ask the customers to make

15    the bulk purchases anyway.

16         103.   CW1 believed that bulk sales at the end of the quarter were not a good practice,

17    especially because PROPEL had an expiration date.  PROPEL has a shelf life of eighteen months

18    to two years.  CW1 recounted that because PROPEL expired, CW1 assisted certain customers

19    with PROPEL product near expiration by finding other customers that could use the product

20    before it expired and facilitated a swap.

21         104.   CW5 recalled that product expiration was sometimes discussed with customers

22    when they were considering a bulk deal.  Sale reps told customers that if the product expired that

23    the sales rep would replace the product.  CW5 recalled that when replacing expired product, the

24    sales reps replaced it with "trunk stock," which is free samples that sales reps give physicians.

25         105.   CW5 recalled replacing product for customers, which was authorized by CW5's

26    supervisor, Tompkins.  CW5 specifically recalled replacing product for Hospital 1 in San Antonio,

27    Texas at the end of 2018.  The customer's product had expired after a bulk deal.  CW5 believed

28    CW5 replaced about three units.

106.   CW2 recalled that "trunk stock" was called "personal inventory" at Intersect.  CW2 had to submit an accounting to the Company showing the number of units in CW2's personal inventory and details on any personal inventory provided to doctors.  CW2 believed the Company had to account for giving away free product, as CW2 believed that the cost to manufacture the product was lost.

107.   CW4 stated that the Company's practice of engaging in bulk deals at the end of quarters put sales reps in a difficult position.  CW4 explained that it was critical that sales reps make sales numbers, and it was not good to miss expectations.  CW4 described Intersect as a high growth environment.  As such, CW4 said sales reps were put in a position in which if they did not engage in bulk deals, they would not meet numbers.  However, if they engaged in bulk deals, it was possible they would then not meet their number the following quarter or even the quarter after that as customers worked through inventory.

108.   CW1 corroborates this account and recalled that at the end of 2018, sales reps were really pushed to engage in bulk sales.  In CW1's case, CW1 was pressured by CW1's Regional Manager, Bunton, and Area Director, Madara.  CW1 remembered that CW1 was able to convince most of CW1's customers to purchase in bulk at the end of 2018, but as a result, those customers had too much inventory in the following two quarters, and CW1 was not able to meet the quota in Q1 and Q2 2019.  CW1 recounted that Bunton falsely dangled the President's Club to CW1 and other sales reps at the end of 2018 in order to pressure them to make bulk sales.  CW1 recalled that they were told they were close to earning President's Club when they were not in order to get sales reps to sell more to customers than those customers wanted or needed.

109.   According to CW2, sales reps awarded "President's Club" were provided with a five to six night trip with the sale's rep's significant other to a tropical place such as Hawaii, Cancun or the Caribbean.  President's Club was an important status to obtain, as sales reps who achieved President's Club were easily able to find other employment, and were recruited by other companies.

110.   CW1 recalled that sales forecasts were determined at the beginning of the quarter. CW1 assembled CW1's own forecast and met with Bunton and/or Madara to discuss.  CW1

recalled that CW1's forecasts were always increased and Madara had the last word in the final forecast figure. CW1 recalled that in order to obtain additional compensation outside of a sale's representative's salary, the "first tier" opportunity to obtain additional compensation was 80 percent of quota.

111. CW2 questioned the forecasts and quotas set by the Company and the basis for those figures. CW2 explained that CW2 received the quota at the beginning of the quarter from the Regional Manager, and halfway through the quarter CW2 and the Regional Manager discussed completed orders as well as potential orders and the number of units. CW2 reported that CW2 typically only achieved 70 to 80 percent of the set quota per quarter and never met the full quota once during CW2's employment at Intersect. CW2 did not understand how Intersect was developing quota figures because it would change consistently and did not make sense. During CW2's twenty year employment history working in medical device sales, CW2 had never experienced such a problem meeting quotas. CW2 noted that the only way to hit the quotas and forecast was to sell PROPEL in bulk. CW2 explained that only sales reps with large bulk sales, such as deals for 50-100 units, went over their quotas.

112. CW2 recalled that there was tremendous pressure from the Regional Sales Manager, Hickmon, during the last few weeks of the quarter to meet quotas and make sales. During the last two weeks of the quarter there were daily check-ins from Hickmon, during which sales reps were supposed to communicate potential sales on a daily basis.

113. CW3 remembered that often times reps in certain territories had to engage in bulk sales because bulk deals were built into the forecast.

114. CW1 recalled that even if a sales rep achieved his/her forecast, the sales rep was still expected to help the Company as a whole make bulk deals at quarter's end. CW1 recalled the pressure to help the Company achieve the guidance figures it had provided investors, which was always inflated due to Intersect's bulk sales practice.

115. CW5 recounted that sales quotas were raised every quarter – roughly ten percent per quarter. CW5 noted that the increase each quarter made the quotas unattainable. CW5 recalled that the quotas were based on Intersect's desire to show growth quarter-over-quarter and

year-over-year.  CW5 remembered that sales reps complained about the bulk sales practice because it hurt them in achieving their quotas the next quarter.  Once a customer purchased in bulk, those customers were unlikely to purchase product the following quarter, or longer, depending on the size of the purchase.  CW5 recalled speaking with CW5's supervisor throughout CW5's tenure with the Company about how the quotas were unrealistic.  CW5 believed Tompkins relayed this information to Madara or Binney.

116.  CW3 noted that bulk sales may have helped sales reps meet projections in one quarter, but it became increasingly more difficult to meet forecasts in the following quarter without engaging in bulk sales.

117.  CW5 remembered having conversations with colleagues about the bulk sales practice.  CW5 recalled that other sales reps expressed that there were not enough cases in certain areas to support the projected growth.  CW5's sales reps colleagues also discussed their belief that the pattern of engaging in bulk deals at quarter's end in order to meet inflated projections was unsustainable.

118.  CW5 explained that bulk sales were how sales reps typically made their quarterly quotas.  CW5 recalled that discussions regarding potential bulk deals usually started in the last month of the quarter.  CW5 had conversations with CW5's supervisor, Tompkins, in the last month of every quarter about the number of units CW5 needed to sell in order to meet the quota and how CW5 would accomplish that goal.  CW5 discussed potential opportunities with Tompkins when discussing targets for the quarter.  CW5 would check with certain customers to see how much product was on their shelves and whether a bulk sale with a discount would be of interest to the customers, which would allow CW5 to meet the quota.  CW5 recalled that the Company mentality was to do "whatever it took" to meet quotas.  CW5 recounted that if CW5 was able to arrange a bulk deal, then CW5 would meet the quota.  CW5 noted, however, that bulk deals were not possible for all customers every quarter.

119.  CW5 recalled a specific bulk transaction at the end of Q4 2017, in which CW5 sold 50 units of PROPEL to Hospital 2 in San Antonio.  CW5 recounted that the total sale was $40,000.  CW5 believed that Tompkins signed to agree to the discounted deal.  CW5 noted that

because this customer utilized about 15 units a month, on average, the Hospital 2 did not purchase as much product as it typically would in the following quarter.  With the help of this bulk deal, CW5 was able to meet the quarter's quota.  CW5 recalled that CW5 received a congratulatory email from customer service after bulk deals, such as the Hospital 2 deal.

120.    CW5 noted that this 50 unit bulk deal was a large transaction for CW5, but CW5 explained that other sales reps made bulk deals much larger than 50 units.  CW5 remembered a doctor who practiced at ENT Clinic 1, would often purchase 250 units of PROPEL in bulk from one of CW5's colleagues.

121.    CW5 also recalled another specific bulk deal CW5 made for SINUVA with payment terms of net 90 days completed in Q1 2019.  CW5 recounted that the sale was approximately $15,000 to $18,000 for about five cases.

122.    CW5 believed Binney knew about which sales reps engaged in bulk deals at the quarter's end.  CW5 noted that it would be obvious which deals were bulk deals based on the number of units sold and the average selling price.

123.    CW6 also believed Binney was aware of bulk deals.  CW6 had conversations with Greg Mielke that led CW6 to believe that Defendant Binney was aware of bulk deals.  CW6 recalled that Mielke indicated when he spoke with Binney about whether certain customers were ready for a bulk deal.

124.    CW6 recalled that after sales reps completed bulk deals that they oftentimes received congratulatory emails.  CW6 noted that Mielke sent these emails nationwide to sales reps and believed that Defendant Binney was included on these email distributions.  In addition, CW6 believed that Binney was informed of daily sales and daily units, which would have informed him of when bulk deals were completed.

125.    In addition, CW4 believed Defendant Earnhardt knew about these deals as well because sales reps received congratulatory messages about end of quarter deals from Defendant Earnhardt conveyed by mid-management to Territory Managers.  CW4 explained that because the entire Company was made aware of large, end-of-quarter bulk sales through these emails, Binney and Earnhardt were aware of the bulk sales.

126.   CW1 corroborates this account, and recalled that congratulatory emails were sent out when a sales rep closed a large deal.  CW1 recalled that Binney occasionally sent out these emails.  CW1 believed these emails were typically sent to all sales reps in a region, but sometimes there was a wider distribution for larger orders.  CW1 remembered that these emails typically went out at the end of the quarter when bulk deals were made.  CW1 recalled that the emails contained the name of the account, the number of units sold and/or the specific quarter(s).

127.   CW3 similarly recalled the congratulatory emails sent out within the Company to recognize bulk sales.  CW3 recalled that Binney sent these emails, as well as Madara and Burton. CW3 reported that during CW3's time at Intersect, Burton and Madara were always aware of when CW3 engaged in specific bulk deals.  CW3 explained that executives would undoubtedly know about a bulk deal if, for example, that customer typically purchased 100 units during the course of a year and suddenly purchased 100 units in bulk.  CW3 opined it would be a "shock" if Earnhardt did not know about such deals.

128.   CW2 corroborates this account, and recalled that congratulatory emails were sent out after orders of 50 or more units.  CW2 remembered that the email would name the sales rep and customer or hospital name and the number of units sold.  CW2 believed Binney was included on these customer service emails and sometimes added a congratulatory email himself.  CW2 recalled that during the last week of the quarter, there were several of these types of emails sent out each day.  CW2 recalled that, in fact, about 80-90 percent of these emails coincided with the quarter's end.  CW2 noted that many of the named customers in these emails were large facilities such as hospitals in Chicago or Seattle or surgery centers with six or more facilities.  CW2 remembered that the congratulatory emails told the sales rep to "keep up the good work" and were intended to motivate other sales reps.

129.   CW1 did not believe SINUVA provided a distraction from the sale of PROPEL. CW1 believed that the true issue with PROPEL sales was bulk sales that occurred every quarter.

130.   Indeed, even before SINUVA launched, CW1 determined that bulk sales were a problem.  CW1 realized that channel stuffing was a common practice at Intersect shortly after CW1's employment began.  CW1 determined this quickly after discovering the amount of product

on customers' shelves and the amount of product actually used by customers in a given quarter.

131.    CW1 believed CW1's predecessor got caught in the trap of bulking, which translated into little to no sales the next quarter because customers would not accept new product. CW1 reported six months of "clean up" after CW1's predecessor, resulting in CW1 not making sales quotas or full compensation while CW1's customers worked through their prior bulk inventory.

132.    CW4 reported that prior to CW4's departure from Intersect around the end of the Class Period, CW4 heard some discussion about "getting away from" bulk deals. CW4 elaborated that during CW4's employment there was much discussion about "getting the business healthy" meaning not engaging in bulk deals because the practice caused sales reps to be behind the next quarter. CW4 noted that the Company wanted to move away from bulk deals in an effort to make projections organically without leveraging bulk deals at quarter's end. However, CW4 recalled that no changes in these practices were made before CW4 left the Company.

133.    CW6, who was a Regional Sales Manager who had more knowledge of the Company's sales as a whole, recalled the Company's statements claiming that built-up inventory accounted for two to three percent of annual sales and believed that figure was too low – CW6 estimated it was actually fifteen to twenty percent of inventory. CW6 noted that CW6 and other sales reps believed that Intersect's estimate that the Company only needed two quarters to work down excess inventory was unrealistic – that a year was a more realistic figure. CW6 believed the Company's statement did not truly address the extent of the excess inventory buildup. CW5 also believed the Company's estimate of two to three percent of buildup inventory was too low.

134.    CW1 believed that Intersect missed projections in August 2018 because the practice of bulking was catching up with the Company. CW1 recalled that in August 2018 that customers had a build up of PROPEL inventory due to bulk sales. CW2 similarly recalled that missed earnings had to do with customers having too much PROPEL inventory on hand.

135.    CW5 corroborates this account, as CW5 did not believe that "distraction" from SINUVA caused the Q2 2018 miss. CW5 recounted that because SINUVA was not approved for reimbursement, physicians were not interested in using it, and thus, sales reps did not spend much

time trying to sell SINUVA.  CW2 remembered that because it was clear to all sales reps after the launch of SINUVA, that the Company was heavily reliant on PROPEL revenue, and sales reps remained focused on selling PROPEL every day.

136.    Similarly, CW6 recalled that the major reason the Company missed its projections in Q2 2018 was due to customer's buildup of inventory from bulk sales in previous quarters. CW3 also believed that the Company missed projections in August 2018 because customers had too much PROPEL inventory from bulk sales.  CW3 noted that a Company can only oversell a product for so long before it becomes an issue.

## F.    AS TRUTH EMERGES, DEFENDANTS COVER UP FRAUDULENT CHANNEL STUFFING SCHEME

137.    As corroborated by multiple CWs, Defendants' fraudulent channel stuffing scheme started to catch up with the Company in the Q2 of 2018, and Intersect missed its quarterly guidance by 5.9% and lowered its 2018 revenue guidance to $106 to $109 million, but Defendants fraudulently covered up the cause of the unexpected shortfall in PROPEL revenue.  Defendants blamed the miss on sales force distraction caused by introducing SINUVA, as Defendant Earnhardt misleadingly stated on the Company's Q2 2018 earnings call:

> To touch on what happened with PROPEL growth during the second quarter, we did expand the number of existing accounts stocking Contour by 20% to about 1,200 accounts and also added about 40 new PROPEL accounts. ***What we did not do, because the sales team was focused on introducing SINUVA and navigating inefficiencies in product access, is sufficiently engage in the more hands-on side of growth. This resulted in a disappointing Q2 for PROPEL.***

138.    Analysts attempted to drill down on how the sales team could have been so distracted with SINUVA that they could not continue to sell PROPEL products at historic rates, but Defendants doubled down on their fraudulent cover up and evaded analysts direct questions:

> ANALYST: So Lisa, you had made the comment that the sales force spent a disproportionate amount of time on the SINUVA launch and didn't effectively engage in the hands-on side of growth for PROPEL. ***Could you maybe quantify that a little bit more, talk about how much time the sales force spent on the SINUVA launch versus the base***?

> DEFENDANT EARNHARDT: Yes. Anytime you have a new launch, that obviously attracts a lot of attention from the team. And there's a significant physician interest, as I had mentioned, ***and so I do believe, as I said, that there***

*was a disproportionate amount of time spent*. I think, of course, we always anticipated the sales team spending time on managing the demand and supporting the clinical education, training required for SINUVA, but what we hadn't anticipated was the amount of time they would spend on sort of troubleshooting product access. And that's really where the disconnect was. As we were sort of working through patients through the funnel, they ended up spending an inordinate amount of time there. So I would expect moving forward, with that process streamlined, we'll continue to move forward with a targeted launch that they will be able to better, a, balance their time and also, b, that we're putting some additional resources to help support continued growth in PROPEL.

