# EXHIBIT U

# Intersect ENT, Inc. NasdaqGM:XENT Company Conference Presentation

**Wednesday, May 16, 2018 9:00 PM GMT**

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants ................................................................... 3

Presentation ...................................................................... 4

Question and Answer ............................................................. 5

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

## EXECUTIVES

**Jeryl L. Hilleman**
*Chief Financial Officer*

**Lisa D. Earnhardt**
*Director*

## ANALYSTS

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

The next session here, very happy to have Intersect. Both Lisa and Jeri are here. So thank you for that. We appreciate you guys coming. This is going to be mostly a fireside chat format. I don't know Lisa, if you wanted to kick it off with anything or we could just go right into Q&A?

**Lisa D. Earnhardt**
*Director*
I think we just dive right in.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Great. So I'm going to apologize in advance, I'm going to ask a lot of reimbursement questions here.

**Lisa D. Earnhardt**
*Director*

I'm so surprised.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Yes. I know, I know. But I just -- it's such an important topic as you enter this new world of sort of hybrid reimbursement. So maybe could we just recap the events of the last 2 weeks? Maybe going to some of the background of kind of how we got to the decision a couple of weeks ago, where we go from here. And then I'll dive in with specifics.

**Lisa D. Earnhardt**
*Director*

Sure. I'll kick it off, and Jeri, you can jump in any time you would like. I think I'll just take one step back and just remind you all, so we have 2 different product lines. We have the PROPEL franchise, which is used in conjunction with sinus surgery. And the reimbursement situation there is relatively straightforward because sinus surgeries are typically reimbursed a set amount and any supply, including products like PROPEL, come right out of that, the facility reimbursement. What's new is what Bob alluded to is, with the SINUVA launch. So we're launching our first physician-administered drug. It's a product that can be used in lieu of sinus surgery in the physician's office under local anesthesia. So there's a lot of benefits there, as you might imagine, for the patient because they literally leave the office feeling better. The physician has a new alternative treatment for those patients. And then ultimately, it's a win for the health care system, because now we're treating them in a less invasive, potentially more cost-effective fashion. So Bob, you're specifically asking around the J-Code decision that was made last week. It was just a week ago. Wow, it's been a long week. But there was a decision made by CMS, a preliminary recommendation made by CMS and their hit picks group, which is in charge of creating new codes as needed for new products like a SINUVA. We had asked for a -- and submitted an application late last year for a product-specific J-Code, which are typically used for physician-administered drugs, which is what SINUVA is. Unfortunately, they did not agree with that and denied our application on a preliminary basis. So what has transpired in the last week is we've had a lot of interactions directly with CMS as well as AMA. And so the question is this, why didn't we bring AMA into the fold. And that is because in this case, CMS did a scan of all the various codes that could potentially be used for a product like SINUVA. And there is a category, there's actually 2 Category III codes for the placement of steroid-releasing sinus implants, which on the surface, SINUVA could potentially fall into. As it turns out though, those codes -- the AMA had a meeting in September of 2017 that we presented in conjunction with the American Academy of Otolaryngology, which is the large ENT Society, brought forth the proposal that those codes could be deleted. So the goal is really to simplify the coding system. There are other codes that could be used for the placement of our products because there's already work that's described in other CPT codes, especially with SINUVA. So those codes are actually -- effectively sunset at the end of this year. And CMS' recommendations for a new J-Code would be applicable starting January 1, 2019. So we're sort of in an interesting position, where obviously, CMS didn't have all the facts at the table or didn't consider all the facts when they made the recommendation. So the great news is we had the opportunity in the last week to pull together AMA and CMS. So now they fully appreciate that, yes, those codes are being deleted and they will no longer be effective as of January 1, 2019. We also sensed that have had the Academy, that AAO submit a letter, supporting the creation of a new J-Code. And then just yesterday, CMS had a public meeting where any applicant can put forth comments around their application. We obviously seized that opportunity and had an opportunity to explain our case in person to the CMS panel. So it was a great opportunity for us to clarify the situation

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

in terms of the CPT codes and some of the confusion there. We also were able to reference the fact that there are several other precedents of physician-administered drugs that haven't awarded product-specific J-Codes. We also referenced the fact that many commercial payers have recommended that providers use an unlisted J-Code in the absence of another code. So that's J3490, that's very consistent with what we have recommended. And we think that further cements the case that there's a programmatic need to have a separate code for SINUVA. So we made that case. It's an interesting process because there isn't a back and forth. There's not a decision made on the spot. In fact, they will make the final decision and that will be published in November. The good news is even in absence of having a product-specific J-Code for SINUVA, we still have -- will and will continue to use the unlisted code throughout 2018. And if we needed to, we could continue to use that code moving forward because we do believe that's the most appropriate code. And the most important thing is just to have a code to be able to submit a claim. That's all we need. It could be all variety of different codes. We just need a code and the unlisted code serves that purpose just fine. The more important thing, quite honestly, reimbursement is coverage. And I'm sure we'll talk about that as well.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Did you get any feedback from the meeting?

**Lisa D. Earnhardt**
*Director*

You know, that's the interesting thing. It's kind of a one-way communication. The way you kind of read into it is sometimes with the questions and sometimes with the comments from the audience. Anyone is invited to speak if they felt like they had an issue or questions. The good news is there was only one question and it was about whether you absolutely needed a J-Code to submit a claim to Medicaid, I believe, which is an interesting question. And yes you do, you can't just submit the NDC or the National Drug Code number. So that was more of a semantic discussion. And otherwise, we were encouraged that there weren't a -- there wasn't a lot of discussion about it. There weren't a lot of questions. And the feedback we've gotten from others, which seems like a pretty straightforward decision for CMS to make. Of course, the proof is in the pudding.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Yes. So that's sort of a natural segue. Can you just walk through, what are the potential range of outcomes for November? And depending on those ranges, how does that impact the launch?

**Lisa D. Earnhardt**
*Director*

Yes. And I'll let Jeri take that one, just to kind of shake it up a little bit.

**Jeryl L. Hilleman**
*Chief Financial Officer*

Sure. Yes. And I can just build on what Lisa just said. There are many solutions here that will work just fine and will not impact our ramp of SINUVA. But we would definitely, most highest probability and what we believe is appropriate and should happen is the issuance of a product-specific J-Code. However, there are some cases where there's been continuance of usage of the unassigned J-Code. We know from what we're seeing today that, that works very well for submission of claims. And then there are a couple of others more obscure codes that could be issued. But nonetheless, all of which would allow us to continue to submit claims to payers successfully.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

One of the things that spooked people a little bit when that first came out was some of the language that CMS was using about referencing a lack of clinical data. I understand what you guys have said. But when

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

you get that question from investors, what about the language that was used about some concerns about clinical evidence on the part of CMS?

**Lisa D. Earnhardt**
*Director*

Go ahead.

**Jeryl L. Hilleman**
*Chief Financial Officer*

Yes. They were really just referencing the CPT code, which does have that language in it. It refers to it as experimental investigational, which was a reference made to PROPEL and its use in office and how they're reviewing that product as -- under our request for separate reimbursement. This is also a procedural code. So they were talking about implementation of really when the decision was made, it was evaluating PROPEL in the in-office setting. And so since this code's being sunset, they were just looking for a code. Their job is really to make sure a product doesn't get assigned 2 codes. That would just be a recipe for total confusion. So they want to make sure, can it be described by a code that's out there or not. And if the answer is no, then they look at issuing codes. If the answer is yes, they refer to that code. And in this case, because it was a CPT 3 code with they were referencing the language on that rather than making a value judgment about SINUVA that's clinical evidence.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

So you mentioned 3 potential outcomes, a product-specific J-Code, an unassigned J-Code or some more obscure codes. Is there a scenario where it's just an outright no?

**Lisa D. Earnhardt**
*Director*

Well, we could always use -- we could always select to use the -- unassigned J-Code. And really, it's up to the pairs to say what do they want to see. And we already know a number of commercial payers have instructed providers, our physician customers to use the unassigned J-Code. So we don't think that, that would change in any way. They can't say, "Don't use the unassigned J-Code."

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Right. And what's -- today, in the early part of the launch, it's -- what codes are being used?

**Lisa D. Earnhardt**
*Director*

That is absolutely the code that's being used. It's J3490, it's an unassigned J-Code. In addition to submitting that code, they typically are marrying it with the product's, SINUVA's, NDC number, which is sort of standard fare. Any physician-administered drug within the first year of launch uses an unassigned J-Code because J-Codes are only awarded once a year. And so it's very typical for this process. And the great news is we have a very strong reimbursement hub called the ASCENT Program, which is used to working through those process. We also have partnered with a couple of specialty pharmacies. We were also very well versed in using the unassigned J-Code for, at least, the initial launch period. It's a little bit new to our physician customers. The whole category of treatment is new to the physician customers because they haven't had -- the majority of ENTs haven't incorporated a specialty pharmacy into the practice, nor a physician-administered drug. So that's really the new part. The good news is we've got partners who've done this for years.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Yes. Care to assign probabilities to these 3 potential outcomes, which one -- if in terms of...

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Lisa D. Earnhardt**
*Director*

I think it's highly likely we'll have a product-specific J-Code.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Okay. You're confident in the process?

**Lisa D. Earnhardt**
*Director*

Yes.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Okay. And then one other thing I wanted to ask about is that just, obviously, the newness of this process for you guys, there's always the risk of sort of friction in the system that you didn't realize would be there because you're sort of carving a new path here a little bit. So what have you learned so far with your launch? Have there been any surprises just in terms of the process of introducing the technology to physicians? Physicians finding the patients and then having sort of the reimbursement process go smoothly? So are there any kind of surprises along that spectrum?

**Lisa D. Earnhardt**
*Director*

Yes. Any time you're introducing a new product, there's learnings to be had. And we definitely are learning. I think things generally are kind of right on track where we thought they would be. I mean, I think in terms of educating the physician on the clinical data and the product and the procedure, that's well within our envelope of our capability as well as that of our physician customers. What really is new is actually this market access piece of things. And so I think some physicians, just like with any change, right, they're used to, "Gosh, Lisa, your reps usually just carry product in their bag, can't they just bring me what I need?" So I'm like no. It's actually -- so there's some just education that needs to happen. And I also think that the good news is they're able to identify the patients. The real learning is, once you've identified them, what needs to happen to get that patient access to the technology. And the good news is, typically, there's someone in a physician's office who is assigned point person for this. And they're the real go-between between the physician and then ultimately the specialty pharmacy or the reimbursement hub. So that's really where the learning is happening. Because it's just a little different way of accessing the product. They're not calling the 1-800 Intersect number, they're calling the -- another 1-800 number. The great news is it's an experienced team on the other end that can help walk them through the process.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

How much of a challenge did you think it will be to fill the funnel to find the patients?

**Lisa D. Earnhardt**
*Director*

I don't believe -- based on our clinical studies that we have done, we completed 4 clinical studies, the last 2 being significant size, one with 100 patients, one with 300 patients, which is a large trial by ENT standards. Based on that, based on our market research, based on the initial physician interactions we've had, we do believe that those patients are out there. I mean, it is a significant unmet need for patients who've had surgery previously return with symptoms because of their polyp disease, which is really an extensive inflammatory response. And those patients are there and really seeking a new solution. It's interesting, our first 2 commercial patients both had, had over 10 prior sinus surgeries. 10 surgeries. I mean, there is a better way to manage these patients, right? And that's where this just falls right in. It's such an intuitive product for physicians and certainly for patients as well. In fact, some of our patients that

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

we treated in our RESOLVE and our RESOLVE II trials are already knocking on physicians' doors saying, "Okay, I'd love to have that again," which anecdotally, is a great feeling that our goal would be for these patients to be SINUVA patients for life.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

So I know you guys are being appropriately conservative. But it does seem like this is just an awful problem for patients. I would think that it would be very easy to get these patients in the door because they have a problem, they need something. So why -- once you sort of figure out the wrinkles from a payer perspective, isn't there competition for sort of almost a bolus of patients that have been waiting for this to kind of come into these physicians' doors and get the procedure done?

**Lisa D. Earnhardt**
*Director*

Yes. It's a good point, Bob. I mean, I think at first, we're really focusing on each and every patient, each and every physician having a great outcome. And that's a great outcome clinically, it's a great outcome with the procedure, it's a great outcome with the market access process. So this year's really a targeted launch. And as we look into next year, you're absolutely right, there's a big unmet need out there. Ultimately, we see direct-to-consumer playing a role here because there are patients that are out there, that are seeking new solutions. And it certainly is a compelling option to be able to treat it in the office setting versus having to go back to the operating room. But for now, we feel like we've set the expectations appropriately for 2018.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

What's your latest thought on really identifying the market opportunity in terms of sizing it numerically? Like, what is really the specific patient population that you think could benefit from this? And I know you guys have put those projections up in the past but as you learn more, what -- from where you sit today with a little bit of experience now in the marketplace, who's the ideal patient and how many are there?

**Lisa D. Earnhardt**
*Director*

Yes. Jeri, do you want to cover that?

**Jeryl L. Hilleman**
*Chief Financial Officer*

Yes, and I think the answer will be consistent with how we framed it in the past. I don't think there's any learnings that have shifted our view on that. But if you look at all the patients that are candidates for SINUVA, all of them will have had 1 sinus surgery at least, because it's necessary to open the cavity and remove a bone and tissue structure that is naturally in that place. But once that's done, one could use SINUVA in the patients. The other criteria we look at though is that these are patients that are regularly seeing the ENTs, that have recurring symptoms from chronic sinusitis. And then of course, we also look for -- consistent with our labeling, that those patients have nasal polyps. So if you look at the overall group of patients that see the physician, that have had surgery, have recurring symptoms, that's about 635,000 patients. And we would estimate about 50% to 60% of those patients have recurring polyp disease and would be really excellent candidates for use of SINUVA. And then we also see that SINUVA, depending on the patient's needs and the physician's preference, might come back and be treated once or twice a year on a regular recurring basis.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Okay. So back on the original topic here, I was wondering if you could give us an example of kind of old model versus new model from a physician perspective. What they're used to doing and the hoops they

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

need to go through now to do this procedure and get paid for it? How is it -- I know it's a little remedial here, I'm asking you to sort of do a little 101, but...

**Lisa D. Earnhardt**
*Director*

No, no. Let's talk about Joe, our patient.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Yes, right, or Joe, a doctor.

**Lisa D. Earnhardt**
*Director*

Yes. He presents to his ENT, [ Susie doctor, Dr. Susie ], in fact, with symptoms, and has the, like, "Hey, doc, what can you do for me?" And like the old model would've been, "Well, I can prescribe, we can keep you going on nasal sprays," which are standard in this patient population. Oftentimes these patients are on some sort of steroid irrigation, so high-dose flushing of the sinuses with steroid. Or I could prescribe you oral steroids but, Joe, I'm concerned because you've had oral steroids already once or twice this year. You can't have them chronically because of all the side effects. And so maybe we should think about going back to surgery. And so now the physician can now have the conversation, it's like, well, I have this new alternative, which is SINUVA, which is basically an office placement of a steroid implant that delivers drug over a period of time at very low doses, so you don't have that side effect profile. And he's like, you can get in my office, yes. Can you do it right now? Well, actually, what we need to do is run it through the payer process first just to make sure they preapprove it. And so what typically would happen is that patient would go away and the physician would write a script, they would send it in, either to the reimbursement hub or well, just for simplicity, go straight to the specialty pharmacy. The specialty pharmacy then -- would then do really all the heavy lifting behind the scenes. So they'll call up the payer and say we've got this patient, here's the indication, here's their plan, will you recover this? Yes, we will. If there's additional documentation, they'll work with the practice to support that. The specialty pharmacy will also collect that patient copayment, which will vary depending on their plan. And then at some point, hopefully, within a relatively short amount of time, that product then would be -- it would be approved for use and it would be shipped directly to the physician's office. And then the patient would come in and in a sort of a routine procedure, get the product placed. And so that's sort of the process from beginning to end in terms of getting that. The trick is, it's -- right now, we're not in a position where the patient (sic) [ physician ] sees a patient and treats them right on the spot, right? But within the ENT community, oftentimes when they're doing office space procedures and I'll use the example of balloon sinuplasty, which is probably one of the more significant procedures they do in the office for sinus issues. They're typically doing that. So they're usually seeing the patients, they're talking to them about it and then they'll book the patient 3 or 4 weeks later and have that patient come in. And in the meantime, their office staff is doing all that work that I was talking about the specialty pharmacy doing. And then in this case, we've just taken that burden off of the physician and we're sort of supporting that process through the specialty pharmacy and the reimbursement hub.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

And how long does that process take?

**Lisa D. Earnhardt**
*Director*

It's highly variable. And that's what we're trying to nail down right now. And part of which is, some of these patients, it's the first time the payer's actually have heard of this product, right? And they're on the other end looking it up in their systems and sometimes there's additional documentation needed. So it's been as short as 24 hours, it's been as long as weeks, right? And so over time, we would expect it would be -- become more predictable and that's exactly why we're going to a targeted launch, because

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

physicians, they want to be able to set those expectations, right? Like, hey, you will probably back within the next month or so for the treatment, or whatever that time period is, they want to have that kind of rule of thumb that they can use. And right now, we're literally -- we just commenced launch last month, right? So we're really early in the process. So I'll look forward to providing more details as we get further along in the process.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

So for maybe a year from now, with this conference and maybe hypothetically, if SINUVA has not gone as well as you thought, what do you think would've been the issue? Where would the potential logjam be?

**Lisa D. Earnhardt**
*Director*

Jeri, do you want to handle this one? It's a fun one, I can take it.

**Jeryl L. Hilleman**
*Chief Financial Officer*

No, I think there's a whole lot of things that we put together that I think will make this successful. And I think we're seeing traction thus far in all of those areas. If you want to think about what are the things that we want to continue to advance and put in place, obviously, having the whole market access working smoothly, having doctors offices get used to that. Getting enough comfort that some of them probably will consider buying the product directly versus going through specialty pharmacy. And I think that also will depend largely on payer policies. And right now, we're very early in that process. Only a very, very small number of payers have put up forth policies. And we've always expected that will take 6 to 12 months, really, to emerge. And I think what we're seeing so far is probably characteristic of our expectations. And that is that payers are either putting it under positive coverage policies and paying for the product and we've seen a couple, including Anthem that -- we talked about that on the call, that have put it in a policy with PROPEL. They're all mometasone furoate [indiscernible] implants but it really isn't the norm to put a device and a drug in the same policy. Furthermore, SINUVA is not used in sinus surgery. So to set it up and to say that it's paid for as a supply out of sinus surgery really doesn't fit with what SINUVA is. So obviously, we'll be working with those payers in going through an educational process. But I think the balancing of just doctors getting used to the market access really routinizing the time frame from you submit the claim and you kind of have a sense of what will happen then when you can actually treat the patient and having payer policies in line with what you would typically see in a physician-administered drug, which is strong coverage.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Lisa, anything you want to add, what could go wrong?

**Lisa D. Earnhardt**
*Director*

No. And I think that's the biggest thing. It's just -- it is the first physician-administered drug that's been launched into the otolaryngologist specialty. So there's some new education, we're having to do that heavy lifting, right? Which is great because we are -- certainly love the position of being a value-added partner to these physicians. I think the great news is the clinical data was so strong, it's all been published. We anticipate this year will supplement that with a meta-analysis as well as looking at it from a payer's perspective in providing some additional details around the cost-effectiveness of the therapy. So we've got a lot of things going for us in terms of having this be a successful launch. But it is new for the specialty, right? It's not what they're used to doing. They're used to using surgical supplies as part of their procedures and any time there's something new, there's a learning curve. And we're absolutely right smack dab in the middle of that process right now.

**Jeryl L. Hilleman**

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Chief Financial Officer*

Yes. I think the good news also is that we've gotten very good feedback from some of the patients that have been treated with this. And for them, being able to have their sinuses immediately open because it's a device that actually provides some mechanical opening, giving them the immediate benefit of feeling better, being able to regain a sense of smell is very encouraging to get that feedback. And physicians have been very positive about what they're seeing in these early days as well. So that part of it, I think, is affirmative and in line with our studies.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Yes. Obviously, the genesis of the question, I think every medical device investor that's been doing it for more than a year, probably at one point or another, has been burned on reimbursement with small cap for various reasons because of the unpredictable nature of it. So if people, just sort of as a blanket risk, go to you and say, "Look, what's the risk that just the insurance coverage community decides that there's not enough clinical evidence, that it's going to be deemed experimental and you're going to have to go back to the drawing board from a clinical trial perspective?" Or just how would you characterize the risk of just your coverage -- positive coverage decisions from insurance companies broadly?

**Lisa D. Earnhardt**
*Director*

I think that risk is always there, Bob, and it's an astute question to ask. We feel confident in the clinical evidence that we've generated. As Jeri alluded to, physician-administered drugs are typically covered by payers because you're going through a more rigorous regulatory review. We went through the NDA process versus our other products through the PMA process. We also aren't resting on our own laurels in terms of clinical evidence. So I mentioned things like the meta-analysis, the budget impact model. We as well commenced an additional trial looking -- late last year looking at repeat use of the product as we once again see that as being typical for this patient population. So we're doing -- we believe doing the right things. And at the end of the day, it will really come down to physician demand and advocacy for this product. And I think because of the compelling clinical outcomes that Jeri alluded to, that once they have that experience, they'll fight for it and we're already seeing that even through the overly kind of appeal process, because sometimes the first answer is no from a payer, that's pretty standard. And what's great is there's a lot of passion and interest in seeing this technology really rolled out and being successful.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

When doctors are skeptical or say they're not interested in tapping this technology, to the degree that happens, what do they sight, the naysayers, what are they...

**Lisa D. Earnhardt**
*Director*

Probably the biggest thing is I'm not sure I'm going to be paid for it. So honestly, it comes back under reimbursement. It's less about the technology that's clinical, the need and the benefits there. It's really, like, some questions' about, like, "I don't want to get stuck with the bill at the end of the day." and "Oh, I don't want my patients stuck with the bill," right? So that's really more of the concern. I wish -- I'm actually glad there's not more out there. But that's the biggest thing.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Right. And then how's the physician training going? The schedule for the rest of the year and into next year? Just talk a little bit about the training and how that's going.

**Lisa D. Earnhardt**
*Director*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes. I mean, it's going. We're right in the midst of it. Much like we did with the early days of PROPEL, we will be there. Not only do we do the physician training in advance, but we are actually there for the first 3 or so cases for SINUVA. We're not just there for the procedure initially, we're actually there for -- if there's a follow-up or 2 that happens thereafter because we want to make sure the experience is a good one for everyone. If there's questions that come up, we want to make sure we're able to address them immediately. So we're very much in the midst of that as we're going. So -- but it's going well. I mean, it's not -- it's, as I said, well within the envelope of capability of an ENT to place this implant. It's not rocket science. But yet, there's -- with any new procedure, there's tips and techniques and we want to make sure they get great outcomes. And so -- and based on our experience, we know there are some things that they could do to make sure that happens.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

I think previously you guys have suggested that the conferences for your specialty, there's some conferences in the fall that happen and that you had hoped maybe by the fall there'd be sort of a -- a little bit of a critical mass of doctors trained by them, are you on track for that?

**Lisa D. Earnhardt**
*Director*

Yes. And that's really -- we're really excited about that. Early October is the American Rhinologic Society and then American Academy of Otolaryngology, their big annual meetings are happening in Atlanta. And it is really sort of the convening opportunity once a year that happens within the specialty. And it will be perfect timing for us because we will have had about 6, 6.5 months of experience, they will have -- this core group of physicians will have treated patients, they will have seen them through and seen the outcomes firsthand, and they also will have made it through that reimbursement process that we talked about, right? And so they'll have more conviction in being able to share their experiences, say yes, I was concerned at first but hey this is what's happened. I've had this many patients treated, they've all been paid for, whatever their experience has been. And that's really our focus for the next couple of quarters, is hey, let's get that strong cohort of believers who can really be champions as we head into that meeting. I mean, at the end of the day, they are physicians and they like to hear from their peers.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

So you're on track for where you wanted to be for...

**Lisa D. Earnhardt**
*Director*

We're absolutely on track.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Okay. And then on -- question on the base business. Because you guys have provided guidance that prudently assumed some disruption. And so I just wanted to get a sense for, it doesn't seem like, over the last quarter -- couple of quarters, there's been any disruption. You've given nicely conservative guidance. Sort of where are we in that process right now? What are you seeing with the base business? It's the same sort of trends or you're starting to see some of that disruption?

**Lisa D. Earnhardt**
*Director*

Jeri, do you want to?

**Jeryl L. Hilleman**
*Chief Financial Officer*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, I think what we've anticipated with our guidance for the second quarter is definitely something that is a real phenomenon, where the sales force is putting a lot of time appropriately into the launch of SINUVA. And while PROPEL -- we think there's just great dynamics in the business. We are currently used in 1 in 8 procedures. Markets where we've been for a long time, we're in 1 or 2 -- 1 to 2 procedures, or 1 in 3 procedures. So we think there's great headroom in PROPEL. We also are going to continue to rollout Contour to all -- more of our accounts. But to drive that growth and to open new accounts and go get doctors to change usage pattern obviously takes some of the sales force's time and a lot of that time is being focused right now on SINUVA as we go through the very first quarters of launch. So I think for this quarter and for the next, we will -- we have allowed for that to impact the growth of PROPEL and that remains consistent with our guidance.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*

Thank you for coming.

**Lisa D. Earnhardt**
*Director*

Great. Thanks so much for the time. I appreciate it.

**Jeryl L. Hilleman**
*Chief Financial Officer*

Thank you.

**Robert Adam Hopkins**
*BofA Merrill Lynch, Research Division*
Absolutely.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2019 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2019 S&P Global Market Intelligence.