GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Jennifer M. Leinbach (#281404)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Lead Plaintiff Avi Yaron*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVI YARON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>INTERSECT ENT, INC., LISA D. EARNHARDT, and JERYL L. HILLEMAN,<br><br>Defendants. | Case No. 4:19-cv-02647-JSW<br><br>**OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Date: January 8, 2021<br>Time: 9:00 a.m.<br>Judge: Hon. Jeffrey S. White<br>Courtroom: 5 |

OPPOSITION TO MOTION TO DISMISS

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ..................................................................................... 1

III. THE SAC'S NEW QUANTITATIVE MATERIALITY ALLEGATIONS ......................... 2

IV.  THE SAC ADEQUATELY ALLEGES FALSITY ........................................................ 4

A.   Standard For Pleading A Materially False Or Misleading Statement ..................... 4

B.   The SAC Adequately Pleads Channel Stuffing ............................................. 4

C.   The Category Two Statements Were Materially Misleading ................................. 6

1.   The SAC Bridges The Pleading Gaps Identified By The Court With Respect To The Category 2 Statements ................................................. 6

2.   Defendants' Arguments Concerning The Category 2 Statements Fail ......... 8

D.   The Category Three Statements Were Materially Misleading ............................. 11

1.   The SAC Adequately Pleads That Channel Stuffing Represented A Separate Risk Impacting PROPEL Sales Over And Above SINUVA-Related Distraction ....................................................... 12

2.   The Length Of The Class Period Does Not Undermine The Inference Of An Improper Channel Stuffing Scheme ........................................... 14

E.   The Category One Statements Were Materially Misleading ............................... 15

F.   The SAC Adequately Pleads Falsity With Respect To The Statements Made Before Q3 2018 ........................................................................ 16

V.   THE SAC ADEQUATELY ALLEGES SCIENTER ................................................... 16

A.   Standard For Pleading Scienter ........................................................... 16

B.   Defendants' Statements Support A Strong Inference Of Scienter ........................ 17

C.   Defendants' Precision Stuffing Gives Rise To A Strong Inference Of Scienter ..... 20

D.   New Management's Quick Discovery Of Truth Supports Inference Of Scienter ... 21

E.   The Confidential Witnesses Strengthen The Inference Of Scienter ..................... 22

F.   The Core Operations Inference Strengthens The Inference of Scienter ................ 24

VI.  THE SAC ADEQUATELY PLEADS LOSS CAUSATION ......................................... 25

VII. THE SAC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY ................... 25

VIII. CONCLUSION ..................................................................................... 25

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

## TABLE OF AUTHORITIES

**CASES**

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)...................................................................... 24

*Berson v. Applied Signal*,
  *Tech.*, 527 F.3d 982 (9th Cir. 2008) .................................................................................. 16

*Bielousov v. GoPro, Inc.*,
  2017 WL 3168522 (N.D. Cal. July 26, 2017) ..................................................................... 22

*Brody v. Transitional Hospitals Corp.*,
  280 F.3d 997 (9th Cir. 2002)........................................................................................... 4, 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Technology, Inc.*,
  856 F.3d 605 (9th Cir. 2017)............................................................................................. 17

*Cunha v. Hansen Natural Corp.*,
  2011 WL 8993148 (C.D. Cal. May 12, 2011)..................................................................... 15

*Curry v. Hansen Medical, Inc.*,
  2012 WL 3242447 (N.D. Cal. Aug. 10, 2012)..................................................................... 25

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)........................................................................................... 25

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995).............................................................................................. 4

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ................................................................................. 21

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ..................................................................... 17

*In re Ashworth Inc. Sec. Litig.*,
  2001 WL 37119391 (S.D. Cal. Dec. 3, 2001)................................................................... 8, 11

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017).............................................................................................. 4

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ..................................................................................... 21

*In re Commtouch Software Ltd. Sec. Litig.*,
  2002 WL 31417998 (N.D. Cal. July 24, 2002) .................................................................... 25

ii

*In re Cornerstone Propane Partners, L.P.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................................... 8

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)..................................................................... 24

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008)..................................................... 17, 20, 23

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................. 8

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................. 22

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017)................................................... 16, 22, 23, 24

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................. 22

*In re Van der Moolen Holding, N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)..................................................................... 16

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).......................................................... 17, 18, 19, 20

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020)...................................................... 22, 23

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
2011 WL 2444675 (D. Del. June 14, 2011) ........................................................... 20

*Makor Issues & Rights, Ltd. v. Tellabs, Corp.*,
513 F.3d 702 (7th Cir. 2008)............................................................................ 14, 15

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ....................................................... 22

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
2008 WL 7084629 (C.D. Cal. July 10, 2008) ....................................................... 17

*Murphy v. Precision Castparts,
Corp.*, 2017 WL 3084274 (D. Ore. June 27, 2017)................................................ 24

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014).......................................................................... 17, 20

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

*SEC v. Mozilo*,
  2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ................................................................. 4

*South Ferry LP No. 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ........................................................... 20, 22

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................................ 17, 24

*Stanley v. Safeskin Corp.*,
  2000 WL 33115908 (S.D. Cal. Sept. 15, 2000) ...................................................... 21

*Stocke v. Shuffle Master, Inc.*,
  615 F. Supp. 2d 1180 (D. Nev. 2009) ...................................................................... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................. 5, 6, 7, 17

*Tricontinental Indus. Ltd. v. Anixter*,
  215 F. Supp. 2d 942 (N.D. Ill. 2002) ...................................................................... 16

**STATUTES**

15 U.S.C. §78u-4(b) ........................................................................................ 8, 16

**OTHER AUTHORITIES**

64 Fed. Reg. 45150-52 (1999) .............................................................................. 8

SEC Staff Accounting Bulletin No. 99 ................................................................... 7, 8

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

**GLOSSARY OF DEFINED TERMS**

| | |
|---|---|
| Appendix 1 | Defendants' Summary of Alleged Misstatements (Dkt. No. 40-1) |
| Binney | Defendant Robert H. Binney, Jr. |
| CAC | Consolidated Amended Class Action Complaint (Dkt. No. 24) |
| Category 1 Statements | Defendants' announcements of financial results and revenue guidance |
| Category 2 Statements | Defendants' representations concerning the strength of PROPEL revenue growth, the drivers of PROPEL revenue growth, and the outlook for future PROPEL revenue growth |
| Category 3 Statements | Defendants' statements attributing weakening PROPEL revenue growth to SINUVA-related sales force distraction |
| Class Period | February 27, 2108 to August 1, 2019 |
| Company | Intersect ENT, Inc. |
| CWs | Confidential Witnesses |
| Defendants | Defendants Intersect ENT, Inc., Lisa D. Earnhardt, Jeryl L. Hilleman and Robert H. Binney, Jr. |
| Earnhardt | Defendant Lisa D. Earnhardt |
| Exhibit 1 | Table of Intersect's revenues between Q4 2017 and Q1 2020 |
| Exhibit 2 | Plaintiff's Categorization of Alleged Misstatements |
| Gallahue | Relevant Non-Party Kieran Gallahue |
| Hilleman | Defendant Jeryl L. Hilleman |
| Individual Defendants | Defendants Lisa D. Earnhardt, Jeryl L. Hilleman and Robert H. Binney, Jr. |
| Intersect | Defendant Intersect ENT, Inc. |
| Lombard Decl. | Declaration of Jeffrey D. Lombard in Support of Defendants' Motion to Dismiss Plaintiff's Consolidated Second Amended Class Action Complaint (Dkt. 40) |
| MTD | Motion to Dismiss Plaintiff's Consolidated Second Amended Class Action Complaint (Dkt. No. 39) |
| Order | Order Granting Defendants' Motions to Dismiss (Dkt. No. 33) |
| Plaintiff | Lead Plaintiff Avi Yaron |
| PROPEL | A self-expanding, steroid releasing, sinus implant |
| PROPEL Contour | Sinus implant to treat sinus ostia |
| PSLRA | Private Securities Litigation Reform Act of 1995 |

OPPOSITION TO MOTION TO DISMISS          Case No. 4:19-cv-02647-JSW

| SAC | Consolidated Second Amended Class Action Complaint (Dkt. No. 38) |
|---|---|
| SINUVA | Mometasone furoate sinus implant |
| Statement of Facts | Statement of Facts section of Plaintiffs' previously filed opposition to Defendants' motion to dismiss the CAC (Dkt. No. 30 at 1-5) |

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

## SUMMARY OF ARGUMENT

The SAC cures all the pleading deficiencies identified by the Court in its Order, and its allegations satisfy all the pleading requirements of the PSLRA.

**Falsity:** The SAC pleads material falsity with respect to each category of misstatement.

*Category Two*: The SAC's new allegations quantify the impact of Defendants' channel stuffing practices on Intersect's financial results. These allegations show that channel stuffing materially inflated the growth rate of PROPEL revenue between Q3 2018 and Q1 2019 and that, without these practices, Intersect would have been required to report negative growth in PROPEL revenue for at least one quarter and likely two quarters. Pursuant to the legal principles articulated by the Court in its Order, these allegations suffice to show that Defendants' representations about strong PROPEL growth were materially misleading.

*Category Three:* The SAC's new allegations quantifying Defendants' channel stuffing and new confidential witness allegations, along with other allegations in the SAC, support a strong inference that "channel stuffing represented a separate risk impacting PROPEL sales over and above SINUVA-related distraction." Order at 13. These allegations show that Defendants' statements concerning the reasons for PROPEL growth deceleration were materially misleading.

*Category One:* Plaintiff shows that Defendants' statements concerning its financial results and revenue guidance are actionable, because, *inter alia*, they misleadingly attribute Intersect's revenue to "growth in adoption" of PROPEL products.

**Scienter:** The SAC adds new allegations showing that "precision stuffing" was used to allow Intersect to artificially achieve analysts' consensus estimates for PROPEL revenue growth. These allegations, along with the SAC's quantitative materiality analysis, provide a new context against which to assess Defendants' pattern of evasive and dissembling responses to repeated questions on the same subject over time. Viewed holistically, the SAC's allegations give rise to a strong inference of scienter.

**Section 20(a):** The SAC alleges predicate Section 10(b) violations and control on the part of the Individual Defendants.

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

# I.    INTRODUCTION

The new allegations of the SAC directly address the deficiencies identified by the Court in its Order.[1] With respect to falsity, the SAC pleads new details quantifying the impact of Defendants' channel stuffing practices. These facts show that discounted end-of-quarter bulk sales materially inflated the growth rate of PROPEL revenue between Q3 2018 and Q1 2019 and that, without these practices, Intersect would have been required to report ***negative growth*** in PROPEL sales for at least one quarter and likely two quarters. These facts render the Category 2 Statements misleading under the analysis of the Court's Order.

The SAC also pleads new details about Defendants' channel stuffing practices from two new confidential witnesses and new financial data reported by Intersect for the first time after the CAC was filed. These allegations, along with others, give rise to a strong inference that "channel stuffing represented a separate risk impacting PROPEL sales over and above SINUVA-related distraction." Order at 13. Accordingly, these facts render the Category 3 Statements misleading under the analysis of the Court's Order.

With respect to scienter, the SAC pleads new facts showing that the end-of-quarter bulk sales were instrumental in allowing Intersect to meet and modestly beat analysts' consensus estimates for PROPEL revenue growth (and that, without these practices, Intersect would have missed those estimates). These "precision stuffing" allegations, along with the SAC's quantitative materiality analysis, provide a new context against which to assess Defendants' pattern of evasive and misleading responses to specific analyst questions. Viewed holistically, these allegations, combined with the SAC's allegations concerning Defendants' access to information, the core operations doctrine, and new management's rapid discovery and discontinuation of the channel stuffing practices within a three-week period, give rise to a strong inference of scienter.

# II.    FACTUAL BACKGROUND

The Court's familiarity with the facts of the CAC is presumed. *See* Order at 1-3 (discussing

---

[1] Capitalized terms are defined in the Glossary. *See supra* at v-vi. Unless otherwise indicated, all emphasis in this brief has been added, all internal citations, quotation marks, and alterations have been removed, and citations in the form of "¶__" refer to the SAC.

1

OPPOSITION TO MOTION TO DISMISS                                    Case No. 4:19-cv-02647-JSW

background of case). Plaintiff incorporates by reference the Statement of Facts section of Plaintiff's previously-filed opposition to Defendants' motion to dismiss the CAC. *See* Dkt. No. 30 at 1-5. Additional facts, including the SAC's new allegations, will be addressed *infra* as appropriate.

## III.    THE SAC'S NEW QUANTITATIVE MATERIALITY ALLEGATIONS

One of the key additions to the SAC is its allegations quantifying the impact of Defendants' channel stuffing scheme on Intersect's financial results. ¶¶230-44. These new factual allegations raise a strong inference that were it not for the undisclosed end-of-quarter discounted bulk sales, Intersect would have been forced to report sharply reduced growth in PROPEL sales for Q3 2018 and very likely *negative growth* in PROPEL sales for Q4 2018 and Q1 2019. ¶243. These allegations bridge a pleading gap identified by the Court and substantially strengthen the inference that the challenged statements were misleading. *See* Order at 12 ("If growth was actually declining in this time period, defendants' statements may have been misleading.").

As the starting point for its quantitative analysis, the SAC points to Gallahue's admission on August 1, 2019 that the discounted bulk sales over a six quarter period had resulted in an inventory build-up of PROPEL product on the shelves of Intersect's customers in an amount equivalent to 2%-3% of Intersect's annual revenue. ¶¶230-37.[2] This equates to $2.2 - $3.2 million. ¶232. This amount, however, represents the volume of excess inventory in the channel *as of August 1, 2019*. Gallahue admitted that once new management discovered the bulk sales practices near the end of Q2 2019, Intersect immediately began to "scale back" on those practices, resulting in an "adverse impact" to revenues in Q2 2019. ¶239. Thus, the amount of excess inventory in the channel *as of March 31, 2019* (the end of Q1 2019, the last period covered by the challenged statements) was necessarily higher than $2.2 - $3.2 million, because the scaling back of the practices at the end of Q2 2019 allowed some of the excess inventory in the channel to dissipate. *Id.* The SAC estimates

[2] As the SAC explains in detail, Gallahue's reference to 2%-3% of annual revenues does not represent the percentage of total sales during the Class Period that were discounted bulk sales; instead, it was a quantification of excess PROPEL inventory on customer shelves at the time of the statement. *Id.* Defendants do not dispute this interpretation, and it is also consistent with the Court's reading. *See* Order at 10 ("Intersect admitted that the discounted bulk sales took place over six quarters and that it resulted in inventory build-up worth 2% to 3% of annual sales.").

2

that the incremental amount of additional excess inventory in the channel as of March 31, 2019 was likely between $0.7 - $1.6 million and that the total amount of excess inventory in the channel as of March 31, 2019 was therefore likely between *$2.9 - $4.8 million*. ¶240; *see also infra* at 9-10.

The SAC goes on to analyze revenue data and growth trends in PROPEL sales for the six quarters at issue during the Class Period (Q4 2017 through Q1 2019) and four subsequent quarters. *See* Exhibit 1;[3] ¶¶241-44. Intersect reported strong year-over-year growth in PROPEL revenues of roughly 20% for Q4 2017 and Q1 2018, then more modest growth of roughly 7% for Q2 2018, Q3 2018 and Q4 2018, and finally growth of roughly 5% for Q1 2019 (the last quarter whose financial statements are challenged). ¶¶241-42. For the next four quarters, Intersect reported negative growth in PROPEL sales as Intersect suffered the long-term after-effects of its channel stuffing scheme and the natural decline in the market's demand for PROPEL products became impossible to conceal. *Id.* Specifically, Intersect reported -0.9% growth in PROPEL revenues for Q2 2019, -3.7% growth for Q3 2019, -3.8% growth for Q4 2019, and -25.8% growth for Q1 2020. *Id.*[4]

While Intersect did not disclose the amount of discounted bulk sales on a quarter-by-quarter basis, the available data allows an estimation of the impact of those bulk sales on the growth rate for PROPEL sales during the last three quarters covered by the Class Period: Q3 2018, Q4 2018, and Q1 2019. For that three-quarter period, the total amount of PROPEL revenue representing year-over-year growth was only $4.9 million. ¶241. As noted *supra*, the amount of excess PROPEL inventory in the channel at the end of Q1 2019 was between approximately $2.9 million and $4.8 million. Thus, the accumulated excess inventory as of March 31, 2019 represented approximately 59% to 98% of all the growth in PROPEL revenue over the three-quarter period ending on that date.[5]

[3] For the Court's convenience, Plaintiff has reproduced at Exhibit 1 to this brief the table from paragraph 241 of the SAC. This table identifies the total revenue reported by Intersect for each quarter, as well as the revenue broken down between PROPEL and SINUVA. ¶241. The table also provides a year-over-year comparison of PROPEL revenue for each quarter and the year-over-year growth rate of PROPEL revenue for each quarter. *Id.*

[4] The huge drop in Q1 2020 appears to be related, at least in part, to COVID. ¶242 n.12. The key point, however, is that once bulk discounting ended, Intersect experienced a sustained period of negative growth over multiple quarters, not just a "short-term" dip in revenue. Order at 16.

[5] It is reasonable to assume that the vast majority of the excess inventory build-up as of March 31, 2019 entered the channel during this three-quarter period. When Gallahue disclosed the existence

3

OPPOSITION TO MOTION TO DISMISS                         Case No. 4:19-cv-02647-JSW

Moreover, during the final two quarters at issue (Q4 2018 and Q1 2019), the total amount of PROPEL revenue representing year-over-year growth was only $3.3 million. ¶¶241, 243. Given the size of the excess inventory build-up as of March 31, 2019 (again, approximately $2.9 million – $4.8 million), it is very likely that absent Defendants' channel stuffing practices, Intersect would have been required to report **negative growth** in PROPEL revenues for these two quarters. ¶243.

## IV. THE SAC ADEQUATELY ALLEGES FALSITY

### A. Standard For Pleading A Materially False Or Misleading Statement

A plaintiff need only allege facts giving rise to a "reasonable inference" that the challenged statement was false or misleading. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017). "[A] statement that is literally true can be misleading and thus actionable under the securities laws" if it "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). "Both the materiality and misleading nature of a misstatement or omission are usually questions for the trier of fact." *SEC v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht*, 70 F.3d at 1081.

### B. The SAC Adequately Pleads Channel Stuffing

In its Order, before addressing the specific categories of alleged false and misleading statements, the Court first addressed whether Plaintiff had pled channel stuffing with sufficient particularity. Order at 9-11. In this context, the Court made three key holdings that bear emphasis. First, the Court held that channel stuffing claims are **not** "disfavored" in the Ninth Circuit. Order at 9-10. Second, the Court held that "even legitimate types of channel stuffing may be part of a

---

of the bulk sales practices on August 1, 2019, he stated that working through the excess inventory was "going to be a process" that would take "1, 2, [or] 3 quarters." ¶230. This supports the conclusion that excess inventory in the channel could generally be expected to dissipate within nine months. Further, Intersect missed its guidance for Q2 2018 and lowered its guidance for 2018 when it announced its Q2 2018 results. ¶12. This partial correction and "reset" in the middle of the Class Period suggests that most of the bulk sales during the Class Period were concentrated in the quarters before Q2 2018 and the quarters after Q2 2018, but not within Q2 2018 itself. *See infra* at 14, 25.

4

fraudulent scheme when used to hide poor business fundamentals." *Id.* at 10. Third, the Court held that the CAC satisfied Rule 9(b), even if it did not identify specific dates, customers and dollar amounts for particular channel stuffing transactions, because Defendants' admission of discounted bulk sales over a six quarter period (resulting in an inventory build-up equivalent to 2%-3% of annual revenue) provided Defendants with sufficient notice of the conduct they needed to defend. *Id.* at 10-11. In their present motion, Defendants did not seek to reargue or disturb any of these holdings, and they remain the law of the case.

The SAC satisfies Rule 9(b) for the same reasons as the CAC. In addition, the SAC alleges new details that bolster Plaintiff's pleading of channel stuffing and provide important context for assessing whether the challenged statements are misleading. Among other things, the SAC alleges instances in which customers were offered the right to replace expired product with new product as an incentive for bulk purchases. ¶¶103-05.[6] This type of arrangement constitutes an "illegitimate" form of channel stuffing because it encourages customers to hold PROPEL inventory on their shelves even if they do not need the product.[7]

In addition, as explained *infra*, the SAC's new quantitative allegations provide a more particularized basis for assessing the impact of the discounted bulk deals on Intersect's reported growth rate for PROPEL revenues in certain quarters. And the SAC's new allegations concerning (1) the magnitude of the inventory build-up and (2) Intersect's financial performance for multiple quarters following the Class Period provide evidence that channel stuffing during the Class Period involved selling unneeded product in substantial excess of natural demand. *See infra* at 12-13.

---

[6] CW5, a territory manager, stated that sales reps would tell customers considering a bulk deal that the if the product expired before the customer could sell it, the sales rep would replace it. ¶104. CW5 recalled a particular incident at the end of 2018 when CW5 replaced product for a customer and stated that such replacements required approval by CW5's supervisor, regional sales manager David Tompkins. ¶105. Similarly, CW1, a territory manager in a different territory, recounted assisting certain customers who held PROPEL product that was nearing expiration by finding other customers that could use the product before it expired and facilitating a swap. ¶103.

[7] *Tellabs II* provides one example of "illegitimate" channel stuffing: shipping product that a customer did not order. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) ("*Tellabs II*"). *Tellabs II*, however, did not define "illegitimate" channel stuffing or purport to list an exhaustive set of examples. In its Order, this Court suggested that illegitimate channel stuffing could involve the shipping of "unordered" or "***unneeded***" product. Order at 10.

5

### C.    The Category Two Statements Were Materially Misleading

The first category of challenged statements that Plaintiff addresses herein are the Category 2 Statements. These statements make representations concerning the strength of PROPEL growth, the drivers of PROPEL growth, and the outlook for future PROPEL growth.[8] The Court held in its Order that the CAC failed to adequately plead that these statements were materially misleading, but, as explained herein, the SAC cures the perceived deficiencies. Plaintiff will first address the holdings of the Order with respect to the Category 2 Statements, and then address the new arguments raised by Defendants with respect to these statements in their motion to dismiss.

### 1.    The SAC Bridges The Pleading Gaps Identified By The Court With Respect To The Category 2 Statements

In its Order, the Court held that the Category 2 Statements could be misleading "[i]f growth was actually declining" at a time that when it was reported to be growing. Order at 12. The Court also held that "[e]ven if channel stuffing shifted some sales from quarter to quarter, the growth from 'regular' demand appears to have been at least as strong as the 'artificial' growth—making defendants statements essentially true." *Id.* This holding implies that if Plaintiff were able to demonstrate the growth from "artificial" bulk discounts was stronger than the growth from "regular" demand over a multi-quarter period, those facts would be sufficient to plead that the Category 2 Statements were materially misleading.

With respect to the last three quarters at issue (Q3 2018, Q4 2018, and Q1 2019), the SAC pleads specific facts give rising to a strong inference that the "artificial" growth due to discounted bulk sales was stronger than the growth from "regular" demand. Specifically, the SAC pleads that between 59% to 98% of all growth in PROPEL revenue during this three-quarter period was attributable to channel stuffing practices. ¶243. Further, the SAC pleads facts giving rise to a strong inference that Intersect would have had to report negative growth during Q4 2018 and Q1 2019 were

---

[8] For the sake of simplicity, Plaintiff structures his arguments according to the three categories of statements identified by Defendants and followed by the Court in its Order. Plaintiff notes, however, that Defendants' Appendix fails to categorize certain of the statements accurately by failing to include all the applicable categories for each statement. In Exhibit 2 to this brief, Plaintiff identifies the additional applicable categories for the statements that Defendants miscategorized.

6

it not for channel stuffing. *Id.* The SAC also pleads that in the absence of channel stuffing, Intersect would have fallen short of analysts' consensus estimates for the PROPEL growth rate for each of Q3 2018, Q4 2018 and Q1 2019, but due to channel stuffing, Intersect was able to modestly beat those estimates in each of the three quarters. ¶¶261-65.

The foregoing facts undercut Gallahue's broad assertion that the bulk sales did not have "a substantial impact on any given period." ¶230. Even if Gallahue's statement were credited, it is so vague that it cannot rebut the SAC's materiality allegations. Gallahue did not specify the numerical threshold he considered to be "substantial" and did not identify which metric he was using to measure "impact": bulk sales as a percentage of total revenue, bulk sales as a percentage of PROPEL revenue, or bulk sales as a percentage of PROPEL revenue growth (or some other measure). The rate of PROPEL revenue growth was a key metric followed by analysts, because it related to Intersect's "base business" involving its "bread and butter" products. ¶¶163, 171, 175, 201, 228, 248. Analysts repeatedly asked about PROPEL's expected growth rate throughout the Class Period.[9]

Intersect's reported growth rate for PROPEL revenue was roughly 7% in Q3 2018 and Q4 2018 and roughly 5% in Q1 2019—modestly ahead of analysts' consensus estimates for each quarter. ¶¶262-64. Without the artificial boost of channel stuffing, however, Intersect would have missed each of these estimates and likely would have had to report ***negative growth*** for Q4 2018 and Q1 2019. ¶¶242-43, 261-65. Intersect's discounted bulk sales practices, therefore, did more than merely "shift[] some sales from quarter to quarter" (Order at 12); they concealed the rapid deceleration of natural demand for PROPEL products, a trend that continued for multiple quarters following the Class Period. While the actual results posted by Intersect did show a declining rate of PROPEL revenue growth, Intersect's channel stuffing practices disguised the slope of the curve and artificially delayed the point of reckoning at which that growth turned from positive to negative.[10]

---

[9] *See, e.g.*, ¶201 ("[L]et's talk about the base business again, a bit more on PROPEL and Contour …. [Y]ou said low double-digit growth in that business next year. So, how do we get comfortable that that's achievable … ?"); ¶217 ("[H]ow much of the PROPEL growth deceleration is in fact stuff that's under your control, and in fact perhaps distraction with SINUVA …. What gives you confidence that if you put more resources to it and you execute better, you will see the growth pick back up in the PROPEL business?"); *see also, e.g.*, ¶¶163, 171, 179, 228.

[10] Under SEC Staff Accounting Bulletin No. 99 ("SAB 99"), two qualitative factors that can render

7

Thus, Defendants' statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

## 2. Defendants' Arguments Concerning The Category 2 Statements Fail

In their motion to dismiss, Defendants raise a number of arguments in relation to the Category 2 Statements. MTD at 15. First, Defendants argue that the SAC's new quantitative allegations only relate to Q3 2018 and later, and therefore all of the challenged statements made before Q3 2018 are inactionable. *Id.* Plaintiff will address those earlier statements in §IV.F, *infra*.

With respect to the statements concerning Q3 2018, Q4 2018 and Q1 2019, Defendants argue that the SAC's new quantitative allegations "are premised solely on speculative math rooted in unfounded assumptions." MTD at 15; *see also id.* at 6-8. This argument fails on multiple grounds. First, the SAC pleads with particularity the factual basis for its quantitative materiality allegations and its estimates of the effects of Defendants' channel stuffing scheme on Intersect's PROPEL revenue growth rate in particular quarters. *See* ¶¶230-44. Under the PSLRA, a plaintiff is entitled to plead on the basis of information and belief, so long as the complaint states with particularity "all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1)(B). This can include, among other things, estimates of the amount of a misstatement, so long as that estimate is reasonably grounded. *See, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (securities fraud plaintiffs alleging financial misstatements should plead basic details such as "the ***approximate*** amount by which revenues and earnings were overstated"); *cf. In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1083 (N.D. Cal. 2005) (under the PSLRA, "plaintiffs must substantiate, with particularity, the reasons for their information and belief that Cornerstone's acquisitions were overvalued and ***some estimation of the overall accounting consequences of those valuations***.").[11]

a quantitatively small misstatement material are whether the misstatement "hides a failure to meet analysts' consensus expectations for the enterprise" or "masks a change in earnings or other trends." 64 Fed. Reg. 45150, 45151-52 (1999). Both factors are present here. However, the Court need not rely on SAB 99, because Defendants' omissions were clearly ***quantitatively material*** in addition to being qualitatively material. That 59% to 98% of all growth in PROPEL revenue between Q3 2018 and Q1 2019 was attributable to discounted bulk deals is clear evidence that the channel stuffing had a "substantial impact" on this three-quarter period. These amounts clearly exceed the 5% "rule of thumb" for quantitative materiality under SAB 99.

[11] *See also In re Ashworth Inc. Sec. Litig.*, 2001 WL 37119391, at *21 (S.D. Cal. Dec. 3, 2001)

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

Second, Defendants' arguments concerning the particulars of the SAC's quantitative allegations ignore crucial details that cannot be reasonably contested. For example, the table at paragraph 241 of the SAC is not based on speculation: it derives PROPEL revenue by subtracting the disclosed amounts of SINUVA revenue from total revenue, and it derives the PROPEL year-over-year growth rate by comparing PROPEL revenue to the same quarter of the previous year. The SAC's allegation that the inventory build-up as of August 1, 2019 was $2.2 million to $3.2 million is derived directly from Gallahue's admission (and corroborated by the calculation of analysts at William Blair). ¶¶230-32.

The SAC also pleads with sufficient particularity that the inventory build-up as of August 1, 2019 of Q2 2019 was necessarily higher than the inventory build-up as of the end of March 31, 2019, because Gallahue stated that the bulk discounting practices were discontinued at the end of Q2 2019 and caused an "adverse impact" in Q2 2019. ¶239. By deciding to end channel stuffing in Q2 2019, new management provided time for some of the excess inventory in the channel to dissipate. ¶¶239-40. Defendants assert that the SAC "does not allege any particularized facts suggesting that inventory from bulk sales had, in fact, accumulated by the end of Q1 2019." MTD at 6. But Gallahue ***admitted*** that the inventory build-up as of August 1, 2019 was "something that built up over probably the last 6 or so quarters." ¶230. Given the absence of new channel stuffing in Q2 2019, the amount of excess inventory in the channel as of March 31, 2019 had to have been higher than the amount as of August 1, 2019. Defendants offer no explanation to the contrary.

The only question is how much higher. The SAC provided a reasonable estimate, based on the observed dissipation rate of the inventory build-up in Q3 2019 and Q4 2019, and approximated that the incremental additional excess inventory as of March 31, 2019 likely would have been between $0.7 million to $1.6 million, and therefore that the total excess inventory in the channel as of March 31, 2019 would have been $2.9 million to $4.8 million. ¶240. While Defendants quarrel with this estimate, they provide no competing estimate of their own, and there are good reasons to

---

(plaintiffs sufficiently pled that reserves were deficient because plaintiffs alleged details including "the ***approximate*** amounts of defective or poor quality product").

9

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

believe that Plaintiff's estimate is, if anything, conservative.[12]

Most importantly, even if Plaintiff's estimate is discounted in its entirety and Plaintiff is given no credit for any dissipation adjustment, the SAC still sufficiently pleads falsity, particularly with respect to Q4 2018 and Q1 2019. At a minimum, the PROPEL inventory build-up as of March 31, 2019 was $2.2 million - $3.2 million. This strongly implies that, in the absence of the discounted bulk sales, there would have been *negative growth* in Q1 2019, in which the incremental PROPEL revenue representing year-over-year growth was only $1.269 million. Moreover, it supports a strong inference that there would have been virtually no growth over the two-quarter period, in which the incremental PROPEL revenue representing year-over-year growth was only $3.349 million.

Defendants also argue that the Category 2 Statements "made in or after Q3 2018 do not carry the implication that PROPEL sales were naturally growing." MTD at 15. But the challenged statements, evaluated in context, did carry this implication. Defendants' statements suggested that PROPEL sales growth, while temporarily slowing due to the SINUVA launch, had strong underlying fundamentals and was expected to reaccelerate back to ~10% once additional resources were put into PROPEL sales. *See, e.g.*, ¶201 (at 11/28/2018 conference, analyst asked why Defendants were "comfortable" that "low double-digit growth" in PROPEL was "achievable," and Hilleman responded that the additional sales people Intersect had put into PROPEL would "restor[e] strength in that area"); ¶205 (at 1/8/2019 conference, Earnhardt stated, "What we've talked is getting PROPEL back to about 10% growth rate, which is, as you know, north of where we've been the last couple of quarters."). These statements were misleading because they failed to disclose that discounted bulk sales accounted for a material portion of the growth in Q3 2018, and that while the reported growth rate was about 7%, the natural growth rate was closer to 0% than 10%.[13]

---

[12] Two CWs stated that they believed that the 2%-3% estimate offered by Gallahue materially understated the scope of the inventory build-up. ¶133. The sustained period of negative growth throughout 2019 also suggests that Gallahue's estimate was low (particularly because Defendants projected double-digit revenue growth for PROPEL in 2019 and reaffirmed that projection as late as January 8, 2019). ¶205. Thus, even without a dissipation adjustment to account for the likely difference between the size of the build-up on March 31, 2019 and the size of the build-up on August 1, 2019, there are reasons to suspect that the build-up was higher than Gallahue acknowledged.

[13] The first of these statements was made shortly after the Q3 2018 results were released, and the

10

Even more clearly misleading were Earnhardt's statements made at the February 28, 2019 SVB Leerink conference. ¶217. Those statements were made after the Q4 2018 results had been released and about two-thirds of the way through Q1 2019. After an extended colloquy between an analyst and Earnhardt concerning Intersect's "growth acceleration trajectory," the analyst asked Earnhardt "how much of the PROPEL growth deceleration is in fact stuff that's under your control" and questioned whether the market for PROPEL had reached a point of "saturation or penetration." *Id.* Earnhardt responded by pointing to granular data concerning account growth, claiming that "[w]e do see headroom for the opportunity to grow that further," and affirming that she was confident that the market for PROPEL was not penetrated. *Id.* These statements were misleading, because the failure to disclose the discounted bulk sales distorted the market's assessment of Intersect's "growth acceleration trajectory" and the fundamentals of the market demand for PROPEL. By this time, natural growth in PROPEL sales was already negative, and Intersect would need massive end-of-quarter sales to report positive growth and satisfy analysts' consensus estimates for Q1 2019.

### D. The Category Three Statements Were Materially Misleading

The next category of challenged statements are the Category 3 Statements. These statements attributed the deceleration of PROPEL growth to sales force distraction due to the SINUVA launch and disclaimed other possible factors causing that deceleration. The Court held in its Order that the CAC did not plead falsity with respect to the Category 3 Statements because it failed to allege sufficient facts to support its conclusion that "channel stuffing represented a separate risk impacting PROPEL sales over and above SINUVA-related distraction." Order at 13. The SAC remedies that deficiency by pleading particularized facts showing that channel stuffing did in fact represent a separate risk impacting PROPEL sales over and above SINUVA-related distraction.[14]

second was made after Q4 2018 had closed, but before the results for Q4 2018 had been released.

[14] Defendants argue that "Plaintiff only attempts to salvage a single statement in Category 3." MTD at 14. Nonsense. Plaintiff maintains that all of the Category 3 Statements (including those that Defendants failed to properly categorize in their Appendix) are materially false and misleading. Plaintiff did not try to "salvage" these allegations by amending the alleged reasons for falsity, but by pleading new facts that alter the predicate underlying the Court's holding.

11

OPPOSITION TO MOTION TO DISMISS     Case No. 4:19-cv-02647-JSW

**1.    The SAC Adequately Pleads That Channel Stuffing Represented A Separate Risk Impacting PROPEL Sales Over And Above SINUVA-Related Distraction**

The SAC pleads facts supporting a strong inference that declining growth in PROPEL sales was principally due to a decline in demand (or PROPEL having reached a level of market saturation) rather than "distraction" due to SINUVA. The SAC also pleads particularized facts showing that end-of-quarter discounted bulk sales concealed the rapidity with which growth was declining.[15]

First, all of the quantitative allegations detailed *supra* support these conclusions. The PROPEL growth rate declined throughout the Class Period, but it would have declined more precipitously, and would have turned from positive to negative at an earlier point, without the artificial boost of end-of-quarter discounted bulk sales. The size of the inventory build-up, and a comparison of that amount to the amount of PROPEL growth during Q3 2018 through Q1 2019, confirms that Intersect was stuffing the channel in material excess of demand. *See supra* at 6-7.

Second, analysts were highly skeptical of Defendants' SINUVA distraction story and became increasingly skeptical over time, because Defendants' explanation did not make much sense, and, at the very least, it appeared to be materially incomplete. *See, e.g.*, ¶¶61-65, 171, 187, 197, 201, 217, 224. As an initial matter, sales force distraction due to the SINUVA launch could not have caused "declining demand" (Order at 14) from Intersect's customers; at most, it could have interfered with Intersect's ability to act upon and optimally execute sales in relation to that demand. If Defendants' explanation were accurate, then Intersect's decision to bring on "additional resources" in Q3 2018 (¶197) should have solved the problem, but instead bulk sales became an increasingly high percentage of PROPEL sales growth during Q4 2018 and Q1 2019, suggesting that the real problem was a decline in natural demand, not SINUVA sales force distraction.

Third, a number of CWs have claimed that management's attempts to blame the softness in PROPEL sales on SINUVA-related distraction did not jibe with their experience. *See, e.g.*, ¶129 ("CW1 did not believe SINUVA provided a distraction from the sale of PROPEL. CW1 believed

---

[15] Many of these allegations are new to the SAC. Some were present in the CAC, but were not adequately explained in Plaintiff's opposition to Defendants' prior motion to dismiss.

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

that the true issue with PROPEL sales was bulk sales that occurred every quarter."); ¶135 ("CW5 did not believe that 'distraction' from SINUVA caused the Q2 2018 miss."); *id.* ("CW2 remembered that … it was clear to all sales reps after the launch of SINUVA … that the Company was heavily reliant on PROPEL revenue, and sales reps remained focused on selling PROPEL every day.").[16] CWs also claimed that Intersect offered customers a right to replace expired product, which is a practice used to incentivize purchases in excess of current demand. *See* ¶¶103-06.

Fourth, Intersect's financial performance after the Class Period supports the conclusion that Intersect was undergoing a long-term trend of declining growth and that channel stuffing practices concealed evidence of this trend. After the channel stuffing practices were terminated, the PROPEL growth rate turned negative in Q2 2019 (-0.9%), then declined further in Q3 2019 (-3.7%) and Q4 2019 (-3.8%), before plummeting in Q1 2020 (-25.8%). ¶241.[17] In addition, unit sales data (first reported by Intersect in correspondence with the SEC after the CAC was filed) confirms the long-term material effect of the channel stuffing practices. ¶236. In 2018, Intersect's revenue growth was driven by a 9% increase in PROPEL unit sales. *Id.* In 2019, Intersect experienced a 4% decline in PROPEL unit sales. *Id.* The decline in unit sales in 2019 was concentrated in Q2 2019 – Q4 2019, because Intersect reported an increase in PROPEL unit sales in Q1 2019. *Id.* That Intersect unit sales grew throughout 2018 by 9%, and then declined by more than 4% over a three-quarter period following the termination of the bulk sales, is further evidence of how thoroughly clogged the channel was with inventory in excess of natural demand.

Fifth, as discussed *infra* at §V.C, the evidence of "precision stuffing" supports the conclusion that Defendants were using end-of-quarter discounted bulk sales to ensure just enough PROPEL sales to hit analysts' consensus estimates of PROPEL revenue growth.

Viewed holistically, the foregoing factors create a strong inference—one that is ***at least***

[16] *See also* ¶136 ("CW6 recalled that the major reason the Company missed its projections in Q2 2018 was due to customer's buildup of inventory from bulk sales in previous quarters. CW3 also believed that the Company missed projections in August 2018 because customers had too much PROPEL inventory from bulk sales."); ¶134 (similar).

[17] It is unknown whether Intersect would have reported positive or negative growth in PROPEL sales if the COVID pandemic did not occur. All available post-Class Period data, however, shows year-over-year declines in PROPEL revenues.

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

equally plausible as the competing non-culpable inference—that the "channel stuffing represented a separate risk impacting PROPEL sales over and above SINUVA-related distraction." Order at 13.

### 2. The Length Of The Class Period Does Not Undermine The Inference Of An Improper Channel Stuffing Scheme

One factor that informed the Court's decision concerning the Category 3 Statements was the length of the Class Period. Order at 13. The Court noted that the alleged stuffing "stretch[ed] for at least six quarters" and held that "[t]he sheer length of time that bulk discounting took place undermines the argument that it was inherently unsustainable or hid short-term weakness." *Id.* The Court further held that when channel stuffing is used to hide poor business fundamentals, it "is necessarily a short-term scheme," because "the underlying weakness will necessarily reveal itself in time." *Id.* at 10.

A more precise articulation of this principle, however, is that channel stuffing is only ***effective*** as a short-term scheme. Plaintiff does not allege a six-quarter class period in which everything was rosy until a sudden corrective disclosure revealed the entire truth. Plaintiff alleges partial corrective disclosures (and/or partial materializations of concealed risks) ***within*** the Class Period, including a reduction of 2018 revenue guidance on August 1, 2018 and a reduction of 2019 revenue guidance on May 6, 2019. ¶¶282-86. Channel stuffing during Q4 2017 and Q1 2018 caused Intersect to miss projections in Q2 2018 (a conclusion supported by multiple confidential witnesses, *see* ¶¶134-36), and channel stuffing during Q3 2018 and Q4 2018 resulted in disappointing results in Q1 2019. Thus, the "underlying weakness" did reveal itself, in part, before the final corrective disclosure. Defendants provided a narrative to account for these results—the SINUVA distraction story—and tried to explain the weakening growth in PROPEL as a temporary phenomenon rather than a fundamental shift in demand or market saturation.

Such a scheme is not inherently illogical. *See Makor Issues & Rights, Ltd. v. Tellabs Corp.*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs III*"). In *Tellabs III*, the Seventh Circuit rejected defendants' argument that they had "no motive to paint the prospects for [their products] in rosy hues because within months they acknowledged their mistakes and disclosed the true situation of the two products, and because there is no indication that Notebaert [Tellabs' CEO] or anyone else who may have been

14

in on the fraud profited from it financially." *Id.* at 710. The Seventh Circuit explained:

> The argument confuses expected with realized benefits. Notebaert may have thought that there was a chance that the situation regarding the two key products would right itself. If so, the benefits of concealment might exceed the costs. … The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news— fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Id.* Likewise here, Defendants may have hoped that market conditions would change and that growth in PROPEL would reaccelerate. It was nonetheless deliberately reckless, if not intentionally misleading, to fail to disclose the material levels of discounted bulk sales (which accounted for increasingly large percentages of PROPEL revenue growth) and to insist that the only factor inhibiting growth in PROPEL sales was sales force distraction due to SINUVA.

### E.    The Category One Statements Were Materially Misleading

The final category of challenged statements are the Category 1 Statements. These statements included announcements of Intersect's financial results and affirmations of revenue guidance. The Court held that the CAC did not adequately plead that these statements were materially false or misleading because "this set of statements made no representations about the causes or nature of the revenue or guidance" and "Defendants did not represent that this revenue was 'organic,' sustainable, or corresponded to quarterly demand for individual PROPEL products." Order at 11.

However, "even if the financial results could not be 'false' … the channel-stuffing could at the very least cause those results to be misleading where it resulted in an overloaded supply chain that could not sustain impressive early results." *See Cunha v. Hansen Natural Corp.*, 2011 WL 8993148, at *2 (C.D. Cal. May 12, 2011). Moreover, the Category 1 Statements included representations that Intersect's revenue growth was driven by "growth in ***adoption*** of the PROPEL® family of products." ¶219.[18] The term "adoption," in this context, implies more than just raw sales: it implies acceptance and use by doctors and patients.[19] Intersect's attribution of its revenue growth

---

[18] *See also* ¶¶165, 181, 191, 207.

[19] *See Drug adoption*, TheFreeDictionary.com ("The acceptance by health care prescribers or managed care organizations of newly released medications."), *available at* https://medical-dictionary.thefreedictionary.com/drug+adoption#:~:text=The%20acceptance%20by%20health%2

OPPOSITION TO MOTION TO DISMISS                         Case No. 4:19-cv-02647-JSW

to "growth in adoption" is actionable, because it misleadingly suggested that natural demand for PROPEL was growing. *See, e.g.*, *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008) (once defendants chose to make claims about operational success, "they were bound to do so in a manner that wouldn't mislead investors"); *In re Van der Moolen Holding, N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (statements that put source of revenue at issue created duty to disclose improper conduct).

### F.    The SAC Adequately Pleads Falsity With Respect To The Statements Made Before Q3 2018

Defendants suggest that the SAC's focus on quantifying the impact of Defendants' channel stuffing on the last three quarters covered by the Class Period means that the SAC does not support Plaintiff's claims relating to Defendants' statements made before Q3 2018. *See* MTD at 15. Not so. Plaintiff is unable to allege with precision the amount of channel stuffing prior to Q3 2018, because Intersect has not disclosed the volume of bulk deals on a quarter-by-quarter basis, but this does not mean that the SAC's allegations are insufficient.[20] Multiple CWs support the conclusion that Intersect stuffed the channel with PROPEL inventory in Q4 2017 and Q1 2018 in material excess of customer demand, resulting in the Q2 2018 miss. *See* ¶¶134-36. These allegations are sufficient to plead falsity, particularly in light of Gallahue's admission that the inventory build-up at the end of the Class Period was "something that built over probably the last 6 or so quarters." ¶230.

## V.    THE SAC ADEQUATELY ALLEGES SCIENTER

### A.    Standard For Pleading Scienter

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144

---

0care,organizations%20of%20newly%20released%20medications.&text=We%20infer%20that%20objective%20benefit,not%2C%20in%20general%2C%20exist.

[20] *Cf. Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 947 (N.D. Ill. 2002) ("Even under the PSLRA, a complaint need not … allege the precise amount of overstatement on a period by period basis, especially where most of the evidence necessary to prove these allegations is in the hands of the defendants.").

OPPOSITION TO MOTION TO DISMISS                Case No. 4:19-cv-02647-JSW

(9th Cir. 2017). A strong inference of scienter arises if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs II*, 551 U.S. at 324. Under this standard, "a tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

In making its scienter determination, a court must review "all the allegations holistically." *Tellabs II*, 551 U.S. at 324. This holistic determination may be based principally, or even entirely, on circumstantial evidence. *See, e.g.*, *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781 (9th Cir. 2008) (scienter may be pled on the basis of "circumstantial evidence and an inference of knowledge arising from the connection between Defendants' job roles and the core operations of the business"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1191 (C.D. Cal. 2008) ("*South Ferry* recognized that complaints ***must*** rely on circumstantial evidence of scienter.").[21]

**B.    Defendants' Statements Support A Strong Inference Of Scienter**

"[T]he most powerful evidence of scienter is the content and context of [Defendants'] statements themselves." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). Throughout the Class Period, Defendants were repeatedly asked specific questions by analysts about the same topics: the expected growth rate for Intersect's "base business" of PROPEL products, the reasons that Defendants were offering guidance perceived by analysts to be conservative, and whether any factors other than sales force distraction related to the launch of SINUVA were dampening expectations for growth in PROPEL. Defendants consistently provided misleading answers to these questions, insisting that SINUVA-related distraction was the only factor constraining growth in PROPEL and failing to disclose Intersect's reliance on discounted bulk sales to prop up those growth figures. These statements, considered against the timeline of PROPEL's growth results and the quantitative evidence of channel stuffing discussed *supra*, provide strong

---

[21] *See also Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014) ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter."), *overruled in part on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Technology, Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at *5 (C.D. Cal. July 10, 2008) ("A securities fraud complaint may rely on circumstantial evidence of scienter as long as that evidence meets the 'strong inference' standard.").

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

circumstantial evidence of scienter.

At the beginning of the Class Period, during the Q4 2017 earnings call on February 27, 2018, an analyst pointed out that Intersect's guidance appeared to assume "a slowdown in the base busines growth rate" and asked whether the guidance was based on a slowdown in growth that was already occurring or whether it was based on an anticipated "disruption" due to the SINUVA launch. ¶163. Hilleman responded that the conservative guidance was based "allowing … for some focus on SINUVA that could come a bit at the expense of PROPEL and PROPEL Mini's growth rate." *Id.* In response to a subsequent question about the growth rate for "the core business" in PROPEL, Hilleman stated that "we're going to be *watching and monitoring closely* ourselves."[22]

On August 1, 2018, Intersect announced disappointing results for Q2 2018 and lowered its guidance for 2018. ¶285. During the earnings call, Earnhardt blamed the poor results on the sales team's "focus[]" on the SINUVA launch, which prevented it from sufficiently engaging "in the more hands-on side of growth" with PROPEL. ¶183. Earnhardt claimed, however, that Intersect was taking concrete steps to address the issue: "[W]e have *expanded the staffing and are closely monitoring performance* to ensure effectiveness and reliable throughput."[23]

One quarter later, during the Q3 2018 earnings call, Earnhardt reaffirmed the outlook for FY 2018 and again blamed the disappointing Q2 results on staffing issues, but assured analysts that Intersect had expanded both the sales team and the sales reimbursement team. ¶195. An analyst asked a question about the PROPEL growth rate and whether there was any fundamental change in the outlook for PROPEL. ¶197. Earnhardt responded that there "was *no fundamental change in our perspective for PROPEL this year outside of the SINUVA launch*." *Id.* By this time, as discussed *supra*, discounted bulk sales had accounted for a very material portion of the reported growth in PROPEL for Q3 2018.

On November 28, 2018, at a Piper Jaffray conference, an analyst asked about Defendants' projection of double-digit growth in PROPEL for FY 2019 and asked "how do we get comfortable

---

[22] Lombard Decl., Ex. C at 12 (Dkt. No. 40-5 at 13).

[23] Lombard Decl., Ex. M at 5 (Dkt. No. 40-13 at 6).

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

that that's achievable." ¶201. Hilleman responded that "it really comes down to the resources we've put into this" and explained that while the SINUVA launch had interfered with the growth of the base business in 2018, Intersect expected to "restor[e] strength" in its base business going forward. *Id.* By this time, Q4 2018 was already two-thirds complete. As discussed *supra*, virtually all (if not all) of the PROPEL growth during this quarter was generated through discounted bulk sales.

On February 28, 2019, at a SVB Leerink conference, an analyst engaged in a lengthy exchange with Earnhardt concerning Defendants' confidence in Intersect's "growth acceleration trajectory." ¶217. In response to a question by the analyst about whether the "PROPEL growth deceleration" was due to "distraction with SINUVA" as opposed to other factors outside of Intersect's control, Earnhardt offered detailed data points concerning the "levers and drivers" of PROPEL growth, opined that there was more "headroom" to grow, and rejected the analyst's premise that the market for PROPEL might be saturated or "penetrated." *Id.* By this time, Intersect's results for Q4 2018 had already been released, and Q1 2019 was already two-thirds complete. As discussed *supra*, **all of the PROPEL growth during this quarter (and then some) was generated through discounted bulk sales**.

In light of all the foregoing, was it really possible that Defendants were unaware that natural demand for PROPEL was dramatically slowing and that Intersect was dependent on end-of-quarter discounted bulk sales to hit analysts' consensus estimates? The answer is: it is possible, but highly unlikely. Defendants stated that they were closely monitoring growth in the base business, and they exhibited clear attention to and knowledge of granular data concerning sales of the various PROPEL products.[24] Defendants kept receiving the same questions from analysts and kept insisting that

---

[24] *See, e.g.*, ¶175 (Hilleman: "[A] little under half of our accounts are currently stocking [PROPEL] Contour …. We added about 50 new accounts for the first quarter."); ¶183 (Earnhardt: "[W]e did expand the number of existing accounts stocking Contour by 20% to about 1,200 accounts and also added about 40 new PROPEL accounts."); ¶217 (Earnhardt: "We also continue to add new accounts. We added about 200 accounts last year and do have a good continuing rate of new adoption even though the product has been on the market some time. . . .We continue to see growth in the hospitals and in the ASCs"); ¶228 (Hilleman: " I think as we look through, in terms of our ability to add new accounts, we added about 40 new accounts in the first quarter [Q1 2019], so I think we continue to see we're able to fill and drive PROPEL forward that way.")..

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

SINUVA-related distraction was the sole cause for the PROPEL growth deceleration. At the very least, analysts' questions over multiple quarters should have caused Defendants to dig into the issue of demand for PROPEL and customer ordering patterns.[25] "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569.

Multiple courts have held that a plaintiff may plead an individual defendant's scienter through that individual's public statements, particularly when those statements reflect misleading responses to direct analyst inquiries, knowledge of the subject matter underlying a misstatement, or a representation that the defendant is monitoring the subject. *See, e.g.*, *Avaya*, 564 F.3d at 270 (strong inference of recklessness where CFO provided misleading answers in response to direct and repeated analyst questions); *South Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (scienter pled where CEO's "statements *themselves* suggest that he had actual knowledge of" WaMu's hedging operations) (emphasis in original); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (defendants' statements that they "closely monitored" advertiser cancellations supported strong inference of scienter).[26] The SAC pleads a strong inference of scienter under this line of authority.

### C.    Defendants' Precision Stuffing Gives Rise To A Strong Inference Of Scienter

During the final three quarters covered by the Class Period (Q3 2018, Q4 2018, and Q1 2019), Defendants used precision stuffing to report modest growth just ahead of analyst consensus forecasts of PROPEL revenue growth. ¶¶261-65. Defendants' undisclosed channel stuffing practices made the difference between modestly beating consensus estimates for PROPEL sales growth and missing those estimates. *See* ¶262 (PROPEL revenue in Q3 2018 of $23.7M modestly

---

[25] New management did such an investigation and, within roughly three weeks, completed the investigation and terminated the channel stuffing practices. *See infra* at §V.D.

[26] *See also Countrywide*, 588 F. Supp. 2d at 1192-93 (scienter adequately pled as to CEO because his public statements concerning company's underwriting standards were inconsistent with company's actual practices as detailed by confidential witnesses and CEO represented that he was knowledgeable about company's underwriting standards).

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

ahead of $23.4M consensus forecast); ¶263 (PROPEL revenue in Q4 2018 of $31.6M modestly ahead of $30.9M consensus forecast); ¶264 (PROPEL revenue in Q1 2019 of $25.8M modestly ahead of $24.9M consensus forecast). According to both CW1 and CW6, Intersect's bulk sales practices were used to artificially achieve the Company's guidance and sales targets. ¶¶71, 75, 114.

The precision nature of the bulk sales support a strong inference of scienter. *See, e.g.*, *Stanley v. Safeskin Corp.*, 2000 WL 33115908, at \*2-\*3 (S.D. Cal. Sept. 15, 2000) (strong inference of scienter where defendants allegedly calculated exactly how much additional product needed to be shipped for the company to record the earnings it had guided analysts to expect for the quarter); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 596-98 (D.N.J. 2001) (strong inference of scienter where defendants allegedly determined the amount of revenue needed to meet analyst estimates and gave the company's sales force target numbers for sales).[27]

**D.    New Management's Quick Discovery Of Truth Supports Inference Of Scienter**

New management's quick discovery and discontinuation of the discounted bulk deals in Q2 2019 following Earnhardt's resignation supports a strong inference that these practices were obvious and known by the Individual Defendants. On June 5, 2019, Gallahue stepped in as Interim President and CEO following Earnhardt's resignation. ¶21, ¶25. By June 30, 2019 (*i.e.*, by the end of Q2 2019), Gallahue already had discovered the bulk sales practices and terminated those practices, causing an "adverse impact" on revenues in Q2 2019. ¶147. Thus, it took new management at most 25 days to discover the practices and decide to end them (and likely less, since end-of-quarter bulk sales had to have ceased for at least a handful of days near the end of Q2 2019 in order to have caused an "adverse impact" on that quarter's results).[28] The rapidity with which new management

---

[27] Similarly, courts have held that accounting errors that make the difference between a company hitting or missing analyst estimates support a strong inference of scienter. *See, e.g.*, *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) ("that the mistakes allowed the Company's reported earnings to achieve consensus estimates" supported strong inference of scienter); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("Importantly, those violations made the difference between failure and success in meeting … Wall Street consensus revenue estimates for two quarters of 2014.").

[28] In its Order, the Court stated that "new management did not apparently discover the built-up inventory until after a two-month investigation into 'PROPEL demand and customer ordering dynamics.'" Order at 14-15. However, while the underlying statement from Gallahue states "we

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

learned about and decided to end the channel stuffing practices supports the conclusion that Defendants knew about the practices and the related inventory build-up. *See In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]he fact that the new CEO ... discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly.").[29]

**E.    The Confidential Witnesses Strengthen The Inference Of Scienter**

In its Order, the Court did not assign substantial weight to the CAC's confidential witness allegations, because "[n]one of the confidential witnesses knew the individual defendants, interacted with them, or communicated any information to them about bulk pricing and its effect on demand." Order at 15. A confidential witness with direct contact with an individual defendant, however, is not necessary for a plaintiff to plead scienter or for the witness's allegations to be relevant to the holistic scienter inquiry under *Tellabs II*. *See, e.g.*, *Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *10-*11 (D. Ariz. Nov. 27, 2018) ("Defendants argue that the confidential witnesses do not demonstrate scienter because there is no confidential witness that had personal knowledge of the Defendants' states of minds. … Defendants misapply the test."); *South Ferry LP, No. 2. v. Killinger*, 687 F. Supp. 2d. 1248, 1257 (W.D. Wash. 2009) (scienter adequately pled, even though "[n]one of the confidential witness statements implicates an individual Defendant directly").[30]

have ***spent the past 2 months*** focused on the whys" (¶147), the two months that Gallahue is referring to are June and July 2019. The statement was made on August 1, 2019, one month after Q2 2019 had ended. Thus, only the first half of that two-month period was necessary for new management to discover and end the channel stuffing practices.

[29] Likewise, the timing and circumstances of Earnhardt's and Hilleman's departures—stepping down after a reduction in guidance and multiple previous quarters of blaming declining PROPEL growth on the SINUVA launch—bolsters the inference of scienter. *See, e.g.*, *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017) (resignation of company's president strengthened inference of scienter); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) ("the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances").

[30] *See also Quality Sys.*, 865 F.3d at 1145 (crediting multiple statements from confidential witnesses, including CW1 and CW4, who had personal knowledge of declining sales during the class period based on information provided through Salesforce software, and finding these allegations contributed to a holistic inference of scienter); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020), *order clarified*, 2020 WL 5083883 (C.D. Cal. July 14, 2020) (finding that even though the CWs did not have direct contact with the individual defendants, the allegations

22

The Court appeared to acknowledge that the CAC's CW allegations were sufficient to support an inference that the relevant "sales data were stored in a salesforce database" and that the Individual Defendants had access to this database. Order at 15. The Court observed, however, that "mere access to internal data and reports does not establish knowledge by the executives." *Id.* That statement is correct, but access to information undermining the accuracy of a defendant's statements can support a strong inference of scienter in combination with other factors. *See, e.g.*, *Countrywide*, 588 F. Supp. 2d at 1191 (plaintiffs may "bridge the gap" between "a defendant's mere access to information and an inference of knowledge" using a variety of different means, including "***a defendant's own public statements <u>or</u>*** confidential witness reports about a defendant's specific activities" ***<u>or</u>*** the core operations doctrine). Here, Plaintiff relies on a combination of multiple different pieces of circumstantial evidence, discussed *supra*, and access to information falsifying Defendants' statements is only one of them.

The Court also appeared to acknowledge that the CAC's CW allegations were sufficient to support an inference that "bulk pricing took place." Order at 15. The SAC expands on these allegations, and provides additional details concerning the scope and the nature of Intersect's channel stuffing practices.[31] Among other things, the SAC alleges:

- According to CW1 and CW6, end-of-quarter discounted bulk sales were used to meet sales targets and constituted a very material portion of sales. ¶¶71,75. According to CW6, these deals easily accounted for 30% of sales each quarter. ¶75.

- According to CW1 and CW2, regional sales managers placed extreme pressure on sales representatives to engage in bulk sales at the end of quarters, even when customers did not need the product. ¶¶102, 108, 112, 114.

- According to CW1, CW3, CW4 and CW6, managers used "chase lists" and "target lists" to identify customers who might agree to bulk deals. ¶¶92-93, 95-96.

- CW5 stated that if customers were concerned about PROPEL product expiration when discussing a bulk deal, sales reps were authorized to tell customers that expired product would be replaced. ¶104. CW1 recounted assisting customers who held PROPEL product nearing expiration by finding customers that could use it before it expired and facilitating a

---

contributed to a strong inference of scienter).

[31] The SAC adequately details the CWs' job descriptions and responsibilities (¶¶32-38), which, in turn, establish their reliability and personal knowledge. *Quality Sys.*, 865 F.3d at 1144-45.

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

swap. ¶103.

- According to CW4, salesforce.com was used to track sales and make projections. ¶87. CW4 understood that Intersect executives, including Binney and Earnhardt, had access to all accounts and information in salesforce.com. *Id.* CW5 believed that Binney received a company-wide daily sales report. ¶100.

- According to multiple CWs, the problem with PROPEL sales was excess bulk sales, not SINUVA-related distraction, and the Q2 2018 miss in particular was due to excess inventory build-up due to bulk sales. ¶¶129, 134-36; *see also supra* at 12-13.

- CW5 and CW6 believed Gallahue's estimate of the inventory build-up at the end of the Class Period (2%-3% of annual revenues) was materially understated. ¶133.

These allegations corroborate one another and paint a consistent narrative. Together with the totality of the SAC's other allegations, the CW allegations support a strong inference of scienter. *See, e.g.*, *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *14, *16-*17 (D. Ore. June 27, 2017) (CW allegations of "widespread reliance on aggressive sales strategies … to create an impression of organic and sustainable growth" supported pleading of falsity and formed part of totality of allegations that holistically created strong inference of scienter).[32]

**F.    The Core Operations Inference Strengthens The Inference of Scienter**

It is well recognized that "the theory that facts critical to a business's core operations ... are known to a company's key officers—can be one relevant part of a complaint that raises a strong inference of scienter." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018); *see South Ferry*, 542 F.3d at 786 (core operations "allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information"). Defendants described PROPEL as the Company's "bread and butter" and throughout the Class Period nearly all revenue was generated by PROPEL sales. ¶¶247-49; *see also* ¶54 (92% of revenue from PROPEL). The importance of PROPEL thus supports a strong inference that Defendants were tracking sales and customer inventory buildup of PROPEL.[33]

---

[32] *See also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (CW statements gave rise to strong inference that significant deviations from underwriting standards were widespread and formed part of holistic body of facts giving rise to strong inference of scienter).

[33] Interest's small size enhances this inference. Executives are typically closer to problems in a

24

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

## VI.    THE SAC ADEQUATELY PLEADS LOSS CAUSATION

Defendants did not address loss causation in their motion, but the Court previously held that the CAC failed to plead loss causation in connection with the August 1, 2018 disclosure. Order at 16-17. The SAC, however, pleads fact supporting an inference that Intersect's Q2 2018 miss and guidance reduction was due to bulk sales in Q4 2017 and Q1 2018 and not SINUVA distraction. *See* ¶¶134-36; *see also supra* at 12-13. Accordingly, the SAC adequately pleads loss causation with respect to all the alleged drops. *See* ¶¶280-87.

## VII.    THE SAC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Defendants' only challenge to the SAC's Section 20(a) claims is their assertion that Plaintiff has failed to plead a predicate violation of Section 10(b). MTD at 15. For all of the reasons discussed *supra*, the SAC does plead predicate violations of Section 10(b). Defendants do not challenge the adequacy of the SAC's pleading of control as to any Individual Defendant. The Court's holding that the CAC adequately pled control as to Defendant Binney remains the law of the case. Order at 17.

## VIII.    CONCLUSION

Defendants' motion should be denied in its entirety. If the Court grants any portion of the motion, Plaintiff requests leave to amend as amendment would not be futile. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to amend should be granted with particular liberality in PSLRA cases).

Dated: October 23, 2020

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Jennifer M. Leinbach
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

---

smaller company. *See, e.g., Curry v. Hansen Medical, Inc.*, 2012 WL 3242447, at *11-*12 (N.D. Cal. Aug. 10, 2012) (that company had "less than 200 employees" contributed to inference of scienter). During the Class Period, Intersect employed 393 employees. ¶40. Given Intersect's "modest size, it is unlikely that transactions ... would fly below the radar of top management." *In re Commtouch Software Ltd. Sec. Litig.*, 2002 WL 31417998, at *9 (N.D. Cal. July 24, 2002).

25

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall Dees
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

*Attorneys for Lead Plaintiff Avi Yaron*

OPPOSITION TO MOTION TO DISMISS                    Case No. 4:19-cv-02647-JSW

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On October 23, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 23, 2020, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay