United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVI YARON,<br>Plaintiff,<br>v.<br>INTERSECT ENT, INC.,<br>Defendants. | Case No. 19-cv-02647-JSW<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Re: Dkt. No. 39 |

Now before the Court is defendants' motion to dismiss the consolidated second amended class action complaint ("SAC"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the motion suitable for disposition without oral argument. See N.D. Civ. L.R. 7-1(b). The Court GRANTS defendant's motions to dismiss.

**BACKGROUND**

The background of this action was previously described, and the Court does not repeat it in full here. (*See* Dkt. No. 33 ("MTD Order") at 1:18-3:25.) In summary, Plaintiff Avi Yaron brings this securities class action against Intersect ENT, Inc. ("Intersect")—a drug delivery company that specializes in ear, nose, and throat conditions—together with its former CEO, current CFO, and former CCO (collectively, "Defendants"). Plaintiff alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, as well as Section 20(a), and brings this purported class action on behalf of those that acquired Intersect securities between February 27, 2018 and August 1, 2019 (the "Class Period").

Plaintiff claims that Intersect misled investors by failing to disclose that it used discounted

United States District Court
Northern District of California

end-of-quarter bulk sales (referred to as "channel stuffing") for its main product, PROPEL. Plaintiff acknowledges that discounted bulk sales occurred prior to the Class Period. (*See* SAC ¶ 69.) However, Plaintiff alleges that the practice became misleading when Intersect introduced a second product, SINUVA. SINUVA was regulated as a physician-administered drug and required new sales tactics, for which Intersect lacked experience. (*Id.* ¶¶ 57, 203.) The SINUVA launch thus strained Intersect's sales resources and took time away from PROPEL. (*See id.* ¶ 137.)

Acknowledging this risk, Intersect repeatedly warned investors that SINUVA-related sales force "distraction" may detract from PROPEL sales. (*See id.* ¶¶ 56, 61, 137, 143.) Intersect also provided conservative earnings guidance throughout the Class Period, which it attributed to risks from SINUVA-related distraction. (*Id.* ¶¶ 53, 59, 62-64.) However, Plaintiff claims that even this conservative guidance was misleading because Defendants created the false impression that the PROPEL sales were organic and reflected strong demand. (*Id.* ¶ 166.) Plaintiff also alleges that the statements attributing earnings losses to SINUVA-related distraction were misleading because they failed to identify discounted bulk sales as an additional factor. (*E.g.*, *id.* ¶ 188.)

The alleged "moment of truth" occurred when Intersect changed leadership. (*Id.* ¶ 7.) After the former CEO Defendant, Lisa Earnhardt, resigned in Q1 2019, the new management disclosed that Intersect's sales force became over-reliant on bulk discounting, which led to inventory build-up with the customers:

> Instead of focusing primarily on working with physicians to broaden their understanding of PROPEL's clinical end benefits and its appropriate usage, as we have done in the past, with less time available to focus on PROPEL, we responded commercially by offering selective discounts on high volume orders. While inner [*sic*] totality the discounted high-volume orders have not been a major factor in our business, they have been growing and moving us away from the flow of natural market demand, and we have already taken steps to correct this.

(*Id.* ¶ 147)

Intersect curbed the discount bulk ordering practice in Q2 2018, which had a negative impact on short-term revenues. (*Id.*) However, Intersect assured investors that bulk discounting "was just something that built over . . . the last 6 or so quarters," when the field was focused a

"little bit more on the support side with SINUVA," and accounted for only "a few percentage points of the total annual revenues, maybe 2%, 3%," with no "substantial impact on any given period." (*Id.* ¶ 149.) Nonetheless, it would take up to three quarters for customers to work through the inventory, which reduced Intersect's revenue in the short term. (*Id.*)

Intersect's stock price dropped by 18%. (*Id.* ¶ 152.) The Court shall address additional facts as necessary in the analysis.

## ANALYSIS

### A. Legal Standard.[1]

#### 1. Pleading Standards

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal under Rule 12(b)(6) is granted when the pleadings fail to state a claim upon which relief can be granted. Pursuant to *Bell Atlantic v. Twombly*, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

Where a plaintiff alleges fraud, Rule 9(b) requires the plaintiff to state the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b). Particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged. *See Kearns v. v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Rule 9(b) "has long been applied to securities complaints." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). However, for claims under Section 10(b) and Rule 10b-5, the complaint must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Id.* The PSLRA requires that "a complaint 'plead with particularity both falsity

[1] The Court repeats the legal standard from the previous Order, which has not changed.



United States District Court
Northern District of California

and scienter.'" *Id.* (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002)).

Under the PSLRA, a plaintiff pleading falsity must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to adequately plead scienter, the PSLRA requires that the plaintiff "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco*, 552 F.3d at 991 (quoting 15 U.S.C. § 78u-4(b)(2)). An inference of scienter is "strong" for purposes of dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

To assist the Court in determining whether a plaintiff has satisfied this heightened pleading standard, "the Supreme Court has provided three points of instruction: (1) 'courts must, as with any [12(b)(6)] motion to dismiss . . ., accept all factual allegations in the complaint as true'; (2) 'courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss'; and (3) 'in determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inference.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citing *Tellabs*, 551 U.S. at 322-23).

**2. Securities Exchange Act**

Section 10(b) of the 1934 Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. Section 20(a) creates joint and several liability for the "control person" who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or any rule or regulation thereunder . . . to the same extent as such controlled person to any person to whom such controlled personal is liable . . . ." 15 U.S.C. § 78t(a).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts that show: (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

A statement is misleading if "it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks omitted). Even if a statement is not false, it may be misleading if it omits material information. *Khoja*, 899 F.3d at 1008–09 (citation omitted). "[A]n omission is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). But omissions are actionable only where they "make the actual statements misleading," even if investors "consider the omitted information significant." *Markette v. XOMA Corp.*, No. 15-cv-03425-HSG, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017).

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). To act with scienter, defendant must have "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (internal quotation marks omitted). Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "[A]n actor is [deliberately] reckless if he had

reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

The scienter inquiry is "inherently comparative." *Tellabs*, 551 U.S. at 323. Thus, in evaluating scienter, the court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint" and only allow the claims "if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991 (citing *Tellabs*, 551 U.S. at 323). The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted). Rather, a complaint survives if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. In evaluating scienter, the court adopts a holistic view and takes "a practical and common-sense perspective." *S. Ferry*, 542 F.3d at 784.

**B. Plaintiff Fails to Sufficiently Allege Securities Fraud.**

As explained in the previous motion to dismiss order, Plaintiff's claims rest on allegations of "legitimate" channel stuffing—meaning, sales practices that cause customers to order more product than usual, where the customers want the purchased product but may wait longer before making the next purchase.[2] (MTD Order at 9-11.) Such sales practices are not themselves fraudulent, but may be part of a fraudulent scheme where they are used to artificially inflate sales and disguise weak fundamentals. *See, e.g.*, *Broudo v. Dura Pharma., Inc.*, 339 F.3d 933, 940 (9th Cir. 2003), *rev'd on other grounds*, 544 U.S. 336 (2005); *In re Dura Pharma., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1028 (S.D. Cal. 2006). Where, on the other hand, a plaintiff claims that channel

---

[2] Channel stuffing has been defined as "the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). However, absent additional allegations, the effect of channel stuffing on future sales is speculative. *Id.* The distinction between "legitimate" and "illegitimate" channel stuffing arose in *Tellabs*, 551 U.S. at 325, which distinguished "writing orders for products customers had not requested" (illegitimate) and "offering customer discounts as an incentive to buy" (legitimate), while leaving room for other possibilities.

United States District Court
Northern District of California

stuffing itself is the fraud—for example, because it will create an oversupply that hurts sales in future quarters—the plaintiff must allege facts to show that the claim is not "speculation made in hindsight." *See Steckman*, 143 F.3d at 1298 (finding speculative that channel stuffing would materially impact future sales).

Here, Plaintiff relies primarily on "legitimate" channel stuffing and argues that Intersect used bulk discounting to hide weak PROPEL demand. Defendants seek to dismiss for lack of sufficient allegations of a materially false or misleading statement and scienter.

### 1. Material Misrepresentation or Omission

In the previous motion to dismiss Order, the Court identified, and the parties now adopt, three categories of challenged statements: (1) Defendants' announcements of financial results and earnings guidance, (2) Defendants' statements that PROPEL sales were strong, and (3) statements attributing weak PROPEL growth to SINUVA-related sales force distraction. The Court again addresses each category.[3]

#### a. Financial Results

The Court previously dismissed Plaintiff's challenge to Defendants' announcements reporting of financial results because the reporting was accurate and did not implicate any causes of the results. (MTD Order at 11-12.) In other words, by reporting total revenue and growth, Defendants did not create a misleading impression that the revenue was caused by any factor, legitimate or illegitimate. Plaintiff does not directly challenge this finding, but argues that some courts have found that reports of positive financial results due to channel stuffing are misleading where the results are not sustainable. *See Cunha v. Hansen Natural Corp.*, No. EDCV 08-1249-GW (JCx), 2011 WL 8993148, at *2 (C.D. Cal. May 12, 2011).

The Court recognizes contrary authority in *Cunha*, but respectfully disagrees for two reasons. First, the majority of courts in this district find that reports of financial results carry no prediction that results will continue or be sustainable. *See, e.g., City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 WL 6877195, at *12 (N.D. Cal. Dec.

---

[3] The parties disagree on some of the categories. For purposes of this Order, the Court adopts Plaintiff's categories, unless otherwise noted. (*See* Dkt. No. 47-2 ("Category Chart").)

United States District Court
Northern District of California

17, 2019); *In re Finisar Corp. Sec. Litig.*, No. 5:11-cv-01252 EJD, 2013 WL 211206, at *4 (N.D. Cal. Jan. 16, 2013); *In re Redback Networks, Inc. Sec. Litig.*, No. C 03-5642 JF, 2007 WL 4259464, at *3 (N.D. Cal. Dec. 4, 2007). For example, in *Redback*, Judge Fogel found that a company had no duty to disclose that positive revenues were caused by *bribery* because the sales were real, even if illegitimately obtained. 2007 WL 4259464 at *3. This rule makes good sense because there is no "completeness" requirement in the Ninth Circuit—parties are free not to speak, so long as they do not mislead when they do—and forcing companies to disclose all factors that impact revenue every quarter would defeat the rule. *See Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Second, even if the Court adopted the *Cunha* interpretation, the complaint fails to allege that bulk discounting had a material impact on revenues during the Class Period, for the reasons stated in the next subsection.

Plaintiff further argues that some challenged statements go beyond reporting financial results to attribute positive financial growth to "growth in adoption of . . . PROPEL." (*See* SAC ¶¶ 165, 181, 191, 207, 219.) Plaintiff claims that "adoption" implies increased acceptance and use by doctors, which creates the misleading impression that demand for PROPEL was growing. The Court agrees that these statements tout increased adoption but finds, for the reasons stated in the next subsection, that Plaintiff fails to allege that PROPEL adoption was not growing during the Class Period.[4] Accordingly, the Court dismisses the statements challenged under category 1, as shown in Plaintiff's exhibit 2.

**b. Strong PROPEL Sales**

The Court previously dismissed Plaintiff's allegations regarding "strong" PROPEL growth and opportunity for growth because Plaintiff had not alleged that PROPEL growth was weak at the time. (MTD Order at 12.) According to Intersect's post-class statements, which are re-alleged in the amended complaint, bulk discounting had no "substantial impact on any given period," "had not been a major factor in [Intersect's] business," and accounted for only 2 or 3% of its annual

[4] The Court notes that even if Plaintiff shows that PROPEL growth was declining, that does not necessarily translate to declining adoption rates since the decline may have come from existing accounts affected by bulk discounting.

revenues. (SAC ¶¶ 147, 230.) Based on these allegations, the Court concluded that Plaintiff had not alleged enough facts to show that Defendants' statements of positive PROPEL growth were false or would have been false in the absence of bulk discounting during the Class Period.[5]

In response, Plaintiff has added allegations that purport to show that Intersect would have reported weak PROPEL growth in the absence of bulk discounting. Plaintiff alleges as follows: *First*, Plaintiff relies on Intersect's post-class statement that bulk discounting led to stockpiled inventory worth "2%, 3%" of Intersect's annual sales to calculate that customers held $2.2 million to $3.2 million worth of excess inventory on August 1, 2019. (*Id.* ¶¶ 149, 232.) *Second*, Plaintiff relies on Intersect's statement that it curbed the bulk discounting practice in Q2 2019 to infer that the amount of stockpiled inventory was higher previously because some inventory "dissipated" (had been used up) by August 1, 2019. (*Id.* ¶¶ 147, 239.) *Third*, to calculate the dissipation rate, Plaintiff cites post-class statements that Intersect's customers used up $1.5 million to $2.0 million of excess inventory in Q3 2019 and that Intersect expected the rest to dissipate in Q4 2019, to calculate a dissipation rate of $1.1 million to $1.6 million per quarter.[6] (*Id.* ¶¶ 234, 240.) *Fourth*, Plaintiff adds the dissipation rate to the reported stockpiled inventory to infer that customers had between $2.9 and $4.8 million of excess inventory on March 31, 2019. (*Id.* ¶ 240.) *Fifth*, Plaintiff compares this number to Intersect's quarterly PROPEL revenue growth to conclude that Intersect would have missed its guidance for three quarters and would have reported negative PROPEL revenue growth in two quarters in the absence of bulk discounting. (*Id.* ¶ 243.)

The Court finds the first, second, third, and fourth inferences reasonable based on the facts alleged in the complaint. Although Defendants claim that the math is "speculative," the Court finds it reasonable to infer that Intersect's customers dissipated inventory at a similar rate in Q2

---

[5] Because Plaintiff relies on "legitimate" channel stuffing, the theory of fraud here assumes that Defendants used bulk discounting to hide poor PROPEL sales. Plaintiff also alleges "illegitimate" channel stuffing by arguing that Intersect sales employees offered to replace expired product for free, but fails to allege enough facts to show that this practice was sufficiently widespread to materially impact PROPEL sales. (SAC ¶¶ 103-05.)

[6] Alternatively, Plaintiff cites Intersect's statement that it would take "1, 2, 3 quarters" to draw down inventory to calculate a dissipation rate of $0.7 million to $1.1 million. (*Id.* ¶¶ 230, 240.) The Court draws all inferences in favor of Plaintiff and finds the higher dissipation rate reasonable based on customers' actual dissipation rate post-class period.

2019 as they did in Q3 and Q2 2019. However, the fifth inference is not reasonable. Plaintiff only arrives at a negative growth number by comparing the *total* value of inventory build-up to *two quarters'* worth of PROPEL revenue growth. (*See id.* (comparing $2.9 and $4.8 million to $3.3 million revenue growth for Q1 2019 and Q4 2018).) Similarly, Plaintiff concludes that Intersect would have missed its earnings guidance without bulk discounting by comparing *total* inventory build-up to *three quarters'* worth of PROPEL revenue growth. (*Id.*) Intersect's post-class statements make clear, however, that inventory had build-up over "six quarters." (*Id.* ¶ 230.) Accordingly, a proper comparison would require dividing the total inventory build-up by six (to arrive at $0.48 million to $0.8 million) to compare to the quarterly PROPEL growth. Under the proper comparison, Plaintiff does not adequately allege that bulk discounting concealed negative PROPEL growth in any quarter.[7] (*See id.* ¶ 241.)

Nor do the other allegations suggest that PROPEL growth was actually declining during the Class Period. Plaintiff cites confidential witnesses who disagree with Intersect managements' estimate that stockpiled inventory amounted to 2-3% of annual revenues, but the job positions of these witnesses (sales managers) do not suggest that they had personal knowledge of Intersect's overall business. (*Id.* ¶¶ 133, 37-38.) On the contrary, Intersect's new management had the best position to know of the extent of inventory buildup (and no apparent incentive to misrepresent it), and it reported that bulk discounting had no "substantial impact on any given period." (*Id.* ¶ 149.) Moreover, the fact that PROPEL revenue declined after the Class Period does not suggest that it was declining previously: Plaintiff's charts show a steady downward trend in growth both before and after the Class Period, and the negative growth after the Class Period was apparently caused by the decision to end bulk discounting, not bulk discounting itself. (*See id.* ¶¶ 236, 241, 147.)

Accordingly, Plaintiff still fails to allege that Defendants' statements regarding PROPEL growth and opportunity for growth were false or misleading. At most, Plaintiff's allegations show that PROPEL sales would have had different timing without bulk discounting. But since the

---

[7] Plaintiff further claims that bulk discounting concealed the "slope" of the growth, but fails to show that the challenged statements make any representation about slope. Plaintiff also makes no allegations about market saturation, so as to make statements about future growth false. (*See* SAC ¶ 217.)

United States District Court
Northern District of California

channel stuffing here is "legitimate" and concerns products that customers actually wanted to buy, merely shifting sales from quarter to quarter does not render Defendants' statements about growth misleading. *See In re ICN Pharma., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1061-62 (C.D. Cal. 2004) ("If channel stuffing occurs over time, the pattern of increased sales toward the end of each quarter and lower sales at the beginning of each quarter would be quite transparent to investors, and thus could not form the basis of an allegation of fraud."); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (recognizing that "[h]istorically, the majority of Oracle's sales were made in the final days of a quarter as customers waited for Oracle to significantly lower prices in an attempt to meet its quarterly projections"). Thus, the Court dismisses the statements challenged under category 2, as shown in Plaintiff's exhibit 2.

**c. SINUVA-Related Distraction**

Plaintiff's last category of challenged statements attributes weakening PROPEL growth to SINUVA-related distraction. (*E.g.*, SAC ¶ 197.) Plaintiff claims that these statements are false or misleading because PROPEL growth was declining due to declining demand (or possibly due to market saturation), and Defendants created the misleading impression that only SINUVA-related distraction was responsible. The Court previously dismissed these allegations because Plaintiff did not allege that bulk discounting presented a "separate risk factor" over-and-above declining demand due to SINUVA-related distraction (of which investors were warned and which therefore cannot form the basis of security fraud). (MTD Order at 13-14.) However, in opposition to the current motion, Plaintiff does not focus on bulk discounting itself but argues that demand was declining for other reasons.

The Court finds, again, that Plaintiff has not adequately alleged falsity. Plaintiff's current theory requires allegations of independently declining demand or market saturation, but the factual allegations support neither theory. Plaintiff does not plead facts that show that PROPEL demand was declining for reasons *other than* SINUVA-related distraction. Although Plaintiff argues that sales force distraction cannot cause reduced demand, Intersect's new management stated that its sales force spent less time "educating" physicians on PROPEL benefits while working on the SINUVA launch—activities that create natural demand growth. (SAC ¶ 147.) Accordingly, to

United States District Court
Northern District of California

plead independently declining PROPEL demand, Plaintiff must allege facts inconsistent with the "obvious alternative explanation" that PROPEL sales declined due to less time spent on physician "education" (marketing). *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013); *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1116 (9th Cir. 2014).

Here, Plaintiff relies on five arguments to show that PROPEL demand was independently declining, none of which are persuasive. First, Plaintiff claims that PROPEL growth would have declined more precipitously without channel stuffing. That cannot show independently declining demand because it does not implicate any causes—the decline could have been caused by SINUVA-related distraction. Second, Plaintiff alleges that analysts were skeptical of Defendants' explanations for declining PROPEL growth and Defendants' increase in sales resources did not address the problem. But, again, Plaintiff does not identify any other causes, and the sales force expansion may have simply been insufficient. Third, Plaintiff argues that confidential witnesses did not believe that SINUVA-related distraction was causing declining PROPEL sales. That is probative of other causes leading to the decline, but the confidential witnesses identify channel stuffing as the true cause, which is insufficiently shown to have materially impacted PROPEL sales during the Class Period. (SAC ¶ 134.) Fourth, Plaintiff alleges that Intersect experienced declining growth after the Class Period. That, again, does not implicate any causes—according to Intersect's post-class statements, the decline arose from the decision to end bulk discounting, not underlying weakness. (*Id.* ¶ 9.) Last, Plaintiff cites "precision stuffing," discussed below, as support. Plaintiff does not explain how these allegations show declining demand.

In short, Plaintiff still fails to identify an independent risk factor that caused declining PROPEL growth sufficient to render Defendants' omission of those factors misleading. At this point, Plaintiff must show either that PROPEL demand declined for independent reasons (market saturation, etc.) or that bulk discounting itself cause lower sales. The first theory is not supported by the complaint allegations, and the second theory is not plausible because it contradicts post-class statements. (*See id.* ¶ 149 (explaining that bulk discounting had no "substantial impact on

United States District Court
Northern District of California

any given period").)[8] Accordingly, the Court dismisses the statements challenged under category 3, as shown in Plaintiff's exhibit 2.

**2. Scienter**

The Court has previously dismissed Plaintiff's allegations of scienter as implausible because Defendants consistently provided lower-than-expected guidance and pessimistic outlooks, which "does not make a whole lot of sense" if they were trying to capitalize on the appearance of strength. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). In response, Plaintiff has not meaningfully amended the allegations, which is fatal to the claims.

There remains a basic disconnect between Plaintiff's theory of fraud and the theory of scienter. As explained above, the alleged fraud rests on naturally declining PROPEL demand caused by factors other than SINUVA-related distraction, which Defendants intentionally hid through channel stuffing.[9] Thus, scienter requires showing that the individual Defendants (1) knew of declining PROPEL demand, (2) knew that it was caused by factors other than SINUVA-related distraction, and (3) deliberately used bulk discounts to hide those facts from investors. Plaintiff alleges none of this. Instead, Plaintiff's allegations focus on the individual Defendants' monitoring of sales (*e.g.*, SAC ¶ 283), confidential witness descriptions of bulk discounting (*e.g.*, *id*. ¶ 75), new management's quick discovery of bulk discounting (*e.g.*, *id.* ¶ 147), and the largely coincidental alleged fact that Intersect reported modest growth for three consecutive quarters.[10] (*Id.* ¶¶ 261-65.) Even if the Court assumes the truth of these allegations and draws all inferences in favor of Plaintiff (which is not the standard applied for scienter), that still would not show

---

[8] The Court has previously found that the length of time that the bulk discounting took place undermines the claim that the practice hid declining demand. (MTD Order at 13.) Although this factor is most relevant to scienter, the Court notes here that even if channel stuffing hid declining demand, the decline may have still been caused by SINUVA-related distraction—a risk factor that Defendants disclosed and that therefore cannot form a basis for a securities fraud claim.

[9] Alternatively, the complaint still alleges that channel stuffing itself created the risk of declining PROPEL sales. (*See, e.g.*, SAC ¶ 164.) For this theory, Plaintiff must show that the individual defendants knew of the inventory buildup (or a related risk) that would affect future sales.

[10] Plaintiff describes this claim as "precision stuffing," but the sole supporting allegation lies in the consistency of the reported modest growth for three quarters. That fails to show that the outcome was intentionally caused by channel stuffing.

scienter because Defendants may not have known that PROPEL sales would be weak or declining *absent* bulk discounting (much less used bulk discounting to intentionally hide such decline).

And applying the correct standard that requires comparing the inference of scienter against competing inferences, *Tellabs*, 551 U.S. at 323, the inference of innocence or negligence remains far more compelling. The Court finds entirely plausible that Defendants simply failed to look past PROPEL sales numbers, accepting them without inquiry into whether they reflected "natural" demand or whether bulk discounting created separate risks. After all, the entire company appears to have been focused on the SINUVA launch, and there is nothing inherently wrong with bulk discounting (the "legitimate" type of channel stuffing).[11] Nor would such failure be "deliberately reckless" unless Defendants intentionally disregarded facts that they could have obtained "without extraordinary effort." *Oracle*, 627 F.3d at 390. At this stage, the Court doubts whether Plaintiff can adequately plead scienter, in light of the strong inference of a lack of scienter and the failure to make meaningful new allegations. Nevertheless, the Court does not conclude, at this time, that amendment would be futile.

Accordingly, the complaint is dismissed for failure to plead scienter.[12]

**C. CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss with leave to amend. Plaintiff shall file and serve an amended complaint or a statement that no such amended complaint shall be filed within twenty days of the date of this Order, and Defendants shall file their response within twenty days thereafter.

---

[11] As noted above, Plaintiff also alleges "illegitimate" channel stuffing in the form of bulk sales with the promise to replace any expired product for free. (SAC ¶ 104.) In that case, Plaintiff must show knowledge or deliberate disregard for the "illegitimate" part of the practice—the offers to make free replacements, not merely the bulk discounting itself.

[12] Defendants seek judicial notice of the same documents the Court considered in the previous motion to dismiss order. (Dkt. No. 41 ("RJN").) The Court GRANTS Defendants' request and takes notice of the facts considered previously—namely, that Defendants provided ample warning of PROPEL sales decline from SINUVA-related distraction and were "persistently gloomy" in their outlook. (MTD Order at 5-6.)

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: January 22, 2021

JEFFREY S. WHITE
United States District Judge