GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Jason L. Krajcer (#234235)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: lglancy@glancylaw.com
        rprongay@glancylaw.com
        jkrajcer@glancylaw.com

*Lead Counsel for Lead Plaintiff Avi Yaron
and the Settlement Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AVI YARON, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> INTERSECT ENT, INC., LISA D. EARNHARDT, JERYL L. HILLEMAN, and ROBERT H. BINNEY, JR., <br><br> Defendants. | Case No.: 4:19-cv-02647-JSW <br><br> **CLASS ACTION** <br><br> **DECLARATION OF JASON L. KRAJCER AND COREY D. HOLZER IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** |

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Avi Yaron in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fee and Reimbursement of Litigation Expenses |
| 2 | Declaration of Patty Nogalski Regarding Notice Administration |
| 3 | Declaration of Jason L. Krajcer, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fee and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 4 | Declaration of Corey D. Holzer, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fee and Reimbursement of Litigation Expenses Filed on Behalf of  Holzer & Holzer, LLC |
| 5 | Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021) |
| 6 | Table of Law Firm Rates |
| 7 | *Hodges v. Akeena Solar, Inc.*, No. 5:09-cv-02147-JW, Amended Order Awarding Lead Counsel Attorneys' Fees and Expenses (N.D. Cal. Dec. 15, 2011) |
| 8 | *In re Interlink Elec., Inc. Sec. Litig.*, No. 05-cv-08133 AG (SH), slip op. (C.D. Cal. June 1, 2009) |
| 9 | *In re 2TheMart.com, Inc. Sec. Litig.*, No. 99-cv-1127-DOC (ANx), slip op. (C.D. Cal. July 8, 2002) |
| 10 | *Elliot v. China Green Agriculture Inc.*, No. 3:10-cv-00648-LRH-WGC, slip op. (D. Nev. Aug. 12, 2014) |
| 11 | *In re Resonant Inc. Sec. Litig.*, No. 2:15-cv-01970 SJO (MRW) slip op. (C.D. Cal. Nov. 22, 2017) |
| 12 | *Jenson v. First Trust Corp.*, No. CV 05-3124 ABC (CTx), Final Order and Judgment (C.D. Cal. June 9, 2008) |
| 13 | *In re HP Sec. Litig.*, No. 3:12-cv-05980-CRB, slip op. (N.D. Cal. Nov. 16, 2015) |

**TABLE OF CONTENTS**

I.      INTRODUCTION .......................................................................................................... 2

II.     PROSECUTION OF THE ACTION .......................................................................... 5

        A.      Background .......................................................................................................... 5

        B.      Commencement of the Instant Action .................................................................. 5

        C.      The Comprehensive Pre-Filing Investigation, Preparation of the FAC, and
                Defendants' Motion to Dismiss the FAC .......................................................... 5

        D.      The SAC and Defendants' Motion to Dismiss the SAC ........................................ 8

        E.      Mediation Efforts, Settlement Negotiations, and the Settlement's Preliminary
                Approval ............................................................................................................ 9

III.    THE RISKS OF CONTINUED LITIGATION ......................................................... 10

        A.      Risks to Proving Liability .................................................................................. 10

        B.      Risks to Proving Loss Causation and Damages ....................................................... 11

        C.      Risks Faced in Obtaining and Maintaining Class Certification .............................. 12

        D.      Other Risks ........................................................................................................ 13

        E.      The Settlement is Reasonable in Light of the Potential Recovery in the Action .... 13

IV.     LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REGARDING THE NOTICE PROGRAM .................................. 15

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ............................ 17

VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT
        OF LITIGATION EXPENSES ......................................................................... 20

        A.      The Fee Application ......................................................................................... 20

                1.      The Excellent Outcome Achieved is the Result of the Significant Time and
                        Labor that Lead Counsel Devoted to the Action ......................................... 21

                2.      Standing and Caliber of Opposing Counsel ................................................ 22

                3.      The Risks of Litigation and the Need to Ensure the Availability of
                        Competent Counsel in High-Risk Contingent Securities Cases.................. 23

                4.      The Reaction of the Settlement Class to the Fee Memorandum ................. 24

                5.      Lead Plaintiff Avi Yaron Supports the Fee Memorandum ........................ 25

B.      Reimbursement of the Requested Litigation Expenses is Fair and Reasonable...... 25

VII.     CONCLUSION ...................................................................................................................... 27

We, Jason L. Krajcer and Corey D. Holzer, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      Court-appointed Lead Counsel Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel"), and additional Plaintiff's Counsel Holzer & Holzer LLC ("H&H" and, together with GPM, "Plaintiff's Counsel"), are counsel of record for Lead Plaintiff Avi Yaron ("Lead Plaintiff") in the above-captioned action (the "Action").[1]  We oversaw or conducted the day-to-day activities in the Action on behalf of our respective firms.  We are familiar with the proceedings in this litigation, and we have personal knowledge of the matters set forth herein based upon supervising and participating in all aspects of the Action.

2.      We respectfully submit this declaration, together with the attached exhibits, in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Lead Plaintiff seeks final approval of the $1,900,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      We also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof ("Fee Memorandum").  As set forth in the Fee Memorandum, Lead Counsel, on behalf of Plaintiff's Counsel, seeks an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $93,929.16, which includes Plaintiff's Counsel's total out-of-pocket litigation costs in the amount of $88,929.16, and $5,000 to Lead Plaintiff Avi Yaron, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for his costs, including lost wages, incurred in connection with his representation of the Settlement Class.

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement, dated May 13, 2021 (the "Stipulation") (ECF No. 64-1).

1

4.     The Court preliminarily approved the proposed Settlement by Order dated June 22, 2021 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class.  *See* ECF No. 67.  Pursuant to the Preliminary Approval Order, A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5.     In total, more than 16,000 copies of the Postcard Notice have been disseminated to potential Settlement Class Members and nominees, and thus far no requests for exclusion and no objections have been received.

## I.     INTRODUCTION

6.     This is a class action that asserted claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  Lead Plaintiff asserts claims against Defendants Intersect ENT, Inc. ("Intersect" or the "Company") and Defendants Lisa D. Earnhardt ("Earnhardt"), Jeryl L. Hilleman ("Hilleman"), and Robert H. Binney, Jr. ("Binney") (collectively, the "Individual Defendants" and together with Intersect, the "Defendants") for material misstatements and omissions regarding the growth rate of PROPEL during the putative class period, which Lead Plaintiff alleges was inflated due to Defendants' channel stuffing practices.

7.     The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $1,900,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, Lead Plaintiff and Plaintiff's Counsel submit that the proposed Settlement represents a highly favorable result for the Settlement Class considering the procedural posture of the case as well as the significant risks remaining in the litigation, including the fact that the Court had *twice* granted Defendants' motions to dismiss making proceeding past the pleading stage a potentially insurmountable obstacle.

8.     Additionally, the $1,900,000 cash Settlement Amount is within the range of reasonableness under the circumstances to warrant final approval of the Settlement.  As discussed more fully below, Lead Plaintiff's best-case damages scenario is estimated to be approximately

$161 million. However, the Court had already twice held that Lead Plaintiff failed to plead the existence of a single false or misleading statement, failed to plead scienter on the part of any Defendant, expressed serious doubt that Lead Plaintiff could cure the pleading issues related to scienter, and dismissed the August 1, 2018 price drop on loss causation grounds. Depending on which of the alleged misrepresentations and loss causation dates were proven, damages could range from $23 million (if falsity was proven only for statements relating to Q1 2019 and loss causation was proven only in relation to the August 2, 2019 stock drop); to $54 million (if falsity was proven only for statements relating to Q4 2018 and Q1 2019, and loss causation was proven in relation to the May 7, 2019 and August 2, 2019 stock drops); to the aforementioned high of $161 million. The $1.9 million Settlement Amount represents approximately 8.26% of $23 million in damages; 3.52% of $54 million in damages; and 1.18% of the aforementioned high of $161 million. A range of recovery of 1.18% - 8.26% for a securities litigation matter that has been dismissed twice, is well-within the range of reasonableness considering the circumstances.

9. Indeed, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

10. The Settlement was reached after nearly two years of contested litigation. Plaintiff's Counsel's efforts involved, among other things: (a) conducting a detailed and substantive investigation into Intersect and the facts forming the basis for the claims asserted in the Action; (b) based on this investigation, filing the FAC (defined below); (c) conducting a continued detailed investigation following the Court's order granting Defendants' first motion to dismiss, including additional interviews with many former employees as well as detailed analysis into quantifying the impact Defendants' alleged channel stuffing practices had on Intersect's financial results; (d) based on this continued investigation, filing the comprehensive SAC (defined below); (e) consulting with experts in the fields of financial analysis, loss causation and damages experts; (f) researching, drafting, and filing oppositions to two rounds of Defendants' motions to dismiss; and (g) engaging in mediation with a well-respected neutral.

11.    In preparation for the mediation, the Parties provided mediator Jed D. Melnick, Esq. of JAMS with the Court's Order granting Defendants' motion to dismiss the FAC without prejudice, the SAC, the motion to dismiss the SAC and opposition thereto, along with confidential statements concerning the Parties' estimates of damages.  After a full day of negotiation, the Parties were unable to reach a settlement.  Following the Court's granting of Defendants' second motion to dismiss, the Parties re-engaged Mr. Melnick regarding the possibility of resolving the Action through settlement.  These negotiations culminated in the Parties accepting Mr. Melnick's recommendation to settle the Action for $1,900,000.  The proposed Settlement is, therefore, the result of arm's-length negotiations between and among well-informed, highly experienced counsel.

12.    Based on the foregoing efforts, Lead Plaintiff and Plaintiff's Counsel are well aware of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiff and Plaintiff's Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

13.    In addition, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiff's damages consultant.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

14.    Finally, Lead Counsel, on behalf of Plaintiff's Counsel, seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum.  As discussed in detail in the accompanying Fee Memorandum, the requested 33⅓% fee is within the range of percentage awards granted by courts in comparable securities class actions.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check and warranted in light of the extent and quality of the work performed and the

substantial result achieved. Likewise, the requested out-of-pocket litigation costs of $88,929.16 and the requested PSLRA award of $5,000 to Lead Plaintiff Avi Yaron is also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

15.    Lead Plaintiff alleged that Defendants engaged in channel stuffing practices that materially inflated the growth rate of PROPEL revenue during the putative class period. Lead Plaintiff also alleged that Defendants' material misstatements and omissions regarding the growth rate of PROPEL revenue violated Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

16.    Lead Plaintiff further alleged that the price of Intersect's common stock was artificially inflated as a result of the Defendants' allegedly false and misleading statements and omissions, and that the price declined when the truth was revealed.

### B.    Commencement of the Instant Action

17.    On May 15, 2019, Lead Plaintiff filed a class action complaint in the United States District Court for the Northern District of California styled, *Yaron v. Intersect ENT, Inc., et al.*, No: 19-cv-02647-JSW. ECF No. 1. The complaint alleged violations of the Exchange Act against Defendants Intersect, Earnhardt, and Hilleman.

18.    On July 15, 2019, Lead Plaintiff filed a motion pursuant to the PSLRA to be appointed lead plaintiff in the Action. ECF No. 18. Lead Plaintiff's motion was unopposed. ECF No. 20.

19.    On September 24, 2019, the Court appointed Mr. Yaron as Lead Plaintiff for the Action and approved his selection of GPM to serve as Lead Counsel. ECF No. 21.

### C.    The Comprehensive Pre-Filing Investigation, Preparation of the FAC, and Defendants' Motion to Dismiss the FAC

20.    In preparation for filing the amended complaint, Plaintiff's Counsel conducted an

extensive factual and legal investigation that included, *inter alia*, (1) reviewing and analyzing (a) Intersect's filings with the U.S. Securities and Exchange Commission ("SEC"), (b) reports prepared by securities and financial analysts, and news articles concerning Intersect, (c) Intersect's investor call transcripts, and (d) other publicly available material related to the Company; and (2) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information. Plaintiff's Counsel also consulted with experts in the fields of financial analysis (with respect to Lead Plaintiff's allegations of channel stuffing), damages and loss causation.

21. On December 2, 2019, Lead Plaintiff filed and served the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws (the "FAC"). ECF No. 24. The FAC asserted claims against Intersect and Individual Defendants pursuant to Section 10(b) of the Exchange Act and 10b-5 promulgated thereunder and pursuant to Section 20(a) of the Exchange Act against Individual Defendants. The FAC alleged that Defendants engaged in channel stuffing practices that materially inflated the growth rate of PROPEL revenue during the putative class period which made Defendants' statements and omissions concerning PROPEL's revenue growth rate of PROPEL materially false and/or misleading during the putative class period.

22. The FAC further alleged that the prices of Intersect's publicly traded securities were artificially inflated as a result of the Defendants' allegedly false and misleading statements and that the price of Intersect's common stock declined when the truth was revealed. Lead Plaintiff asserted these allegations on behalf of himself and a class of Intersect shareholders who purchased or otherwise acquired the publicly traded Intersect common stock between February 27, 2018 and August 1, 2019, inclusive, and were damaged thereby. ECF No. 24

23. Defendants moved to dismiss the FAC on January 31, 2020. Defendants argued, among other things, that Lead Plaintiff failed to: (1) plead falsity with respect to (a) Intersect's financial results and earnings guidance, (b) statements that PROPEL sales were strong, and (c) statements attributing weak PROPEL growth to SINUVA-related sales force distraction;

6

(2) plead scienter; and (3) plead loss causation as to the first alleged corrective disclosure on August 1, 2018.  ECF No. 27.

24.    On March 16, 2020, Lead Plaintiff filed and served his opposition to the motion to dismiss.  Lead Plaintiff argued that he adequately stated claims pursuant to Section 10(b) and 20(a) the Exchange Act.  Specifically, Lead Plaintiff argued that the FAC adequately alleged Defendants' statements were materially misleading based on a failure to disclose the Company's alleged channel stuffing practices which created an impression of a state of affairs that materially differed from the one in existence at the time.  Lead Plaintiff also argued that the FAC adequately alleged scienter based on, *inter alia*, facts that included not only the content but also the context of Defendants' misrepresentations, new management's rapid discovery of the channel stuffing practices following the resignation of the Company's CEO and CFO, and the accounts of multiple confidential witnesses.  Finally, Lead Plaintiff argued that the FAC adequately alleged loss causation as to the August 1, 2018 disclosure because it revealed at least some aspect of the illicit channel stuffing scheme.  ECF No. 30.

25.    Defendants filed a brief in reply in support of the motion to dismiss the FAC on April 24, 2020.  ECF No. 31.

26.    The Court granted Defendants' motion to dismiss, dismissing Lead Plaintiff's claims without prejudice, on June 19, 2020.  The order held that Lead Plaintiff did not adequately plead that any of the challenged statements were materially false or misleading.  Specifically, the Court agreed with Defendants' arguments that Lead Plaintiff failed to allege falsity with respect to: (1) Intersect's financial results and earnings guidance; (2) Defendants' statements that PROPEL sales were strong; and (3) Defendants' statements attributing weak PROPEL growth to SINUVA-related sales force distraction.  The Court also held that the FAC failed to adequately allege that Defendants made false or misleading statements intentionally or with deliberate recklessness as required to sufficiently allege scienter.  Finally, the Court held that the Plaintiff failed to plead loss causation for the August 1, 2018 disclosure based on Plaintiff's failure to allege that channel stuffing had a material negative impact on Intersect's financial performance during the Class Period.  ECF No. 33.

7

**D.      The SAC and Defendants' Motion to Dismiss the SAC**

27.      Following the Court's dismissal of the FAC, Lead Counsel continued their investigation into Defendants' alleged channel stuffing practice.  This continued investigation included additional interviews with former employees as well as detailed analysis into quantifying the impact Defendants' alleged channel stuffing practices had on Intersect's financial results.

28.      On July 29, 2020, Lead Plaintiff filed a Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC") asserting claims under the Exchange Act against Defendants, which included additional factual allegations based on Plaintiff's Counsel's continued investigation and analysis quantifying the financial impact of Intersect's alleged channel stuffing practices.  ECF No. 38.

29.      On September 18, 2020, Defendants filed a motion to dismiss the SAC, in which Defendants argued that the SAC failed to cure any of the deficiencies previously identified by the Court.  Specifically, Defendants argued, among other things, that Lead Plaintiff's additional materiality and "precision stuffing" allegations continued to fall short in adequately pleading that the purported channel stuffing scheme covered up hidden declining demand in PROPEL. Defendants also argued that Lead Plaintiff's reliance on the accounts of six confidential witnesses was improper due to a failure to establish their reliability, knowledge of the facts alleged or connection to any Defendant.  ECF No. 39.

30.      On October 23, 2020, Lead Plaintiff filed his opposition to Defendants' motion to dismiss.  Lead Plaintiff argued that the SAC cured all the pleading deficiencies identified by the Court in its order dismissing the FAC, and that the SAC's allegations satisfied the pleading requirements of the PSLRA.  Specifically, Lead Plaintiff argued that the SAC pled new factual details quantifying the impact of Defendants' channel stuffing practices, which showed discounted end-of-quarter sales materially inflating the PROPEL growth rate between 3Q 2018 and 1Q 2019. Additionally, Lead Plaintiff asserted that the SAC's new scienter allegations provided a new context against which to assess Defendants' pattern of evasive and misleading responses to specific analyst inquiry.  ECF No. 47.

31.      On November 20, 2020, Defendants filed a reply in support of the motion to

dismiss the SAC.  ECF No. 48.

**E.   Mediation Efforts, Settlement Negotiations, and the Settlement's Preliminary Approval**

32.   On October 29, 2020, the Parties engaged in private mediation with Mr. Melnick of JAMS.  In advance of that session, the Parties provided Mr. Melnick with the Court's Order granting Defendants' motion to dismiss the FAC without prejudice, the SAC, the motion to dismiss the SAC and opposition thereto, along with confidential statements concerning the Parties' estimates of damages.  After a full day of negotiation, the Parties were unable to reach a settlement.

33.   On January 22, 2021, the Court granted Defendants' motion to dismiss the SAC without prejudice.  The Court's dismissal of the SAC included a finding that the allegations failed to cure the deficiencies previously identified.  Specifically, the Court agreed with Defendants' arguments that Plaintiff failed to adequately allege falsity with respect to: (1) Intersect's financial results and earnings guidance; (2) Defendants' statements that PROPEL sales were strong; and (3) Defendants' statements attributing weak PROPEL growth to SINUVA-related sales force distraction.  The Court also held that the SAC failed to adequately allege that the Individual Defendants (1) knew of declining PROPEL demand; (2) knew declining demand was caused by factors other than SINUVA-related distraction; and (3) deliberately used bulk discounts to hide declining demand from investors.  ECF No. 54.

34.   Following the January 22 Order, Plaintiff's Counsel continued to investigate the allegations against Defendants and worked with their investigator to locate and interview additional former Intersect employees.  During this time, the Parties re-engaged Mr. Melnick regarding the possibility of resolving the Action through settlement.  The Parties continued their discussions of the strengths and weaknesses of the case under the auspices of Mr. Melnick.

35.   On February 5, 2021, the Court entered an Order approving the Parties' stipulation to continue Lead Plaintiff's deadline to file an amended complaint, or otherwise indicate that no such amended complaint will be filed, from February 11, 2021, to March 4, 2021.  ECF No. 56.

36.   On March 4, 2021, the Parties accepted a double-blind mediator's proposal to

9

resolve the Action for $1.9 million on a class-wide basis, subject to the execution of a customary long-form stipulation and agreement of settlement and related papers.

37. Following additional negotiations, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation dated May 13, 2021. The following day, Lead Plaintiff submitted his Unopposed Motion for Preliminary Approval of Class Action Settlement.

38. On June 22, 2021, the Court issued its Preliminary Approval Order. ECF No. 67.

**III.    THE RISKS OF CONTINUED LITIGATION**

39. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $1,900,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals. Prior to contemplating a potential trial and likely appeal, the most immediate risk faced by the Settlement Class was the procedural posture of the case—the Court had already twice granted Defendants' motions to dismiss and another motion to dismiss was anticipated if Lead Plaintiff amended the complaint for a third time. Thus, there was no guarantee that Lead Plaintiff and the Settlement Class would later achieve any recovery, let alone one greater than $1,900,000.

**A.    Risks to Proving Liability**

40. In addition to the hurdles of proceeding past the pleading stage and obtaining class action status (discussed below), Lead Plaintiff and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their motions to dismiss (which the Court granted *twice*)—and undoubtedly would have continued to argue at summary judgment and/or trial—that Lead Plaintiff could not establish the elements of his Exchange Act claims.

41. For instance, Defendants would argue Lead Plaintiff could not establish falsity with respect to: (1) the Company's financial results and earnings guidance; (2) Defendants' statements that PROPEL sales were strong; and (3) Defendants' statements attributing weak PROPEL growth to SINUVA-related sales force distraction. Defendants would also likely argue that Lead

Plaintiff's method of quantifying the impact of Defendants' purported channel stuffing practices would fail to prove that discounted end-of-quarter sales materially inflated the PROPEL growth rate between 3Q 2018 and 1Q 2019.

42.     Defendants would further argue that Lead Plaintiff could not establish scienter.  For example, Defendants would argue that the Individual Defendants lacked a motive to commit securities fraud and that they did not know or recklessly disregard the fact that the declining demand was caused by factors other than SINUVA-related distraction as Lead Plaintiff alleged.

**B.     Risks to Proving Loss Causation and Damages**

43.     Even assuming that Lead Plaintiff overcame the above risks and successfully established Defendants' liability, Lead Plaintiff would have confronted considerable challenges in establishing loss causation and class-wide damages, especially given the Court had already dismissed the August 1, 2018 price drop on loss causation grounds.  ECF No. 33 at 16-17.

44.     While Lead Plaintiff would have argued that the declines in Intersect's stock price were attributable to corrections of the alleged misstatements and omissions that occurred on May 7, 2019 and August 2, 2019, Defendants would have asserted that much of the decline was due to other negative news, and that even if some portion of the decline in Intersect's stock price was caused by corrective disclosures, damages were minimal.  Moreover, Defendants likely would have argued that there was no loss causation for all of the remaining alleged corrective disclosures found in the SAC.  If the Court agreed with this argument, as it already did once regarding the August 1, 2018 corrective disclosure, it would substantially reduce the amount of damages at issue.

45.     In order to prove their claims, Lead Plaintiff would have had to proffer expert testimony demonstrating, among other things: (a) what the "true value" of Intersect common stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of Intersect common stock was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the disclosures on May 7, 2019 and August 2, 2019.  Such expert testimony is expensive, time consuming, and subject to rebuttal.

11

46.    Indeed, Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for Intersect's price declines on the alleged disclosure dates.  Defendants would most likely have challenged Lead Plaintiff's expert(s) at the class certification stage, summary judgment, with *Daubert* motions, and at trial and appeal.  This "battle of the experts" creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of Defendants' competing experts.

47.    In sum, had any of Defendants' damages arguments been accepted, they could have dramatically limited—if not eliminated—any potential recovery.

**C.    Risks Faced in Obtaining and Maintaining Class Certification**

48.    Defendants likely would have argued against class certification.  While Plaintiff's Counsel analyzed the class question and are confident that all of the Rule 23 requirements would have been met, and that the Court would have certified the proposed class, Lead Plaintiff bears the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification.  Moreover, even if Lead Plaintiff successfully obtained class certification, Defendants could have sought permission from the Ninth Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.  Class certification was, by no means, a forgone conclusion.

49.    Additionally, a recent ruling by the United States Supreme Court has made obtaining class certification for Lead Plaintiff more difficult and could potentially provide additional challenges should the litigation against Defendants proceed.  In *Goldman Sachs Grp. v. AR Teacher Ret.*, 141 S.Ct. 1951 (June 21, 2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact.  Accordingly, courts are now permitted to assess materiality of an alleged misstatement and consider "all evidence relevant to price impact" at the class

certification stage.   On the plus side for Lead Plaintiff, the Supreme Court did clarify that defendants bear the burden of persuasion of showing a lack of price impact by a preponderance of the evidence.

**D.    Other Risks**

50.    Lead Plaintiff would have to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one.  Lead Counsel knows from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.  For example, approximately two years ago, GPM lost a six-week antitrust jury trial in this District after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).  Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

51.    Even if Lead Plaintiff succeeded in proving all elements of his case at trial and obtained a jury verdict, Defendants almost certainly would have appealed.  An appeal not only would have renewed all the risks faced by Lead Plaintiff—as Defendants would have reasserted all their arguments summarized above—but also would have resulted in significant additional delay.  Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the Settlement represents an excellent result for the Settlement Class.

**E.    The Settlement is Reasonable in Light of the Potential Recovery in the Action**

52.    In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  If Lead Plaintiff had fully prevailed in each of his claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Lead Plaintiff's damages theory, including proof of loss causation as to each of the three stock price drop dates alleged in this case—*i.e.*, Lead Plaintiff's best-case scenario—estimated total ***maximum*** damages are approximately $161 million.  However, the Court has already twice held that Lead Plaintiff failed to plead the existence of a single false or misleading statement,

failed to plead scienter on the part of any Defendant, expressed serious doubt that Lead Plaintiff could cure the pleading issues related to scienter, and dismissed the August 1, 2018 price drop on loss causation grounds.

53.    Depending on which of the alleged misrepresentations and loss causation dates were proven, damages could have ranged from $23 million (if falsity was proven only for statements relating to Q1 2019 and loss causation was proven only in relation to the August 2, 2019 stock drop); to $54 million (if falsity was proven only for statements relating to Q4 2018 and Q1 2019, and loss causation was proven in relation to the May 7, 2019 and August 2, 2019 stock drops); to the aforementioned high of $161 million.  Thus, the $1.9 million Settlement Amount represents approximately 8.26% of $23 million in damages; to 3.52% of $54 million in damages; to 1.18% of the aforementioned high of $161 million.  A range of recovery of 1.18% - 8.26% for a securities litigation matter that has been dismissed twice, is well-within the range of reasonableness considering the circumstances.

54.    Moreover, the estimated damages for each of these scenarios assumes that Plaintiffs are given full credit for each of the respective drops and does not take into account any disaggregation arguments that Defendants may have raised.  *See Destefano v. Zynga, Inc.*, 2016 WL 537946, at *10 (N.D. Cal. Feb. 11, 2016) ("[L]oss causation might have been particularly difficult for Lead Plaintiff to prove, as Defendants would have argued that Lead Plaintiff's expert could not apportion losses to Defendants' misstatements as opposed to other events and information available on the market …."); *In re Scientific Atl., Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379-80 (N.D. Ga. 2010) (granting motion for summary judgment because plaintiffs did not disentangle fraud-related and non-fraud-related portions of stock decline).  Even if Plaintiffs were able to establish that at least some portion of the stock price drop on each of the alleged corrective disclosure dates were attributable to the fraud, Defendants likely would have raised arguments concerning the release of other, non-fraud related information on those dates, which could have decreased the amount of recoverable damages even further. In that light, the Settlement amount is even more reasonable.

## IV.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REGARDING THE NOTICE PROGRAM

55.    The Preliminary Approval Order (ECF No. 67) directed that the Postcard Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Postcard Notice") be disseminated to the Settlement Class.  The Preliminary Approval Order also set a deadline of October 1, 2021 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum or to request exclusion from the Settlement Class and set a final fairness hearing date of October 22, 2021 (the "Settlement Hearing").[2]

56.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Ltd.'s Class Action Administration Company ("A.B. Data"), the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and to publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed A.B. Data to post downloadable copies of the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Proof of Claim and Release Form ("Claim Form") online at www.IntersectSecuritiesLitigation.com (the "Settlement Website").  Upon request, A.B. Data mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

57.    The Postcard Notice directed potential Settlement Class Members to downloadable versions of the Notice and Claim Form posted online on the Settlement Website.  The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of

---

[2] Following the entry of the Preliminary Approval Order, the Court entered the Clerk's Notice Continuing Fairness Hearing, which rescheduled the Settlement Hearing *only* to November 5, 2021.  ECF No. 68.

15

a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee Memorandum, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $130,000 which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff Yaron directly related to his representation of the Settlement Class up to $5,000.

58. To disseminate the Postcard Notice, A.B. Data obtained from Defendants' Counsel, through Lead Counsel, the names and addresses of 13 record holders of Intersect common stock that are potential Settlement Class Members. On July 21, 2021, A.B. Data disseminated copies of the Postcard Notice to each of the 13 Settlement Class Members by first-class mail. *See* Declaration of Patty Nogalski Regarding Notice Administration ("Nogalski Decl."), attached hereto as Exhibit 2.

59. In addition, A.B. Data maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees (the "Record Holder Mailing Database"). *See id.* at ¶5. At the time of the initial mailing, the Record Holder Mailing Database contained 4,152 mailing records. On July 21, 2021, A.B. Data caused the Postcard Notice to be sent by First-Class Mail to the 4,152 addresses whose mailing records were contained in the Record Holder Mailing Database. *Id.*

60. Following the mailing to the Record Holder Mailing Database, A.B. Data received an additional 4,610 names and addresses of potential Settlement Class Members from individuals or brokerage firms, banks, institutions, and other nominees. *See id.* at ¶8. A.B. Data also received requests from brokers and other nominee holders for 7,245 Postcard Notices to be forwarded by the nominees to their customers. *Id.*

61. As of September 15, 2021, an aggregate of 16,020 Postcard Notices have been sent to potential Settlement Class Members and their nominees. *Id.* at *¶*9.

62. On August 2, 2021, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted

16

once over the *PR Newswire*. *See id.* at ¶10; Ex. 2-C, 2-D (copies of publication confirmations).

63.     Lead Counsel also caused A.B. Data to establish the Settlement Website, which became operational on July 21, 2021, to provide Settlement Class Members with information concerning the Settlement, submit a claim online, download copies of the full Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and the SAC.  Nogalski Decl. at ¶13.

64.     The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Fee Memorandum or to request exclusion from the Settlement Class is October 1, 2021.  To date, no requests for exclusion have been received.  *Id.* at ¶15.  A.B. Data will file a supplemental affidavit after the October 1, 2021 deadline addressing whether any requests for exclusion have been received.  To date, no objections to the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by Plaintiff's Counsel.  Lead Counsel will file reply papers by October 15, 2021 that will address any objections that may be received.

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

65.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $1.9 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Lead Plaintiff for his costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than November 18, 2021.  *See* Ex. 2-B (Notice) at p. 3; Stipulation at ¶24.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

66.     The Plan of Allocation is detailed in the long-form Notice.  *See* Ex. 2-B (Notice, pp. 9-13).  The full Notice is posted online at the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member.  The Plan of Allocation's

objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry, Company-specific factors or factors unrelated to the alleged violations of law, and takes into consideration when each Authorized Claimant purchased and/or sold shares of Intersect common stock. *See* Ex. 2-B (Notice at ¶¶53-54).

67. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶54.

68. The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Lead Plaintiff contends could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiff's allegation that the price of Intersect common stock was artificially inflated during the period between February 27, 2018 and August 1, 2019, due to Defendants' alleged materially false and misleading statements and omissions. The Plan of Allocation is based on the premise that the decrease in the price of Intersect common stock following the alleged corrective disclosures that occurred on August 1, 2018, May 7, 2019 and August 1, 2019 may be used to measure the alleged artificial inflation in the price of Intersect common stock prior to these disclosures.

69. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶63.

70. An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many

18

shares of Intersect common stock the Claimant purchased, acquired, or sold during the Settlement Class Period and when that Claimant bought, acquired, or sold the shares.  If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Intersect stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud.  Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

71.    The Net Settlement Fund in its entirety will be distributed to Authorized Claimants and if any funds remain after the initial distribution (for example, due to uncashed or returned checks), further distributions to Authorized Claimants who would receive at least $10.00 from such a re-distribution will be conducted as long as they are cost effective.  If Lead Counsel, in consultation with the Claims Administrator, deems a further distribution not cost effective, Lead Counsel proposes Investor Protection Trust as the *cy pres* recipient of any residual funds that may remain.

72.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Intersect common stock that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

73.    As noted above, as of September 15, 2021, 16,020 copies of the Postcard Notice which directs Settlement Class Members to the Settlement Website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members.  *See* Nogalski Decl. at ¶9; Ex. 2-A (Postcard Notice).  To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

**VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

74.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of 33⅓% of the Settlement Fund (or $633,333.00, plus interest earned at the same rate as the Settlement Fund) on behalf of all Plaintiff's Counsel.  Lead Counsel also requests reimbursement of the out-of-pocket expenses that Plaintiff's Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $88,929.16.  Finally, Lead Counsel request reimbursement to Lead Plaintiff in the amount of $5,000 for costs, including lost wages, incurred directly related to his representation of the Settlement Class pursuant to 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting a 33⅓% fee award are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith.  The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

**A.      The Fee Application**

75.     Lead Counsel is applying for a percentage of the common fund fee award to compensate Plaintiff's Counsel for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery.  The lawyers are motivated to obtain the maximum recovery in the shortest amount of time required under the circumstances.  This paradigm minimizes unnecessary drain on the Court's resources.  Notably, the percentage of the fund method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature.

76.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved.  As discussed in the Fee Memorandum, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable

settlements.

### 1.    The Excellent Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action

77.    Attached hereto as Exhibits 3 & 4 are declarations from GPM and H&H in support of an award of attorneys' fees and reimbursement of litigation expenses.   In accordance this District's Procedural Guidance for Class Action Settlements, included within each supporting declaration is a schedule summarizing the hours by category[3] and lodestar of each firm from the inception of the case through and including August 30, 2021, summaries of each attorneys' work performed on the Action, a summary of expenses by category, and a firm resume.   Time expended in preparing the application for fees and reimbursement of expenses has not been included.   The following is a summary chart of the hours expended and lodestar amounts for the two firms:

| LAW FIRM | LODESTAR |
|---|---|
| GLANCY PRONGAY & MURRAY LLP | $731,745.00 |
| HOLZER & HOLZER LLC | $369,790.00 |
| TOTAL LODESTAR | $1,101,535.00 |

78.    As set forth above and in detail in Exhibits 3 & 4, Plaintiff's Counsel have collectively expended a total of 1,506.15 hours in the investigation and prosecution of the Action through and including August 30, 2021.   The resulting total lodestar is $1,101,535.00.   The requested fee of 33⅓% of the Settlement Fund equals $633,333.00 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a multiplier of 0.57 to Plaintiff's Counsel's lodestar and is reasonable when viewing the range of fee multipliers typically awarded in comparable securities class action and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

79.    As detailed above, throughout this case, Plaintiff's Counsel devoted substantial time to the prosecution of the Action.   We maintained control of and monitored the work

---

[3] The five categories of litigation include: (i) Initial Investigation and Lead Plaintiff Appointment; (ii)  Preparation of Complaints and Factual Investigation; (iii)  Research and Briefing the Motions to Dismiss; (iv) Mediation and Settlement; and (v) Miscellaneous Court Filings, including, but not limited to, Stipulations, Status Updates, *etc*.

performed by lawyers and other personnel on this case.  We personally devoted substantial time to this case, and were personally involved in drafting or reviewing and editing all pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiff, communicating with Lead Plaintiff on a regular basis, engaging with counsel for Defendants on a variety of matters, and were intimately involved in Settlement negotiations.  Other experienced attorneys at our firms also drafted, reviewed and/or edited pleadings, court filings, and other correspondence prepared on behalf of Plaintiff and were involved in Settlement negotiations and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, Plaintiff's Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

80.    As demonstrated by the firm resumes, attached hereto as Exhibits 3-D and 4-D, Plaintiff's Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation.  Indeed, GPM has substantial experience in litigating securities fraud class actions and has negotiated scores of other class settlements, which have been approved in courts throughout the country.  Similarly, H&H enjoys a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters.  We believe Plaintiff's Counsel's experience added valuable leverage in the settlement negotiations.

### 2.    Standing and Caliber of Opposing Counsel

81.    The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Cooley LLP, a firm with a national reputation for the tenacious defense of class actions and other complex civil matters.  In the face of this experienced and formidable opposition, Plaintiff's Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

**3.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

82.      This prosecution was undertaken by Plaintiff's Counsel on an entirely contingent-fee basis.  From the outset, this Action was an especially difficult and highly uncertain securities case.   There was no guarantee that Plaintiff's Counsel would ever be compensated for the substantial investment of time and money the case would require.   In undertaking that responsibility, Plaintiff's Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.  With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiff's Counsel received no compensation during the course of the Action and have incurred $88,929.16 in out-of-pocket litigation-related expenses in prosecuting the Action.

83.      Additionally, the claims for securities fraud had to be developed solely by Plaintiff's Counsel and Lead Plaintiff without subpoena power and were hindered by the PSLRA's automatic discovery stay.

84.      Plaintiff's Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this is never assured.  Plaintiff's Counsel knows from personal experience that despite the most vigorous and competent of efforts, success in contingent litigation is never assured.  In fact, GPM recently lost a six-week antitrust jury trial in this District after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

85.      Moreover, courts have repeatedly recognized having experienced and able counsel enforcing the securities laws and regulations regulating the duties of the officers and directors of

23

public companies is in the public interest. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("[P]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted).  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

86.    Plaintiff's Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, we respectfully submit that the requested fee is reasonable and should be approved.

**4.    The Reaction of the Settlement Class to the Fee Memorandum**

87.    As noted above, as of September 15, 2021, 16,020 copies of the Postcard Notice were disseminated, which advised potential Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. Nogalski Decl. ¶9; Ex. 2-A (Postcard Notice).  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  Nogalski Decl. at ¶10; 2-C, 2-D (confirmations of Summary Notice publication).  To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice, Summary Notice, and the long-form Notice have been received or entered on this Court's docket.  Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by October 15, 2021.

88.    In sum, Plaintiff's Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, we respectfully submit that a fee award of 33⅓%, which equates to a fractional multiplier of 0.57, is fair and reasonable, and is supported by the fee awards

courts in this Circuit and others have granted in other comparable cases.

### 5.    Lead Plaintiff Avi Yaron Supports the Fee Memorandum

89.    As set forth in the declaration submitted by Lead Plaintiff, Mr. Yaron concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 1 at ¶8. Mr. Yaron has been intimately involved in this case since its earliest stages, and his endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### B.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable

90.    Plaintiff's Counsel seek a total of $93,929.16 in Litigation Expenses to be paid from the Settlement Fund. This amount includes $88,929.16 in out-of-pocket costs and expenses reasonably and necessarily incurred by Plaintiff's Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; and $5,000 in costs incurred by Lead Plaintiff.

91.    Plaintiff's Counsel are seeking reimbursement of a total of $88,929.16 in out-of-pocket costs and expenses. The following is a combined breakdown by category of all expenses incurred by Plaintiff's Counsel:

| CATEGORY OF EXPENSE: | AMOUNT |
|---|---|
| COURIER & SPECIAL POSTAGE | $210.61 |
| COURT FILING FEES | $1,110.00 |
| EXPERTS | $23,597.00 |
| INVESTIGATIONS | $42,533.79 |
| MEDIATION | $14,659.28 |
| ONLINE RESEARCH | $6,341.48 |
| PHOTOCOPYING/IMAGING | $105.00 |
| PRESS RELEASES | $372.00 |
| **GRAND TOTAL** | **$88,929.16** |

92.    As stated above, Lead Plaintiff seeks reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of his reasonable costs (including lost wages) directly incurred in connection with his representation of the Settlement Class, in the amount of $5,000. *See* Ex. 1 at ¶¶10-11. Mr. Yaron worked closely with Plaintiff's Counsel throughout the pendency of this Action in connection with

his service as Lead Plaintiff.  For example, Mr. Yaron: (i) reviewed all significant pleadings and briefs filed in the Action; (ii) regularly communicated with his attorneys via email and telephone about case developments and litigation strategy; (iii) reviewed Court orders and discussed them with his attorneys; (iv) consulted with counsel regarding the mediation and Settlement Amount, and ultimately approved the Settlement; and (vii) communicated with counsel regarding the process for finalizing the Settlement.  *Id.* at ¶¶4-5.

93.    The Postcard Notice, Summary Notice, and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $130,000.  The total amount requested by Plaintiff's Counsel and Lead Plaintiff, $93,929.16, falls well below the $130,000 cap Settlement Class Members were advised could be sought.  To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard Notice, Summary Notice, and long-form Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

94.    From the beginning of the case, Plaintiff's Counsel was aware that they might never recover any of their expenses.  Plaintiff's Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of funds advanced to prosecute this Action.  Accordingly, Plaintiff's Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

95.    The large component of expenses, $42,533.79, or approximately 48% of the total expenses, was expended on the retention of a private investigation firm to assist Plaintiff's Counsel in their factual investigation into Lead Plaintiff's claims.

96.    Another large component of expenses, $23,597.00, or approximately 26.7%, was expended on the retention of experts in the fields of financial analysis, loss causation and damages.  The experts were consulted at different points throughout the litigation, including on matters related to the preparation of the amended complaint, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

97.     Another large component of expenses, $14,659.28, or approximately 16.6% of the total expenses, was expended on Plaintiff's Counsel's share of mediation fees paid to JAMS for the services of Mr. Melnick and his team.

98.     The other Litigation Expenses for which Plaintiff's Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These Litigation Expenses include, among others, costs of on-line legal and factual research, court fees, copying costs, and postage and delivery expenses.

99.     In our opinion, the Litigation Expenses incurred by Plaintiff's Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.    CONCLUSION

100.     For all the reasons set forth above, we respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate.  We further submit that the requested attorneys' fee in the amount of 33⅓% of the Settlement Amount should be approved as fair and reasonable, and the request for reimbursement of $93,929.16 in Litigation Expenses (which includes $5,000 for Lead Plaintiff's Avi Yaron costs should also be approved.

We declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 17th day of September 2021, at Los Angeles, California.

_s/ JASON L. KRACJER_
JASON L. KRACJER

27

Executed this 17th day of September 2021, at Atlanta, Georgia.


                                        *s/ COREY D. HOLZER*
                                         COREY D. HOLZER

28

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On September 17, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 17, 2021, at Los Angeles, California.


_s/ Jason L. Krajcer_
Jason L. Krajcer