139.   While Intersect's PROPEL revenue temporarily "grew" in Q3 and Q4 2018, Defendants knew that the illicit channel stuffing scheme would again catch up to the Company.

140.   And the scheme did catch up to Intersect.  In Q1 2019 Intersect not only announced the resignation of Defendant Earnhardt concurrently with announcing the Company's Q1 2019 results, but also drastically lowered the Company's revenue guidance for the full year 2019 from $123 million to $127 million to $113 million to $117 million.

141.   During the Company's Q1 2019 earnings call Defendants once again tried to fraudulently cover up the true cause of the disappointing PROPEL sales – continuing their false cover story that SINUVA was to blame for Intersect's revised guidance.

142.   Analysts attempted to drill down on how much of the lowered guidance stemmed from softness in PROPEL sales as opposed to other factors and how the product mix would impact Q3 and Q4 2019.  Defendant Hilleman's response was evasive and avoided directly answering the analyst's question:

ANALYST: But just like -- this first question is really going to be on guidance. So obviously, you've taken a pretty healthy step down. You kind of walked through why that's the case in your prepared remarks. But I guess just in terms of cadence, right, if we're looking at 2Q as only being a modest year-over-year growth rate, *how should we think about like kind of the mix of that between PROPEL? I am guessing like the majority of that is coming from soft PROPEL. But then how should we think about PROPEL improving maybe in the back half of the year*, seeing as it does sound like you've made some pretty substantial enhancements to kind of the reimbursement and sales structure so far already this year.

DEFENDANT HILLEMAN: Let me address your question. I think it's a very good question, and as *we are thinking about the nature of work we need to do with the sales force, Allen, we also talked about making this field easier for physicians to access SINUVA*. We certainly think that, that is going to be the

focus in that. Our aim is absolutely to get both SINUVA and PROPEL to higher levels of growth over time. And how that will play out over the year we can give better visibility as we make progress.

143.   Analysts were confused by Defendants' renewed excuse that SINUVA was to blame when Defendants had previously represented in Q2 2018 that Intersect was addressing revenue issues by hiring additional staff.  Defendants stuck to their cover story – despite analyst questions about whether something other than SINUVA was responsible for lower revenue:

ANALYST: Wanted to just start off with the -- kind of the balancing between PROPEL and SINUVA and kind of the allocation of resources that are seemingly kind of limiting the growth acceleration of both businesses.

*This was the problem I think that you guys had called out last quarter and heading into the 2019 time frame, but you felt like you had taken the appropriate steps to staff up, especially on that PROPEL business, and you would kind of put your guidance range at a level that you thought had captured the ramp that would be associated with that*.

So the question here is, what's the kind of a calculus or what gives you confidence this time around that you've identified exactly the right level of resources to get to the numbers that you've set out? And how did you arrive at that? *And what's changed? Because it feels like we had the same kind of issue before, you had visibility into these frictions. <u>What's changed between now and a couple of months ago</u>?*

LISA D. EARNHARDT: . . . And you're right, these are a lot of the same issues, and I think we had hoped and believed that some of the friction was going to be streamlined with some of the earlier changes we've made, and we were wrong. *And so we clearly have made some changes to our commercial strategy as it relates to increasing the number of field reimbursement team members. That's, obviously -- those are putting experts in the field who will be focused day and night on getting patients treated with SINUVA and educating our accounts.*

*This is, obviously, something that the sales team has had to spend a disproportionate amount of time on.* It's not what they do best, and so we're refocusing them on sort of creating demand and driving clinical value and great clinical outcomes and really supplementing them with sort of experts in the field at the access problem. So I think that's where we – we're slow out of the gate to getting those resources, getting the right resources on board.

144.   Even when analysts specifically asked whether something else was going on other than "distraction" from SINUVA, Defendants again denied any other issue and stuck to their cover story:

SECOND AMENDED CLASS ACTION COMPLAINT
34

ANALYST: A couple of questions, first on SINUVA. Lisa, **can you go into some more detail on why the changes you made 9 months ago didn't have the impact you expected? And what's different this time?** Because as you said, these are the same issues we were discussing then, and the proposed solution then was also throwing more resources at the problem. So is the difference now that these are going to be Intersect employees instead of third-party consultants? ***Or is there something else that's materially different here?***

DEFENDANT EARNHARDT: Yes. I do think that part of that is there are now dedicated full-time employees with us. ***And previously, we had tried to solve for the issue by using a contract sales organization to really bolster our PROPEL sales and make sure that during that -- during the SINUVA launch period we weren't dropping balls on PROPEL.***

***And we recognized that, that still left our sales organization and our sales representatives with doing a lot of the work as it relates to SINUVA, which creating the clinical demand, ensuring great clinical outcomes is right in their sweet spot.***

145.    The market responded to Intersect's lowered guidance for the remainder of 2019, and the Company's share price fell $8.05, or more than 25%, to close at $25.10 per share on May 7, 2019, on unusually heavy trading volume.

146.    Intersect's stock took another blow on August 1, 2019 following the Company's Q2 2019 earnings call.  Intersect's Independent Director, Gallahue, and Intersect's new CEO, West, admitted that Intersect had engaged in an illicit channel stuffing scheme over the past six quarters, and that the Company had to immediately stop the channel stuffing practices and lower its guidance.  New management also admitted that Defendants' prior explanations for revenue misses in Q2 2018 and Q1 2019 were misleading.

147.    Intersect's channel stuffing scheme was explained by Independent Director Gallahue on the earnings call wherein new management admitted that Defendants' prior descriptions regarding "sales force distraction" were really about the problems with inventory buildup caused by bulk sales:

While Intersect has a long history of product and clinical innovation, it is not always translated to delivering the desired commercial results. Recognizing this, we have spent the past 2 months focused on the whys, aiming to achieve better understanding of 3 critical areas. ***First, understanding PROPEL demand and customer ordering dynamics***. Second, assessing SINUVA and what we can do to improve SINUVA product access and adoption. And third, clarifying our priorities with an emphasis on the fundamentals of commercial execution.

\*\*\*

To be clear, this was not a full switch on or switch off of activity, but rather a question of balance. ***Instead of focusing primarily on working with physicians to broaden their understanding of PROPEL's clinical end benefits and it's appropriate usage, as we have done in the past, with less time available to focus on PROPEL, <u>we responded commercially by offering selective discounts on high volume orders</u>. While inner [sic] totality the discounted high-volume orders have not been a major factor in our business, <u>they have been growing and moving us away from the flow of natural market demand</u>, and we have already taken steps to correct this.*** We sought to address these challenges of competing demands by expanding the sales force in the latter part of last year.

However, a true market development campaign needs an organized, prioritized and sustain focus across the sales force to be effective. And in our case, market development and market expansion for PROPEL were not prioritized as highly in the past.

\*\*\*

Additionally, we decided to scale back on the higher volume orders that I just mentioned.

***We began this adjustment to order discounting immediately at the end of Q2 <u>and felt its adverse impact on short-term revenues in the quarter</u>. We plan to continue that renewed shift in balance from larger orders to a renewed focus on market development activities. <u>This will result in lowering customer shell stock and potentially reducing revenues for the remainder of the year.</u>*** Importantly, we believe the back to basics approach will yield stronger business fundamentals and will position PROPEL for additional, more sustainable and predictable growth in the future.

148.   The material impact caused by Intersect's channel stuffing scheme was explained by Independent Director Gallahue as follows:

So market development is a process that yields a longer-term benefit but takes a little bit longer for you to see the impact. Transactionally, when you move away from some of these larger orders, you feel the impact more quickly. And particularly, what we've been trying to do is work with your customers to make sure that they work of any inventories that may be sitting on the shelves and make sure that their real focus is on the pull through.

So you got an in balance and timing, and that's why you feel it short term on the negative side before you feel the, sort of, rising wave that getting back to the basics and fundamentals. It's a little bit of short term pain for a lot more long term gain is simplistic way of looking at it. So even a couple of percentage of annual sales, if you try to work them off over 1 or 2 quarters, it -- unfortunately when you're a company our size, it affects the growth rate a couple of points, and that sort of drives us towards that flat period. The good news and actually what we

would expect to see during that time actually is that the fundamental utilization of the product is actually little bit higher than the new revenue because working off your inventory for a bit.

149.   Analysts were surprised by this revelation for why Intersect experienced issues in 2018 and 2019, as Defendants had previously misled investors about the root cause of Intersect's Class Period revenue misses, falsely attributing those misses to SINUVA's launch rather than Defendants' illicit channel stuffing scheme:

ANALYST: . . . First, when did the stocking start, and maybe you could help us understand how much it contributed in 2018 and first half of '19? And where are levels now and what do they need to come down to?

GALLAHUE: . . .  And so it really wasn't anything that was sudden, ***it was just something that built over probably the last 6 or so quarters***, where the behavior in the field was a little bit more on the support side with SINUVA, maybe a little bit more on the transactions with customers, a little bit less on the PROPEL pull through and so it was sort of a bit by bit sort of process that grew up over time. Just to gauge this though, ***we're talking about is a few percentage points of the total annual revenues, maybe 2%, 3%*** or so, so it sort of gets you in the right ballpark. So not a substantial impact on any given period. It's just that as we work to help our customers work that off and turn our priorities or I should say balance our priorities back on market development, ***it's going to be a process that over 1, 2, 3 quarters, we're going to see that sort of inventory of the customers working its way through,*** and we'll be able to focus on what's really the right thing for us to be doing, which is building the long-term demand of the PROPEL product.

150.   Analysts at BTIG praised Intersect's new management for finally "coming clean" regarding the Company's channel stuffing scheme in its August 1, 2019 report:

Clearing the decks – again. Last quarter, XENT's CEO abruptly resigned and guidance was slashed without much reason offered. This time, a new CEO has joined but again guidance was lowered. This quarter it was due to channel stuffing, which was explained as having been unintentional and having taken place over some time as reps were unfocused but certainly helped the company hit numbers in the past. While shares may fall tomorrow, we applaud new management on coming clean and taking a start-over approach to driving XENT's business.

We have said for years that we felt XENT took shortcuts that might catch up with them, and now they have.

151.   Analysts at William Blair, Guggenheim and Northland Capital were surprised by new management's revelations in their respective August 1-2, 2019 reports:

SECOND AMENDED CLASS ACTION COMPLAINT
37

On Thursday, August 1, Intersect ENT announced second-quarter results, updated its outlook for 2019, *gave a sober reflection on the commercial challenges that have plagued growth for the last five quarters,* and outlined a strategy to eventually return to growth.

We are appreciative of the straightforward and streamlined approach to messaging, where management took responsibility for the organization's missteps and emphatically pronounced a path to get "back to basics." …

*Interestingly as it relates to revenue, management came forward with the admission sales have been bolstered over the last six or so quarters through the offering of discounts on high-volume orders. This has led to an increase in the number of devices on customer shelves, and at present it is estimated there is approximately 2% to 3% of annual revenue ($2.2 million to $3.2 million) at customers. As such, the team will need to work down this volume over the coming one to two quarters, which helps explain part of the reason why management is taking 2019 guidance from $115 million at the midpoint, to roughly $108.5 million (flat year-over-year).* It also explains why the team is now rightsizing its manufacturing production to better reflect demand and in so doing will see less than typical overhead absorption and a 2020 gross margin that is likely to be below historical levels of roughly 80%.

\*\*\*

*In the meantime, visibility into Intersect's growth profile in 2020 and beyond is extremely limited.* The base Propel business was flat in 2Q, continuing a trend of decelerating growth that's now persisted for the past six quarters. We view the persistence of this slowdown as worrisome, especially since Intersect began adding resources to unburden its sales reps from having to troubleshoot Sinuva reimbursement issues (and free them up to refocus on Propel) a year ago. *On Thursday's call, management disclosed that one of the sales team's responses to this lackluster Propel growth over the past few quarters has been an increasing reliance on bulk orders offered at a discount to customers. While these orders only topped out at 2-3% of sales, the decision to reverse this practice and draw down customer inventory is now expected to be a headwind in 2H19.* While we believe there's still plenty of headroom for Propel adoption to increase over time, we don't expect investor concerns about peaking penetration of Intersect's core product line to go away until the franchise returns to growth.

\*\*\*

Q2-19 revs @ $26.7M, in-line with consensus & our estimates. FY19 guidance however was lowered once again from the $113 - $117M range to ~$108M, flat y/y. *The shifting explanations of the root cause of continued softness in the business leaves us worried if there is something more fundamental at work* (high ASP', bulk order strategy, distracted reps, poor fundamental demand, launch of dupilimumab, reimbursement codes). Maintain MP / lowering forward estimates, hence PT to $15.

Company emphasized its "back to basics" approach to its products. This shift in

strategy required moving away from providing bulk order discounts (**which frankly speaking came as a surprise to us**.....the levels of inventory in the field remain unclear), and adopting a careful market build strategy.

152.    On this news, the Company's share price fell $3.63, or more than 18%, to close at $16.36 per share on August 2, 2019, on unusually heavy trading volume.

153.    On November 1, 2019, Intersect's new management was forced to further reveal the extent of the Company's channel stuffing practices after disappointing Q3 2019 results. Intersect's New CEO, Tom West, stated:

> [On the August 2019 conference call] we communicated our intention to pull back on larger often discounted bulk orders that could build-up inventory and drive down ASP, while simultaneously striving to work down any accumulated PROPEL inventory in the channel. I'm pleased to tell you that we addressed all three of these points successfully in the third quarter.

154.    On the call, Defendant Hilleman announced that the Company would have "flat growth" as compared to 2018 due to Intersect's illicit channel stuffing practices.  Specifically, Hilleman reported that **Intersect's customers had multiple quarters worth of inventory on their shelves, and estimated that Intersect "cleared in the range of $1.5 to $2 million of customer inventory accumulation sold in prior quarters**" which lowered Intersect's Q3 results commensurately.

155.    West reported that customers would be working through that inventory for the remainder of 2019:

> Finally, we consciously more tightly aligned PROPEL shipments to procedure-driven customer order flow, encouraging utilization of existing product on customer shelves **for the limited customers where inventory had grown beyond quarterly usage.** In our assessment, at the end of the third quarter, we achieved our goal in reducing shelf inventory and we continue to believe this issue will be largely behind us by year-end.

156.    New management also revealed that Intersect's prior sales during the Class Period did not reflect the natural or true demand for PROPEL:

> So I know you will ask, it's premature to indicate what level of growth we expect to achieve next year with PROPEL. But with our renewed focus on market development and clinical selling, a better more proportionate focus in our efforts on PROPEL and **a more naturally flowing procedure driven order pipeline**, we are confident that we will reestablish PROPEL growth.

1

2      157.    Analysts attempted to drill down on how much of the excess inventory in the

3   channel related specifically to PROPEL and consequently how much revenue growth was inflated

4   during the Class Period as a result of Defendants' channel stuffing scheme:

5          ANALYST: I just wanted to follow-up on Rich's question on the PROPEL side of
           things. *I think you said you took $1.5 million to $2 million out of inventory in*
6          *Q3. Is that all PROPEL revenue first of all, or PROPEL product, first of all?*
           *And then secondly, if you back that out, did your procedure growth in the*
7          *quarter was at something in the 3% to 4% range*? So you actually would have
           grown a little bit here in Q3, had not been for that inventory reduction?

8
           THOMAS A. WEST: *Yes. So first, relative to the $1.5 billion* [sic] *to $2 million*
9          *is it all PROPEL? Yes, it is.* And yes, I mean, if you think about the fact that we
           took down inventory, demand would have been -- procedure demand would have
10         been higher and revenue would have been higher had we not pulled down that
           amount of inventory. But we were clear in our direction to the field sales
11         organization, and candidly, our commitment to you, that we were going to bring
           that back down and get to a much more procedure-driven order flow, a much
12         more predictable way of managing the business and understanding where we
           stand. So we feel good about what we've done. Yes, it took a little bit of a bite out
13         of the revenue line, but that was the right move to do, and I would do it again.

14
                                              ***
15         ANALYST: Okay. I'm just -- I think you can see what I'm trying *to triangulate it*
16         *not here is that* [sic] *the base business, the PROPEL business actually would*
           *have grown probably something more like mid-single digits without all these*
17         *activities which you are doing during the quarter.* So again, not wanting to get
           into 2020 too much, but just a general sense of what the base business is doing
18         despite some of the early efforts that you have on refocusing the organization.

19
           THOMAS A. WEST: *Yes*. And I appreciate what you're doing, and I'll confess
20         that I do the same back-of-the envelope calculations myself. But I think the
           important thing is let's get the engine running well again in terms of a real clarity
21         of intention, right messaging in the field, and we should be able to bring back a
           predictable level of growth. *Again, PROPEL is not likely to go back to the 20%*
22         *grower.* But can we make it a predictable, steady piece of the business, while
           SINUVA then begins to take off. That's what I'm playing for.
23

24      158.    As revealed in November 2019, Defendants' channel stuffing during the Class

25   Period was so rampant that with new management's clean up, Intersect will be impacted for the

26   remainder of 2019 and potentially into 2020 as customers work their way through excess PROPEL

27   inventory.

28

                            SECOND AMENDED CLASS ACTION COMPLAINT

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.   Materially False And Misleading Statements Regarding Intersect's Q4 2017 And FY 2017 Financial Results And FY 2018 Revenue Guidance

#### 1.   Q4 2017 Press Release

159.   On February 27, 2018, Defendants issued a press release (the "Q4 2017 press release"), which announced the Company's financial results for Q4 2017 and FY 2017 and offered guidance for FY 2018:

> Total revenue grew to $29.5 million for the fourth quarter of 2017 compared to $24.2 million for the same period of 2016, an increase of 22%. The increase in revenue was attributable primarily to growth in adoption of the PROPEL® family of products.
>
> ***
>
> Total revenue grew to $96.3 million for 2017 compared to $78.7 million for 2016, an increase of 22%. The increase in revenue was attributable primarily to growth in adoption of the PROPEL family of products.
>
> ***
>
> The company continues to forecast full year 2018 revenue of $111 to $116 million, including an estimated 8% contribution from SINUVA product sales, and first quarter 2018 revenue of $23.2 to $23.7 million. The company continues to expect to launch SINUVA commercially in the second quarter of 2018.

On the same day, Intersect filed a Form 8-K with the SEC attaching the Q4 2017 press release.

160.   The statements in ¶ 159 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136 which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  Moreover, PROPEL sales were not driven by adoption but rather benefited significantly from the undisclosed end-of-quarter bulk sales.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

#### 2.   Q4 2017 Earnings Call

161.   On February 27, 2018, Defendants hosted a conference call with analysts and investors to discuss FY 2018. During the call, Defendants reaffirmed Intersect's financial results

for Q4 2017 and FY 2017 and its outlook of $111 million to $116 million in total revenue for

2018. Defendant Hilleman reported:

> This view allows for the launch focus to have some impact on PROPEL sales, as
> our salesforce works to promote PROPEL and to introduce SINUVA. We have
> begun launch prep activities this quarter and are reaffirming our first quarter
> revenue outlook of $23.2 million to $23.7 million.

162.    The statements in ¶ 161 were materially false and misleading because Defendants

knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel

stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures

and financial results to meet revenue and growth targets and artificially inflated market

expectations as to Intersect's future performance.  As a result, the Company's reported financial

guidance created a materially false and misleading impression as to the underlying demand for the

Company's PROPEL products and the growth of its PROPEL business.

163.    Based on Defendants' 2018 revenue guidance, which appeared to factor in a

slowdown in the base business, analysts questioned whether there was another reason for the

slowdown other than SINUVA, to which Defendants misleadingly responded by failing to identify

any other factors (including the channel stuffing scheme) that could cause a slowdown in

PROPEL's revenue growth:

> ANALYST: And then relating to the business, sort of, excluding SINUVA, and I
> appreciate the guidance and the philosophy behind the guidance, given the
> newness of this process. But I guess I know it's pretty early and the product hasn't
> launched yet, but the guidance assumes a slowdown in the base business growth
> rate, in part, because of the SINUVA launch and the focus on the SINUVA
> launch, I assume that thus far, that disruption hasn't happened, because the launch
> hasn't really happened, ***but I'm just curious is that guidance more reflecting
> what you anticipate conservatively, it might happen? Or is that guidance
> reflecting what you're already seeing happen today?***
>
> DEFENDANT HILLEMAN: We set our guidance for the start of the year at the
> beginning of the year, and we're really upholding that now, because we believe
> things are on track and that guidance was consistent with how we've given
> guidance in past quarters and also reflected in the fact that we're doing quite a bit
> of work with the salesforce preparing for the launch. So while that you're right,
> this launch technically hasn't happened, our internal activities and preparations
> certainly have started this quarter. And then we do expect and are allowing along
> for some focus on SINUVA that could come a bit at the expense of PROPEL and
> PROPEL Mini's growth rate, as the salesforce focuses a bit on the targeted launch

that we'll have for the next couple of quarters. So we're really reaffirming our view of things, that we set at the beginning of the year and then that continues to be our outlook.

ANALYST: Well, just curious. *Is that something you're seeing now or just something you're allowing for in guidance?*

DEFENDANT HILLEMAN: *It's something we allowed for in our guidance.*

164.    Defendant Hilleman's statements identified in ¶ 163 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business. In addition, Defendant Hilleman's statements in ¶ 163 were materially false and misleading because they attributed the expected slowdown in the base business to the SINUVA launch without identifying Intersect's channel stuffing practices as a material factor in the expected slowdown.

**B.      Materially False And Misleading Statements Regarding Intersect's Q1 2018 Financial Results And FY 2018 Revenue Quidance Q1 2018 Press Release**

**1.      Q1 2018 Press Release**

165.    On May 1, 2018, Defendants issued a press release (the "Q1 2018 press release"), which announced the Company's financial results for Q1 2018 and offered guidance for FY 2018 and Q2 2018:

Total revenue grew to $24.7 million for the first quarter 2018 compared to $20.5 million for the same period of 2017, an increase of 21%. The increase in revenue was attributable primarily to growth in adoption of the company's PROPEL® family of steroid releasing implants.

***

The company continues to forecast full year 2018 revenue of $111 to $116 million, including an estimated 8% contribution from SINUVA product sales, and forecasts second quarter 2018 revenue of $27.7 to $28.2 million.

On the same day, Intersect filed a Form 8-K with the SEC attaching the Q1 2018 press release.

166.    The statements in ¶ 165 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  Moreover, PROPEL sales were not driven by adoption but rather benefited significantly from the undisclosed end-of-quarter bulk sales.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

## 2.    Q1 2018 Earnings Call

167.    On May 1, 2018, Defendants hosted a conference call with analysts and investors to discuss Q1 2018. During the call, Defendants touted PROPEL's "top line growth."  Defendant Earnhardt reported:

> It certainly has been a busy and exciting start to the year for our team, ***delivering 21% top line growth and commencing the commercial launch of SINUVA. There were no surprises in our first quarter PROPEL family results. We continue to deliver strong growth with a balanced product portfolio.*** Our newest PROPEL product, Contour, continues to represent about ¼ of our sales, with the balance split between PROPEL and Mini.

168.    Defendant Earnhardt's statements in ¶ 167 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

169.    During the call, Defendant Hilleman reported "first quarter revenue of $24.7 million reflected a 21% growth in our PROPEL product business and de minimis SINUVA revenue."  Defendant Hilleman misleadingly projected for the second quarter revenue outlook of $27.7 million to $28.2 million, which "anticipates that the launch date of SINUVA will be time

intensive for our sales force as they make product and market access introductions to physicians and attend initial procedures.  Still, we are continuing to expect PROPEL to grow over the second quarter of last year in low double digits, which, combined with the initial SINUVA revenue, enables us to target growth over Q2 last year in the range of 15% to 18%, while navigating the early launch."

170.    Defendant Hilleman's statements in ¶ 169 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's financial performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

171.    Analysts questioned why Defendants would maintain such conservative guidance given the "strong" Q1 2018 results and again questioned whether the conservativism was a result of some other undisclosed reason Defendants were seeing with the business, but Defendants continued to claim there was no other reason outside of SINUVA's launch and its impact on the sales force:

ANALYST: Maybe I could just start with the guidance outlook. You guys did 21% in the first quarter. And if I take the midpoint of the range, and I back out the $8 million -- or the high single-digit million implied for SINUVA guidance, I'm getting to something like 10% growth in the base business for the balance of the year. *So maybe you could help us understand how much is conservatism. Or what other items we should be factoring in thinking about guidance?*

DEFENDANT HILLEMAN: So Robbie, it's a good question, and I think we'll be learning a lot more about that as we get through this first full quarter of launch because the -- *we did have a great track record with PROPEL in Q1 continuing our growth. We recognized, though, that SINUVA is going to be a time and energy-intensive launch for our sales force as we go through the first couple of quarters. And our guidance really anticipates the impact that, that could have on overall business.* As we go through Q2 and Q3, we'll be able to give a much clearer picture of whether that's the right outlook, or whether there is opportunity for changing that as we gain experience.

172.   Defendant Hilleman's statements in ¶ 171 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.   In addition, Defendant Hilleman's statements in ¶ 171 were materially false and misleading because they attributed the expected slowdown in the base business to the SINUVA launch without identifying Intersect's channel stuffing practices as a material factor in the expected slowdown.

### 3.   Q1 2018 10-Q

173.   On May 3, 2018, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2018 fiscal year first quarter (the "Q1 2018 10-Q"). The Form 10-Q was signed by Defendants Earnhardt and Hilleman, and reported the Company's financial results for Q1 2018 as follows:

> ***Revenue increased $4.2 million, or 21%, to $24.7 million during the three months ended March 31, 2018***, compared to $20.5 million during the three months ended March 31, 2017. ***The growth in revenue was attributable to an increase in unit sales of our PROPEL family of products***, driven by sales of PROPEL Contour which was approved by the FDA in February 2017, and to a lesser degree, an increase in the average selling price of our PROPEL family of products.

174.   The statements in ¶ 173 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

**C.**     **May 9, 2018 Deutsche Bank Healthcare Conference**

175.     On May 9, 2018 at the Deutsche Bank Healthcare Conference, Defendants misleadingly touted PROPEL's growth in response to analyst questions:

> ANALYST: Okay, perfect. And then maybe if we could turn to the base business, and the first quarter of that did a little bit better than I think expectations were. ***Can you maybe just talk about what you're seeing with PROPEL***?
>
> DEFENDANT HILLEMAN: Yes. ***I think we're seeing continued growth in PROPEL, and it comes from a number of things.*** Contour continues to be a driver of growth. We are in -- a little under half of our accounts are currently stocking Contour, which is just part of our rollout. And also, in some cases, there's committees that are reviewing and so forth. So we fully expect to continue to have Contour be a significant driver of our growth. We are also working with physicians to expand the frequency of their use. And we continue to add new accounts. We added 50 new accounts in the first quarter, which has been consistent for quite some time. So I think one of the nice things is as we add Contour, we find that the doctors that are most enthusiastic about Contour are also increasing the use of the PROPEL. So we're seeing really nice synergies in our products. And we've had some anecdotal, very early commentary from physicians that I'd say look at SINUVA, they're also saying, well, I need to reexamine my usage of PROPEL. Because as you know, some doctors may choose to use PROPEL selectively, and we feel there's opportunity for all patients to benefit from PROPEL, as we have shown in our clinical studies.

176.     Defendant Hilleman's statements in ¶ 175 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial growth created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

177.     When asked about PROPEL's revenue growth potential in the next few years, Defendant Hilleman touted PROPEL's opportunity for growth:

> ANALYST: Okay, perfect. Any questions from the audience? All right. I'll keep going. ***Just in terms of PROPEL, just going back to that, how do you kind of think about the progression over the next couple of years*** in terms of adding to the portfolio potentially and just kind of the runway there in terms of getting new accounts and whatnot?

DEFENDANT HILLEMAN: *Yes. We believe that we're going to continue to grow and expand PROPEL certainly this year through the addition of Contour, also continuing to increase penetration into new accounts.* We are used by 1 in 3 ENTs today. And many of those, there's certainly a case for them to consider using PROPEL more broadly. And then we also believe that as we are in 1 in 8 procedures, that also indicates potential for growth. And if you think about dividing those procedures up, about 1 in 3 are with polyp cases. And we certainly know that providing steroid-eluting implant has double benefit for those patients not only to heal the inflammation associated with surgery, but also to treat the patient. *So we do believe there is continuing headroom for growth of PROPEL.*

178.    Defendant Hilleman's statements in ¶ 177 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial growth created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

**D.    May 16, 2018 Bank Of America Merrill Lynch Healthcare Conference**

179.    On May 16, 2018 at the Bank of American Merrill Lynch Healthcare Conference, Defendants misleadingly blamed SINUVA's launch on conservative guidance when asked directly about whether Defendants were seeing trends in PROPEL's business that could impact its guidance:

ANALYST: Okay. And then on -- question on the base business. **Because you guys have provided guidance that prudently assumed some disruption. And so I just wanted to get a sense for, it doesn't seem like, over the last quarter -- couple of quarters, there's been any disruption. You've given nicely conservative guidance. Sort of where are we in that process right now?** *What are you seeing with the base business? It's the same sort of trends or you're starting to see some of that disruption?*

DEFENDANT HILLEMAN: *Yes, I think what we've anticipated with our guidance for the second quarter is definitely something that is a real phenomenon, where the sales force is putting a lot of time appropriately into the launch of SINUVA.* And while PROPEL -- we think there's just great dynamics in the business. We are currently used in 1 in 8 procedures. Markets where we've been for a long time, we're in 1 or 2 -- 1 to 2 procedures, or 1 in 3 procedures. So we think there's great headroom in PROPEL. We also are going to continue to rollout Contour to all -- more of our accounts. *But to drive that growth and to*

*open new accounts and go get doctors to change usage pattern obviously takes some of the sales force's time and a lot of that time is being focused right now on SINUVA as we go through the very first quarters of launch. So I think for this quarter and for the next, we will -- we have allowed for that to impact the growth of PROPEL and that remains consistent with our guidance.*

180.    Defendant Hilleman's statements in ¶ 179 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial growth created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.   In addition, Defendant Hilleman's statements in ¶ 179 were materially false and misleading because they attributed the expected slowdown in the base business to the SINUVA launch without identifying Intersect's channel stuffing practices as a material factor in the expected slowdown.

**E.    False And Misleading Statements Regarding Financial Results For Q2 2018 And FY 2018 Guidance**

**1.    Q2 2018 Press Release**

181.    On August 1, 2018, Defendants issued a press release (the "Q1 2018 press release"), reporting Q2 2018 earnings results:

*Total revenue grew to $26.3 million for the second quarter 2018* compared to $24.0 million for the same period of 2017, an increase of 10%. This increase was attributable to growth in the adoption of the PROPEL® family of steroid releasing implants as well as to the commercialization of SINUVA, which contributed 2% of revenue in the second quarter of 2018.
                                             \*\*\*
*The company expects to achieve third quarter revenue in the range of $23.8 to $24.3 million*, and updated full year revenue guidance to $106 to $109 million, including an estimated 2% to 4% contribution from SINUVA product sales.

On the same day, Intersect filed a Form 8-K with the SEC attaching the Q2 2018 press release.

182.    The statements in ¶ 181 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures

1   and financial results to meet revenue and growth targets and artificially inflated market

2   expectations as to Intersect's future performance. Moreover, PROPEL sales were not driven by

3   adoption but rather benefited significantly from the undisclosed end-of-quarter bulk sales. As a

4   result, the Company's reported financial results and guidance created a materially false and

5   misleading impression as to the underlying demand for the Company's PROPEL products and the

6   growth of its PROPEL business.

7                    **2.      Q2 2018 Earnings Call**

8           183.    On August 1, 2018, Defendants hosted a conference call with analysts and

9   investors to discuss Q2 2018 earnings results. During the call, Defendant Earnhardt lauded the

10  Company's PROPEL revenue growth despite the Q2 revenue miss – citing the launch of SINUVA

11  as the reason for the disappointing results:

12          Our business continued to make progress in Q2, ***growing revenues at 10% and***
            ***advancing in our journey to both drive adoption of our 3 core PROPEL***
13          ***products*** while launching our first pharmaceutical product, SINUVA. As we have
            discussed in the past, the early months of a new product launch can be a bit
14          bumpy as we educate our customers on the product and new business practices,
            streamline product access, establish consistent reimbursement and keep our sales
15          team appropriately focused on both existing and new products.
16                                        ***
            To touch on what happened with PROPEL growth during the second quarter, we
17          did expand the number of existing accounts stocking Contour by 20% to about
            1,200 accounts and also added about 40 new PROPEL accounts. ***What we did not***
18          ***do, because the sales team was focused on introducing SINUVA and navigating***
            ***inefficiencies in product access, is sufficiently engage in the more hands-on***
19          ***side of growth. This resulted in a disappointing Q2 for PROPEL***
20                                        ***
            Finally, our experience in the second quarter is reshaping our expectations for
21          both the SINUVA ramp and PROPEL growth. As we roll out the action plan I
            discussed and build on the impact of these changes, we anticipate 2018 revenue in
22          the range of $106 million to $109 million, continuing our previously -- view of
            annual PROPEL revenue while adjusting our SINUVA expectations. We expect
23          third quarter growth to be similar to Q2 and to see improvement in the fourth
            quarter and on into next year as our modifications begin to bear fruit.
24                                        ***
25          Through achieving these goals, we believe that we will position ourselves to once
            again deliver in the range of 20% annual growth for 2019 and beyond as we
26          expand SINUVA from a targeted rollout and expand reach with PROPEL.

27          184.    Defendant Earnhardt's statements in ¶ 183 were materially false and misleading
28

SECOND AMENDED CLASS ACTION COMPLAINT
50

because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  Moreover, PROPEL sales were not driven by adoption but rather benefited significantly from the undisclosed end-of-quarter bulk sales.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.  In addition, Defendant Earnhardt's statements in ¶ 183 were materially false and misleading because they attributed the Q2 2018 guidance miss and revised revenue outlook to the SINUVA launch without identifying Intersect's channel stuffing practices as a material factor in the guidance miss and revised revenue outlook.

185.   During the call, Defendant Hilleman similarly touted the Company's PROPEL growth, asserting that "PROPEL Contour represented 29% of sales in the quarter, up from 27% in Q1, continuing to drive growth as we roll this product out to customers."  Defendant Hilleman reiterated the Company's guidance – claiming continued growth due to sales force improvements:

> Looking to the third quarter, as mentioned earlier, we are implementing improvements to market access and expanding our sales force. We expect these efforts to gain traction in fourth quarter and, accordingly, are setting our guidance for Q3 in the range of $23.8 to $24.3 million and for the year at $106 million to $109 million, with about 2% to 4% of our annual revenue to come from SINUVA.

186.   Defendant Hilleman's statements in ¶ 185 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.  In addition, Defendant Hilleman's statements in ¶ 185 were materially false and misleading because his references to "improvements in market access" and "expanding our sales

1  force" misleadingly implied that the reason for the Q2 2018 guidance miss and revised revenue

2  outlook was related to the SINUVA launch and failed to identify Intersect's channel stuffing as a

3  material factor in the guidance miss and revised revenue outlook.

4        187.   During the call, analysts questioned future PROPEL growth and Defendants'

5  guidance, in response to which Defendants lauded PROPEL's growth potential and blamed

6  Intersect's revenue miss and lowered guidance on SINUVA's launch and related staffing issues.

7  Defendant Hilleman stated:

> As we think about Q3, for the reasons we described, we will be putting in place the additional sales force. We have just recently expanded the staffing at the hub and put a number of other measures in place. But those are going to take time to play out, so we think we'll begin to reap the benefit of these changes as we go into the fourth quarter, *so we are implying a higher rate of growth for PROPEL in the fourth quarter. But we think the third quarter will look much like the second quarter in terms of growth rates, and our guidance is very similar to that.*
>
>                             \*\*\*
>
> ANALYST: So Lisa, you had made the comment that the sales force spent a disproportionate amount of time on the SINUVA launch and didn't effectively engage in the hands-on side of growth for PROPEL. *Could you maybe quantify that a little bit more, talk about how much time the sales force spent on the SINUVA launch versus the base?*
>
> DEFENDANT EARNHARDT: *Yes. Anytime you have a new launch, that obviously attracts a lot of attention from the team. And there's a significant physician interest, as I had mentioned, and so I do believe, as I said, that there was a disproportionate amount of time spent.* I think, of course, we always anticipated the sales team spending time on managing the demand and supporting the clinical education, training required for SINUVA, but what we hadn't anticipated was the amount of time they would spend on sort of troubleshooting product access. *And that's really where the disconnect was. As we were sort of working through patients through the funnel, they ended up spending an inordinate amount of time there.* So I would expect moving forward, with that process streamlined, we'll continue to move forward with a targeted launch that they will be able to better, a, balance their time and also, b, that we're putting some additional resources to help support continued growth in PROPEL.

25        188.   Defendants' statements in ¶ 187 were materially false and misleading because

26  Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit

27  channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales

28  figures and financial results to meet revenue and growth targets and artificially inflated market

expectations as to Intersect's future performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.  In addition, Defendants' statements in ¶ 187 were materially false and misleading because they attributed the Q2 2018 guidance miss and revised revenue outlook to the SINUVA launch without identifying Intersect's channel stuffing practices as a material factor in the guidance miss and revised revenue outlook.

### 3.    Q2 2018 10-Q

189.    On August 3, 2018, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2018 fiscal year second quarter (the "Q2 2018 10-Q").  The Form 10-Q was signed by Defendants Earnhardt and Hilleman, and reported the Company's financial results for Q2 2018 as follows:

> *Revenue increased $2.3 million, or 10%, to $26.3 million during the three months ended June 30, 2018*, compared to $24.0 million during the three months ended June 30, 2017, and increased $6.5 million, or 15%, to $51.0 million during the six months ended June 30, 2018, compared to $44.5 million during the six months ended June 30, 2017. *The growth in revenue was attributable to an increase in unit sales of our PROPEL family of products*, driven by sales of PROPEL Contour which was approved by the FDA in February 2017, and to a lesser degree, limited sales of SINUVA, which contributed 2% to 2018 revenue, and an increase in the average selling price of our PROPEL family of products.

190.    The statements in ¶ 189 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

**F.**   **False And Misleading Statements Regarding Financial Results And FY 2018 Guidance For Q3 2018**

**1.**   **Q3 2018 Press Release**

191.   On November 5, 2018, Defendants issued a press release (the "Q3 2018 press release"), reporting Q3 2018 earnings results:

> *Total revenue grew to $24.7 million for the third quarter 2018* compared to $22.3 million for the same period of 2017, an increase of 11%. *This increase was attributable to growth in the adoption of the PROPEL® family of steroid releasing implants* as well as to commercialization of the SINUVA® (mometasone furoate) Sinus Implant, which contributed over 3% of revenue, or $0.8 million, in the third quarter of 2018.
>
> ***
>
> *Intersect ENT continues to forecast 2018 revenue in the range of $106 to $109 million* and gross margin of approximately 80%. The outlook for operating expenses is lowered to $110 to $111 million, from $113 to $115 million, reflecting timing of hiring and other expenses. The fourth quarter revenue outlook is in the range of $30.3 to $33.3 million, of which approximately 4% is expected from sales of the SINUVA (mometasone furoate) Sinus Implant.

On the same day, Intersect filed a Form 8-K with the SEC attaching the Q3 2018 press release.

192.   The statements in ¶ 191 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  Moreover, PROPEL sales were not driven by adoption but rather benefited significantly from the undisclosed end-of-quarter bulk sales.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

**2.**   **Q3 2018 Earnings Call**

193.   On November 5, 2018, Defendants hosted a conference call with analysts and investors to discuss Q3 2018 earnings results.  During the call, Defendant Earnhardt touted PROPEL's year-over-year growth and reiterated the Company's guidance for FY 2018:

> Turning to PROPEL, our Q3 year-over-year growth was similar to Q2 consistent

with our stated expectations. Contour continues to be a strong element in our mix at 29% of PROPEL family sales, and we continue to add about 50 new PROPEL family accounts a quarter. Our focus in Q4 is to train and integrate these new team members to support 2019 growth. We believe we will continue to improve the growth of both PROPEL and SINUVA and are, therefore, maintaining our 2018 guidance of $106 million to $109 million.

194.    The statements in ¶ 193 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

195.    On the November 5, 2018 earnings call, Defendant Hilleman reaffirmed the outlook for FY 2018 and once again blamed Q2's disappointing results on staffing issues – affirming that the Company's anticipated growth, driven by PROPEL, was in the range of 20% for FY 2019:

> We have definitely expanded our sales team. We've also expanded the sales reimbursement team and the goal was that the sales team spends less time having to track down product access questions that could over time and should over time improve productivity. ***Our most pointed focus, though, is really, as Lisa mentioned, continuing to grow the business of -- in the range of 20%, and that would really include a higher level of growth for PROPEL and what we've seen since the launch of SINUVA***. So we're really very much focused for going into next year driving top line growth, which over time will, of course, improve productivity.

196.    Defendant Hilleman's statements in ¶ 195 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL

business.  In addition, the statements in ¶ 195 were materially false and misleading because Hilleman's analysis of PROPEL's growth potential (1) misleadingly implied that the cause of the previous slowdown in PROPEL growth during Q2 was the SINUVA launch and related staffing issues and (2) failed to identify Intersect's channel stuffing as a material factor in that slowdown.

197.   Analysts followed up with whether there was a fundamental change to the PROPEL business or if SINUVA's launch was truly to blame for the conservative guidance, to which Defendants continued to stick to their cover story:

> ANALYST: Sure. Lisa, what I was trying to understand is PROPEL. The math indicates growth rate, let's say, in the 10% or low double digits. How many sites are doing these cases independently, of the 2,800-or-so that you have? *I'm just trying to connect the dots as -- is there a fundamental change? Or is it just resources being diverted to SINUVA? Any color would be great.*

> DEFENDANT EARNHARDT: ***Yes, there really was no <u>fundamental change in our perspective for PROPEL this year outside of the SINUVA launch</u>***, which, as you know, has been, I hate to use the word distraction, because it's a labor of love and there's a lot of enthusiasm with SINUVA, but it certainly has taken some of our sales team's time in the last quarter or 2 and we'd expect the same thing in the fourth quarter. But we do believe the additional resources we brought onboard in the third quarter, once they're up to speed and trained, will start having a more immediate impact, in particular as it relates to the PROPEL franchise.

198.   Defendant Earnhardt's statements in ¶ 197 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business. In addition, the statements in ¶ 197 were materially false and misleading because Earnhardt's analysis of PROPEL's growth potential (1) misleadingly implied that the cause of the previous slowdown in PROPEL growth during Q2 was the SINUVA launch and related staffing issues and (2) failed to identify Intersect's channel stuffing as a material factor in that slowdown.

1

2

3

4

5

                         **3.**      **Q3 2018 10-Q**

      199.    On November 5, 2018, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2018 fiscal year second quarter (the "Q3 2018 10-Q").  The Form 10-Q was signed by Defendants Earnhardt and Hilleman, and reported the Company's financial results for Q3 2018 as follows:

6

7

8

9

10

11

> ***Revenue increased $2.4 million, or 11%, to $24.7 million during the three months ended September 30, 2018***, compared to $22.3 million during the three months ended September 30, 2017, and increased $8.9 million, or 13%, to $75.7 million during the nine months ended September 30, 2018, compared to $66.8 million during the nine months ended September 30, 2017. ***The growth in revenue was attributable to an increase in unit sales and average selling price of our PROPEL family of products*** and to initial sales of SINUVA, which contributed 3% and 2% to revenue during the three and nine months ended September 30, 2018, respectively.

12

13

14

15

16

17

18

      200.    The statements in ¶ 199 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflate market expectations as to Intersect's future performance.  As a result, the Company's reported financial results created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

19

**G.**     **November 28, 2018 Piper Jaffray Health Care Conference**

20

21

22

      201.    On November 28, 2018 at the Piper Jaffray Health Care Conference, Defendants again blamed the launch of SINUVA for any slowdown in PROPEL's growth and recklessly claimed that double-digit growth would be possible for FY 2019:

23

24

25

26

27

28

> ANALYST: So, let's talk about the base business again, a bit more on PROPEL and Contour, I think everybody gets SINUVA and the opportunity there is massive***. It seems like in Q3, the base business slowed down a little bit. Again, I'm not sure how much of that was SINUVA versus Contour with all these new reps coming in. But you said low double-digit growth in that business next year. So, how do we get comfortable that that's achievable, because – I think, Jeri, you mentioned there's still big opportunity with Contour? Just any metrics you can provide around the base business and feeling comfortable in that low double-digits for next year that you talk about?***

DEFENDANT HILLEMAN: I think it really comes down to the resources we've put into this, and ***I think that our intention is that the people that we have added this year should be effective and benefit next year, and continue to drive growth because we really haven't during the year, initial launch of SINUVA, been able to focus on building growth in our current base and that has always been an important driver of growth. So, I think restoring strength in that area, coupled with continuing to roll out Contour and continuing to add new accounts, it's really aligned with our outlook for next year.***

ANALYST: ***Okay. Has PROPEL specifically still been growing recently*** or is it primarily Contour, that's growing the base business?

DEFENDANT HILLEMAN: Contour, has actually been fairly stable in the last couple of quarters at around 30% of our business.

ANALYST: Okay.

DEFENDANT HILLEMAN: So, we do expect it to continue to grow a little bit as the mix, but not as dramatically as the other.

202.    Defendant Hilleman's statements in ¶ 201 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.   As a result, the Company's reported financial guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business. In addition, the statements in ¶ 201 were materially false and misleading because Hilleman's analysis of PROPEL's growth potential (1) misleadingly implied that the cause of the previous slowdown in PROPEL growth during Q2 and Q3 was the SINUVA launch and related staffing issues and (2) failed to identify Intersect's channel stuffing as a material factor in that slowdown.

**H.    January 8, 2019 JPMorgan Global Healthcare Conference**

203.    On January 8, 2019, at the JPMorgan Healthcare Conference Defendants once again blamed SINUVA for PROPEL's issues, with Defendant Earnhardt claiming:

***So -- and we had some stumbles on the PROPEL product, our base business, as we launched a first-of-its-kind product with SINUVA***. It is the first physician-administered drug for us, so it's the first product that we've launched that's regulated as a pharmaceutical. ***It's also the first physician-administered drug for***

*the otolaryngology specialty, so there were lots of learnings. And because of that, we realized we were bandwidth constrained.* And so while we continue to drive new adoption of Contour and we added new accounts, where -- what we failed to do was drive continued depth and continued penetration with our existing customers. So we made the decision to expand our sales force and brought on about 20 new reps this fall, so we have a sales organization now of about 140 sales representatives across the country.

204.    Defendant Earnhardt's statements in ¶ 203 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business. In addition, the statements in ¶ 203 were materially false and misleading because Earnhardt's analysis of Intersect's "stumbles" with respect to PROPEL (1) misleadingly implied that the cause of the previous slowdown in PROPEL growth during Q2 and Q3 was the SINUVA launch and related staffing issues and (2) failed to identify Intersect's channel stuffing as a material factor in that slowdown.

205.    Analysts drilled down on guidance for FY 2019, in response to which Defendants recklessly projected double-digit revenue growth based on PROPEL:

ANALYST: And I didn't see it in the press release, *but can you help us understand what's built into the guidance for SINUVA expectations in the base business?* And then is international a material number at all?

DEFENDANT EARNHARDT: Yes, I'll start with that. *Our focus this year is really driving top line growth.* So we, at least at this point, have not given guidance on a product-specific basis. SINUVA will ramp over the course of the year. *What we've talked about previously is getting PROPEL back to about 10% growth rate, which is, as you know, north of where we've been the last couple of quarters.* And so that's sort of -- as we're thinking this year, just thinking about that as you think about your own models and those types of things, international is a small but growing portion, but it still is immaterial at this point in terms of a contributor. And it's just PROPEL at this time.

ANALYST: *And then we're to think low single-digit millions?*

1    DEFENDANT HILLEMAN: *For -- yes*.

2    DEFENDANT EARNHARDT: *Yes, yes*.

3    206.    Defendants' statements in ¶ 205 were materially false and misleading because

Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit

channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales

figures and financial results to meet revenue and growth targets and artificially inflated market

expectations as to Intersect's future performance.  As a result, the Company's reported financial

guidance created a materially false and misleading impression as to the underlying demand for the

Company's PROPEL products and the growth of its PROPEL business.

**I.    False And Misleading Statements Regarding Financial Results For Q4 2018, FY 2018 And FY 2019 Guidance**

**1.    Q4 2018 Press Release**

207.    On February 25, 2019, Defendants issued a press release (the "Q4 2018 press

release"), reporting Q4 2018 earnings results, full year 2018 results, and financial guidance for FY

2019:

> **Total revenue grew to $32.8 million for the fourth quarter** of 2018 compared to
> $29.5 million for the same period of 2017, an increase of 11%. **This increase was
> attributable to growth in the adoption of the PROPEL® family of steroid
> releasing implants** as well as to commercialization of the SINUVA®
> (mometasone furoate) Sinus Implant, which contributed approximately 4% of
> revenue, or $1.2 million, in the fourth quarter of 2018.
>                                              ***
> **Total 2018 revenue grew to $108.5 million** compared to $96.3 million in 2017, an
> increase of 13%. **This increase was attributable to growth in the adoption of the
> PROPEL family of steroid releasing implants** as well as to commercialization of
> SINUVA, which contributed 3% of revenue, or $2.8 million, in 2018.
>                                              ***
> **Intersect ENT continues to forecast 2019 revenue in the range of $123 to $127
> million and first quarter revenue in the range of $26.0 to $26.5 million**.

On the same day, Intersect filed a Form 8-K with the SEC attaching the Q4 2018 press release.

208.    The statements in ¶ 207 were materially false and misleading because Defendants

knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel

stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures

SECOND AMENDED CLASS ACTION COMPLAINT
60

and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance. Moreover, PROPEL sales were not driven by adoption but rather benefited significantly from the undisclosed end-of-quarter bulk sales. As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

### 2.    Q4 2018 Earnings Call

209.    On February 25, 2019, Defendants hosted a conference call with analysts and investors to discuss Q4 2018 earnings results, FY 2018 results and FY 2019 outlook. During the call, Defendant Earnhardt touted PROPEL's revenue growth reporting that "[r]evenue grew 10% driven primarily by expanded usage of Contour among the current and new physicians. In the fourth quarter, Contour sales comprised 31% of total PROPEL sales, up from 26% at the end of 2017."

210.    The statements in ¶ 209 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance. As a result, the Company's reported financial results created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

211.    On the call, Defendant Hilleman touted the Company's revenue stating, "[o]ur fourth quarter and full year revenue were in line with the guidance we set last summer, with both PROPEL and SINUVA hitting their targets."

212.    The statements in ¶ 211 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflated market expectations as to Intersect's future performance. As a result, the Company's reported financial

results created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

213.   Analysts attempted to drill down on whether the guidance Defendants provided for Q1 2019 signaled a slowdown or something specific in PROPEL's business, which Defendants denied:

> ANALYST: And then as we think about *the Q1 guidance, either Jeri or Lisa, it was a little lighter than I was expecting and it kind of signaled a pretty meaningful slowdown in the core business regardless of what SINUVA number that you threw in there on a 2-year stack basis.* And I know it's seasonal and everything else like that, *<u>but is there something specifically with the core business you're signaling here in Q1</u>?*

> DEFENDANT HILLEMAN: *I don't know that it's so much a signal.* You're absolutely right about the seasonality. And if you look at where we were in Q4, it's a guide of around 20% down from Q4, which ties very much to seasonality.

214.   Defendant Hilleman's statements in ¶ 213 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflate market expectations as to Intersect's future performance.  As a result, the Company's reported financial guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

### 3.   False And Misleading Statements In Intersect's 2018 Form 10-K

215.   On February 28, 2019, the Company filed its Annual Report with the SEC on Form 10-K for the 2018 fiscal year (the "2018 10-K").  The Form 10-K was signed by Defendants Earnhardt and Hilleman, and reiterated the Company's earnings results previously stated on February 25, 2019:

> *For the years ended December 31, 2018, 2017 and 2016, we generated revenue of $108.5 million, $96.3 million and $78.7 million,* respectively, and incurred a net loss of $22.9 million, $16.4 million and $25.2 million, for each respective year. As of December 31, 2018, we had an accumulated deficit of $187.8 million.
> ***
> *Revenue increased $12.2 million, or 13%, to $108.5 million during the year ended December 31, 2018*, compared to $96.3 million during the year ended

December 31, 2017. *The growth in revenue was attributable to an increase in unit sales and average selling price of our PROPEL family of products* and initial sales of SINUVA, which contributed 3% to revenue during the year ended December 31, 2018.

216.   The statements in ¶ 215 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet its revenue and growth targets and artificially inflate market expectations as to Intersect's future performance.  As a result, the Company's reported financial results created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

**J.      False And Misleading Statements From February 28, 2019 SVB Leerink Global Healthcare Conference**

217.   During the February 28 conference, following the release of Intersect's FY 2019 guidance, Defendants' touted the Company's potential for revenue growth and doubled down on their cover story that SINUVA was to blame for PROPEL's shortfalls, which had been corrected with the addition of more sales reps:

ANALYST:  Let's talk a little bit about the acceleration that you guys are calling for in your entire business as we look out to 2019. *I think your guidance is calling for basically mid-teens earnings sales growth rate at the midpoint. That's better than what you did in 2018.* And you're entering the year with some real momentum with your new product launch in SINUVA for drug-eluting [ph] stent for chronic sinusitis in office. So, maybe, talk to us a little bit about what's getting better as we move into the year to give you the confidence in that growth acceleration trajectory?

DEFENDANT EARNHARDT: As [ph] I reset back on *2018, we delivered $108.5 million in revenue. It was around 13% revenue growth. And you are correct, Rich, we are looking for an acceleration in the business this year. Last year, our growth was driven primarily by PROPEL which is our surgical products used in conjunction with sinus surgery to improve outcomes.*

ANALYST: So, you didn't split out SINUVA from PROPEL in your guidance. You kind of – you gave us a growth range and you left it to us to figure out kind of the pieces, but you did give us some components to pieces of a puzzle to figure it out. We – for our part, we're getting to between $9 million and $10 million SINUVA for the year and that includes or that implies the PROPEL business growing for the year just under 10%. I guess one directionally, are we thinking

SECOND AMENDED CLASS ACTION COMPLAINT
63

about the pieces right? Are we way off by an order of magnitude or are we at least kind of within the ballpark of where you would have hoped range of consensus would have come out?

DEFENDANT EARNHARDT: Yeah. I think if you take the pieces of that and look at PROPEL, *the way that we anticipate driving further growth in PROPEL is really related to bandwidth.* Last year, when we added in SINUVA, the senior most of our reps, the territory managers really focused very heavily on that and we find they continue to drive growth with our current accounts, get doctors to use the product more. There's a very important role to be played by our sales consultants and which are less or more junior reps in our mix of field sales force and we have expanded that tremendously. *We added roughly 20 or so sales people at the – from the last four months of the year, they're now just getting up to speed and adding productivity. So we see that as a key driver of PROPEL growth* and then if you look at SINUVA actually we had about we had $1.2 million in revenue in the fourth quarter January with resetting of deductibles is you know has its challenges and we're well aware of that. But then as we get into the second quarter where it's more allergy season and people are seeing their ENTs more regularly and we also had our sales force meeting at the end of January so our sales people are out there now very actively going beyond the targeted launch.

So we think with that, we're starting to put the accelerator down a bit and that that will over the course of the year hopefully result in growth in SINUVA. So if you look at that starting point in view of a general ramp I think that can frame your numbers.

ANALYST: Okay. That's, that's helpful. Now your 1Q guidance it baked in a number of seasonality type issues as the potential for a deductible resets and you know the 1Q is kind of an anomaly relative to the rest of the year or at least that's the way that it the math works out to get to your full-year numbers and is it reasonable to assume that once we get past the 1Q, it's not necessarily all a 4Q weighted year but pretty much 2Q through 4Q you'll see you know over double-digit growth, maybe low to mid-teens growth kind of for the rest of the year or should we be thinking of it even more back end loaded?

DEFENDANT EARNHARDT: Yeah. I don't want to expand too much on our guidance until we get there but I think that certainly for SINUVA we would see that ramping and *we would expect to see increased productivity from our sales force starting in the next quarter.*

***

ANALYST: *So, one of the questions that I get from investors is how much of the PROPEL growth deceleration is in fact stuff that's under your control, and in fact perhaps distraction with SINUVA versus maybe they're a victim of their own success.* They got to a point in the market saturation or penetration of this product that's about a $100 million business now already. That's just the growth trajectory is slow. What gives you – how would you respond to that? *What gives you confidence that if you put more resources to it and you execute better, you*

*will see the growth pick back up in the PROPEL business?*

DEFENDANT EARNHARDT: Yeah. If you look at how we have addressed growth and the levers and drivers of growth, we launched Contour last year and that – I'm sorry, 2017, and that provided a lot of growth, but we continue to roll that out to all of our accounts and we're in about 70% of our accounts. *We do see headroom there for the opportunity to grow that further*. We also continue to add new accounts. We added about 200 new accounts last year and do have a good continuing rate of new adoption even though the product has been on the market some time. Our mix of business has stayed very stable. We continue to see growth in the hospitals and in the ASCs, so the ratios there have stayed very stable. And we really – when we examined last year, what we saw less of was change in usage among our doctors who do use the product and some of them will use it in a very large number of their cases. Others will use it only in their most severe. And, historically, we have had very good success at working with doctors and showing them – reminding them of the evidence of efficacy for all patients, working with them on procedures, and inviting them to consider trying it in a broader range of patients, and that has led to higher usage. *But because of we believe rammed with constraints last year, we fell short of that element of our growth. And we think that with the additional bandwidth we have, we are aiming to restore that as a driver of growth.*

ANALYST: Okay. So you're confident that the market is not penetrated, basically, for PROPEL.

DEFENDANT EARNHARDT: Yes.

218.    Defendant Earnhardt's statements in ¶ 217 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet revenue and growth targets and artificially inflate market expectations as to Intersect's future performance.   As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.

### K.    False And Misleading Statements Regarding Financial Results For Q1 2019 And FY 2019 Guidance

#### 1.    Q1 2019 Press Release

219.    On May 6, 2019, Defendants issued a press release (the "Q1 2019 press release"), reporting Q1 2019 earnings results and forecasting revenue (i.e., revising guidance downward) for

1  FY 2019:

2         ***Total revenue was $26.7 million for the first quarter of 2019*** compared to
3  $24.7million for the same period of 2018, an increase of 8%. ***This increase
       resulted primarily from growth in adoption of the PROPEL® family of products***
4  and from adoption of SINUVA®, which contributed $0.9 million, or 4% of first
       quarter 2019 revenue.

5                                                 ***

6         ***Intersect ENT is updating its outlook for revenue for the full year 2019 revenue
       to $113 to $117 million compared to prior guidance of $123 to $127 million***, and
7         for modest growth in the second quarter.

8  On the same day, Intersect filed a Form 8-K with the SEC attaching the Q1 2019 press release.

9        220.    The statements in ¶ 219 were materially false and misleading because Defendants
10  knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel
11  stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures
12  and financial results to meet revenue and growth targets and artificially inflate market expectations
13  as to Intersect's future performance.  Moreover, PROPEL sales were not driven by adoption but
14  rather benefited significantly from the undisclosed end-of-quarter bulk sales.  As a result, the
15  Company's reported financial results and guidance created a materially false and misleading
16  impression as to the underlying demand for the Company's PROPEL products and the growth of
17  its PROPEL business.

18                **2.**      **Q1 2019 Earnings Call**

19        221.    On May 6 2019, Defendants hosted a conference call with analysts and investors to
20  discuss Q1 2019 earnings results and FY 2019 outlook.  During the call, Defendant Earnhardt
21  reported Q1 revenue and blamed SINUVA for the disappointing results, "[t]otal revenue for the
22  first quarter was $26.7 million, an increase of 8% over the first quarter of last year. . . . The high
23  degree of effort required by both our sales and market access team has continued to impact our
24  ability to balance growth for both PROPEL and for SINUVA."

25        222.    Defendant Earnhardt also blamed SINUVA's launch on the revised downward
26  guidance, "[b]ased on our continued learnings and modifications to our commercial strategy, we
27  are revising our 2019 outlook to $113 million to $117 million a growth of 4% to 8%.  We expect
28  to deliver modest growth in the second quarter as we work through this transitionary period."

223.    Analysts questioned whether the revision in guidance was coming from soft PROPEL sales, to which Defendant Hilleman evaded the question:

> ANALYST: But just like -- this first question is really going to be on guidance. So obviously, you've taken a pretty healthy step down. You kind of walked through why that's the case in your prepared remarks. *But I guess just in terms of cadence, right, if we're looking at 2Q as only being a modest year-over-year growth rate, how should we think about like kind of the mix of that between PROPEL? I am guessing like the majority of that is coming from soft PROPEL. But then how should we think about PROPEL improving maybe in the back half of the year, seeing as it does sound like you've made some pretty substantial enhancements to kind of the reimbursement and sales structure so far already this year*.

> DEFENDANT HILLEMAN: Let me address your question. I think it's a very good question, and as we are thinking about the nature of work we need to do with the sales force, Allen, we also talked about making this field easier for physicians to access SINUVA. We certainly think that, that is going to be the focus in that. Our aim is absolutely to get both SINUVA and PROPEL to higher levels of growth over time. And how that will play out over the year we can give better visibility as we make progress.

224.    Analysts were confused by Defendants' renewed excuse that SINUVA was to blame when Defendants had previously represented in Q2 2018 that Intersect was addressing revenue issues by hiring additional staff.  Defendants stuck to their cover story – despite analyst questions about whether something other than SINUVA was responsible for lower revenue:

> ANALYST: Wanted to just start off with the -- kind of the balancing between PROPEL and SINUVA and kind of the allocation of resources that are seemingly kind of limiting the growth acceleration of both businesses.

> *This was the problem I think that you guys had called out last quarter and heading into the 2019 time frame, but you felt like you had taken the appropriate steps to staff up, especially on that PROPEL business, and you would kind of put your guidance range at a level that you thought had captured the ramp that would be associated with that*.

> So the question here is, what's the kind of a calculus or what gives you confidence this time around that you've identified exactly the right level of resources to get to the numbers that you've set out? And how did you arrive at that? *And what's changed? Because it feels like we had the same kind of issue before, you had visibility into these frictions. <u>What's changed between now and a couple of months ago</u>*?

> LISA D. EARNHARDT: Yes. Rich, I'll start with that, and then Jeri can supplement. And you're right, these are a lot of the same issues, and I think we

had hoped and believed that some of the friction was going to be streamlined with some of the earlier changes we've made, and we were wrong. ***And so we clearly have made some changes to our commercial strategy as it relates to increasing the number of field reimbursement team members. That's, obviously -- those are putting experts in the field who will be focused day and night on getting patients treated with SINUVA and educating our accounts.***

***This is, obviously, something that the sales team has had to spend a disproportionate amount of time on.*** It's not what they do best, and so we're refocusing them on sort of creating demand and driving clinical value and great clinical outcomes and really supplementing them with sort of experts in the field at the access problem. So I think that's where we – we're slow out of the gate to getting those resources, getting the right resources on board.

And I think that and combined with creating sort of a new role on the sales team around SINUVA specialists, which we just started doing in April just to kind of, once again, free up the sales team with some of the detail that's required around SINUVA and putting some of our best resources so that we can effectively walk and chew gum at the same time. But certainly not how we had intended this year to play out.

\*\*\*

ANALYST: A couple of questions, first on SINUVA. Lisa, ***can you go into some more detail on why the changes you made 9 months ago didn't have the impact you expected? And what's different this time?*** Because as you said, these are the same issues we were discussing then, and the proposed solution then was also throwing more resources at the problem. So is the difference now that these are going to be Intersect employees instead of third-party consultants? ***<u>Or is there something else that's materially different here?</u>***

DEFENDANT EARNHARDT: Yes. I do think that part of that is there are now dedicated full-time employees with us. ***And previously, we had tried to solve for the issue by using a contract sales organization to really bolster our PROPEL sales and make sure that during that -- during the SINUVA launch period we weren't dropping balls on PROPEL.***

***And we recognized that, that still left our sales organization and our sales representatives with doing a lot of the work as it relates to SINUVA, which creating the clinical demand, ensuring great clinical outcomes is right in their sweet spot.*** And I would put our sales team against any other as it relates to their capabilities there.

But what they aren't as skilled at, because it's not their typical medical device job, is all the work that's required for [public] access. And so instead of working primarily just without third parties there, the small team we've actually really bolstered that organization. And with 20-people strong, I feel significantly better than I did.

In retrospect, as I look back, we definitely underpowered some of the market

access piece of this launch going into it, and I think we've learned that the hard way the last several quarters.

225.    The statements in ¶¶ 221-24 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet its revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results and guidance created a materially false and misleading impression as to the underlying demand for the Company's PROPEL products and the growth of its PROPEL business.   In addition, the statements in ¶¶ 221-24 were materially false and misleading because they (1) misleadingly implied "the transitionary period" of weak growth in PROPEL sales was due to the SINUVA launch and related staffing issues and (2) failed to identify Intersect's channel stuffing as a material factor in that weak growth.

### 3.    Q1 2019 10-Q

226.    On May 7, 2019, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2019 fiscal year first quarter (the "Q1 2019 10-Q").  The Form 10-Q was signed by Defendants Earnhardt and Hilleman, and reported the Company's financial results for Q1 2019 as follows:

> ***Revenue increased $2.0 million, or 8%, to $26.7 million during the three months ended March 31, 2019***, compared to $24.7 million during the three months ended March 31, 2018. The growth in revenue was attributable to an increase in unit sales and average selling price of our PROPEL family of products and initial sales of SINUVA, which contributed approximately 4% to revenue during the three months ended March 31, 2019.

227.    The statements in ¶ 226 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet its revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial results created a materially false and misleading impression as to the underlying demand for the

1  Company's PROPEL products and the growth of its PROPEL business.

2  **L.      May 14, 2019 Bank Of America Merrill Lynch Healthcare Conference**

3  228.      During the May 14, 2019, Bank of America Merrill Lynch Healthcare Conference

4  analysts were surprised to hear that Q1 2019 revenue declined from Q4 2018, which Defendants

5  again blamed on SINUVA:

> ANALYST: Got it. So then can we -- let's shift gears, maybe talk about SINUVA. Because you just -- you know obviously, the launch has been a bit of a struggle, and we talked about it quite a bit over the course of the last 12 months. ***But I guess I was just particularly surprised this quarter where it went down from the fourth quarter, and obviously, there's a little seasonality in that, but the number is just so low that seasonality seems like it shouldn't matter at this point. You're going from whatever low 1s to high hundreds of thousands. So I just why did it take a step backwards in the first quarter?***
>
> DEFENDANT EARNHARDT: Yes. It's a great point, Bob, because we did see a decline in overall revenue, Q4 to Q1. Encouragingly, we did see a step-up in enrollments which is the number of prescriptions for SINUVA. Our challenge really was getting those patients from being prescribed SINUVA to actually being treated with SINUVA. So it's really sort of managing patients through that funnel, and that's what we saw in March. We've continued to see it in April which has, hey, we've got the demand there. We know the outcomes continue to be fantastic for the patients, but we are still struggling with the market access piece of it. We can talk about some of the changes that we're making.
>
> ***But that's really why the first quarter was what it was. We did beat our guidance number, so we felt good about delivering on our overall commitment for the first quarter. But clearly, based on our experience in margin, April chose to take a step back, look at everything that was happening.*** And the totality of sort of the headwinds facing the business and decided to lower guidance as part of that.
>
> ANALYST: Okay. Okay. And then yes, revenue was down 20%.
>
> DEFENDANT EARNHARDT: Yes.
>
> ANALYST: ***<u>So what happened? I don't feel like I understand it. How did it get worse in terms of – I imagine that gap was closer in the couple of preceding quarters. So why did that gap widen?</u>***
>
> DEFENDANT EARNHARDT: Yes. Jeri, do you want to talk about some of the challenges and...
>
> DEFENDANT HILLEMAN: Well, I think part of it. ***Yes. I think there's a number of challenges for SINUVA.*** But just to talk about the relative measures,

enrollment will often play out in the following quarter because there's a lag between when a patient is first put into the system and when they actually receive treatment. So you can't really compare the quarterly revenue with the quarterly enrollments. They're a little bit off. And I think that's something that***, as we went through and had a very busy December that was part of – SINUVA really didn't get brought up, and the doctors were focused on other procedures and so forth.*** So I think that's just some of the little puts and takes of seasonality.

ANALYST: Yes. Okay. And just maybe a couple of comments on the base business because, yes, as you said, you hit the quarter relative to the guidance, but almost certainly as PROPEL did a little better and SINUVA did a little worse. ***So what -- just kind of your thoughts on how the base business is doing?*** When you look at the guidance for 2019, my assumption would be you've probably taken a very limited view of PROPEL until you have J code and assume there's not much more in the current run rate embedded in the guidance. So that implies somewhere in the high single digits for PROPEL. So is that a reasonable way to think about how you guys are thinking about the business?

DEFENDANT HILLEMAN: Yes. I think that really does accurately reflect the interpretation of the guidance. ***And if you look at the challenges, we're very committed to working through the product access process with SINUVA, and that is going to take some time for the field reimbursement team to get up to speed and be able to create more bandwidth for the sales force. And so that means that PROPEL, there's going to be a balance and trade-off between the 2 products.*** I think as we look though, in terms of our ability to add new accounts, we added about 40 new accounts in the first quarter, so I think we continue to see we're able to fill and drive PROPEL forward that way.

And then as the sales force can rebalance a little bit better, there's also going to be the opportunity to work with doctors and get them up the usage curve which has always been a very strong source of growth for us. So I think the activities continue to be strong in place, and it's really more a matter of just how we're making the trade-offs in people's time in the sales force.

ANALYST: Did PROPEL surprise you in the quarter? I mean did it do a little better than you thought?

DEFENDANT HILLEMAN: I think it came in right about where we wanted it to and where we thought it would.

229.    The statements in ¶ 228 were materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Intersect was reliant upon an illicit channel stuffing scheme, as described in ¶¶ 66-136, which artificially inflated the Company's sales figures and financial results to meet its revenue and growth targets and artificially inflated market expectations as to Intersect's future performance.  As a result, the Company's reported financial

1   results and guidance created a materially false and misleading impression as to the underlying

2   demand for the Company's PROPEL products and the growth of its PROPEL business.   In

3   addition, the statements in ¶ 228 were materially false and misleading because they (1)

4   misleadingly implied that weak growth in PROPEL sales was due to the SINUVA launch and

5   related staffing issues and (2) failed to identify Intersect's channel stuffing as a material factor in

6   that weak growth.

7   **VII.   ADDITIONAL MATERIALITY ALLEGATIONS**

8         230.   On Intersect's August 1, 2019 earnings call for Q2 2019, interim CEO Gallahue

9   stated that one measure of the Company's discounted bulk sales was "maybe 2%, 3%" of "total

10   annual revenues."   It was unclear, however, whether this statement was in response to an analyst

11   question concerning the degree that bulk sales contributed to revenue during the six quarter period

12   between Q1 2018 and Q2 2019 or a second question from the same analyst concerning the levels

13   of excess inventory on the shelves of Intersect's customers that needed to be cleared in order for

14   sales to return to normal levels.   Specifically, the exchange between Gallahue and the analyst was

15   as follows:

16
17         ANALYST: … First, when did the stocking start, and maybe you could help us
understand how much it contributed in 2018 and first half of '19? And where are
levels now and what do they need to come down to?

18
19         GALLAHUE: … And so it really wasn't anything that was sudden, ***it was just
something that built over probably the last 6 or so quarters***, where the behavior
20   in the field was a little bit more on the support side with SINUVA, maybe a little
bit more on the transactions with customers, a little bit less on the PROPEL pull
21   through and so it was sort of a bit by bit sort of process that grew up over time.
Just to gauge this though, ***we're talking about is a few percentage points of the***
22   ***total annual revenues, maybe 2%, 3%*** or so, so it sort of gets you in the right
ballpark. So not a substantial impact on any given period. It's just that as we work
23   to help our customers work that off and turn our priorities or I should say balance
our priorities back on market development, ***it's going to be a process that over 1,***
24   ***2, 3 quarters, we're going to see that sort of inventory of the customers working***
***its way through,*** and we'll be able to focus on what's really the right thing for us
25   to be doing, which is building the long-term demand of the PROPEL product.

26
27         231.   In an analyst report dated August 1, 2019, authored by Brian Weinstein, Andrew

28   Brackmann and Casey McClelland of William Blair, those analysts construed Gallahue's

admission as relating to **inventory buildup, _not_ the effect on overall revenue in prior periods**. Specifically, they wrote:

> Interestingly as it relates to revenue, management came forward with the admission sales have been bolstered over the last six or so quarters through the offering of discounts on high-volume orders. ***This has led to an increase in the number of devices on customer shelves, and at present it is estimated there is approximately 2% to 3% of annual revenue ($2.2 million to $3.2 million) at customers.*** As such, the team will need to work down this volume over the coming one to two quarters, which helps explain part of the reason why management is taking 2019 guidance from $115 million at the midpoint, to roughly $108.5 million (flat year-over-year). It also explains why the team is now rightsizing its manufacturing production to better reflect demand in so doing will see less than typical overhead absorption and a 2020 gross margin that is likely to be below historical levels of roughly 80%.

232.    Thus, the William Blair analysts interpreted Gallahue's statement of "maybe 2%, 3%" of "total annual revenues" to refer to the amount of excess PROPEL inventory "on customer shelves" at the time of Gallahue's statement (in response to the question "where are levels now"), rather than a quantification of the percentage of sales that were discounted bulk sales over the six quarter period between Q1 2018 and Q2 2019.[4]   Intersect's total revenue for FY 2018 was $108,472,000.   Two percent of that amount is $2,169,440, and three percent of that amount is $3,254,160.[5]   Thus, two to three percent of total annual revenues equated to roughly $2.2 to $3.2 million, which is the amount William Blair estimated to represent the accumulated excess inventory of PROPEL products on the shelves of Intersect's customers, not the total amount of channel stuffing that occurred over the six quarter period between Q1 2018 and Q2 2019.

233.    A number of factors confirm that William Blair's interpretation of Gallahue's admission was correct, including but not limited to: (1) subsequent statements from Defendant

---

[4] To be clear, the relevant six quarter period in which the channel stuffing occurred was Q4 2017 through Q1 2019, but Plaintiff here is referring to the question from the analyst to which Gallahue was responding when he mentioned the 2%-3% of annual revenue, which referred to 2018 and the first half of 2019.

[5] The amount would be slightly different if the one year period was calculated as the four quarter period ending on March 31, 2019 or the four quarter period ending on June 30, 2019, but not materially so.   Total revenue for the four quarter period ending on March 31, 2019 was $110,422,000 and 2% to 3% of that amount would be between $2,208,440 and $3,312,660.   Total revenue for the four quarter period ending on June 30, 2019 was $110,781,000, and 2% to 3% of that amount would be between $2,215,620 and $3,323,430.

1   Hilleman and Intersect's new CEO West; (2) Intersect's financial performance throughout 2019;

2   and (3) the statements of multiple confidential witnesses.

3        234.    First, on Intersect's November 1, 2019 earnings call for Q3 2019, Defendant

4   Hilleman stated, "We also estimate that we cleared in the range of $1.5 million to $2 million of the

5   customer inventory accumulation sold in prior quarters, which lowered our Q3 results

6   commensurately.  We maintain our outlook for approximately flat growth over 2018."  New CEO

7   West similarly referred to the $1.5 million to $2 million in customer inventory that had been

8   cleared from the channel and explained that this amount represented a subpart of the inventory

9   buildup that had been previously disclosed on the August 1, 2019 call.   Specifically, West

10  responded to a question from analyst as follows:

> ANALYST:  I have a couple [questions] here.  Just I know that the PROPEL
> business was impacted by some inventory work down in the quarter.  I was just
> hoping you could update us on how we should think about that working its way
> through into the fourth quarter if anything and beyond? …
>
> WEST:  Sure.  So 2 parts to your question.  First, relative to inventory.  *As we just
> stated, we took about $1.5 million to $2 million of inventory out of the channel
> that had been built up.  I believe on our last call, we said we were in the range
> of $2 million to $3 million overall.  So we still have a bit of work to do in the
> fourth quarter*.  But as I noted, I think that will be largely behind us as we close
> out the year. …

18       235.    Thus, West's comments made clear that Gallahue's reference in the August 1, 2019

19  call to "maybe 2%, 3%" of "total annual revenues" referred to the accumulation of excess

20  inventory by Intersect's customers, not a measurement of the percentage of total sales that the

21  discounted bulk sales represented over the six quarter period between Q1 2018 and Q2 2019.[6]

22  West's comments also made clear that of the roughly $2.2 million to $3.2 million in inventory

23  accumulation at the end of Q2 2019, roughly $1.5 million to $2.0 million was cleared in Q3 2019,

24  and the remainder (approximately $0.7 million to $1.2 million) was expected to be cleared in Q4

25  2019.

---

27  [6] No reference to "2 million to $3 million" was made in the August 1, 2019 earnings call—only
    Gallahue's statement concerning 2%-3% of annual revenues.  Therefore, Gallahue's statement

28  concerning 2%-3% of annual revenues was the only statement to which West could have been
    referring as the relevant disclosure on the previous call.

236.    Second, Intersect's financial performance over the course of Q2 2019 through Q4 2019 confirms the materiality of the channel stuffing scheme and the previous excess inventory accumulation.  In a December 4, 2019 letter to the SEC, Intersect reported that its revenue growth in 2018 was driven by a 9% increase in PROPEL unit sales.[7]  In contrast, as reported in Intersect's Form 10-K for the 2019 fiscal year (filed on February 27, 2020), Intersect experienced a 4% decline in PROPEL unit sales in 2019.[8]  However, Intersect reported an increase in PROPEL unit sales in Q1 2019.[9]  Thus, the decline in PROPEL unit sales in 2019 must have been concentrated in Q2 2019 through Q4 2019 (and must have exceeded 4% for those three quarters, in order to offset the increase in unit sales for Q1 2019).  That PROPEL unit sales grew consistently throughout 2018 (by 9%) and then declined for a sustained period following the termination of the bulk discounts in Q2 2019 (by more than 4% over the course of Q2 2019 through Q4 2019) is strong evidence that Defendants' channel stuffing practices over the course of the Class Period had a lasting material effect on Intersect's financial performance (for a period of at least three quarters).  Moreover, while Intersect partially compensated for the decline in PROPEL unit sales with an increase in the average selling price, overall revenue from PROPEL still declined, rather than grew, over the course of Q2 2019 through Q4 2019, as reflected in Table 1, *infra*.

237.    Third, as detailed *supra* (in ¶¶ 70-136), multiple confidential witnesses observed that bulk discount sales comprised a much higher percentage of Intersect's PROPEL sales than merely 2%-3%.  These accounts, combined with West's admissions on the November 1, 2019 earnings call and Intersect's financial performance from Q2 2019 through Q4 2019, together

---

[7] This letter was in response to a November 22, 2019 letter from the staff of the SEC requesting additional information from Intersect about the significant drivers behind material changes in Intersect's results of operations.  Intersect's response letter was not available at the time that the First Amended Complaint was filed.

[8] Specifically, Intersect stated, "Lower PROPEL revenue in 2019 resulted from a 4% decrease in unit sales, offset by a 3% increase in average selling price."

[9] In its Q1 2019 10-Q, Intersect reported that its growth in revenue "was attributable to an increase in unit sales and average selling price of our PROPEL family of products and initial sales of SINUVA, which contributed approximately 4% to revenue during the three months ended March 31, 2019."  Intersect did not report a specific amount of the increase of unit sales in PROPEL products, but according to a May 7, 2019 analyst report from Guggenheim, the increase in PROPEL revenue during Q1 2019 implied "2-3% growth on a unit basis."

1  suggest that the 2%-3% figure offered by Gallahue referred only to the accumulated inventory
2  buildup as of the end of Q2 2019 and not to the overall contribution of discounted bulk sales to
3  Intersect's overall revenue during the Class Period.   These facts also substantially undercut
4  Gallahue's assertion that the discounted bulk sales did not have "a substantial impact on any given
5  period."

6         238.   Given Intersect's failure to disclose the impact of the discounted bulk sales on a
7  quarter-by-quarter basis, a precise quantification of the channel stuffing scheme on each of the
8  quarters in the Class Period is not possible.  However, by examining the quarterly growth trends in
9  PROPEL sales and working backwards from the inventory accumulation at the end of the Class
10 Period, a few key facts are apparent, particularly with respect to the final three quarters of the
11 Class Period.

12        239.   As a starting point, the inventory buildup of $2.2 million to $3.2 million of
13 PROPEL product on customer shelves at the end of the Class Period reflects the accumulated
14 aggregate effect of Defendants' channel stuffing scheme *as of the end of Q2 2019* (or, more
15 precisely, as of August 1, 2019, the date of the Q2 2019 earnings call).  *The accumulated*
16 *aggregated effect of Defendants' channel stuffing scheme as of the end of Q1 2019 was*
17 *necessarily higher*.  That is because, according to Gallahue on the August 1, 2019 earnings call,
18 Intersect began to "scale back on the higher volume orders …. immediately at the end of Q2
19 [2019] and felt its adverse impact on short-term revenues in the quarter."   Thus, the excess
20 inventory that had accumulated in the channel as of March 31, 2019 had an opportunity to begin to
21 dissipate, and new channel stuffing did not occur in Q2 2019, because the discounted bulk sales
22 practices were discontinued near the end of Q2 2019 and caused an adverse impact on revenues in
23 that quarter.

24        240.   One way of estimating the size of the additional amount of accumulated excess
25 inventory as of the end of Q1 2019 is to look at the dissipation rate of the accumulated excess
26 inventory as of Q2 2019.  Gallahue stated on the August 1, 2019 call that working through the
27 approximately $2.2 million to $3.2 million of excess inventory in the channel would be a
28 "process" that was expected to take between one and three quarters.  Later, Intersect informed that

investors that it had been able to work through $1.5 million to $2.0 million in Q3 2019 and expected to work through most of the rest of it in Q4 2019 (*i.e.*, that the process would take roughly two quarters).  Assuming that $2.2 million to $3.2 million dissipated over two quarters, the average amount of dissipation would be $1.1 million to $1.6 million per quarter.  Assuming that $2.2 million to $3.2 million dissipated over three quarters, the average amount of dissipation would be $0.7 million to $1.1 million per quarter.  Thus, assuming that excess inventory dissipated at roughly the same rate during Q2 2019, a reasonable estimate of the incremental additional excess inventory as of March 31, 2019 would be between $0.7 million and $1.6 million, and a reasonable estimate of the total excess inventory in the channel as of March 31, 2019 would be between $2.9 million and $4.8 million.

241.   Below in Table 1 is a summary of Intersect's revenues between Q4 2017 and Q4 2019, including a breakdown of revenue attributable to the Company's PROPEL products and revenue attributable to SINUVA.[10]

| Period | Total Revenue | Change In Total Revenue YoY | Change In Total Revenue YoY (%) | SINUVA Revenue[11] | PROPEL Revenue | Change In PROPEL Revenue YoY | Change In PROPEL Revenue YoY (%) |
|---|---|---|---|---|---|---|---|
| Q4 17 | $29,529 | $5,298 | 21.9% | $0 | $29,529 | $5,298 | 21.9% |
| Q1 18 | $24,723 | $4,249 | 20.8% | $260 | $24,463 | $3,989 | 19.5% |
| Q2 18 | $26,300 | $2,315 | 9.7% | $512 | $25,788 | $1,803 | 7.5% |
| Q3 18 | $24,666 | $2,353 | 10.5% | $815 | $23,851 | $1,538 | 6.9% |
| Q4 18 | $32,783 | $3,254 | 11.0% | $1,174 | $31,609 | $2,080 | 7.0% |
| Q1 19 | $26,673 | $1,950 | 7.9% | $941 | $25,732 | $1,269 | 5.2% |
| Q2 19 | $26,659 | $359 | 1.4% | $1,096 | $25,563 | ($225) | -0.9% |

[10] All dollar amounts in this table are in thousands of dollars.

[11] Before Q2 2019, Intersect only reported SINUVA revenue rounded to the nearest $100,000. Starting in Q2 2019, however, Intersect began to report SINUVA revenue rounded to the nearest $1000 and provided prior period comparisons that allowed more precise calculations of SINUVA revenue for prior periods.

| Period | Total Revenue | Change In Total Revenue YoY | Change In Total Revenue YoY (%) | SINUVA Revenue [11] | PROPEL Revenue | Change In PROPEL Revenue YoY | Change In PROPEL Revenue YoY (%) |
|--------|-------------|----------|----------|----------|----------|----------|----------|
| **Q3 19** | $24,056 | ($610) | -2.5% | $1,094 | $22,962 | ($889) | -3.7% |
| **Q4 19** | $31,754 | ($1,029) | -3.1% | $1,354 | $30,400 | ($1,209) | -3.8% |
| **Q1 20** | $19,826 | ($6,847) | -25.6% | $736 | $19,090 | ($6,642) | -25.8% |

242.    As reflected in Table 1, Intersect reported growth in both overall revenues and in revenues attributable to PROPEL throughout the Class Period, although growth started to slow down in the latter portion of the Class Period.  Reported growth in PROPEL revenues was at around 20% for Q4 2017 and Q1 2018, slowed to around 7% for Q2 2018, Q3 2018 and Q4 2018, and then dropped to around 5% for Q1 2019.  Intersect then reported declines in PROPEL revenues for three consecutive quarters (Q2 2019, Q3 2019, Q4 2019).[12]

243.    Of particular relevance are the three latter quarters within the Class Period (Q3 2018, Q4 2018, and Q1 2019).  For these three quarters, Intersect reported modest growth in PROPEL revenues, ranging from 5% to 7%.  In terms of dollar amounts, the growth in PROPEL revenues was roughly $1.5 million for Q3 2018, roughly $2.1 million for Q4 2018, and roughly $1.3 million for Q1 2019 (and thus roughly $4.9 million for the entire nine month period).  It is instructive to compare these amounts to the accumulated excess inventory as of the end of Q1 2019, which, as detailed *supra*, was likely in the range of $2.9 million to $4.8 million.  Thus, one can infer that a substantial majority of the reported growth in PROPEL revenues for the nine month period consisting of Q3 2018, Q4 2018, and Q1 2019 (somewhere between 59% to 98%) was attributable to Defendants' channel stuffing practices.  Moreover, it is likely that most of the accumulated inventory in the channel as of March 31, 2019 had entered into the channel during Q1 2019 and Q4 2018.  During those two quarters, the total reported growth in PROPEL revenue was only $3.3 million.  It is therefore likely that absent Defendants' channel stuffing practices,

[12] Intersect also reported a very significant decline in PROPEL revenue for Q1 2010, although this drop appears to be principally related to COVID.

Intersect would have been required to report *negative growth* in PROPEL revenues for those two quarters (just as Intersect was forced to do in the three quarters following the Class Period).

244.    Intersect's reported growth trends in PROPEL revenues during the Class Period and its subsequent admissions concerning inventory buildup make it clear that Defendants' channel stuffing practices materially distorted Intersect's financial profile and growth trends during the Class Period.  Defendants' channel stuffing concealed the decline in demand for PROPEL products and delayed the day of reckoning when Intersect was finally forced to admit that natural demand for PROPEL was contracting rather than expanding.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

245.    As alleged herein, Defendants acted with scienter because Defendants knew the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Intersect, their control over, and/or receipt and/or modification of Intersect's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Intersect, participated in the fraudulent scheme alleged herein.

### A.      PROPEL Is Intersect's "Bread and Butter"

246.    The fraud alleged herein relating to concealing of the true state of affairs with respect to Intersect's revenue growth and financial success, which involved Intersect's core operations, and knowledge of the fraud may therefore be imputed to the Officer Defendants.

247.    Specifically, PROPEL was the Company's primary and most important product and the success of PROPEL sales on operations was undoubtedly crucial to the Company's viability and success.  With respect to PROPEL, Defendants acknowledged on multiple occasions that PROPEL was the Company's "bread and butter."

248.    For example, at the January 1, 2019 JPMorgan Healthcare Conference, Defendant

Earnhardt lauded PROPEL, "[s]o let's talk a little bit more about the PROPEL family, which is the bread-and-butter of our business today."

249.    The Company's 2018 Form 10-K, signed by Defendants Earnhardt and Hilleman, reported that Intersect's "*revenue has been derived almost exclusively from the sales of our PROPEL family of products*."

### B.    Defendants Tracked Inventory And Bulk Sales

250.    Defendants Earnhardt and Hilleman were substantially involved in the details of the Company's operations, including the sale of PROPEL products and Intersect's financial forecasts.

251.    The Officer Defendants, as members of Intersect's corporate management, had access to and reviewed reports, utilization data and information about PROPEL sales, internal projections and inventory.  Specifically, Defendants had access to salesforce.com, which made bulk sales readily identifiable.

252.    Further, on Intersect's May 1, 2018 Q1 2018 earnings call, Defendants admitted that they tracked inventory, as Defendant Hilleman stated, ***"We track inventory very close to usage so we're not building up inventory."***

### C.    Defendants' Mid-Class Cover-Up Provides Evidence of Scienter

253.    Defendants' mid-class cover-up is further evidence of the Officer Defendants' scienter.

254.    Specifically, when Defendants were asked about the Q2 guidance miss and revised revenue guidance for FY 2018 on August 1, 2018, during Defendants' hosted conference call, and Q1 2019 results and revised revenue guidance for FY 2019 on Defendants' February 27, 2019 conference call, Defendants misleadingly blamed SINUVA and "sales rep distraction" for the guidance miss and downward adjustment, which was revealed to be false by new management following Q2 2019.

255.    As detailed *supra*, throughout the remainder of the Class Period (i.e., between August 2018 and August 2019), Defendants continually offered misleading explanations for why Intersect's guidance was conservative and successively lowered, blaming the entire problem on the SINUVA launch and staffing issues related to SINUVA and failing to disclose the Company's

channel stuffing practices.  This continued reliance on a false narrative is further evidence that Defendants knew that their omission to disclose the Company's channel stuffing practices was misleading to investors.

    **D.**    **Defendant Earnhardt's Resignation And Defendant Hilleman's Departure Strengthens The Inference Of Scienter**

256.    The departure of Officer Defendants from their positions as CEO and CFO also strengthen the inference of scienter given the facts, timing, and circumstances of Defendants' departures from the Company.

257.    On May 6, 2019, Intersect announced that Earnhardt was to step down as CEO, effective June 5, 2019:

> Intersect ENT, Inc., a company dedicated to transforming care for patients with ear, nose and throat conditions, today announced that Lisa Earnhardt will be stepping down from her role as Chief Executive Officer on June 5, 2019 to accept another opportunity.

> Kieran Gallahue, the company's Lead Director, has been appointed Executive Chairman of the Board of Directors, effective May 7, 2019, and Interim Chief Executive Officer, effective June 5, 2019.  Ms. Earnhardt will remain a member of the Intersect ENT Board.

258.    Earnhardt is no longer on Intersect's Board.

259.    On June 27, 2019, Intersect announced that Hilleman was to step down as CFO in 2020:

> The company also today announced that Jeryl ("Jeri") Hilleman, Chief Financial Officer, will step down as part of a planned transition at the beginning of 2020 so that she can focus on board responsibilities.  The Board has initiated a search process to identify Intersect's ENT's next CFO.

260.    On June 26, 2020, Defendant Binney left Intersect.

    **E.**    **Defendants' Precision Stuffing Supports A Strong Inference Of Scienter**

261.    As detailed *supra*, the three most critical quarters of the Class Period were Q3 2018, Q4 2018, and Q1 2019, because during those periods natural growth in PROPEL sales was markedly declining, and in Q4 2018 and Q1 2019 in particular, Intersect likely would have recorded negative growth in PROPEL revenue in the absence of discounted bulk sales used to conceal the natural growth trends.  *See supra* at ¶¶ 230-244.  In each of the three quarters,

1 Defendants used channel stuffing in order to artificially satisfy analysts' consensus expectations

2 for PROPEL revenue growth.

3       262.    Following Intersect's issuance of its financial results for Q3 2018 on November 5,

4 2018, Guggenheim published a report on November 5, stating, "After backing out the contribution

5 from Sinuva, we estimate that the base Propel/Contour business grew 7% in 3Q to $23.7M,

6 *modestly ahead* of the consensus forecast of $23.4M."

7       263.    Following Intersect's issuance of its financial results for Q4 2018 on February 25,

8 2019, Guggenheim published a report on February 26, stating, "Fourth quarter Propel/Contour

9 sales grew 7% to $31.6M, *modestly ahead* of the consensus forecast of $30.9M."

10      264.    Following Intersect's issuance of its financial results for Q1 2019 on May 6, 2019,

11 Guggenheim published a report on May 7, stating, "First quarter Propel/Contour sales grew 5% to

12 $25.8M, *modestly ahead* of the consensus forecast of $24.9M."

13      265.    That Intersect posted three consecutive quarters of modestly beating consensus

14 estimates—during a time in which, in the absence of Defendants' channel stuffing practices,

15 Intersect would have fallen short of those estimates and shown either negative growth or lower

16 than consensus growth—is evidence of precision stuffing.  In other words, in each quarter,

17 Intersect was able to manufacture just enough revenue to beat consensus estimates and give itself a

18 slight cushion.  This pattern bears the hallmarks of an intentional smoothing of Intersect's

19 financial results.  Given that Intersect had already missed its guidance in Q2 2018 and lowered its

20 revenue guidance for the remainder of the year (suffering a punishing stock drop), Defendants

21 were loathe to allow Intersect to miss its revised guidance.  Defendants therefore used channel

22 stuffing practices to conceal the declining growth and/or negative growth in Intersect's core

23 PROPEL business while failing to disclose that bulk discounted sales were the driving force

24 behind Intersect's modest success.

25 **IX.    CORPORATE SCIENTER ALLEGATIONS**

26      266.    Throughout the Class Period, Defendants Earnhardt and Hilleman served as CEO

27 and CFO.  As CEO and CFO, Individual Defendants signed each of the Class Period SEC filings

28 on behalf of Intersect.  Defendants Earnhardt and Hilleman, therefore, acted with apparent

1   authority to speak on behalf of the Company and their statements were made with the imprimatur

2   of the Company that selected them to speak on its behalf.  Moreover, as CEO and CFO, Earnhardt

3   and Hilleman were highly involved in the preparation, review, finalization, and issuance of the

4   Company's financial statements, and investors relied on their honesty and integrity.

5         267.   Defendant Binney served as the Intersect's Chief Commercial Officer from January

6   2019 to June 26, 2020, and, prior to that, served as a high-ranking Vice President of Sales and

7   Marketing (from April 2018 through January 2019) and Vice President of Sales (from July 2011

8   through April 2018).  Thus, during the entirety of the Class Period, Binney served as either a C-

9   level officer or, at the very least, a high-ranking member of management.  In his role of Chief

10  Commercial Officer, he was involved in the preparation, review, finalization and issuance of the

11  Company's financial statements, and, before that, he knew that the sales information he was

12  providing to Intersect would be incorporated into its public statements.  Binney was involved in

13  approving bulk sales and in overseeing these sales practices throughout the organization.

14        268.   Based on the foregoing, Defendant Earnhardt, Hilleman, and Binney's actions,

15  knowledge and scienter are imputable to Intersect at all times during the Class Period.  Defendants

16  Earnhardt, Hilleman, and Binney acted as an agent of Intersect, both with respect to the SEC

17  filings that they signed and also with respect to the SEC filings and earnings releases that they

18  assisted in preparing and/or that their  oversaw or participated in the accounting for.  Therefore,

19  Defendants Earnhardt, Hilleman, and Binney's knowledge and states of mind are imputable to

20  Intersect for all of the challenged statements in this Complaint, whether or not they personally

21  signed those statements.

22        269.   In addition to the Individual Defendants, the actions, knowledge and scienter of a

23  number of relevant non-parties are also imputable to Intersect at all times during the Class Period.

24  These include, but are not limited to, Michelle Bunton, Dan Madera, Greg Mielke, Terrell

25  Hickmon, David Thompkins, and other management-level employees employed during the Class

26  Period.

27        270.   As alleged herein, corporate scienter can be inferred separately and apart from the

28  scienter of the Individual Defendants.

SECOND AMENDED CLASS ACTION COMPLAINT

1  **X.      CLASS ACTION ALLEGATIONS**

2         271.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

3  Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

4  purchased or otherwise acquired Intersect securities between February 27, 2018 and August 1,

5  2019, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are

6  Defendants, the officers and directors of the Company, at all relevant times, members of their

7  immediate families and their legal representatives, heirs, successors, or assigns, and any entity in

8  which Defendants have or had a controlling interest.

9         272.    The members of the Class are so numerous that joinder of all members is

10 impracticable.   Throughout the Class Period, Intersect's common shares actively traded on the

11 NASDAQ.   While the exact number of Class members is unknown to Plaintiff at this time and can

12 only be ascertained through appropriate discovery, Plaintiff believes that there are at least

13 hundreds or thousands of members in the proposed Class.   Millions of shares of Intersect common

14 stock were traded publicly during the Class Period on the NASDAQ.   Record owners and other

15 members of the Class may be identified from records maintained by Intersect or its transfer agent

16 and may be notified of the pendency of this action by mail, using the form of notice similar to that

17 customarily used in securities class actions.

18        273.    Plaintiff's claims are typical of the claims of the members of the Class as all

19 members of the Class are similarly affected by Defendants' wrongful conduct in violation of

20 federal law that is complained of herein.

21        274.    Plaintiff will fairly and adequately protect the interests of the members of the Class

22 and has retained counsel competent and experienced in class actions and securities litigation.

23        275.    Common questions of law and fact exist as to all members of the Class and

24 predominate over any questions solely affecting individual members of the Class.   Among the

25 questions of law and fact common to the Class are:

26        276.    (a)     whether the federal securities laws were violated by Defendants' acts as

27 alleged herein;

28        277.    (b)     whether statements made by Defendants to the investing public during the

1   Class Period omitted and/or misrepresented material facts about the business, operations, and

2   prospects of Intersect; and

3          278.   (c)      to what extent the members of the Class have sustained damages and the

4   proper measure of damages.

5          279.   A class action is superior to all other available methods for the fair and efficient

6   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

7   damages suffered by individual Class members may be relatively small, the expense and burden of

8   individual litigation makes it impossible for members of the Class to individually redress the

9   wrongs done to them.  There will be no difficulty in the management of this action as a class

10  action.

11  **XI.    LOSS CAUSATION**

12         280.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused

13  the economic loss suffered by Plaintiff and the Class.

14         281.   During the Class Period, Plaintiff and the Class purchased Intersect's securities at

15  artificially inflated prices and were damaged thereby.  The price of the Company's securities

16  significantly declined when the misrepresentations made to the market, and/or the information

17  alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

18  causing investors' losses.

19         282.   The truth regarding Intersect's financial condition and the undisclosed channel

20  stuffing scheme was partially revealed through a series of partial corrective disclosures and/or

21  partial materializations of concealed risks on or about: August 1, 2018, May 7, 2019, and August

22  2, 2019.

23         283.   The undisclosed risks alleged herein above that were created by Defendants' illicit

24  channel stuffing scheme eventually materialized when the Company failed to meet and was forced

25  to lower its 2019 guidance, due in part to its failure to meet sales targets as a result of the

26  previously undisclosed systemic bulk sales practices and the risks inherent in such practices. In

27  addition, Defendants ultimately admitted that they overstated the Company's 2019 revenue

28  guidance and that revenue for the remainder of 2019 (and beyond) would be impacted by ceasing

1    the Company's previously concealed channel stuffing practices.

2            284.    When Defendants' prior misrepresentations and fraudulent conduct, or the

3    economic consequences thereof, were disclosed and became apparent to the market, the price of

4    Intersect's securities declined disproportionately to the market and relevant peer indices, thereby

5    eliminating the prior artificial inflation.  This disproportionate decline in Intersect's share price,

6    including but not limited to, the disproportionate stock drops described below that occurred on

7    August 1, 2018, May 7, 2019, and August 2, 2019, caused economic damages to be incurred by

8    class members, including Plaintiff, who had purchased Intersect securities at artificially inflated

9    prices prevailing in the market during the Class Period.

10           285.    On August 1, 2108, Defendants markedly lowered the Company's revenue

11   guidance for the full year 2018 from $111 to $116 million to $106 to $109 million citing sales

12   force distraction caused by the launch of the SINUVA business segment.   On this partial

13   corrective disclosure and/or partial materialization of concealed risk, shares of Intersect stock

14   dropped $6.30 per share (over 19%), from a closing price of $32.35 per share on July 31, 2018, to

15   close at $26.05 per share on August 1, 2018, trading on very heavy volume.

16           286.    On May 6, 2019, Defendants drastically lowered the Company's revenue guidance

17   for the full year 2019 from $123 million to $127 million to $113 million to $117 million, again

18   citing sales force distraction caused by the launch of the SINUVA business segment.   On this

19   partial corrective disclosure and/or partial materialization of concealed risk, shares of Intersect

20   stock dropped $8.05 per share (over 24%), from a closing price of $33.15 per share on May 6,

21   2019, to close at $25.10 per share on May 7, 2019, trading on very heavy volume.

22           287.    On August 1, 2019, Defendants' concealed risks further materialized, upon the

23   Company's disclosure of Intersect's rampant channel stuffing scheme, which was responsible for

24   extremely disappointing Q2 2019 results, and Defendants' related announcement of further

25   downward revision to the Company's 2019 guidance.  On this partial corrective disclosure and/or

26   partial materialization of concealed risk, the Company's stock was hammered by massive sales,

27   sending the stock price plummeting to close at $16.50 on August 2, 2019, marking an ultimate

28   decline of over 18%.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

288.    The market for Intersect's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Intersect's securities traded at artificially inflated prices during the Class Period. On February 27, 2019, the Company's share price closed at a Class Period high of $35.35 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Intersect's securities and market information relating to Intersect and have been damaged thereby.

289.    During the Class Period, the artificial inflation of Intersect's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Intersect's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Intersect and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

290.    At all relevant times, the market for Intersect's securities was an efficient market for the following reasons, among others:

> (a)    Intersect shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> (b)    As a regulated issuer, Intersect filed periodic public reports with the SEC and/or the NASDAQ;
>
> (c)    Intersect regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of

press releases on the national circuits of major newswire services and through other

wide-ranging public disclosures, such as communications with the financial press

and other similar reporting services; and/or

    (d)    Intersect was followed by securities analysts employed by brokerage firms

who wrote reports about the Company, and these reports were distributed to the

sales force and certain customers of their respective brokerage firms.  Each of these

reports was publicly available and entered the public marketplace.

291.   As a result of the foregoing, the market for Intersect's securities promptly digested current information regarding Intersect from all publicly available sources and reflected such information in Intersect's share price. Under these circumstances, all purchasers of Intersect's securities during the Class Period suffered similar injury through their purchase of Intersect's securities at artificially inflated prices and a presumption of reliance applies.

292.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, based on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII.   NO SAFE HARBOR

293.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Intersect who knew that the statement was false when made.

## XIV. LEGAL CLAIMS ASSERTED

### FIRST CLAIM
**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against Defendants Intersect, Earnhardt and Hilleman**

294.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

295.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Intersect's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

296.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Intersect's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

297.    Defendants, individually and in concert, directly and indirectly, by the use, means

1   or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

2   continuous course of conduct to conceal adverse material information about Intersect's financial

3   well-being and prospects, as specified herein.

4        298.   Defendants employed devices, schemes and artifices to defraud, while in

5   possession of material adverse non-public information and engaged in acts, practices, and a course

6   of conduct as alleged herein in an effort to assure investors of Intersect's value and performance

7   and continued substantial growth, which included the making of, or the participation in the making

8   of, untrue statements of material facts and/or omitting to state material facts necessary in order to

9   make the statements made about Intersect and its business operations and future prospects in light

10  of the circumstances under which they were made, not misleading, as set forth more particularly

11  herein, and engaged in transactions, practices and a course of business which operated as a fraud

12  and deceit upon the purchasers of the Company's securities during the Class Period.

13       299.   Each of the Individual Defendants' primary liability and controlling person liability

14  arises from the following facts: (i) the Individual Defendants were high-level executives and/or

15  directors at the Company during the Class Period and members of the Company's management

16  team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and

17  activities as a senior officer and/or director of the Company, was privy to and participated in the

18  creation, development and reporting of the Company's internal budgets, plans, projections and/or

19  reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the

20  other defendants and was advised of, and had access to, other members of the Company's

21  management team, internal reports and other data and information about the Company's finances,

22  operations, and sales at all relevant times; and (iv) each of these defendants was aware of the

23  Company's dissemination of information to the investing public which they knew and/or

24  recklessly disregarded was materially false and misleading.

25       300.   Defendants had actual knowledge of the misrepresentations and/or omissions of

26  material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to

27  ascertain and to disclose such facts even though such facts were available to them.   Such

28  defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing Intersect's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

301.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Intersect's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Intersect's securities during the Class Period at artificially high prices and were damaged thereby.

302.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Intersect was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Intersect securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

303.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

304.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

1

2

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

3

4

305.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

5

6

7

8

9

10

11

12

13

14

15

16

306.    Individual Defendants acted as controlling persons of Intersect within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

17

18

19

20

307.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

21

22

23

24

25

26

308.    As set forth above, Intersect and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

27

28

XV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

XVI.   **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 29, 2020                                          **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Jennifer M. Leinbach
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

-and-

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall Dees
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

*Attorneys for Lead Plaintiff Avi Yaron*

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On July 29, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 29, 2020, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay